UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


CASE NO.:  3:24-cv-00044-MMH-MCR


WILLIAM LEE LAWSHE,
an individual,

        Plaintiff,

vs.

MIKAYLA PRESTON,
in her individual capacity
as a Detective for St. Johns
County Sheriff's office
and KATHLEEN DULLY, in her
individual capacity as
medical director of the UF
Child Protection Team,

        Defendants.
                              /


ZOOM VIDEOTAPED DEPOSITION OF:  KATHLEEN DULLY,
                                M.D.

DATE:          April 28, 2025

TIME:          10:00 a.m. - 12:26 p.m.

LOCATION:      Via Zoom

REPORTED BY:  LISA K. PENKACIK, RMR

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 2

A P P E A R A N C E S:

MICHAEL K. ROBERTS, ESQUIRE
Law Offices of Nooney, Roberts
Hewett and Nowicki
1680 Emerson Street
Jacksonville, Fl  32207
mroberts@nrhnlaw.com
     On behalf of the Plaintiff.

AMY SHEVLIN, ESQUIRE
Buchanan & Buchanan, P.A.
1900 SE 18th Avenue
Suite 300
Ocala, FL 34471-8237
ashevlin@rbtrial.com
     On behalf of the Defendant Kathleen Dully,
     M.D.

MATTHEW CARSON, ESQUIRE
Sniffen & Spellman, P.A.
123 N Monroe Street
Tallahassee, FL 32301-1509
mcarson@sniffenlaw.com

     On behalf of Defendant Mikayla Preston.

ALSO PRESENT:  Danny Holguin, videographer
               Shayne A. Thomas, Esquire
               (University of Florida)
               Autumn Zepf, paralegal

Page 3

I N D E X

TESTIMONY OF:  KATHLEEN DULLY, M.D.

DIRECT EXAMINATION by Mr. Roberts . . . . . .  4

CERTIFICATE OF OATH . . . . . . . . . . . . . 87
CERTIFICATE OF REPORTER . . . . . . . . . . . 88
ERRATA SHEET. . . . . . . . . . . . . . . . . 89
PLAINTIFF'S EXHIBITS:
1 (Articles). . . . . . . . . . . . . . . . . 85
2 (Dr. Krugman's report). . . . . . . . . . . 85
3 (Demonstrative image) . . . . . . . . . . . 85
4 (Dr. Dully's letters) . . . . . . . . . . . 85

S T I P U L A T I O N S

     It is hereby stipulated and agreed by and between counsel for the respective parties and the deponent that the reading and signing of the deposition be reserved.

Page 4

P R O C E E D I N G S

          THE VIDEOGRAPHER:  Good morning, this is the beginning of media one in the deposition of Dr. Kathleen Dully in the matter of William Lee Lawshe versus Mikayla Preston, case number 3:24-cv-00044-MMH.  Today's date is April 28, 2025 and the time is 10:01 a.m.  My name is Danny Holguin.  I am the videographer.  The court reporter is Lisa Penkacik.  We are here with Huseby Global Litigation.

          Counsel please introduce yourselves after which the court reporter will swear in the witness.  Thank you.

          MR. ROBERTS:  Michael Roberts for the plaintiff, Mr. Lawshe.

          MS. SHEVLIN:  Amy Shevlin on behalf of Dr. Dully.

          MR. CARSON:  Matt Carson representing Detective Preston.

          KATHLEEN DULLY, M.D., having been first duly sworn by the reporter, thereupon testified upon her oath as follows:

          THE WITNESS:  I do.

                    DIRECT EXAMINATION

BY MR. ROBERTS:

Page 5

     Q.    Okay.  Dr. Dully, I introduced myself a little bit earlier, my name is Michael Roberts, I'm here to ask some questions today.  I assume -- you've had your deposition taken before?

     A.    Yes, but never as a defendant, but, yes.

     Q.    Okay.  You've had it taken as an expert witness?

     A.    Yes.

     Q.    Well, a deposition is a deposition, same ground rules apply, you're under oath, and I'll be asking you questions.  At any time if you don't understand a question that I've asked you, please let me know and I'll try to rephrase it.  I don't have a script that I'm going from, so it's probable that I will ask a bad question, so don't hesitate to question me if you don't understand.  Also, there is a court reporter who is trying to take down everything that we say, question and answer, so we'll just try to be mindful of the job that she's trying to do and not speak over one another; sometimes that's difficult for me and sometimes it's difficult for witnesses.  So we'll do the best we can.  But the last thing that I'll say is, a lot of times we'll speak colloquially, we'll say uh-huh or uh-huh or they'll be a nod of the head, I'll ask for a verbal

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 6

response, if I catch it, just because the court reporter will not be able to describe un-huh, uh-huh, I'll know what you mean by a nod of the head, but she can't write that down so...

A.   Thanks.

Q.   With that, can you just state your full name for the record?

A.   Kathleen Mary Dully, D-u-l-l-y.

Q.   And where are you currently employed?

A.   The University of Florida College of Medicine in Jacksonville.

Q.   And I understand you work for the Child Protection Team?

A.   Yes, I'm the medical director of the Child Protection Team for the University of Florida.

Q.   And what does that mean; what is a medical director of the Child Protection Team?

A.   I supervise the medical care that we deliver on a case by case basis and solve problems and help hire people, essentially.

Q.   And just for those who may not know, what is the Child Protection Team?

A.   The Child Protection Team is the body of experts that consults for DCF usually and sometimes law enforcement as well on suspected or advertised

Page 7

child maltreatment cases.  And offers them determinations on the likelihood of abuse or that it is not abuse.  We cover the eight counties -- this Child Protection Team covers the eight northeast counties of Florida.

Q.   What is -- well, what is your training and background?

A.   So in 1981 I graduated from Cornell University College of Arts and Sciences, in Ithaca, New York with a Bachelor of Arts and I graduated with distinction in all subjects and Cum Laude.  In 1986, I graduated from the F. Edward Hebert, H-e-b-e-r-t School of Medicine in Bethesda, Maryland, which is Fed Med or the military medical school.

And from there I went to pediatric internship followed by residency training at Naval Hospital Oakland, California from 1986 through 1989. In 1989, I was transferred to my first duty station as a pediatrician, and that was here at Naval Air Station Jacksonville, Florida where I served for two years.  I was assigned to be the Chair of the Child Abuse Case Review Committee here at this military region Navy Marine Corps while I was there.

At the time the only training that was available was in the conference format, so although I

Page 8

had seen and cared for children of possible child maltreatment before, I had only learned about it as a resident and on the job training is what that is and by reading and studying the cases in the medical literature.

Then in 1990 the Navy sent me to my first child abuse conference in January in San Diego, California, which was the child maltreatment conference that is offered by what is called now Navy Children's Hospital in San Diego and the American Academy of Pediatrics and the American Professional Society of Abusive Children.  The conference format for many years was all that was available in terms of getting additional medical training and consultation and so I continued to pursue that all the time every year, and then in 1980 -- sorry, during Desert Shield.  1991, the Navy moved me to Naval Medical Center San Diego.

In San Diego they made me in charge because I had the training, child abuse case review, subcommittees for physical abuse, sexual abuse and something they called the multi-problem family unit. And those I was the Chair, but actually functioned as the medical consultant to a team of people doing case reviews for military commanders.

Page 9

In 1993, there was some ability to propose to the military that specialized fellowships could be developed, and were slowly becoming available, and in 1994 the Navy sent me to the Chadwick Center for Children & Families, which was Rady Children's Hospital for a year of fellowship.  And there I was able to see cases under supervision of people who had been working in the field for 30 and more years, and do the medical assessments on suspected child maltreatment cases, as well as that which is not.  So that was a specialized opportunity.

When I finished that in 1994, the Navy moved me to the Naval Hospital Camp Pendleton, California, and there I was again the medical consultant for the child abuse case review committee for Marine Corps Commanders and then I was also the domestic violence consultant for their domestic violence case review committees.

In all of this time I had served as faculty and am a teacher for medical residents and positions in training at all levels in child maltreatment, be it radiology or orthopedics, or OB/GYN or pediatrics, of course, and emergency medicine.

And after 1994 when I finished the fellowship, my additional training went back to

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 10

conferences and continuing medical education and then I was able -- though I had passed the general pediatric specialty boards in 1989, the first child abuse specialty board became available in 2009 and I was grandmothered into the field with about 200 others, and I was able to sit for and pass that EXAMINATION in 2009 to be a board certified specialist in child abuse pediatrics.

Q.    Very good.  Thank you for that.

So currently at the Child Protection Team, do you -- do you see -- do you have patients; do you form a patient -- a doctor/patient relationship with the people that you examine?

A.    On a case by case basis, yes.

Q.    And tell me, what do you mean by that?

A.    So I am consultant.  I don't become the child's pediatrician, but I consult for DCF and law enforcement and the hospitals and so I have a time of a doctor/patient relationship, but the relationship goes back to the primary care pediatrician.

Q.    In the time that you consult, do you -- do you agree that you have to practice within the standard of applicable care, medical care?

A.    Yes.

MS. SHEVLIN:  Form.

Page 11

Q.    And so this child abuse board certification, is that a medical/legal certification?

MS. SHEVLIN:  Form.

A.    It's a medical from -- administered by the American Board of Pediatrics.

Q.    Is there a legal component to it?

MS. SHEVLIN:  Form.

A.    No.

Q.    Okay.  All right.  Is part of that curriculum designed to help you interface with law enforcement or DCF?

MS. SHEVLIN:  Form.

A.    Not in any direct way, no.  Of course you have to be able to do that.

Q.    Do you understand that the child abuse -- that the purpose of the child abuse certification is to aid DCF and law enforcement in investigations?

MS. SHEVLIN:  Form.

A.    That is not the purpose, that is one of the practice points, I would say yes, but it is to take care of kids and try to stop whatever is going on, if, in fact, something is going on.

Q.    Okay.  Well, what do you mean by "trying to stop something that's going on"?

A.    If there is child maltreatment going on,

Page 12

sometimes it can be stopped and then the child can have a more normal life.

Q.    Do doctors stop that?

MS. SHEVLIN:  Form, speculation.

Q.    Well, let me ask you a better way.

As a doctor, are you trained in your -- in your child abuse specialty, are you trained to stop child abuse in a home setting?

MS. SHEVLIN:  Form.

You can answer, Dr. Dully.  I'm laying a record.  Unless I tell you not to answer a question, just go ahead and answer to the best of your ability if you understand the question, I'm just making some objections for the record.

A.    I was missing those completely.  I'm sorry, I didn't understand.

MS. SHEVLIN:  That's okay.  I just objected to form.  If you understood the question and you can answer, you can go ahead and answer.

A.    I have no ability to stop it, but by helping to assess the evidence that is present that may contribute to stopping it.

Q.    Okay.  So who -- who stops it?  As a medical doctor, what are you talking about?

MS. SHEVLIN:  Form.

Page 13

A.    The community, which involves responsible investigators and agencies.

Q.    So is it not a fair statement to say that the child abuse board -- like that training exist to provide expertise to determine what is and what is not child abuse?

MS. SHEVLIN:  Form.

A.    There is various levels of certainty, but at one end of the spectrum, it may not be child abuse and at the other end of the spectrum, it may only be child abuse.

Q.    Right.  But to treat the condition or the injury, you were qualified to treat injuries or illnesses as a pediatrician without the child abuse specialty; do I understand that correctly?

MS. SHEVLIN:  Form.

A.    I think I do, as a general pediatrician, I take care of kids.

Q.    Right.  So the only -- what I'm trying to get at, the child abuse specialty is really solely aimed at the distinction or you making a distinction between what may or may not constitute abuse, correct?

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 14

A.   There are things that look like child abuse that are not and I'm consulted in those and there are things where we can't say for sure, and there are things that are child abuse and not something else. And that is part of the determination and diagnostic process.

Q.   And that, grappling with those decisions, that is the job of a child abuse specialist, correct?

MS. SHEVLIN:  Form.

A.   That is what we do in the medical case, yes.

Q.   And that's what I'm getting at, right.  I understand that you're a pediatrician, but the board certification specifically regarding child abuse, that is what gives you the purported expertise of making a determination or an opinion about whether something is or is not child abuse; is that a fair characterization of what that specialty is?

MS. SHEVLIN:  Form.

A.   The board certification is a board certification and I passed it because of a lot of other things, and so there's training, experience, literature and the years that go by and the things that children and parents have taught me.  So it doesn't distill down to an exam or a -- a yes or no

Page 15

determination.

Q.   And I am sorry if you took that question as being like what the test entails.  What I'm trying to understand, and I'll just ask you the question.

What does it mean to be a child abuse -- do you consider you to be an expert on child abuse medicine?

MS. SHEVLIN:  Form.

A.   -- abuse pediatrics.

Q.   What does that mean?

A.   That is what the board -- American Board of Pediatrics decided to call it, and it is a specialty where we can see the children and put the time in, and whatever else is required to help determine how correct that concern may be or not.

Q.   And when you say concern, you're talking about abuse?

A.   Yes.

Q.   Concern for abuse, correct?

A.   So people report things and then I am in a position if there are medical concerns to bring those to bear on what they reported to help decide if they could be right or not right or we cannot say for sure.

Q.   And so how long have you been with the

Page 16

University of Florida?

A.   10 and a half years now.

Q.   And other than the Navy is the University of Florida the only other employer that you had in your career?

A.   No.  I also did the same work as a child abuse pediatrician and sex assault examiner for the Rady Children's Hospital before I came here.  There I was not medical director, and there, technically, I worked for their specialty group, not necessary -- not for the center -- not for the hospital.  Although those are the patients that I saw.

Q.   Do you -- and I'm going to use the term "moonlight"; do you know what that means?

A.   Yes.

Q.   Have you moonlighted anywhere else as a pediatrician or anything like that?

MS. SHEVLIN:  Form.

A.   When I was active duty military, my work for Rady Children's, Chadwick Center for Children & Families as a child abuse pediatrician and sex assault examiner, that was considered moonlighting through 2006 and I retired upon my return from Iraq. The moonlighting after that, I did not do or need to do because I was able to work continuously in my

Page 17

specialty.

Q.   So how many physicians currently work for your department that you're a medical director of?

A.   In the division, there are three of us and all three of us participate on the team.

Q.   And are you responsible for setting policies and procedures?

MS. SHEVLIN:  Form.

A.   I contribute to them.  I make recommendations about them, I may be the person who writes and signs them, but these other two pediatricians are also board certified child abuse pediatricians with many years experience and I consult with them before putting things in writing in general.

Q.   Okay.  So we're here today about a case that you consulted on -- do you understand that correctly; did you consult on the case against Mr. Lawshe?

MS. SHEVLIN:  Form.

A.   I did not know that person's name at the time.  I consulted for a detective at the St. Johns Sheriff's office.

Q.   Subsequently have you learned that Mr. Lawshe was the subject of that investigation?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 18

A.   Yes.

Q.   I have three letters; one is dated February 22nd; one is April 5th and the other is April 5th; do you have access to those as we sit here today?

A.   I do not have the February 22 letter.  I can't find it.

Q.   I'll share it with you when we get to that.

I want to ask you just to start off, some general -- some general questions.

So what is sexual maturity rating?

A.   Sexual maturity rating is a way of stating how close to puberty or in the middle of puberty or completed puberty may be progressing.

Q.   I've also seen it referred to as Tanner staging; is Tanner staging and SMR or sexual maturity, is that the same thing; are those two terms synonymous?

MS. SHEVLIN:  Form.

A.   In the 1980s and 1990s early, it was called Tanner staging.  In about 1998 it changed because there had been so many other studies both before and after Tanner and Marshall and it was changed to sexual maturity rating.  As the years go by, there's more data than just Dr. Tanner's data.

Q.   All right.  And so when did you first

Page 19

learn -- when you first learned about it, it was called Tanner staging?

MS. SHEVLIN:  Form.

A.   Well, it didn't have a formal name and I actually don't remember what the other pediatricians were calling it in fellowship.

Q.   Okay.  And do you know what the -- the test was designed to do?

MS. SHEVLIN:  Form.

A.   In the clinical setting?

Q.   In the clinical setting, yes.

A.   Yes.

Q.   First of all, was it designed as a clinical test?

MS. SHEVLIN:  Form, speculation.

A.   It was -- sexual maturity rating was designed to be able to monitor progress through puberty or a completion thereof or delay thereof, as well as early puberty.

Q.   So a pediatrician would be able to assess whether or not there were any delays or abnormal start to puberty in their patients; that was sort of the reason -- that was the function of Tanner staging or sexual maturity rating as you understand it?

MS. SHEVLIN:  Form, prior

Page 20

mischaracterization of prior testimony.

A.   For most pediatricians that is its function.

Q.   Okay.  And what do you mean by that "for most pediatricians that's its function"?

A.   Well, even newborns aren't Tanner two or SMR two, so it is normal to have some variability in the development of puberty.  Sometimes it's actually the sign of a tumor, so we want to have some idea of what's normal, so that we can identify deviations from normal.  For instance, a three year old who already has Tanner three or SMR three breast buds, plus pubic hair, that would not be normal.  So we use it on the very little kids as well as those who are approaching puberty and in reference to the concerns from the parents or the child, sometimes a teen-age child is worried that they're not normal.

Q.   But that is not the way in which you employ sexual maturity rating in this case, is it?

A.   In this case, the opportunity to assess the patient never occurred.

Q.   But you did use the sexual maturity rating in forming your opinions in this case?

A.   Yes.

Q.   All right, okay.  So let me -- let's just

Page 21

go back.

How long have you been using sexual maturity rating to -- let me ask you this.  Looking for predicate for this.

Do you use sexual maturity rating to chronologically estimate the age of individuals in digital pornographic photographs?

MS. SHEVLIN:  Form.

A.   It is not to estimate the age, it's to estimate the appearance of the age, yes.

Q.   What does that mean?

A.   The appearance of the age is not the same thing as knowing the chronological age.

Q.   What's the difference?

A.   One is in terms of years of age and has documents to go with it.  And the other is based on appearance and in this case, in photographs.

Q.   So I'm struggling with that distinction.  So you -- so you're -- you're not attempting to state or estimate how old the individual depicted in the photograph is, you are trying to estimate how old they appear to be?

A.   Yes.

Q.   So any type of -- you're aware that photographs can be digitally edited?

WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.
Kathleen Dully, M.D. on 04/28/2025

Page 22

MS. SHEVLIN:  Form.

A.   Yes.

Q.   You're aware that models can remove pubic hair through multiple different modalities, correct?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   Any digital altering of a photograph would render your opinion say -- would not make it a reliable opinion, correct?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

A.   That's not true, it will be a reliable opinion about the appearance of the image.

Q.   But it would not be a reliable opinion about the actual age of the individual that is depicted?

A.   It may not be.

Q.   And that's true as well as grooming.  If somebody had been groomed, it may not be -- it may be an -- you may be given an accurate depiction or opinion about the appearance, but if there were grooming that was undetectable to you, it would not be an accurate opinion or reliable opinion about the actual age of the individual?

MS. SHEVLIN:  Form.

Page 23

A.   The chronological age is a different question.  This is just the appearance of the image.

Q.   Okay.  So from a scientific -- you understand that -- let me just ask you.

Would you agree with me that that is a -- a limitation on what your opinion could be accurately understood to be?

A.   Yes.

MS. SHEVLIN:  Form.

Q.   Can you describe that limitation for me?

A.   It is not an opinion about chronological age, it is an opinion about the apparent appearance of the image and what its age may be.  It's not the same thing.

Q.   How long have you interacted with law enforcement -- let me ask you this question.

How long do you think you have been using SMR in this way, to look at a pornographic image and estimate the appearance of chronological age?

MS. SHEVLIN:  Form.

A.   Since shortly after 1994.

Q.   And is that sort of like the burst of the internet or like widely used internet, what was 1994?

MS. SHEVLIN:  Form.

A.   It was just my fellowship.

Page 24

Q.   Okay.  What was special about that fellowship that that's what made you start doing that?

MS. SHEVLIN:  Form.

A.   Law enforcement was bringing cases for evaluation to Rady Children's and my colleague pediatricians were also doing these evaluations.  I had not been aware of it before 1994.

Q.   And when is the last time you did an evaluation like this?

A.   2024.  Maybe Nassau County Sheriff.  I know I did at least one for them in 2024.

Q.   You don't think you've done any this year?

A.   I have not.

Q.   Has there been any change in your practice or policies since 2023 in regards to evaluation of these types of images?

MS. SHEVLIN:  Wait, Dr. Dully, hang on a second.  Michael, we're getting into subsequent remedial measures, there's case law on this.  I'm not going to let her answer this question.

MR. ROBERTS:  You can't direct her not to answer questions, whether it's relevant or not is not a reason for you to instruct her not to answer.

Page 25

MS. SHEVLIN:  It's not relevant.  It's subsequent remedial measures.  There's case law on it.

MR. ROBERTS:  That's not -- that's not the law.  And you cannot -- and you can't -- you can, but there's two reasons why you can instruct the witness not to answer and they both deal with privilege.

MS. SHEVLIN:  You're asking her for subsequent remedial measures.

MR. ROBERTS:  And that is perfectly discoverable.  That is perfectly discoverable.

MS. SHEVLIN:  If you want to provide me case law on your position, I'm happy to look at it.

MR. ROBERTS:  Are you instructing her -- are you instructing her not to answer that question?

MS. SHEVLIN:  At this time I'm instructing her not to answer that question.  If there is case law, tell me that I'm wrong, I'm happy to look at it.

MR. ROBERTS:  I haven't briefed the issue, I've only done this for 21 years but --

Q.   Have you -- have you read my -- or Mr.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 26

Lawshe's expert report in this case?

A.   I saw it on Friday, yes.

Q.   Okay.  What was your impression of that?

MS. SHEVLIN:  Form.

A.   I don't agree with it.

Q.   Have you read the article The Difficult Issue of Age Assessment on pedo-pornographic material?

A.   Not to my knowledge, no.

Q.   The last time you attempted to do any research on the reliability of applying sexual maturity rating to online pornographic images?

MS. SHEVLIN:  Form.

A.   I was reviewing what I already have last night.

Q.   What is it that you already have?

A.   I have the original Tanner and Marshall articles from 1959 and '70, the Noshney (ph) publication that came a decade or so later.  It's sort of an update on sexual maturity ratings.  The Herman and Giddens work that came about 10 years after that in the 1990s on sexual maturity in American girls.  I do have some other population evaluation articles such as from Switzerland or from Hong Kong or Asia, but those don't really apply in

Page 27

this case to my knowledge, and I did not review them much at all.  And what else?  I did look at an American Academy of Pediatrics publication that summarizes all of the pubertal stage photographs from, I think it's from 1996 and then also the -- was there anything else good?  There is another article that I reviewed.  Let me see.  I don't know if I have -- well, and of course, the standard textbook that I use which is the 15th Edition of Nelson's textbook of pediatrics.

Q.   So those sound like journals that are pediatric journals about Tanners staging or sexual maturity rating in the clinical setting?

A.   They -- they are and also a -- a publication, I think it's a desktop publication from the military from the Armed Forces Center for Child Protection in 1998, I think it was.  I looked at it, that was -- I was actually asked to help get these images taken care of by the Armed Forces Center for Child Protection about that time when I was active duty.

Q.   And just so -- anyway, clinical setting by clinical setting, I mean and I want to make sure we're on the same page, a pediatrician who is treating a patient in the clinical or office setting;

Page 28

is that -- is that a fair way to use clinical?

A.   Yes.  Except that all the work was done from photographs -- where most of the work was done from photographs as a study modality.  So it is a clinical tool, and if you ever get access to the child, then you can use it that way.  But sometimes in child abuse pediatrics, you do or do not have access to the child; you do have access to the images and are consulted to estimate the appearance of their sexual maturity based on photographs.

Q.   Okay.  So I want to share the screen here.  This is an article that we disclosed to you a month ago, a couple months ago.  Can you see this on your screen?

A.   Okay.  Yeah, that's a lot of fine print.

Q.   Let me -- Forensic Science international; have you heard of that journal?

A.   Well, it's not a medical journal, but I have heard of it.

Q.   I just want to go down here to the conclusion.  I'm going to read some of these -- well, let me just read this.  We'll start with this.  Much pornographic, pedo-pornographic material depicts women who seem sexually mature and who may be late teenagers or women over the 18 years of age.  Our

Page 29

study, in fact, proves that it is nearly impossible to say that adults who look like sub adults are indeed adults, which obviously may apply to all those sub adults who seem sexually mature.  Did I read that correctly?

A.   You read it out loud, yes.

Q.   And it says, forensic and medical experts should avoid using such unscientific behavior which may have drastic consequences in a Court of law; did I read that correctly?

A.   Yes.

Q.   Now, you're unfamiliar with this, but I'd ask you to get familiar with it.  This study shows that pediatricians who attempt to age pornographic images of women are wrong between 95 and 73 percent of the time when they do that; does that surprise you?

A.   Well, they're against it, so it doesn't surprise me.  I think that's what they wanted to find.

Q.   This study was funded by the E.U. Project to help develop ways of detecting child ponography online; why do you see that this is what they wanted?

MS. SHEVLIN:  Form, she has not had an opportunity to read the entire article.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 30

MR. ROBERTS:  Stop, stop, I don't want a speaking objection.  She said this article was published by people who wanted to find that.

Q.   Dr. Dully, why do you think the people who wrote this article wanted to find that?

MS. SHEVLIN:  Form.

A.   Because their conclusion and their tables say that in what you have shown me.  It needs to be read critically with a jaundiced eye because it appears on the surface that that is their aim.  It's also a legal journal, not a medical journal.  It would be read with a jaundiced eye.

Q.   So you're discounting an article that you've never seen or read?

MS. SHEVLIN:  Form.

A.   I am discounting a journal that is not a medical journal and I would read it critically if you give me the chance.

Q.   Well, you had a chance and you haven't done it, have you?

MS. SHEVLIN:  Form.

A.   I haven't seen this before.

Q.   Well, you -- you -- you had access to the article last week.

MS. SHEVLIN:  Form.

Page 31

A.   I have never seen this before.

Q.   Because you chose not to look at it.

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.   I have never seen this before.

Q.   Why have you not seen it before?

A.   It was not provided to me.  I have never seen it before.

Q.   It was in the expert's report that you said you read last week?

A.   It's certainly not in there.

Q.   Okay.  I'm going to share what we'll mark as Exhibit 2.  That will be Exhibit 1.

This is the report of Scott Krugman; does this look familiar to you?

A.   Yes.

Q.   See three here, The Difficult Issue of Age Assessment on Pedo Pornographic Material?

A.   It is a reference, yes.

Q.   You agree it was -- the name of the article, the journal and the citation was provided in his report?

MS. SHEVLIN:  Form, mischaracterization of her prior testimony.

A.   The citation is there.

Page 32

Q.   So why -- why didn't you look at it?

MS. SHEVLIN:  Form.

A.   Because I know it's a difficult assessment. I know that it's difficult.

Q.   Why do you say that it's difficult?

A.   Because it is an appearance, it is not a chronicle age.  Chronological age, sorry, not enough syllables.

Q.   So let me ask you this.  So if I was a person who had to make a legal determination about whether or not someone was, in fact, or -- let me re-ask the question.  If I was someone who was being asked to make a factual determination about whether or not a model depicted in a pornographic image on the internet was a minor; in fact, a minor, would your opinion about the appearance be a reliable opinion for me to base that decision on?

MS. SHEVLIN:  Form.

A.   No, that's what the investigation is for.

Q.   That seems like a major limitation in your opinion about age; would you agree with that?

MS. SHEVLIN:  Form.

Q.   I'm sorry, almost all of your answers are being interrupted by Amy's objection.  Was that a yes?

Page 33

A.   It was a correct.

MS. SHEVLIN:  Give us just like one second so I can make an objection and then we won't talk over other.

A.   Sorry, sorry.

Q.   And maybe I'm -- do you tell law enforcement officers about the limitations in your opinions before you give them to them?

MS. SHEVLIN:  Form.

A.   Yes.

Q.   It happened again.  It happened again.  So you said yes to that question, correct?

A.   Yes.

Q.   Can you tell me what you explain to law enforcement officers when you give them your opinion?

A.   That this is the appearance of the person in the image, and that is, if I can see the image; sometimes the images are too blurry or just not good enough to even see.  So they know quality of the image and they know that it is only an image and that the appearance depicts something that is based on sexual maturity rating that may or may not prove to be a minor.  They don't bring the little kids, they bring these borderline kids to be looked at or images and they investigate after that.  Because I can only

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 34

give them appearance.

Q.   So you're aware that a lot -- I mean, do you have any impression of how much or how many images that are published on the internet have been digitally altered in some way?

MS. SHEVLIN:  Form.

A.   I'm sure it's an astrological number.  I don't know the number.

Q.   As we sit here, I mean, you're -- I mean, you believe -- let me just -- you think that most images have some sort of digital altering on them for aesthetic purposes?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.   No.  A lot of images have -- may have alterations and a lot of images may not have alterations, I don't know what those numbers might be.

Q.   And that is a fair answer.  If you don't know the answer, just say I don't know.

But whether or not there were alterations would have a significant impact on the accuracy or the reliability of your opinion as to the actual age of the model?

MS. SHEVLIN:  Form, speculation.

Page 35

A.   What I see on the image does not necessarily give an indication of the actual chronological age that may be discovered during investigations.

Q.   So what is -- what do you see -- what is the value -- I mean, your -- your job is to consult with law enforcement in these cases, correct?

A.   Yes.

Q.   What do you see the value of your opinions being?

MS. SHEVLIN:  Form.

A.   There are times when it leads to a real child or a trafficked child and it may be local; it may not have any bearing at all because it may turn out to be modified images that were made to look like an adolescent.  So I don't know what direction it will go after I tell them, yes, they have an appearance of an adolescent going through puberty and that is its only value.

Q.   So, okay.  I'm going to put a pin in that statement.  I want to go to actually sexual maturity rating.  In terms -- and let's just have this and just talk about females.  All of the images you reviewed in this case were females, correct?

A.   Yes.

Page 36

Q.   So and let's just start with a genital or vaginal appearance in females.  Can you describe what the grades of sexual maturity -- first of all, what are the grades of sexual maturity rating?

A.   I, II, III, IV, V and for pubic hair there may be a VI.

Q.   Okay.  So can you just give me the pubic hair -- first of all, in the genital region is there any other factor other than pubic hair development in sexual maturity rating?

A.   There is another factor but we usually can't see it and that is the appearance of the hymen itself.

Q.   And that's an internal anatomical body part?

A.   It's a little bit internal; it's not -- it's still considered external, but it's not readily visible.

Q.   Did that have any bearing on your opinions in this case, the hymen?

A.   No, I could not see that structure.

Q.   So, the only, I guess anatomical appearance would be the appearance of pubic hair in terms of genital development?

A.   Generally speaking, yes.  I don't have the

Page 37

images, so I haven't seen them in two years, so...

Q.   Well, we'll talk about that because, Amy, I thought that's what we were doing, is you were going to give her the images.

MS. SHEVLIN:  I meant to talk to you about that on Friday.  When we take a break, I'll call you.

MR. ROBERTS:  Okay.  All right.

Q.   So, grade- -- what's grade I?  I'm sorry, we're just talking about genitals or pubertal hair --

A.   For the female child, that's the little girl, so she will have fully developed labia majora if she's a term infant and that appearance will continue until she becomes -- developed some pubic hair.  So once she starts developing some pubic hair that is not vellus hair, different from the hair on her abdomen, she could be called SMR II.

Q.   Okay.  And grade -- what is grade III?

A.   Grade III is a little bit more pubic hair on the labia and also where the labia come together up front that will no longer be clearly or plainly visible because there is pubic hair at the top of that, the labia majora where they come together, the interior commissure, and part of the mons pubis is covered with pubic hair that is not the same as

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 38

vellus hairs on the abdomen.

Q.   And grade IV.

A.   Grade IV fills out the entire triangle shape of the labia majora, the anterior commissure and the mons pubis over to, but not involving where the thighs join at the pelvis.

Q.   What do you mean by triangle?

A.   That is the shape when the legs are together of the hair bearing parts over the mons pubis in front of the anterior commissure and on either side it's wider and between the legs, it will come to appointment so it may look like an inverted triangle.

Q.   And grade IV?

A.   Grade IV will involve the inner thighs as well.  And also hair will be thicker or more abundant.

Q.   So, I mean, human beings are all different; the thickness is a very subjective evaluation, I would imagine?

MS. SHEVLIN:  Form.

A.   Is that a clinical question or --

Q.   Yeah, it is.  Between making the distinction between IV and V, I mean, how -- what is the thickness of a V versus the thickness of a IV?

Page 39

A.   I would look at the inner thighs to tell the difference.  And most -- most of the children are shaved, so we don't get to assess thickness, there isn't anything to see, there are whiskers there.

Q.   Because most -- most people at that age do groom themselves at least at the thigh level?

MS. SHEVLIN:  Form, speculation.

Q.   Well, I think that was just your testimony, wasn't it?

A.   No, that wasn't my testimony, but --

Q.   What did you say?  I'm sorry, can you just say it again, you don't get to see at the thigh, you said something about shaving?

A.   There are whiskers.  We cannot judge the thickness of the pubic hair, we can only look at the location of the hair bearing parts by looking for the whiskers, the obvious shaving.

Q.   So, really, the difference between four and five is whether or not you see over the inguinal notch, that crease between our thighs and the pubic level, the pubic area?

A.   Practically speaking, it is the inner thighs.

Q.   Yep, okay.  And if there were waxing or grooming such that you couldn't see whiskers or

Page 40

something, but it was obviously being groomed, you would not be able to distinguish between IV and V?

A.   So I can see whiskers on the inner thighs, that distinguishes V from IV.

Q.   But if you can't, because of the method of grooming or the digital altering, you would not be able to tell the difference between a IV and a V?

MS. SHEVLIN:  Form.

A.   I'm talking about an actual patient. You're talking about images?

Q.   Oh, is there a difference?

MS. SHEVLIN:  Form.

A.   An actual patient, I can see the difference because I can see the hair follicles.

Q.   So what's the difference when you're evaluating an image?

A.   There isn't as much fine focus or close view to necessarily be able to see and blond individuals may be less obvious as well.

Q.   So it's much more difficult or it's more difficult for you to make the distinction between a IV and a V on -- on a digital image?

MS. SHEVLIN:  Form.

A.   On any image, yes.

Q.   Okay, okay.  All right.

Page 41

So this triangle of pubic hair, what -- what's the significance of that?  Why do you say a triangle?

A.   Because I'm trying to be descriptive.

Q.   No, but I mean, is that the way that pubic hair grows in on females is in a triangle -- is that the way it's supposed to grow in?

A.   At a certain maturity, it will look like a triangle.  Early on it does not look like a triangle.

Q.   But at the IV to V stage, an ungroomed female model should have a triangle shape to her pubic hair?

MS. SHEVLIN:  Form.

A.   Roughly, except for what's out on the inner thigh they're going more posterior.  Some people have it going up to their belly button as well, that's called a six.

Q.   Okay.  Pubic hair that goes up to your belly button would be a VI?  Grade VI; is that correct?

A.   In a straight line up the midline lafay (ph), there can be a VI, and it may go posterior around the anus, too.

Q.   How long can people appear to be -- well, before I ask that question.  Give me the same rundown

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 42

with breasts.  Grades IV through V in breasts, just describe what those are.

A.   Grade IV, just grade IV and V?

Q.   No, I'm sorry, grade I through V.  I'm sorry if I asked that question wrong.

A.   Okay.  So most newborns are II, maybe III in their sexual maturity rating, they've been exposed to estrogen in utero.  Even the male infant has breast buds, so the newborn is, by definition, a sexual maturity rating of II and sometimes III.  As the estrogen effect from being a fetus goes down in their bloodstream in little girls that takes two to four years.  The breast buds become small and flat and no longer palpable.  So there will be a flat little pale nipple and if they're cold, they may have a papilla protruding in the middle.  As the -- that is an SMR I, which is sometime after birth until estrogen effects starts being produced by their own body.  The breast buds will then redevelop and when it's confined to just under the nipple and its areola, then that is an SMR II.

When there is a little bit more enlargement of a mound outside the area of the pink areola, then that's a III.  When the breast tissue is beginning to meet at the sternum and the midline, then it is a IV

Page 43

when looking at it an anterior/posterior way, so we're looking directly at the person's chest.  If we look from the side, you -- or have a side view, you can see that a IV has two mounds; one mound for the breast tissue and a separate mound on top of it for the nipple for areola and papilla.  So IV, sexual maturity rating is two mounds instead of one.  V has become a single globular shape, and so it has a papilla at the top of the nipple, but there is one mound that is under the pink of the areola and the breast tissue all the way to the chest wall.

Q.   Okay.  So how long in chronological age can a female present as a grade IV on clinical exam?

MS. SHEVLIN:  Form.

A.   About 20 percent of women who are not pregnant revert to a IV.  And will be that way through parts of their adulthood.

Q.   So a female being a grade IV is not inconsistent with them being over the age of 18?

A.   Correct.

MS. SHEVLIN:  Form.

Q.   And when you meet with detectives, do you give them some explanation of what the -- the sexual maturity rating is; do you give them like a little primer course if you've never met them before?

Page 44

MR. STEWART:  Form.

A.   In general, I don't -- I'm not the first pediatrician that they have met with, but I will ask them if they have any questions and show them what I use, my reference.

Q.   You show them a reference book or something like that?

A.   The pediatric, Nelson's Textbook of Pediatrics, yes.

Q.   Okay.  Actually, and I'm just going to show you this.  It's just -- and you can tell me if it's helpful or not helpful.  I guess that means it's a demonstrative aid, it just has -- it's like a textbook, I don't know if it's from your textbook or not, and you can tell me if it's not helpful.  Do you see this?

A.   I can see it.

Q.   Is that a visual depiction of what you just testified to, that image there?  What's that?

A.   Yes, they are trying to depict that here.

Q.   And I understand it's like -- it's a drawing, it's probably just a pen drawing, but this -- this is kind of -- I see a triangle at IV and I see a larger triangle at V; is this generally what you were testifying to earlier?

Page 45

A.   Yes, roughly.

MS. SHEVLIN:  Are you making that as an exhibit?

MR. ROBERTS:  We can mark that as 3.  1 was the article.  2 was the expert report and 3 was that demonstrative image.

Q.   I want to go back to Exhibit 2, which is Dr. Krugman's report and you said you disagreed with the report, but I just want to maybe dial in on that.

For example, I just want to go to the -- the letter E here, Dr. Dully.  It's well-known and documented that adult females can exhibit and appear to be SMR IV; you would agree with Dr. Krugman on that point?

A.   Yes.

Q.   Do you know Dr. Krugman?

A.   I know Dick Krugman, I don't think I know Scott Krugman.

Q.   Okay.  In this he says that you're a member of a list serves that he's a member of and this issue about the concerns and limitations of using SMR in CSAM investigations has been raised in that -- in that e-mail list serve; is that true?

A.   It's been discussed off and on for at least a decade, yes.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 46

Q. I mean, has anyone suggested on there that it is not scientific to be applying SMR ratings to the pornographic images on the internet to determine chronological age?

MS. SHEVLIN: Form.

A. I don't remember anybody saying that it was unscientific, but we all agree that there are limitations to stating what the appearance may be versus what the age of the patient may actually be.

Q. Let me ask a question in a different way, because we may be just ships passing in the nights here.

Do you agree that it is not scientifically reliable to use SMR ratings to determine the actual chronological age of a model depicted in a pornographic image on the internet?

MS. SHEVLIN: Form.

A. Yes.

Q. Yes. Sorry.

So you agree that that's not scientific to say the actual age of the model?

A. I agree.

Q. What you are saying is, is that you can apply SMR and say what it appears to be, irrespective of the possibility of grooming or digital

Page 47

manipulation?

MS. SHEVLIN: Form.

MR. CARSON: Join.

Q. I didn't even -- I don't even know I know what your answer is there, so can you restate your answer?

A. I said correct.

Q. Correct, okay.

Do you think that you communicate that idea to law enforcement when they come to you?

A. Yes.

Q. So when Detective Preston came to you with these images and she left, you would have told her that you cannot give her any reliable information about the actual age of this individual depicted in this image?

A. Yes.

Q. All right. So, in some ways, I think maybe you agree with Dr. Krugman if he is talking about actual age; is that fair enough -- is that a fair statement?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

Q. Do you understand my question, Dr. Dully?

A. I'm -- I'm not sure how your question is

Page 48

different from all the others. I guess I'm not sure. I must be missing the nuance.

Q. Well, you said originally that you disagreed with his opinions; do you remember that testimony?

A. I disagreed with his opinion about my opinion.

Q. If he thought that your opinion was stating the actual age of the individual, rather than just the appearance, would that be an explanation for the disagreement between Dr. Krugman and yourself?

MS. SHEVLIN: Form, speculation.

A. Yes.

Q. Okay. So did you understand that your opinions were going to be used in a probable cause affidavit to seek a search warrant?

MS. SHEVLIN: Form.

A. No.

Q. What did you think that they were going to be used for?

A. That there were probably other files to be looked at or other circumstances and there would be some determination on whether they would move forward or not.

Q. Do you think -- I'm sorry, I didn't mean to

Page 49

cut you off. Were you finished? I'm sorry.

A. I think I was finished.

Q. Okay. Sometimes on Zoom it's a little hard to know when people are finished or not, but...

Would you be comfortable with your opinions being used in a probable cause affidavit without the caveat --

MS. SHEVLIN: Form.

Q. -- that you've just given us here about the limitations of your opinion?

A. I don't think my comfort matters. I'm just making a statement about the appearance. And then there's decisions on whether to move forward with that or not. Sometimes they do and sometimes they don't, and I don't know that one image is going very far ever; I don't know that.

Q. Well, no, that's not my -- so it's, you know, as a child abuse expert that your opinion sometimes have serious legal consequences, correct?

A. Yes.

MS. SHEVLIN: Form.

Q. Parents lose their children sometimes because of your opinions.

A. Yes.

Q. In this case someone went to jail, in part,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 50

because of your opinion; were you aware of that?

MR. STEWART:  Form.

A.   I was informed after it was published in a newspaper.  A colleague informed me that that had been in the newspaper, but I did not know that.

Q.   Did you suspect that your opinions might be used in front of a judge?

MS. SHEVLIN:  Form.

A.   Sometimes they go before a judge, sometimes they go before a jury; that's not my determination.

Q.   But that's not my question.

My question was, when you gave this -- when you wrote these letters, did you expect that the law enforcement officer, Detective Preston, was -- was going to quote them in a probable cause affidavit for a judge?

A.   I know that she was going to investigate further, but I did not know what the next step might be.

Q.   All right.  So I'm going to just pull up and share the -- you don't have the February 22nd report; did I understand that correctly?

A.   I did not.

Q.   So -- and we'll mark this as Plaintiff's Exhibit 4.  And it will be a composite exhibit

Page 51

because I have them in a PDF that has all three of your letters.  I'll represent to you that this letter is almost verbatim copy and pasted from your -- in your April 5th, so the words are going to probably look very similar, but just take a second and look at it.  Just tell me when you're done.

A.   Okay.

Q.   So my first question is, why did you not include in your letter any commentary on the limitations of your opinion in regards to the actual age of the model or the ima- -- the person depicted in the photograph?

A.   I think the limitations are obvious, and I say what appears to be.  And that is the appearance, the developmental genital appearance and she does not appear to be shaved; the whole thing is about appearance.  I think that's pretty apparent.

Q.   Well, you told -- you've already testified that you would have told Detective Preston explicitly that I am not talking about the actual age of the individual, I'm only talking about the appearance?

A.   I'm only talking about the appearance that's --

Q.   And you would have communicated that to Detective Preston?

Page 52

A.   And it's in writing, yes.

Q.   And when you say it's in writing, you're talking about your use of the word "appears," you use the word appears over and over again?

A.   Yes.

Q.   Okay.  So I understand you don't have the images in front of you and we're going to take a break here in just a minute and I can talk to Amy about that, but I just want -- I want to go through this real quick, okay.

You, in this depict -- you describe the image that you're looking at, correct?

A.   Yes.

Q.   And can you describe for the record -- do you -- first of all, do you remember meeting for the first time Detective Preston?

A.   I remember that I met her, yes.

Q.   Do you remember -- you had that meeting in general, maybe not word for word, but in general do you remember that meeting?

A.   Only vaguely.

Q.   So she showed you an image on her laptop is what's related in this letter.  Can you describe what that image looked like?

A.   I can only read to you what I typed.

Page 53

Q.   Please do.

A.   The image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet.  She is on a wood floor in a knees to chest position with her lower legs and ankles parted to expose her genitalia for the camera.

Q.   So she was in a knees to chest position; is that correct?

A.   Yes.

Q.   Now, you were of the opinion -- Oh, I'm sorry, I didn't mean to stop sharing there, I'm sorry.

Your opinion was that she appeared to be SMR IV; is that correct?

A.   Just of her genitals, yes.

Q.   Because you -- you couldn't evaluate her breasts?

A.   I don't think I was able to see them or I would have put them in there.

Q.   Well, knees to chest, in theory, she would be covering her breasts with her knees or her legs, correct?

MR. KASS:  Form.

A.   That sounds right.

Q.   Yeah.

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 54

You put that she would have achieved this developmental genital appearance of SMR IV at 12 to 15 years of age. Why didn't you put that she could -- but she could be 18 or 19 or 20 with an SMR IV?

MS. SHEVLIN: Form.

A. Well, that would depend on the modifications and grooming, as you're calling it, that she would undertake, and I'm not assessing grooming, I'm assessing appearance of the photograph, which is what pornography is all about.

Q. Well, you testified earlier and you agreed with Dr. Krugman that women can present as SMR IV for their entire life?

A. For their breast development, yes.

Q. And genital pubic hair?

A. That depends on shaving and heritage or depilatories or waxing or other things.

Q. You say that she (sic) did not assess her grooming, but you did in the next sentence assess the grooming?

A. She did not appear to be shaved; that, again, is an appearance.

Q. How -- what scientific basis do you have to make that determination?

MS. SHEVLIN: Form.

Page 55

A. I don't see any hair there and so she does not appear, you know, to be shaved. I mean, there is or there isn't hair, right, why say that there is anterior pubic hair present.

Q. But that's just a lay opinion, right, that's not a scientific opinion, you're just saying I don't see any hair?

A. No, I think you mischaracterize it big time, clinically.

Q. Tell me, I asked the question and you didn't answer it.

What is the scientific basis for your opinion that she does not appear to be shaved, medical, scientific basis for your opinion?

A. The hair is still there.

Q. I don't understand, you said the hair is still hair?

A. Shaving removes hair, but the hair is still there; it's present or absent in the image.

Q. Is that a medical opinion?

A. That's a clinical medical assessment what the image looks like.

Q. What about waxing or electrolysis or chemical hair removal?

MS. SHEVLIN: Form, speculation.

Page 56

A. What about it? The hair --

Q. Do those leave visible signs of hair?

MS. SHEVLIN: Same objections.

Q. Well, hold on. You're saying as a medical expert, you can determine whether someone is groomed or not groomed, correct?

MS. SHEVLIN: Form, mischaracterization of her prior testimony.

A. I know what shaving looks like because I see it all the time and it has been that way since the 90's so --

Q. Yeah, and I'm asking about go waxing or electrolysis; you're familiar that there are other types of grooming other than shaving, correct?

A. There are, yes.

Q. And they leave a different -- they look different; the results is different than shaving, correct?

MS. SHEVLIN: Objection, speculation.

A. They're designed to be the same or they can be designed to be different.

Q. Right.

So, how can you look at a pornographic image and determine whether or not they have been waxed or electrolysis hair removal, some other form

Page 57

of hair removal?

A. I'm not assessing the hair removal, I am saying the pubic hair is present.

Q. But if she is groomed that would destroy any validity to your SMR rating as -- as regards to pubic hair, correct?

MS. SHEVLIN: Form.

A. The hair is still present. It can be assessed for its appearance.

Q. We're going to follow back up with that. But before we take a break, I'm going to ask you this quick and I'm going to go back to this image.

Okay. This is the general image and we talked were the triangle. Dr. Dully, you've described this model in the February 22nd, 2023 as sitting towards the camera, knees to chest, correct?

A. Yes.

Q. It would have been impossible for you to determine whether this model had a triangle or not based on the way that she was sitting, correct?

A. I do not know; I do not know what the image looks like.

Q. You've described the image as knees to chest, sitting on the floor, that would obscure the inguinal notch or the inner thigh from your view,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 58

correct?

MS. SHEVLIN: Form.

A. No, that depends on the image.

Q. Well, if the image, because I've seen it, if the image obscured the inguinal notch, it would be impossible for you to determine whether or not the model had a triangle or the hair crossed the inguinal notch to the thigh, correct?

MS. SHEVLIN: Form.

A. Well, there is not -- there is no inguinal notch, I don't know what you're talking about, and I can see -- I state that I can see, but I don't have the image, you have an advantage over me, you're not seeing it, correctly.

Q. Okay. The thigh -- you testified -- tell me what was the difference between, again, IV and V?

A. Can I see the image?

Q. I am not actually comfortable because the image is still on a Nick Nick database because no one is doing their job, and I'm afraid that if we transmit it, we're all going to get investigated for child pornography even though it's an adult, so I'm just going to ask you questions right now based on the hypothetical and I will show you the image, but can you, once again, tell me what is the difference

Page 59

between a IV and a grade V pubic hair?

A. The presence of hair or the shaved area of hair on the inner thighs, on either side of the fully developed roughly triangle shape of hair.

Q. So if you could not see the inner thigh, you could not distinguish -- it would be impossible for you to even say what appears to be a grade IV versus a grade V?

MS. SHEVLIN: Form.

A. I cannot see the image. I can't comment one way or the other.

Q. You have to answer my questions unless you don't understand them.

A. I can't see the image. You're asking me --

Q. I'm asking you a hypothetical question, Dr. Dully.

A. Okay. A hypothetical, not about this case, about something else, okay, try that.

Q. Hypothetically, if the image did not show the inner thigh or the inner section of the inner thigh and the pubic region, you could not distinguish between a grade IV and a grade V in terms of sexual maturity rating appearance?

MS. SHEVLIN: Form.

A. I would need to see the image, but I would

Page 60

consider that as facts, yes.

Q. Evaluating whether or not pubic hair has crossed the line onto the thigh is the distinguishing factor between a grade IV and grade V, pubic hair distribution for sexual maturity rating, correct?

A. It is the most helpful distinction, yes.

Q. Okay. All right. Why don't we take a break, we've been going for an hour and a half.

Amy, do you want to call me?

MS. SHEVLIN: Yeah, I'll you on your cell.

THE VIDEOGRAPHER: Going off the record the time is 11:29 a.m.

(Whereupon a break was taken.)

THE VIDEOGRAPHER: We're on the record, the time is 11:47 a.m.

Q. Okay. So we had an off record discussion and through no fault of Dr. Dully, there's just a logistical issue with Miss Shevlin's office and the photographs did not get sent to her. So we are going to ask a few more questions, but then continue the deposition to a later time in which she will have access to those photographs and we will reschedule it, Matt raised the concern about him asking questions and that certainly will be accommodated when we reschedule the deposition. He also has the

Page 61

ability to reset a deposition as well. Is that a fair summary, Matt and Amy?

MS. SHEVLIN: I think that's a fair summary.

MR. CARSON: Agreed.

MS. SHEVLIN: And I do also want to add just one thing. The questions that you'll be asking her are largely going to be hypothetical if we're talking about the images from this point forward and then when we have an opportunity for her to look at the images, they'll be specific to those images, correct?

MR. ROBERTS: Some of them may be hypothetical. I don't intend to go through every image in a hypothetical way, but I am going to ask about some general principles, you know, that maybe we don't even need the images for, but yeah, some may be hypothetical, but I don't intend to go through everything like that.

Q. All right, Dr. Dully, I want to ask you -- and this is not a hypothetical, when you were making these assessments at the request of law enforcement, do you use any other set of scientific principles or methods in rendering the opinion on the appearance of the model, other than sexual maturity rating?

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 62

A.   Yes, sometimes I do.  It depends on the image.  So sometimes I --

Q.   What would those be?

A.   So sometimes I can see the teeth, and I can tell if they're baby teeth or mixed dentition, which is adult teeth in some stage of eruption, sometimes with missing teeth as well.  And then sometimes if they're very young, I can look at it by proportion, if they're very young, images of the very young, I can look at body proportion which is head size to body size.  And most of the size or height is not visible in most images; sometimes they're standing next to an adult and I can look at approximate height, but most of these images are not that, and so occasionally, you know, there's more information or appearance information on the images and sometimes, there is not.

Q.   If you relied on any other data such as proportion, height, teeth, would that be information that would be included in your report?

A.   Yes.

Q.   So if it's not included in your report, I can take from that that you did not consider other data in forming that opinion?

A.   Not other image data.  Sometimes I look at

Page 63

the bio main or something that's printed on it, or for sexual content, but that's often not helpful either.  It's just all letters and numbers and asterisks, that doesn't help.

Q.   Yeah, I understand.  If -- if there was something, though, you would put that in your report?

A.   I would.

Q.   All right.  So I think when we left off, there was this hypothetical and I don't -- and I apologize, and I'm going to ask this hypothetical again, and I use inguinal notch, but I think it's inguinal -- what is it that --

MS. SHEVLIN:  Form.

A.   I don't know.

Q.   It's -- I'm sorry, do you know the anatomical term that I'm talking about?

MR. CARSON:  Groove.

Q.   Inguinal groove?

A.   Yeah, I don't know what you're referring to.

Q.   It's just an anatomy term.  It's the -- it's the -- it's the line between the abdominal wall and your hip, that groove, that crease.

A.   Oh, that would be -- you could call that an inguinal fold.

Page 64

Q.   Inguinal fold, yeah, I've seen notch, I've seen fold, I've seen groove, I've seen -- but that's the line that you're talking about in the distinction of -- between IV and V, correct?

A.   No, that is very anterior.  I'm talking about medial thighs, which is the inner surface of the upper thighs.

Q.   But if a picture did not -- if an image did not depict the upper thigh or the abdominal wall where it meets the thigh, it would be impossible for you to distinguish between a grade IV and a grade V pubic hair presentation, correct?

MS. SHEVLIN:  Form.

A.   No, that's not the location.  The location isn't abdominal wall and it's not in the inguinal fold.  It is between where the thighs come together in the middle, so it's anterior and medial, the inner thigh.

Q.   Okay.  So if you cannot see in a digital image, the interior thigh, it would be impossible for you to distinguish between a grade IV and a grade V?

MS. SHEVLIN:  Form.

A.   No, it's the anterior, a-n-t-e-r-i-o-r and medial thigh, m-e-d-i-a-l, which is where the legs come together between the upper thighs and on the

Page 65

front of the medial surface of the thighs.

Q.   If you cannot see that area, it would be impossible for you to distinguish between a grade IV or a grade V presentation, correct?

MS. SHEVLIN:  Form.

A.   Probably, but grade IV and grade V are also a subjective determination of quantity amount of pubic hair.

Q.   You would not be able to, scientifically, with any degree of reliability distinguish between a grade IV and grade V if you had not seen the area that you have just described?

MS. SHEVLIN:  Form.

A.   At a hundred percent level of certainty, probably not.

Q.   No, you can't ever say with 100 degree -- 100, you know, that's not -- that's not what I'm talking about.  And I want to -- I'm going to spend as much time on this as we need to.  What I'm going to do, is I'm going to pull back up our demonstrative aid.

Mr. Videographer, do you have this demonstrative aid?

THE VIDEOGRAPHER:  Yes, sir, if I see it?

MR. ROBERTS:  Yeah, can you do like a split

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 66

screen, the ability to do a split screen with the witness in this?

THE VIDEOGRAPHER: I see it now. She's on the -- do you guys see it? She's on the side right now.

MR. ROBERTS: That's fine, yeah, that's fine.

THE VIDEOGRAPHER: Okay.

Q. So we have a -- can you see cursor, Dr. Dully?

A. Yes.

Q. So on grade IV, grade V; is my cursor, the area where my cursor on both the IV and the V, is that the area that you're talking about?

A. Yes. Also between the thighs.

Q. Also between the thighs.

A. To each other.

Q. If you cannot see this area that I am running my cursor on, you cannot do a SMR rating to distinguish between a IV and a V on a pornographic image off the internet, can you?

MS. SHEVLIN: Form.

A. There can be a difference in quality, as you can see, and then also there's medial thighs which you can't see on these diagrams, so if I can

Page 67

see better than just this, maybe.

Q. At what point would you say to -- first of all, have you ever told a law enforcement officer, you know, there's just not enough here for me to reliably give you an opinion about the sexual maturity rating.

A. Yes.

Q. And what would be the criteria for that?

A. Sometimes the image is too pixilated or blurry or the clothes are covering the vital structures.

Q. What are the vital structures?

A. The breast area from more than one view, and the pubic area as well.

Q. Okay. So if the breast area is obscured and the pubic area is obscured, those are circumstances in which you believe you have communicated to a law enforcement officer that this just isn't enough for me to reliably opine on the sexual maturity rating as it appears in the photograph?

MS. SHEVLIN: Form.

A. Correct. Maybe I can see the teeth, maybe it's an image that belongs to a bigger file that shows more information, but based on that one image

Page 68

alone, I can't do the sexual maturity rating.

Q. So you do have -- first of all, do you recall, I think you met with Detective Preston twice; is that what your rec- -- records indicate?

A. Yes.

Q. February 22nd and April 5th. Do you have any calendars or anything in your possession that document those meetings?

A. I have a date and a time on my Outlook calendar.

Q. Have you gone back and checked that Outlook calendar and -- and found an April 5th and a February 22nd?

A. I did not remember the February visit, so when I went back, I did find the February visit on my calendar.

Q. Have you met with her any other times other than April 5th or April (sic) 22nd?

A. Not met with her. I may have seen her in the hallway, potentially, but, no, I didn't share any cases with her to my knowledge.

Q. Okay. Did you check for that?

A. No.

Q. So you just don't recall having any other cases that you consulted with her about?

Page 69

A. I don't know that they were with her; sometimes it's a team. I have seen other St. John's County cases at the hospital --

Q. Right.

A. -- but I don't remember her being a prominent figure in any of the others.

Q. Okay. So do you recall -- so you don't recall her -- meeting her in February with a single image as we sit here today?

A. I do not.

Q. Do you recall meeting her in April with multiple images?

A. Yes, because we scheduled that. And she had images, more than one, yes.

Q. And we've talked a little bit about that meeting. Do you recall the discussions that you had with her during that meeting?

A. In any vivid way, no.

Q. You testified earlier that you would have counseled her on the limitations of your opinions regarding appearance versus actual age; is that correct?

A. In a simple way, yes, that's all I would have said.

Q. In any way you wouldn't be misleading

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 70

anybody in what your opinions are, correct?

MS. SHEVLIN: Form.

MR. CARSON: Join.

A. Correct, the investigation needs to occur.

Q. What do you mean by that, the investigation need to occur?

A. I have no access to actual -- any additional information at all about the case, the person depicted, other computer's images, I don't have any of that information, so if there is an investigation that's occurring, that I am not part of.

Q. Do you mean that, in part, that your opinions are not enough to establish the actual age of the individuals depicted from a medical standpoint?

A. Right.

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

Q. So, it's okay. I got your answer that time.

MR. CARSON: If you don't mind, I didn't hear her. I think I might have spoken over the witness.

Q. I think you gave me another "correct"?

Page 71

A. I think I did, yes.

MR. CARSON: I apologize, Doctor.

A. I'm sorry, I'm sorry.

Q. I'll re-ask it.

You have not -- in these -- in these three reports that I have that you produced in this case, you have not rendered a reliable medical opinion on the actual age of the individuals depicted in this -- in these images, correct?

A. Correct.

Q. So let me ask you this and these are kind of hypothetical questions, but they are about the images, so does that mean when you're presented an image and, for example, the model appears, for whatever reason, to have no pubic hair, that in regards to sexual maturity rating is going to be -- that that is a sexual maturity rating of one?

A. Probably, but I'll look to see if I can see the other areas, too, and countenance of the person.

Q. Right. But I mean, you're not, if you're not -- if you can't look at the breast and you don't have a picture of her face or anything like that and you just see a genital area and there's no pubic hair that is visible to you, that's a sexual maturity rating of what?

Page 72

A. That would be the appearance -- if the person is blonde, I will explain that I might not be able to see blonde pubic hair even if it's there, so I don't know the image, so I don't know if it was a blonde or not.

Q. Well, I guess for whatever reason, right, I'm just asking, brunette red head or whatever, if you look at an image and you do not see any pubic hair, that would result in a sexual maturity rating of one in terms of appearance?

A. Yes.

Q. And do you make any effort to determine whether or not the image has been manipulated, touched up, edited in any way?

A. No, I have no expertise in that.

Q. Talk about shaving, do you have any expertise in the appearance of electrolysis, hair removal?

A. Not to my knowledge, no.

Q. Do you have any expertise in what an individual who has received electrolysis looks like when you take a picture of them -- of their pubic hair?

A. No.

Q. Same question with waxing; do you -- are --

Page 73

do you have any expertise in determining whether or not from looking at a picture someone has been waxed?

A. If there's folliculitis where the hairs are starting to grow back, maybe, otherwise, no.

Q. Because your understanding is waxing pulls the hair follicles out of the skin in that process, correct?

A. Yes. And there would be a period of time where the follicles look healed over.

Q. And that would be the appearance of no growth of pubic hair?

A. Yes.

Q. Is there a reason why you only say in -- in these opio- -- in these letters that the model or she does not appear to be shaved rather than waxed?

A. No, I just used shaved as the customary term.

Q. So by shaved, you mean grooming of any type?

MS. SHEVLIN: Form.

A. The after care is still present, not shaved in a general sense, not absent.

Q. Hold on, I'm not understanding you. Let's not even look at the first letter, let's just look at April 5th, okay? You've got an April 5th. I can

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 74

pull it up.

MS. SHEVLIN:  Could you pull it up, I want to make sure it's the correct one for all of us to pull up at the same time.

MR. ROBERTS:  There's two April 5ths.

Q.   So I'm going to share your report again. I'm going to scroll down to the second -- so, I just want to go over here on the second paragraph, can you see this, the second image is imprinted with white script.  That's the way it begins.  You say she does not appeared to be shaved.  What do you mean by that statement?

A.   That there's no shaving bumps or folliculitis that we might see, and I don't see -- you can see that I say she appears to have no pubic hair development.

Q.   So I guess what I'm saying, what I'm getting at is what if she was waxed?

MS. SHEVLIN:  Form, speculation.

A.   I could have said she does not appear to be waxed, I would be saying the same thing.

Q.   Bill, but -- do you get bumps from waxing?

MS. SHEVLIN:  Form, speculation.

A.   You can.

Q.   But I think we just established that there

Page 75

is a period after waxing where it appears that you have no pubic hair growth, correct?

A.   It may appear you have no hair growth wherever was waxed, I don't know how long that lasted.

Q.   So how could you rule out in giving your opinion here that she hadn't been waxed?

MS. SHEVLIN:  Form.

A.   I'm not making any statement about waxing at all.

Q.   And that's my question, why not?  Why not?

A.   Because the presence of pubic hair is the presence of pubic hair; what cosmetic procedure is not part of the question.

Q.   She doesn't have any presence of pubic hair, so isn't it part of the question, why does she not have pubic hair; your answer is that she's prepubescent, there are other explanations, correct?

MS. SHEVLIN:  Form.

A.   Correct, she has appearance of prepubescent or -- yes.

Q.   Or she has the appearance of one is who is just been waxed?

MS. SHEVLIN:  Form, speculation.

A.   I can't see the image, but hypothetically,

Page 76

that is one explanation.

Q.   Why is that explanation less likely than your given explanation that she's prepubescent?

MS. SHEVLIN:  Form.

A.   Which explanation?

Q.   That she's just been waxed?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.   I was a military doctor and all the young women are shaved, they're not waxed.  Waxing and electrolysis and laser hair treatments are expensive, and so in general, they're shaved.  So for me as a military physician, shaved is a general term.

Q.   Whatever happens in the military happens in the military.  I'm not asking about the military; you've been a U.F. physician for 10 years, correct?

A.   And a military physician since 1982.

Q.   And you had no reason to believe that this model was in the military, correct?

MS. SHEVLIN:  Form, speculation.

A.   Correct, but my customary vocabulary is definitely effected,

Q.   No, and I'm not talking semantics, Dr. Dully, and I -- I apologize if you think I am talking semantics, I am not.  You just testified that one

Page 77

possible explanation for her not having the appearance of hair, is that she was waxed?

A.   Okay.

Q.   That's correct, right?

A.   Or shaved or something else, yes.

Q.   Or electrolysis, correct?

A.   Maybe.

Q.   Now, my question to you is, you offered the opinion that the reason why she does not have pubic hair is because she is less than nine to 13 years old, correct?

MS. SHEVLIN:  Form, mischaracterization of prior testimony.

A.   Based on the appearance.

Q.   But the appearance is also consistent with someone who's been waxed, correct?

MS. SHEVLIN:  Same objections.

A.   Correct, but I'm not seeing the image, so hypothetically, it could be.

Q.   Right, so here's my question.  What makes it more likely that your opinion, that it is her pubertal development that explains her lack of pubic hair, rather than waxing or electrolysis?

MS. SHEVLIN:  Form.

A.   The investigation will verify or refute.  I

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 78

have no ability to do that.

Q. Well, I'm just asking you from a medical perspective, okay. You get an image, right, from the internet, you knew this was an image from the internet, correct?

A. No, I know it was a Nick Nick tip based on what I was told, I don't actually know.

Q. Actually, and you may not know this, this was not a Nick Nick tip, this picture, you describe it, it had a file name, it's a screen shot and then there is Duck Duck Go dot -- did you not know that that was a screen shot from the internet?

MS. SHEVLIN: Form.

A. No, I didn't know where it came from.

Q. Well, you'll look at it when you look at the image, you'll agree it is from the internet; it has the website.

MS. SHEVLIN: Form.

Q. Well, let's not get into that, we'll ask that later.

You're being asked a medical opinion by the detective, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. Now, you know, as a medical doctor that

Page 79

there can be multiple explanations for a model in an image not having the appearance of pubic hair, correct?

A. There can be, yes.

Q. Right.

One of those is that the image has just been digitally altered to remove evidence of pubic hair, correct?

A. Yes.

MS. SHEVLIN: Form.

Q. One of those would be waxing or electrolysis or some form of hair removal that did not leave any visible evidence of hair, correct?

MS. SHEVLIN: Form.

A. Yes.

Q. All right. One of the explanations would be that the model has not reached a certain level of puberty, correct?

A. Yes.

Q. So as a medical doctor, this would be what we call kind of a differential diagnosis, correct? You got -- you got three different things that could explain what you are observing; is that a fair characterization?

MS. SHEVLIN: Form.

Page 80

A. Potentially, yes.

Q. What makes you think that pubertal development would be more likely than digitally altering the image or some sort form of hair removal that you couldn't see on the picture?

MS. SHEVLIN: Speculation.

A. I am not saying how likely or unlikely it is, I'm only saying what the appearance is.

Q. So when you're entering these opinions, you're not saying with any degree of reliability that they're correct?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. It's not chronological age, their appearance.

Q. Well, why didn't you -- I guess my question here is and I don't think you need to look at the image for this, you acknowledge that waxing can produce the same effect of no visual evidence of pubic hair; why would you as a doctor say that she is an SMR I rather than she just had a really good wax job?

MS. SHEVLIN: Form, speculation.

A. Again, I need to see the patient, which is the image.

Page 81

Q. Okay. Well, we'll certainly do that when we get the images and I guess we can answer those questions then.

In this same -- and this perhaps highlights what we've been going around today more than anything else. In the first paragraph here you review another image, and this is -- let's just call it by its file name: YCBLVVFQ underscore O.JPG. This is an image that you evaluated and I'm just going to read your opinion. Her breasts are partially visible and could be SMR IV to V. However, her genitals -- genitals are plainly visible and her thighs spread widely apart and showing she is SMR I with respect to pubic hair. Then you say this developmental appearance is less than nine to 13 years of age.

So my first question is, what developmental appearance is less than nine to 13 and a half years of age with this model?

MS. SHEVLIN: Form.

A. Absence of hair bearing parts.

Q. Okay. But what about her breasts?

A. Well, I did not have a good view of her breasts, so that was the best that I could do was IV to V.

Q. Yeah, but what's the developmental

Page 82

appearance of a V breast; what's the age ra- -- age range of that?

A. Post pubertal or beyond.

Q. **Greater than 18 years old, correct?**

A. Well, no, not necessarily, because part of the sexual maturity rating is looking for disorders that involve estrogen exposure at any age, and the five can -- breast development sometimes starts first and finishes first and so you can have a V during puberty, so it's good to be able to see both areas if possible.

Q. **What kind of disorder would that be called, someone who has an SMR rating of V breasts, but no pubertal hair development?**

A. Well, it can be normal, and it can be normal based on the limitations of the photographs, and there are cases of precocious thelarche it's called where breast development happens without actual pubertal development.

Q. **Your testimony here today is that it is normal for a female to have grade IV to V breasts, but no pubic -- pubertal hair development in a clinical setting?**

A. It is possible, yes.

Q. **And if that is possible, you would look at**

Page 83

it and say -- you would run some diagnostic tests to try to explain why that was happening, correct?

A. No, not necessarily. It depends on the whole picture.

Q. **How many pictures have you seen -- have you ever treated that had grade V breasts, but no pubertal development; is that someone that you've treated before?**

MS. SHEVLIN: Form.

A. Yes. I have seen one in the military and she had a sexual development disorder.

Q. **Okay. So something that was not normal?**

A. It turned out that it was not normal, but when we started, that was not necessarily so.

Q. **How old was she when you stopped treating her?**

A. 17.

Q. **So at 17 she had no pubertal hair development?**

A. That was why I was seeing her, yes.

Q. **Did she have pubertal development when she was 18?**

A. I didn't see her past 17, I don't know.

Q. **So it's possible for someone to present with an SMR IV -- IV or V breast, no pubertal hair**

Page 84

development and be 18 years-old?

MS. SHEVLIN: Form, mischaracterization of prior testimony.

A. Well, it's -- it's possible; it would depend on the underlying causes.

Q. **You would have to be in a clinical setting to diagnose and figure that out, right?**

MS. SHEVLIN: Form.

A. Yeah.

Q. **Why did you -- why in this one, though, would you have -- would you have relied on the pubic hair SMR rating, but not the breast development SMR rating?**

A. Because I can see the pubic hair development.

Q. **But there was enough for you to say SMR IV to V?**

A. I erred on the old side since I could not really see, so the breast development was potentially that mature.

MR. ROBERTS: Give me one second, okay. I think it's probably a good point to just continue the deposition, go through the photographs and all that stuff, I'm sure there will be a lot more questions. Does that sound good to everybody?

Page 85

MS. SHEVLIN: Fine with me.

THE VIDEOGRAPHER: Sorry, Mr. Roberts, no video orders right now?

MR. ROBERTS: Yeah, no video orders. I will actually order a copy of the transcript.

MS. SHEVLIN: We'll take a copy as well, just E-Tran.

THE COURT REPORTER: Mr. Carson, do you need a copy?

MR. CARSON: I'm good for now.

THE COURT REPORTER: Read or waive?

MR. ROBERTS: You know, I don't even know if we're continuing it, if it's an official transcript. It's up to you, Doctor, you can read it if you want.

MS. SHEVLIN: I'm going to have her read, but given the circumstances, we'll make sure it gets to her as soon as possible as soon as we get it.

THE VIDEOGRAPHER: The video recorded deposition of Dr. Kathleen Duffy, going off the record, the time is 12:26 p.m. Thank you.

(Plaintiff's Exhibit Nos. 1 through 4 were marked by the reporter subsequent to the deposition.)

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**

Page 86

(Whereupon the deposition terminated at 12:26 p.m.)

Page 87

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF ORANGE )

I, the undersigned authority, certify that KATHLEEN DULLY, M.D. personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 10th day of May 2025.

LISA K. PENKACIK, RMR
Notary Public - State Of Florida
My Commission expires 9/7/2026
Commission No.:  HH 289853

Page 88

CERTIFICATE OF REPORTER

STATE OF FLORIDA  )

COUNTY OF ORANGE  )

I, LISA K. PENKACIK, Registered Merit Reporter, certify that I was authorized to and did stenographically report the deposition of KATHLEEN DULLY, M.D.; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I, further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in this action.

Dated this 10th day of May, 2025.

LISA K. PENKACIK, RMR

Page 89

ERRATA SHEET

PAGE:    LINE:     CORRECTION:     REASON:

_____
DATE

_____
KATHLEEN DULLY, M.D.

### Exhibits

**Plt Exhibit 1**
 3:8 31:13

**Plt Exhibit 2**
 3:8 31:13
 45:7

**Plt Exhibit 3**
 3:9

**Plt Exhibit 4**
 3:9 50:25

### 1

**1** 31:13 45:4
 85:23

**10** 16:2 26:21
 76:16

**100** 65:16,17

**10:01** 4:7

**11:29** 60:12

**11:47** 60:15

**12** 54:2

**12:26** 85:22
 86:2

**13** 77:10
 81:15,17

**15** 54:3

**15th** 27:9

**17** 83:17,18,
 23

**18** 28:25

43:19 54:4
82:4 83:22
84:1

**19** 54:4

**1959** 26:18

**1980** 8:16

**1980s** 18:19

**1981** 7:8

**1982** 76:17

**1986** 7:11,17

**1989** 7:17,18
 10:3

**1990** 8:6

**1990s** 18:19
 26:22

**1991** 8:17

**1993** 9:1

**1994** 9:4,12,
 24 23:21,23
 24:8

**1996** 27:5

**1998** 18:20
 27:17

### 2

**2** 31:13 45:5,
 7

**20** 43:15 54:4

**200** 10:5

**2006** 16:23

**2009** 10:4,7

**2023** 24:16
 57:15

**2024** 24:11,12

**2025** 4:7

**21** 25:24

**22** 18:5

**22nd** 18:3
 50:21 57:15
 68:6,13,18

**28** 4:6

### 3

**3** 45:4,5

**30** 9:8

**3:24-cv-00044-
mmh** 4:6

### 4

**4** 50:25 85:23

### 5

**5th** 18:3 51:4
 68:6,12,18
 73:25

**5ths** 74:5

### 7

**70** 26:18

**73** 29:15

### 9

**90's** 56:11

**95** 29:15

### A

**a-n-t-e-r-i-o-r**
 64:23

**a.m.** 4:7
 60:12,15

**abdomen** 37:17
 38:1

**abdominal**
 63:22 64:9,
 15

**ability** 9:1
 12:13,20
 61:1 66:1
 78:1

**abnormal** 19:21

**Absence** 81:20

**absent** 55:19
 73:22

**abundant** 38:17

**abuse** 7:2,3,
 22 8:7,20,21
 9:15 10:4,8
 11:1,15,16
 12:7,8 13:4,
 6,9,11,14,
 20,22 14:1,
 4,8,14,17
 15:5,6,9,17,

19 16:7,21
17:12 28:7
49:18

**Abusive** 8:12

**Academy** 8:11
27:3

**access** 18:4
28:5,8 30:23
60:22 70:7

**accommodated**
60:24

**accuracy** 34:22

**accurate**
22:20,23

**accurately**
23:6

**achieved** 54:1

**acknowledge**
80:18

**active** 16:19
27:20

**actual** 22:15,
24 34:23
35:2 40:9,13
46:14,21
47:15,20
48:9 51:10,
20 69:21
70:7,14 71:8
82:19

**add** 61:6

**additional**
8:14 9:25

70:8

**administered**
11:4

**adolescent**
35:16,18

**adult** 45:12
58:22 62:6,
13

**adulthood**
43:17

**adults** 29:2,3,
4

**advantage**
58:13

**advertised**
6:25

**aesthetic**
34:12

**affidavit**
48:16 49:6
50:15

**afraid** 58:20

**age** 21:6,9,
10,12,13,15
22:15,24
23:1,12,13,
19 26:7
28:25 29:14
31:17 32:7,
21 34:23
35:3 39:5
43:12,19
46:4,9,15,21
47:15,20

48:9 51:11,
20 54:3
69:21 70:14
71:8 80:14
81:15,18
82:1,7

**agencies** 13:2

**agree** 10:22
23:5 26:5
31:20 32:21
45:13 46:7,
13,20,22
47:19 78:16

**agreed** 54:11
61:5

**ahead** 12:12,
19

**aid** 11:17
44:13 65:21,
23

**aim** 30:10

**aimed** 13:21

**Air** 7:19

**alterations**
34:16,17,21

**altered** 34:5
79:7

**altering** 22:7
34:11 40:6
80:4

**American** 8:10,
11 11:5
15:11 26:23
27:3

**amount** 65:7

**Amy** 4:16 37:2
52:8 60:9
61:2

**Amy's** 32:24

**anatomical**
36:14,22
63:16

**anatomy** 63:21

**ankles** 53:6

**answers** 32:23

**anterior** 38:4,
10 55:4
64:5,17,23

**anterior/
posterior** 43:1

**anus** 41:23

**apologize**
63:10 71:2
76:24

**apparent** 23:12
51:17

**appearance**
21:10,12,17
22:13,21
23:2,12,19
28:9 32:6,16
33:16,21
34:1 35:18
36:2,12,22,
23 37:13
46:8 48:10
49:12 51:14,
15,17,21,22

54:2,9,22
57:9 59:23
61:24 62:16
69:21 72:1,
10,17 73:10
75:20,22
77:2,14,15
79:2 80:8,15
81:14,17
82:1

**appeared** 53:13
74:11

**appears** 30:10
46:24 51:14
52:3,4 53:2
59:7 67:20
71:14 74:15
75:1

**applicable**
10:23

**apply** 5:10
26:25 29:3
46:24

**applying** 26:11
46:2

**appointment**
38:12

**approaching**
20:15

**approximate**
62:13

**April** 4:6
18:3 51:4
68:6,12,18
69:11 73:25

74:5

**area** 39:21
42:23 59:2
65:2,11
66:13,14,18
67:13,14,15,
16 71:23

**areas** 71:19
82:10

**areola** 42:21,
23 43:6,10

**Armed** 27:16,
19

**article** 26:6
27:6 28:12
29:25 30:2,
5,13,24
31:21 45:5

**articles**
26:18,24

**Arts** 7:9,10

**Asia** 26:25

**assault** 16:7,
22

**assess** 12:21
19:20 20:20
39:3 54:18,
19

**assessed** 57:9

**assessing**
54:8,9 57:2

**assessment**
26:7 31:18

32:3 55:21

**assessments**
9:9 61:22

**assigned** 7:21

**assume** 5:3

**asterisks** 63:4

**astrological**
34:7

**attempt** 29:14

**attempted**
26:10

**attempting**
21:19

**avoid** 29:8

**aware** 21:24
22:3 24:8
34:2 50:1

---
**B**
---

**baby** 62:5

**Bachelor** 7:10

**back** 9:25
10:20 21:1
45:7 57:10,
12 65:20
68:11,15
73:4

**background** 7:7

**bad** 5:15

**base** 32:17

**based** 21:16

28:10 33:21
57:20 58:23
67:25 77:14
78:6 82:16

**basis** 6:19
10:14 54:23
55:12,14

**bear** 15:22

**bearing** 35:14
36:19 38:9
39:16 81:20

**beginning** 4:3
42:24

**begins** 74:10

**behalf** 4:16

**behavior** 29:8

**beings** 38:18

**belly** 41:16,
19

**belongs** 67:24

**Bethesda** 7:13

**big** 55:8

**bigger** 67:24

**Bill** 74:22

**bio** 63:1

**birth** 42:17

**bit** 5:2 36:16
37:19 42:22
69:15

**blond** 40:18

**blonde** 72:2,3,

5

**bloodstream** 42:12

**blurry** 33:18 67:10

**board** 10:4,7 11:1,5 13:4 14:13,20 15:11 17:12

**boards** 10:3

**body** 6:23 36:14 42:19 62:10,11

**book** 44:6

**borderline** 33:24

**break** 37:6 52:8 57:11 60:8,13

**breast** 20:12 42:9,13,19, 24 43:5,11 54:14 67:13, 15 71:21 82:1,8,18 83:25 84:12, 19

**breasts** 42:1 53:17,21 81:10,21,23 82:13,21 83:6

**briefed** 25:23

**bring** 15:21 33:23,24

**bringing** 24:5

**brunette** 72:7

**buds** 20:12 42:9,13,19

**bumps** 74:13, 22

**burst** 23:22

**button** 41:16, 19

---

**C**

---

**calendar** 68:10,12,16

**calendars** 68:7

**California** 7:17 8:8 9:14

**call** 15:12 37:6 60:9 63:24 79:21 81:7

**called** 8:9,22 18:19 19:2 37:17 41:17 82:12,18

**calling** 19:6 54:7

**camera** 53:6 57:16

**Camp** 9:13

**care** 6:18 10:20,23 11:21 13:18 27:19 73:21

**cared** 8:1

**career** 16:5

**Carson** 4:18 22:11 47:3 61:5 63:17 70:3,18,22 71:2 85:8,10

**case** 4:5 6:19 7:22 8:20,24 9:15,18 10:14 14:10 17:16,18 20:19,20,23 21:17 24:20 25:2,14,21 26:1 27:1 35:24 36:20 49:25 59:17 70:8 71:6

**cases** 7:1 8:4 9:7,10 24:5 35:7 68:21, 25 69:3 82:17

**catch** 6:1

**caveat** 49:7

**cell** 60:10

**center** 8:18 9:4 16:11,20 27:16,19

**certainty** 13:8 65:14

**certification** 11:2,16 14:14,20,21

**certified** 10:7 17:12

**Chadwick** 9:4 16:20

**Chair** 7:21 8:23

**chance** 30:18, 19

**change** 24:15

**changed** 18:20, 22

**characterization** 14:18 79:24

**charge** 8:19

**check** 68:22

**checked** 68:11

**chemical** 55:24

**chest** 43:2,11 53:5,7,20 57:16,24

**child** 6:12, 14,17,22,23 7:1,4,21 8:1,7,8,20 9:9,15,21 10:3,8,10 11:1,15,16, 25 12:1,7,8

13:4,6,9,11,
14,20 14:1,
4,8,14,17
15:5,6 16:6,
21 17:12
20:16,17
27:16,20
28:6,7,8
29:22 35:13
37:11 49:18
53:3 58:22

**child's**  10:17

**children**  8:1,
12 9:5 14:24
15:13 16:20
39:2 49:22

**Children's**
8:10 9:5
16:8,20 24:6

**chose**  31:2

**chronicle**  32:7

**chronological**
21:13 23:1,
11,19 32:7
35:3 43:12
46:4,15
80:14

**chronologically**
21:6

**circumstances**
48:22 67:17
85:17

**citation**
31:21,25

**clinical**
19:10,11,13
27:13,22,23,
25 28:1,5
38:22 43:13
55:21 82:23
84:6

**clinically**
55:9

**close**  18:12
40:17

**clothes**  67:10

**cold**  42:15

**colleague**  24:6
50:4

**College**  6:10
7:9

**colloquially**
5:24

**comfort**  49:11

**comfortable**
49:5 58:18

**commanders**
8:25 9:16

**comment**  59:10

**commentary**
51:9

**commissure**
37:24 38:4,
10

**committee**  7:22
9:15

**committees**
9:18

**communicate**
47:9

**communicated**
51:24 67:18

**community**  13:1

**completed**
18:13

**completely**
12:15

**completion**
19:18

**component**  11:6

**composite**
50:25

**computer's**
70:9

**concern**  15:15,
16,19 60:23

**concerns**  15:21
20:15 45:21

**conclusion**
28:21 30:7

**condition**
13:12

**conference**
7:25 8:7,9,
12

**conferences**
10:1

**confined**  42:20

**consequences**
29:9 49:19

**considered**
16:22 36:17

**consistent**
77:15

**constitute**
13:22

**consult**  10:17,
21 17:14,18
35:6

**consultant**
8:24 9:15,17
10:16

**consultation**
8:14

**consulted**  14:2
17:17,22
28:9 68:25

**consults**  6:24

**content**  63:2

**continue**  37:14
60:20 84:22

**continued**  8:15

**continuing**
10:1 85:13

**continuously**
16:25

**contribute**
12:22 17:9

**copy**  51:3
85:5,6,9

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**                    Index: Cornell..Desert

Cornell   7:8

Corps   7:23
  9:16

correct   13:23
  14:8 15:15,
  19 22:4,9
  33:1,12
  35:7,24
  41:20 43:20
  47:7,8 49:19
  52:12 53:8,
  14,22 56:6,
  14,18 57:6,
  16,20 58:1,8
  60:5 61:12
  64:4,12 65:4
  67:23 69:22
  70:1,4,25
  71:9,10 73:7
  74:3 75:2,
  18,20 76:16,
  19,21 77:4,
  6,11,16,18
  78:5,22
  79:3,8,13,
  18,21 80:11
  82:4 83:2

correctly
  13:15 17:18
  29:5,10
  50:22 58:14

cosmetic   75:13

Counsel   4:11

counseled
  69:20

countenance
  71:19

counties   7:3,5

County   24:11
  69:3

couple   28:13

court   4:8,12
  5:17 6:1
  29:9 85:8,11

cover   7:3

covered   37:25

covering   53:21
  67:10

covers   7:4

crease   39:20
  63:23

criteria   67:8

critically
  30:9,17

crossed   58:7
  60:3

CSAM   45:22

Cum   7:11

curriculum
  11:10

cursor   66:9,
  12,13,19

customary
  73:16 76:21

cut   49:1

—————————
       **D**
—————————

D-U-L-L-Y   6:8

Danny   4:7

data   18:24
  62:18,24,25

database   58:19

date   4:6 68:9

dated   18:2

DCF   6:24
  10:17 11:11,
  17

deal   25:7

decade   26:19
  45:25

decide   15:22

decided   15:12

decision   32:17

decisions   14:7
  49:13

defendant   5:5

definition
  42:9

degree   65:10,
  16 80:10

delay   19:18

delays   19:21

deliver   6:19

demonstrative
  44:13 45:6
  65:20,23

dentition   62:5

department
  17:3

depend   54:6
  84:5

depends   54:16
  58:3 62:1
  83:3

depict   44:20
  52:11 64:9

depicted   21:20
  22:16 32:14
  46:15 47:15
  51:11 70:9,
  15 71:8

depiction
  22:20 44:18

depicts   28:23
  33:21 53:2

depilatories
  54:17

deposition   4:3
  5:4,9 60:21,
  25 61:1
  84:23 85:21,
  25 86:1

describe   6:2
  23:10 36:2
  42:2 52:11,
  14,23 78:9

descriptive
  41:4

Desert   8:16

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                     Index: designed..documents

designed   11:10
  19:8,13,17
  56:20,21

desktop   27:15

destroy   57:4

detecting
  29:22

detective   4:19
  17:22 47:12
  50:14 51:19,
  25 52:16
  68:3 78:22

detectives
  43:22

determination
  14:5,16 15:1
  32:10,13
  48:23 50:10
  54:24 65:7

determinations
  7:2

determine   13:5
  15:14 46:3,
  14 56:5,24
  57:19 58:6
  72:12

determining
  73:1

develop   29:22

developed   9:3
  37:12,14
  59:4

developing
  37:15

development
  20:8 36:9,24
  54:14 74:16
  77:22 80:3
  82:8,14,18,
  19,22 83:7,
  11,19,21
  84:1,12,15,
  19

developmental
  51:15 54:2
  81:14,16,25

deviations
  20:10

diagnose   84:7

diagnosis
  79:21

diagnostic
  14:5 83:1

diagrams   66:25

dial   45:9

Dick   45:17

Diego   8:7,10,
  18,19

difference
  21:14 39:2,
  18 40:7,11,
  13,15 58:16,
  25 66:23

differential
  79:21

difficult   5:21
  26:6 31:17
  32:3,4,5

40:20,21

digital   21:7
  22:7 34:11
  40:6,22
  46:25 64:19

digitally
  21:25 34:5
  79:7 80:3

direct   4:24
  11:13 24:22

direction
  35:16

directly   43:2

director   6:14,
  17 16:9 17:3

disagreed   45:8
  48:4,6

disagreement
  48:11

disclosed
  28:12

discounting
  30:13,16

discoverable
  25:12

discovered
  35:3

discussed
  45:24

discussion
  60:16

discussions
  69:16

disorder   82:12
  83:11

disorders   82:6

distill   14:25

distinction
  7:11 13:21
  21:18 38:24
  40:21 60:6
  64:3

distinguish
  40:2 59:6,21
  64:11,21
  65:3,10
  66:20

distinguishes
  40:4

distinguishing
  60:3

distribution
  60:5

division   17:4

doctor   12:6,24
  71:2 76:9
  78:25 79:20
  80:20 85:14

doctor/patient
  10:12,19

doctors   12:3

document   68:8

documented
  45:12

documents
  21:16

Case 3:24-cv-00044-JAR-SJH    Document 66-1    Filed 08/12/25    Page 31 of 47 PageID 503
**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**          Index: domestic..expose

domestic  9:17

dot  78:11

drastic  29:9

drawing  44:22

Duck  78:11

Duffy  85:21

Dully  4:4,17,
  20 5:1 6:8
  12:10 24:18
  30:4 45:11
  47:24 57:14
  59:16 60:17
  61:20 66:10
  76:24

duly  4:21

duty  7:18
  16:19 27:21

---

### E

e-mail  45:23

E-TRAN  85:7

E.U.  29:21

earlier  5:2
  44:25 54:11
  69:19

early  18:19
  19:19 41:9

earrings  53:3

edited  21:25
  72:14

Edition  27:9

education  10:1

Edward  7:12

effect  42:11
  80:19

effected  76:22

effects  42:18

effect  72:12

electrolysis
  55:23 56:13,
  25 72:17,21
  76:11 77:6,
  23 79:12

emergency  9:23

employ  20:18

employed  6:9

employer  16:4

end  13:9,10

enforcement
  6:25 10:18
  11:11,17
  23:16 24:5
  33:7,15 35:7
  47:10 50:14
  61:22 67:3,
  18

enlargement
  42:22

entails  15:3

entering  80:9

entire  29:25
  38:3 54:13

erred  84:18

eruption  62:6

essentially
  6:20

establish
  70:14

established
  74:25

estimate  21:6,
  9,10,20,21
  23:19 28:9

estrogen  42:8,
  11,18 82:7

evaluate  53:16

evaluated  81:9

evaluating
  40:16 60:2

evaluation
  24:6,10,16
  26:24 38:19

evaluations
  24:7

evidence  12:21
  79:7,13
  80:19

exam  14:25
  43:13

EXAMINATION
  4:24 10:7

examine  10:13

examiner  16:7,
  22

exhibit  31:13

45:3,7,12
  50:25 85:23

exist  13:4

expect  50:13

expensive
  76:11

experience
  14:22 17:13

expert  5:6
  15:6 26:1
  45:5 49:18
  56:5

expert's  31:9

expertise  13:5
  14:15 72:15,
  17,20 73:1

experts  6:24
  29:7

explain  33:14
  72:2 79:23
  83:2

explains  77:22

explanation
  43:23 48:10
  76:1,2,3,5
  77:1

explanations
  75:18 79:1,
  16

explicitly
  51:19

expose  53:6

exposed    42:7

exposure    82:7

external    36:17

eye    30:9,12

――――――――――――
F
――――――――――――

face    71:22

fact    11:22
  29:1 32:11,
  15

factor    36:9,11
  60:4

facts    60:1

factual    32:13

faculty    9:19

fair    13:3
  14:17 28:1
  34:19 47:20
  61:2,3 79:23

familiar    29:13
  31:15 56:13

Families    9:5
  16:21

family    8:22

fault    60:17

February    18:2,
  5 50:21
  57:15 68:6,
  13,14,15
  69:8

Fed    7:14

feet    53:4

fellowship
  9:6,25 19:6
  23:25 24:2

fellowships
  9:2

female    37:11
  41:11 43:13,
  18 53:3
  82:21

females    35:23,
  24 36:2 41:6
  45:12

fetus    42:11

field    9:8
  10:5

figure    69:6
  84:7

file    67:24
  78:10 81:7

files    48:21

fills    38:3

find    18:6
  29:20 30:3,5
  68:15

fine    28:15
  40:17 66:6,7
  85:1

finished    9:12,
  24 49:1,2,4

finishes    82:9

flat    42:13,14

floor    53:4
  57:24

Florida    6:10,
  15 7:5,20
  16:1,4

focus    40:17

fold    63:25
  64:1,2,16

follicles
  40:14 73:6,9

folliculitis
  73:3 74:14

follow    57:10

Forces    27:16,
  19

forensic    28:16
  29:7

form    10:12,25
  11:3,7,12,18
  12:4,9,18,25
  13:7,16,24
  14:9,19 15:8
  16:18 17:8,
  20 18:18
  19:3,9,15,25
  21:8 22:1,5,
  10,25 23:9,
  20,24 24:4
  26:4,13
  29:24 30:6,
  15,21,25
  31:3,23
  32:2,18,22
  33:9 34:6,
  13,25 35:11

38:21 39:7
40:8,12,23
41:13 43:14,
21 44:1
46:5,17
47:2,22
48:12,17
49:8,21
50:2,8 53:23
54:5,25
55:25 56:7,
25 57:7
58:2,9 59:9,
24 63:13
64:13,22
65:5,13
66:22 67:22
70:2,18
73:20 74:19,
23 75:8,19,
24 76:4,7,20
77:12,24
78:13,18,23
79:10,12,14,
25 80:4,12,
23 81:19
83:9 84:2,8

formal    19:4

format    7:25
  8:12

forming    20:23
  62:24

forward    48:23
  49:13 61:10

found    68:12

Friday    26:2

37:6

**front**   37:21
38:10 50:7
52:7 65:1

**full**   6:6

**fully**   37:12
59:3

**function**   19:23
20:3,5

**functioned**
8:23

**funded**   29:21

---

### G

**gave**   50:12
70:25

**general**   10:2
13:17 17:15
18:9 44:2
52:19 57:13
61:16 73:22
76:12,13

**generally**
36:25 44:24

**genital**   36:1,
8,24 51:15
54:2,15
71:23

**genitalia**   53:6

**genitals**   37:10
53:15 81:11

**Giddens**   26:21

**girl**   37:12

**girls**   26:23
42:12

**give**   30:18
33:2,8,15
34:1 35:2
36:7 37:4
41:25 43:23,
24 47:14
67:5 84:21

**giving**   75:6

**Global**   4:10

**globular**   43:8

**good**   4:2 10:9
27:6 33:18
80:21 81:22
82:10 84:22,
25 85:10

**grade**   37:9,
18,19 38:2,
3,14,15
41:19 42:3,4
43:13,18
59:1,7,8,22
60:4 64:11,
21 65:3,4,6,
11 66:12
82:21 83:6

**grade-**   37:9

**grades**   36:3,4
42:1

**graduated**   7:8,
10,12

**grandmothered**

10:5

**grappling**   14:7

**Greater**   82:4

**groom**   39:6

**groomed**   22:19
40:1 56:5,6
57:4

**grooming**
22:18,22
39:25 40:6
46:25 54:7,
9,19,20
56:14 73:18

**groove**   63:17,
18,23 64:2

**ground**   5:10

**group**   16:10

**grow**   41:7
73:4

**grows**   41:6

**growth**   73:11
75:2,3

**guess**   36:22
44:12 48:1
72:6 74:17
80:16 81:2

**guys**   66:4

---

### H

**H-E-B-E-R-T**
7:12

**hair**   20:13

22:4 36:5,8,
9,23 37:10,
15,16,19,22,
25 38:9,16
39:15,16
40:14 41:1,
6,12,18
54:15 55:1,
3,4,7,15,16,
17,18,24
56:1,2,25
57:1,2,3,6,8
58:7 59:1,2,
3,4 60:2,4
64:12 65:8
71:15,23
72:3,9,17,23
73:6,11
74:16 75:2,
3,12,13,16,
17 76:11
77:2,10,23
79:2,8,12,13
80:4,20
81:14,20
82:14,22
83:18,25
84:12,14

**hairs**   38:1
73:3

**half**   16:2
60:8 81:17

**hallway**   68:20

**hang**   24:18

**happened**   33:11

**happening**   83:2

happy    25:14, 21

hard    49:3

head    5:25  6:3 62:10  72:7

healed    73:9

hear    70:23

heard    28:17, 19

Hebert    7:12

height    62:11, 14,19

helpful    44:12, 15  60:6  63:2

helping    12:21

heritage    54:16

Herman    26:21

hesitate    5:15

highlights 81:4

hip    63:23

hire    6:20

hold    56:4 73:23

Holguin    4:8

home    12:8

Hong    26:25

hospital    7:17 8:10  9:6,13 16:8,11  69:3

hospitals 10:18

hour    60:8

human    38:18

hundred    65:14

Huseby    4:10

hymen    36:12, 20

hypothetical 58:24  59:15, 17  61:8,14, 15,18,21 63:9,10 71:12

hypothetically 59:19  75:25 77:19

———————————

**I**

———————————

idea    20:9 47:9

identify    20:10

II    36:5  37:17 42:6,10,21

III    36:5 37:18,19 42:6,10,24

illnesses 13:14

ima-    51:11

image    22:13 23:2,13,18

32:14 33:17, 20  35:1 40:16,22,24 44:19  45:6 46:16  47:16 49:15  52:12, 22,24  53:2 55:19,22 56:24  57:12, 13,21,23 58:3,4,5,13, 17,19,24 59:10,14,19, 25  61:15 62:2,25 64:8,20 66:21  67:9, 24,25  69:9 71:14  72:4, 8,13  74:9 75:25  77:18 78:3,4,16 79:2,6  80:4, 18,25  81:7,8

images    24:17 26:12  27:19 28:8  29:15 33:18,24 34:4,11,15, 16  35:15,23 37:1,4  40:10 46:3  47:13 52:7  61:9, 11,12,17 62:9,12,14, 16  69:12,14 70:9  71:9,13 81:2

imagine    38:20

impact    34:22

impossible 29:1  57:18 58:6  59:6 64:10,20 65:3

impression 26:3  34:3

imprinted    74:9

include    51:9

included 62:20,22

inconsistent 43:19

indication 35:2

individual 21:20  22:15, 24  47:15 48:9  51:21 72:21

individuals 21:6  40:19 70:15  71:8

infant    37:13 42:8

information 47:14  62:15, 16,19  67:25 70:8,10

informed    50:3, 4

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025

**inguinal** 39:19 57:25 58:5, 7,10 63:11, 12,18,25 64:1,15

**injuries** 13:13

**injury** 13:13

**instance** 20:11

**instruct** 24:24 25:6

**instructing** 25:16,17,19

**intend** 61:14, 19

**interacted** 23:15

**interface** 11:10

**interior** 37:24 64:20

**internal** 36:14,16

**international** 28:16

**internet** 23:23 32:15 34:4 46:3,16 66:21 78:4, 5,12,16

**internship** 7:16

**interrupted** 32:24

**introduce** 4:11

**introduced** 5:1

**inverted** 38:12

**investigate** 33:25 50:17

**investigated** 58:21

**investigation** 17:25 32:19 70:4,5,11 77:25

**investigations** 11:17 35:4 45:22

**investigators** 13:2

**involve** 38:15 82:7

**involves** 13:1

**involving** 38:5

**Iraq** 16:23

**irrespective** 46:24

**issue** 25:23 26:7 31:17 45:20 60:18

**Ithaca** 7:9

**IV** 36:5 38:2, 3,14,15,24, 25 40:2,4,7, 22 41:10 42:1,3,25 43:4,6,13,

16,18 44:23 45:13 53:14 54:2,4,12 58:16 59:1, 7,22 60:4 64:4,11,21 65:3,6,11 66:12,13,20 81:11,23 82:21 83:25 84:16

**J**

**Jacksonville** 6:11 7:20

**jail** 49:25

**January** 8:7

**jaundiced** 30:9,12

**job** 5:19 8:3 14:8 35:6 58:20 80:22

**John's** 69:2

**Johns** 17:22

**join** 22:11 38:6 47:3 70:3,19

**journal** 28:17, 18 30:11,16, 17 31:21

**journals** 27:11,12

**judge** 39:14 50:7,9,16

**jury** 50:10

**K**

**KASS** 53:23

**Kathleen** 4:4, 20 6:8 85:21

**kids** 11:21 13:18 20:14 33:23,24

**kind** 44:23 71:11 79:21 82:12

**knees** 53:5,7, 20,21 57:16, 23

**knew** 78:4

**knowing** 21:13

**knowledge** 26:9 27:1 68:21 72:19

**Kong** 26:25

**Krugman** 31:14 45:13,16,17, 18 47:19 48:11 54:12

**Krugman's** 45:8

**L**

**labia** 37:12, 20,23 38:4

**lace** 53:4

**lack** 77:22

**lafay**  41:21

**laptop**  52:22

**largely**  61:8

**larger**  44:24

**laser**  76:11

**lasted**  75:5

**late**  28:24

**Laude**  7:11

**law**  6:25 10:17 11:10, 17 23:15 24:5,20 25:2,5,14,21 29:9 33:6,14 35:7 47:10 50:13 61:22 67:3,18

**Lawshe**  4:5,15 17:19,25

**Lawshe's**  26:1

**lay**  55:5

**laying**  12:10

**leads**  35:12

**learn**  19:1

**learned**  8:2 17:24 19:1

**leave**  56:2,16 79:13

**Lee**  4:4

**left**  47:13 63:8

**legal**  11:6 30:11 32:10 49:19

**legs**  38:8,11 53:5,21 64:24

**letter**  18:5 45:11 51:2,9 52:23 73:24

**letters**  18:2 50:13 51:2 63:3 73:14

**level**  39:6,21 65:14 79:17

**levels**  9:21 13:8

**life**  12:2 54:13

**likelihood**  7:2

**limitation**  23:6,10 32:20

**limitations**  33:7 45:21 46:8 49:10 51:10,13 69:20 82:16

**Lisa**  4:9

**list**  45:20,23

**literature**  8:5 14:23

**Litigation**  4:10

**local**  35:13

**location**  39:16 64:14

**logistical**  60:18

**long**  15:25 21:2 23:15, 17 41:24 43:12 75:4

**longer**  37:21 42:14

**looked**  27:17 33:24 48:22 52:24

**lose**  49:22

**lot**  5:23 14:21 28:15 34:2,15,16 84:24

**loud**  29:6

**lower**  53:5

---

**M**

---

**m-e-d-i-a-l**  64:24

**M.D.**  4:20

**made**  8:19 24:2 35:15

**main**  63:1

**major**  32:20

**majora**  37:12, 23 38:4

**make**  17:9 22:8 27:23 32:10,13 33:3 40:21 54:24 72:12 74:3 85:17

**makes**  77:20 80:2

**making**  12:14 13:21 14:16 38:23 45:2 49:12 61:21 75:9

**male**  42:8

**maltreatment**  7:1 8:2,8 9:10,21 11:25

**manipulated**  72:13

**manipulation**  47:1

**Marine**  7:23 9:16

**mark**  31:12 45:4 50:24

**marked**  85:24

**Marshall**  18:22 26:17

**Mary**  6:8

**Maryland**  7:13

**material**  26:8 28:23 31:18

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**                    Index: Matt..moved

Matt  4:18
  60:23 61:2

matter  4:4

matters  49:11

mature  28:24
  29:4 84:20

maturity
  18:10,11,16,
  23 19:16,24
  20:19,22
  21:3,5
  26:12,20,22
  27:13 28:10
  33:22 35:21
  36:3,4,10
  41:8 42:7,10
  43:7,24
  59:23 60:5
  61:25 67:6,
  20 68:1
  71:16,17,24
  72:9 82:6

means  16:14
  44:12

meant  37:5

measures  24:20
  25:2,10

Med  7:14

media  4:3

medial  64:6,
  17,24 65:1
  66:24

medical  6:14,
  16,18 7:14

8:4,14,17,24
9:9,14,20
10:1,23 11:4
12:24 14:10
15:21 16:9
17:3 28:18
29:7 30:11,
17 55:14,20,
21 56:4
70:15 71:7
78:2,21,25
79:20

medical/legal
  11:2

medicine  6:11
  7:13 9:23
  15:7

meet  42:25
  43:22

meeting  52:15,
  18,20 69:8,
  11,16,17

meetings  68:8

meets  64:10

member  45:19,
  20

met  43:25
  44:3 52:17
  68:3,17,19

method  40:5

methods  61:24

Michael  4:14
  5:2 24:19

middle  18:12
  42:16 64:17

midline  41:21
  42:25

Mikayla  4:5

military  7:14,
  22 8:25 9:2
  16:19 27:16
  76:9,13,14,
  15,17,19
  83:10

mind  70:22

mindful  5:19

minor  32:15
  33:23

minute  52:8

mischaracterizat
ion  13:24
  20:1 31:3,23
  34:13 47:22
  56:7 76:7
  77:12 80:12
  84:2

mischaracterize
  55:8

misleading
  69:25

missing  12:15
  48:2 62:7

mixed  62:5

modalities
  22:4

modality  28:4

model  32:14
  34:24 41:11
  46:15,21
  51:11 57:15,
  19 58:7
  61:25 71:14
  73:14 76:19
  79:1,17
  81:18

models  22:3

modifications
  54:7

modified  35:15

monitor  19:17

mons  37:24
  38:5,9

month  28:12

months  28:13

moonlight
  16:14

moonlighted
  16:16

moonlighting
  16:22,24

morning  4:2

mound  42:23
  43:4,5,10

mounds  43:4,7

move  48:23
  49:13

moved  8:17
  9:13

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025          Index: multi-problem..palpable

multi-problem 8:22

multiple 22:4 69:12 79:1

**N**

naked 53:3

Nassau 24:11

Naval 7:16,19 8:17 9:13

Navy 7:23 8:6,9,17 9:4,12 16:3

necessarily 35:2 40:18 82:5 83:3,14

Nelson's 27:9 44:8

newborn 42:9

newborns 20:6 42:6

newspaper 50:4,5

Nick 58:19 78:6,9

night 26:15

nights 46:11

nipple 42:15, 20 43:6,9

nod 5:25 6:3

normal 12:2 20:7,10,11,

13,17 82:15, 16,21 83:12, 13

northeast 7:4

Nos 85:23

Noshney 26:18

notch 39:20 57:25 58:5, 8,11 63:11 64:1

nuance 48:2

number 4:5 34:7,8

numbers 34:17 63:3

**O**

O.JPG. 81:8

Oakland 7:17

oath 4:22 5:10

OB/GYN 9:22

Object 70:18

objected 12:17

objection 30:2 32:24 33:3 56:19

objections 12:14 56:3 77:17

obscure 57:24

obscured 58:5 67:15,16

observing 79:23

obvious 39:17 40:19 51:13

occasionally 62:15

occur 70:4,6

occurred 20:21

occurring 70:11

offered 8:9 77:8

offers 7:1

office 17:23 27:25 60:18

officer 50:14 67:3,18

officers 33:7, 15

official 85:13

online 26:12 29:23

opine 67:19

opinion 14:16 22:8,9,13, 14,21,23 23:6,11,12 32:16,17,21 33:15 34:23 48:6,7,8 49:10,18

50:1 51:10 53:10,13 55:5,6,13, 14,20 61:24 62:24 67:5 71:7 75:7 77:9,21 78:21 81:10

opinions 20:23 33:8 35:9 36:19 48:4, 15 49:5,23 50:6 69:20 70:1,14 80:9

opio- 73:14

opportunity 9:11 20:20 29:25 61:10

order 85:5

orders 85:3,4

original 26:17

originally 48:3

orthopedics 9:22

Outlook 68:9, 11

**P**

p.m. 85:22 86:2

pale 42:15

palpable 42:14

papilla   42:16
  43:6,9

paragraph   74:8
  81:6

parents   14:24
  20:16 49:22

part   11:9
  14:5 36:15
  37:24 49:25
  70:11,13
  75:14,16
  82:5

parted   53:6

partially
  81:10

participate
  17:5

parts   38:9
  39:16 43:17
  81:20

pass   10:6

passed   10:2
  14:21

passing   46:11

past   83:23

pasted   51:3

patient   10:12
  20:21 27:25
  40:9,13 46:9
  80:24

patients   10:11
  16:12 19:22

PDF   51:1

pediatric   7:15
  10:3 27:12
  44:8

pediatrician
  7:19 10:17,
  20 13:14,17
  14:13 16:7,
  17,21 19:20
  27:24 44:3

pediatricians
  17:12,13
  19:5 20:2,5
  24:7 29:14

pediatrics
  8:11 9:22
  10:8 11:5
  15:9,12
  27:3,10 28:7
  44:9

Pedo   31:18

pedo-
pornographic
  26:7 28:23

pelvis   38:6

pen   44:22

Pendleton   9:13

Penkacik   4:9

people   6:20
  8:24 9:7
  10:13 15:20
  30:3,4 39:5
  41:15,24
  49:4

percent   29:15
  43:15 65:14

perfectly
  25:11,12

period   73:8
  75:1

person   17:10
  32:10 33:16
  51:11 70:9
  71:19 72:2

person's   17:21
  43:2

perspective
  78:3

ph   26:18
  41:22

photograph
  21:21 22:7
  51:12 54:9
  67:21

photographs
  21:7,17,25
  27:4 28:3,4,
  10 60:19,22
  82:16 84:23

physical   8:21

physician
  76:13,16,17

physicians
  17:2

picture   64:8
  71:22 72:22
  73:2 78:9
  80:5 83:4

pictures   83:5

pin   35:20

pink   42:23
  43:10 53:3

pixilated   67:9

plainly   37:21
  81:12

plaintiff   4:15

plaintiff's
  50:24 85:23

point   45:14
  61:9 67:2
  84:22

points   11:20

policies   17:7
  24:16

ponography
  29:22

population
  26:23

pornographic
  21:7 23:18
  26:12 28:23
  29:14 31:18
  32:14 46:3,
  16 56:23
  66:20

pornography
  54:10 58:22

position   15:21
  25:14 53:5,7

positions   9:20

possession 68:7

possibility 46:25

Post 82:3

posterior 41:15,22

potentially 68:20 80:1 84:19

Practically 39:22

practice 10:22 11:20 24:15

precocious 82:17

predicate 21:4

pregnant 43:16

prepubescent 75:18,20 76:3

presence 59:2 75:12,13,15

present 12:21 43:13 54:12 55:4,19 57:3,8 73:21 83:24

presentation 64:12 65:4

presented 71:13

Preston 4:5,19 47:12 50:14 51:19,25 52:16 68:3

pretty 51:17

primary 10:20

primer 43:25

principles 61:16,23

print 28:15

printed 63:1

prior 13:25 19:25 20:1 31:4,24 34:14 47:23 56:8 76:8 77:13 80:13 84:3

privilege 25:8

probable 5:14 48:15 49:6 50:15

problems 6:19

procedure 75:13

procedures 17:7

process 14:6 73:6

produce 80:19

produced 42:18 71:6

Professional 8:11

progress 19:17

progressing 18:13

Project 29:21

prominent 69:6

proportion 62:8,10,19

propose 9:1

Protection 6:13,15,17, 22,23 7:4 10:10 27:17, 20

protruding 42:16

prove 33:22

proves 29:1

provide 13:5 25:13

provided 31:7, 21

pubertal 27:4 37:10 53:3 77:22 80:2 82:3,14,19, 22 83:7,18, 21,25

puberty 18:12, 13 19:18,19, 22 20:8,15 35:18 79:18

82:10

pubic 20:13 22:3 36:5,7, 9,23 37:14, 15,19,22,25 39:15,20,21 41:1,5,12,18 54:15 55:4 57:3,6 59:1, 21 60:2,4 64:12 65:8 67:14,16 71:15,23 72:3,8,22 73:11 74:15 75:2,12,13, 15,17 77:9, 22 79:2,7 80:20 81:13 82:22 84:11, 14

pubis 37:24 38:5,10

publication 26:19 27:3, 15

published 30:3 34:4 50:3

pull 50:20 65:20 74:1, 2,4

pulls 73:5

purported 14:15

purpose 11:16,

19

**purposes** 34:12

**pursue** 8:15

**put** 15:13 35:20 53:19 54:1,3 63:6

**putting** 17:14

---

**Q**

**qualified** 13:13

**quality** 33:19 66:23

**quantity** 65:7

**question** 5:12, 15,16,18 12:12,13,18 15:2,4 23:2, 16 24:21 25:18,20 32:12 33:12 38:22 41:25 42:5 46:10 47:24,25 50:11,12 51:8 55:10 59:15 72:25 75:11,14,16 77:8,20 80:16 81:16

**questions** 5:3, 11 18:9 24:23 44:4 58:23 59:12

60:20,24 61:7 71:12 81:3 84:25

**quick** 52:10 57:12

**quote** 50:15

---

**R**

**ra-** 82:1

**radiology** 9:22

**Rady** 9:5 16:8,20 24:6

**raised** 45:22 60:23

**range** 82:2

**rating** 18:10, 11,23 19:16, 24 20:19,22 21:3,5 26:12 27:13 33:22 35:22 36:4, 10 42:7,10 43:7,24 57:5 59:23 60:5 61:25 66:19 67:6,20 68:1 71:16,17,25 72:9 82:6,13 84:12,13

**ratings** 26:20 46:2,14

**re-ask** 32:12 71:4

**reached** 79:17

**read** 25:25 26:6 28:21, 22 29:4,6, 10,25 30:9, 12,14,17 31:10 52:25 81:9 85:11, 14,16

**readily** 36:17

**reading** 8:4

**real** 35:12 52:10

**reason** 19:23 24:24 71:15 72:6 73:13 76:18 77:9

**reasons** 25:6

**rec-** 68:4

**recall** 68:3,24 69:7,8,11,16

**received** 72:21

**recommendations** 17:10

**record** 6:7 12:11,14 52:14 60:11, 14,16 85:22

**recorded** 85:20

**records** 68:4

**red** 72:7

**redevelop** 42:19

**reference** 20:15 31:19 44:5,6

**referred** 18:14

**referring** 63:19

**refute** 77:25

**region** 7:23 36:8 59:21

**related** 52:23

**relationship** 10:12,19

**relevant** 24:23 25:1

**reliability** 26:11 34:23 65:10 80:10

**reliable** 22:9, 12,14,23 32:16 46:14 47:14 71:7

**reliably** 67:5, 19

**relied** 62:18 84:11

**remedial** 24:20 25:2,10

**remember** 19:5 46:6 48:4 52:15,17,18, 20 68:14 69:5

**removal** 55:24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
**Kathleen Dully, M.D. on 04/28/2025**          Index: remove..sexually

56:25 57:1,2 72:18 79:12 80:4

**remove** 22:3 79:7

**removes** 55:18

**render** 22:8

**rendered** 71:7

**rendering** 61:24

**rephrase** 5:13

**report** 15:20 26:1 31:9, 14,22 45:5, 8,9 50:22 62:20,22 63:6 74:6

**reported** 15:22

**reporter** 4:9, 12,21 5:17 6:2 85:8,11, 24

**reports** 71:6

**represent** 51:2

**representing** 4:18

**request** 61:22

**required** 15:14

**reschedule** 60:22,25

**research** 26:11

**reset** 61:1

**residency** 7:16

**resident** 8:3

**residents** 9:20

**respect** 81:13

**response** 6:1

**responsible** 13:1 17:6

**restate** 47:5

**result** 72:9

**results** 56:17

**retired** 16:23

**return** 16:23

**revert** 43:16

**review** 7:22 8:20 9:15,18 27:1 81:6

**reviewed** 27:7 35:24

**reviewing** 26:14

**reviews** 8:25

**Roberts** 4:14, 25 5:2 24:22 25:4,11,16, 23 30:1 37:8 45:4 61:13 65:25 66:6 74:5 84:21 85:2,4,12

**roughly** 41:14 45:1 59:4

**rule** 75:6

**rules** 5:10

**run** 83:1

**rundown** 41:25

**running** 66:19

---
### S
---

**San** 8:7,10, 18,19

**scheduled** 69:13

**school** 7:13,14

**Science** 28:16

**Sciences** 7:9

**scientific** 23:3 46:2,20 54:23 55:6, 12,14 61:23

**scientifically** 46:13 65:9

**Scott** 31:14 45:18

**screen** 28:11, 14 66:1 78:10,12

**script** 5:14 74:10

**scroll** 74:7

**search** 48:16

**section** 59:20

**seek** 48:16

**semantics** 76:23,25

**sense** 73:22

**sentence** 54:19

**separate** 43:5

**serve** 45:23

**served** 7:20 9:19

**serves** 45:20

**set** 61:23

**setting** 12:8 17:6 19:10, 11 27:13,22, 23,25 82:23 84:6

**sex** 16:7,21

**sexual** 8:21 18:10,11,15, 23 19:16,24 20:19,22 21:2,5 26:11,20,22 27:12 28:10 33:22 35:21 36:3,4,10 42:7,10 43:6,23 59:22 60:5 61:25 63:2 67:5,20 68:1 71:16,17,24 72:9 82:6 83:11

**sexually** 28:24

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                    Index: shape..speaking

29:4

**shape**  38:4,8
  41:11 43:8
  59:4

**share**  18:7
  28:11 31:12
  50:21 68:20
  74:6

**sharing**  53:11

**shaved**  39:3
  51:16 54:21
  55:2,13 59:2
  73:15,16,18,
  21 74:11
  76:10,12,13
  77:5

**shaving**  39:13,
  17 54:16
  55:18 56:9,
  14,17 72:16
  74:13

**Sheriff**  24:11

**Sheriff's**
  17:23

**Shevlin**  4:16
  10:25 11:3,
  7,12,18
  12:4,9,17,25
  13:7,16,24
  14:9,19 15:8
  16:18 17:8,
  20 18:18
  19:3,9,15,25
  21:8 22:1,5,
  10,25 23:9,

20,24 24:4,
18 25:1,9,
13,19 26:4,
13 29:24
30:6,15,21,
25 31:3,23
32:2,18,22
33:2,9 34:6,
13,25 35:11
37:5 38:21
39:7 40:8,
12,23 41:13
43:14,21
45:2 46:5,17
47:2,22
48:12,17
49:8,21 50:8
54:5,25
55:25 56:3,
7,19 57:7
58:2,9 59:9,
24 60:10
61:3,6 63:13
64:13,22
65:5,13
66:22 67:22
70:2,19
73:20 74:2,
19,23 75:8,
19,24 76:4,
7,20 77:12,
17,24 78:13,
18,23 79:10,
14,25 80:6,
12,23 81:19
83:9 84:2,8
85:1,6,16

**Shevlin's**
  60:18

**Shield**  8:17

**ships**  46:11

**shortly**  23:21

**shot**  78:10,12

**show**  44:4,6,
  10 58:24
  59:19

**showed**  52:22

**showing**  81:13

**shown**  30:8

**shows**  29:13
  67:25

**sic**  54:18
  68:18

**side**  38:11
  43:3 59:3
  66:4 84:18

**sign**  20:9

**significance**
  41:2

**significant**
  34:22

**signs**  17:11
  56:2

**similar**  51:5

**simple**  69:23

**single**  43:8
  69:8

**sir**  65:24

**sit**  10:6 18:4
  34:9 69:9

**sitting**  57:16,
  20,24

**size**  62:10,11

**skin**  73:6

**slowly**  9:3

**small**  42:13

**SMR**  18:15
  20:7,12
  23:18 37:17
  42:17,21
  45:13,21
  46:2,14,24
  53:14 54:2,
  4,12 57:5
  66:19 80:21
  81:11,13
  82:13 83:25
  84:12,16

**Society**  8:12

**socks**  53:4

**solely**  13:20

**solve**  6:19

**sort**  19:22
  23:22 26:20
  34:11 80:4

**sound**  27:11
  84:25

**sounds**  53:24

**speak**  5:20,24

**speaking**  30:2
  36:25 39:22

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025     Index: special..talking

special  24:1

specialist
  10:8  14:8

specialized
  9:2,11

specialty
  10:3,4  12:7
  13:15,20
  14:18  15:12
  16:10  17:1

specific  61:11

specifically
  14:14

spectrum  13:9,
  10

speculation
  12:4  19:15
  34:25  39:7
  48:12  55:25
  56:19  74:19,
  23  75:24
  76:20  80:6,
  23

spend  65:18

split  65:25
  66:1

spoken  70:23

spread  81:12

St  17:22  69:2

stage  27:4
  41:10  62:6

staging  18:15,
  20  19:2,23

27:12

standard  10:23
  27:8

standing  62:12

standpoint
  70:16

start  18:8
  19:22  24:2
  28:22  36:1

started  83:14

starting  73:4

starts  37:15
  42:18  82:8

state  6:6
  21:19  58:12

statement  13:3
  35:21  47:21
  49:12  74:12
  75:9

stating  18:11
  46:8  48:8

station  7:18,
  20

step  50:18

sternum  42:25

STEWART  44:1
  50:2

stop  11:21,24
  12:3,7,20
  30:1  53:11

stopped  12:1
  83:15

stopping  12:22

stops  12:23

straight  41:21

structure
  36:21

structures
  67:11,12

struggling
  21:18

studies  18:21

study  28:4
  29:1,13,21

studying  8:4

stuff  84:24

subcommittees
  8:21

subject  17:25

subjective
  38:19  65:7

subjects  7:11

subsequent
  24:19  25:2,
  10  85:24

Subsequently
  17:24

suggested  46:1

summarizes
  27:4

summary  61:2,4

supervise  6:18

supervision

9:7

supposed  41:7

surface  30:10
  64:6  65:1

surprise
  29:16,19

suspect  50:6

suspected  6:25
  9:9

swear  4:12

Switzerland
  26:24

sworn  4:21

syllables  32:8

synonymous
  18:17

———————

**T**

———————

tables  30:7

takes  42:12

talk  33:4
  35:23  37:2,5
  52:8  72:16

talked  57:14
  69:15

talking  12:24
  15:16  37:10
  40:9,10
  47:19  51:20,
  21,22  52:3
  58:11  61:9
  63:16  64:3,5

65:18 66:14 76:23,24

**Tanner** 18:14, 15,20,22 19:2,23 20:6,12 26:17

**Tanner's** 18:24

**Tanners** 27:12

**taught** 14:24

**teacher** 9:20

**team** 6:13,15, 17,22,23 7:4 8:24 10:10 17:5 69:2

**technically** 16:9

**teen-age** 20:16

**teenagers** 28:25

**teeth** 62:4,5, 6,7,19 67:23

**term** 16:13 37:13 63:16, 21 73:17 76:13

**terminated** 86:1

**terms** 8:13 18:16 21:15 35:22 36:23 59:22 72:10

**test** 15:3

19:7,14

**testified** 4:22 44:19 51:18 54:11 58:15 69:19 76:25

**testifying** 44:25

**testimony** 13:25 20:1 31:4,24 34:14 39:8, 10 47:23 48:5 56:8 76:8 77:13 80:13 82:20 84:3

**tests** 83:1

**textbook** 27:8, 9 44:8,14

**thelarche** 82:17

**theory** 53:20

**thereof** 19:18

**thicker** 38:16

**thickness** 38:19,25 39:3,15

**thigh** 39:6,12 41:15 57:25 58:8,15 59:5,20,21 60:3 64:9, 10,18,20,24

**thighs** 38:6,15 39:1,20,23 40:3 59:3 64:6,7,16,25 65:1 66:15, 16,24 81:12

**thing** 5:23 18:16 21:13 23:14 51:16 61:7 74:21

**things** 14:1,3, 4,22,23 15:20 17:14 54:17 79:22

**thought** 37:3 48:8

**time** 4:7 5:11 7:24 8:15 9:19 10:18, 21 15:13 17:22 24:9 25:19 26:10 27:20 29:16 52:16 55:9 56:10 60:12, 15,21 65:19 68:9 70:21 73:8 74:4 85:22

**times** 5:23 35:12 68:17

**tip** 78:6,9

**tissue** 42:24 43:5,11

**today** 5:3

17:16 18:4 69:9 81:5 82:20

**Today's** 4:6

**told** 47:13 51:18,19 67:3 78:7

**tool** 28:5

**top** 37:22 43:5,9

**touched** 72:14

**trafficked** 35:13

**trained** 12:6,7

**training** 7:6, 16,24 8:3, 14,20 9:21, 25 13:4 14:22

**transcript** 85:5,14

**transferred** 7:18

**transmit** 58:21

**treat** 13:12, 13

**treated** 83:6,8

**treating** 27:25 83:15

**treatments** 76:11

**triangle** 38:3,

7,13 41:1,3,
6,9,11
44:23,24
57:14,19
58:7 59:4

**true** 22:12,18
45:23

**tumor** 20:9

**turn** 35:14

**turned** 83:13

**type** 21:24
73:19

**typed** 52:25

**types** 24:17
56:14

---
**U**
---

**U.F.** 76:16

**uh-huh** 5:24
6:2

**un-huh** 6:2

**underlying**
84:5

**underscore**
81:8

**understand**
5:12,16 6:12
11:15 12:13,
16 13:15
14:13 15:4
17:17 19:24
23:4 44:21
47:24 48:14

50:22 52:6
55:16 59:13
63:5

**understanding**
73:5,23

**understood**
12:18 23:7

**undertake** 54:8

**undetectable**
22:22

**unfamiliar**
29:12

**ungroomed**
41:10

**unit** 8:22

**University**
6:10,15 7:9
16:1,3

**unscientific**
29:8 46:7

**update** 26:20

**upper** 64:7,9,
25

**utero** 42:8

---
**V**
---

**vaginal** 36:2

**vaguely** 52:21

**validity** 57:5

**variability**
20:7

**vellus** 37:16
38:1

**verbal** 5:25

**verbatim** 51:3

**verify** 77:25

**versus** 4:5
38:25 46:9
59:8 69:21

**VI** 36:6
41:19,22

**video** 85:3,4,
20

**view** 40:18
43:3 57:25
67:13 81:22

**violence** 9:17,
18

**visible** 36:18
37:22 56:2
62:12 71:24
79:13 81:10,
12

**visit** 68:14,
15

**visual** 44:18
80:19

**vital** 67:10,
12

**vivid** 69:18

**vocabulary**
76:21

---
**W**
---

**Wait** 24:18

**waive** 85:11

**wall** 43:11
63:22 64:9,
15

**wanted** 29:19,
23 30:3,5

**warrant** 48:16

**wax** 80:21

**waxed** 56:25
73:2,15
74:18,21
75:4,7,23
76:6,10
77:2,16

**waxing** 39:24
54:17 55:23
56:12 72:25
73:5 74:22
75:1,9 76:10
77:23 79:11
80:18

**ways** 29:22
47:18

**wearing** 53:3

**website** 78:17

**week** 30:24
31:10

**well-known**
45:11

**whiskers** 39:4,

**WILLIAM LEE LAWSHE vs MIKAYLA PRESTON, ET AL.**
Kathleen Dully, M.D. on 04/28/2025                        Index: white..Zoom

14,17,25
40:3

**white** 53:4
74:9

**widely** 23:23
81:12

**wider** 38:11

**William** 4:4

**witnesses** 5:22

**women** 28:24,
25 29:15
43:15 54:12
76:10

**wood** 53:4

**word** 52:3,4,
19

**words** 51:4

**work** 6:12
16:6,19,25
17:2 26:21
28:2,3

**worked** 16:10

**working** 9:8

**worried** 20:17

**write** 6:4

**writes** 17:11

**writing** 17:14
52:1,2

**wrong** 25:21
29:15 42:5

**wrote** 30:5
50:13

—————————
**Y**
—————————

**YCBLVVFQ** 81:8

**year** 8:16 9:6
20:11 24:13

**years** 7:21
8:13 9:8
14:23 16:2
17:13 18:23
21:15 25:24
26:21 28:25
37:1 42:13
54:3 76:16
77:10 81:15,
17 82:4

**years-old** 84:1

**York** 7:10

**young** 62:8,9
76:9

—————————
**Z**
—————————

**Zoom** 49:3