**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

     Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

     Defendants.

_____/

REMOTE DEPOSITION OF EUGINE TOLBERT

Taken on Behalf of the Plaintiff

DATE TAKEN:   Tuesday, December 17, 2024
TIME:         1:01 p.m. - 2:47 p.m.
PLACE:        Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 2

APPEARANCES:
Counsel for Plaintiff:

        MICHAEL K. ROBERTS, ESQUIRE
        LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
        NOWICKI
        1680 Emerson Street
        Jacksonville, Florida 32207
        mroberts@nrhnlaw.com
Counsel for Defendants, Robert Hardwick and Mikayla Preston:

        MATTHEW JOSEPH CARSON, ESQUIRE
        SNIFFEN & SPELLMAN, P.A.
        123 Monroe Street
        Tallahassee, Florida 32301-1509
        mcarson@sniffenlaw.com

Counsel for Defendant, Kathleen Dully:
        AMY K. SHEVLIN, ESQUIRE
        BUCHANAN & BUCHANAN, P.A.
        1900 Southeast 18th Avenue, Suite 300
        Ocala, Florida 34471-8237
        ashevlin@rbtrial.com

Page 3

                I N D E X
REMOTE ZOOM DEPOSITION OF EUGINE TOLBERT

DIRECT EXAMINATION BY MR. ROBERTS:              4

CROSS EXAMINATION BY MS. SHEVLIN:              72

REDIRECT EXAMINATION BY MR. ROBERTS:          82

                E X H I B I T S

Plaintiff's Ex. No. 1  CyberTipline Report     49

Plaintiff's Ex. No. 2  4-5-23 Letter           59

Plaintiff's Ex. No. 3  Photo ID                65

Page 4

                PROCEEDINGS
Whereupon,
        EUGINE TOLBERT, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:
        THE WITNESS:  I do.
                DIRECT EXAMINATION
BY MR. ROBERTS:
        Q.   Good afternoon, Detective.  Is it detective?  I saw -- are you sergeant detective or detective?
        A.   Yeah, detective sergeant.  Call me anything, just don't call me late for dinner.
        Q.   It won't be the worst thing you've been called, right?
        Okay.  So Detective, I introduced myself just before we got on to the record.  My name is Michael Roberts.  I'm here to take your deposition today.  I understand that you have had your deposition taken before, so I won't go through the -- the kind of ground rules and procedure stuff with you.
        We're here about a case, it's a -- my client is a guy named William Lee Lawshe.  Are you familiar with the investigation or the prosecution of Mr. Lawshe for allegations of possession of child pornography?
        A.   Can you hear me?

Page 5

        I am.
        Q.   You are.  Okay.
        A.   Yes, sir.
        Q.   Yeah, sorry.
        So first of all, tell me, what -- what's your -- your title, your job title, as we sit here today?
        A.   So currently I'm of two sergeants assigned to supervise the major crimes unit at the St. Johns County Sheriff's Office.
        Q.   And what was your -- your job back in the beginning of 2023?
        A.   When this case was going?  Are you referring to when this case --
        Q.   Yeah.
        A.   -- was going on?
        Q.   Yes.
        A.   I was in -- I was in transition at that point.  I was transitioning as the supervisor of the Internet Crimes Against Children Unit, ICAC, transitioning back to major crimes unit.
        Q.   So how long were you -- I think you -- were you the supervisor of the ICAC unit --
        A.   Yeah.
        Q.   -- back at that time?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 6

A.   Yes.

Q.   And how long had you done that?  And just give me kind of the timeframe of when you were the supervisor of the ICAC unit.

A.   About two years.

Q.   And prior to that two years, so I'm guessing '21 to '23 timeframe, you were the ICAC supervisor?

A.   Correct.

Q.   Prior to that, it sounds like you were in the major crimes unit at that time, too?

A.   Correct, prior to.  So I was -- I was a patrol deputy from 2001 to 2009, if this makes it easy.

Q.   Yeah.

A.   2009 I came to investigations in what was then referred to as robbery/homicide is now referred to as major crimes, so it's changed its name.  I was there for ten and-a-half years as a homicide detective.  While I was there, I got promoted to sergeant in 2018 and supervised that unit for two additional years.  And then in 2020, I rotated back to patrol.  I did just a little over a year in patrol.  In '21 I transitioned to ICAC as a supervisor of ICAC.  I was there for about two years, and then I transitioned back to the supervisor of major crimes because the other sergeant retired.

Page 7

Q.   So can you just describe for me what your involvement in the investigation of Mr. Lawshe's case was?

A.   Yeah.  So as the ICAC supervisor, I reviewed -- received and reviewed the cyber tips that were sent to our agency through the North Florida ICAC task force.  And I assigned tips out to detectives for follow-up investigation and then general supervision of the investigation.

Q.   In this case, did -- were you the lead investigator investigating Mr. Lawshe's case?

A.   I was not, no.  I assigned it to a detective.

Q.   Now, I understand you assigned it to Detective Preston; is that correct?

A.   Yes, correct.

Q.   And she was the detective in the ICAC unit at St. Johns County Sheriff's Office?

A.   She was, yes.  She still is.

Q.   Is there any particular reason that you assigned this case to Detective Preston?

A.   It was her turn in the barrel.

Q.   So let me ask you this.  I just want to understand your -- your process of dealing with the -- the -- the cyber tips.  That's what we're talking about, correct?

Page 8

A.   Yes.

Q.   We just had a deposition with Mr. Greene or Detective Greene, and we talked about National Centers for Missing & Exploited Children.  That's what we're -- you understand that's what I'm referring to when I say "NCMEC"?

A.   Yes.

Q.   All right.  And do you, when you get the cyber tip -- and we're talking about in the timeframe, let's just say first quarter of 2023, do you refer every cyber tip to an investigator or detective for what you say, further follow-up investigation?

A.   No.

Q.   Did you cull out any cyber tips prior to assigning them to the detectives?

A.   When you say "call out," I'm not quite sure what you mean by that.

Q.   Yeah.  So cull, my grandmother used to cull things, but --

A.   Oh, I'm sorry, cull.  I thought you said "call."  I apologize.

Q.   No, no, cull.

A.   Yeah.  So not all tips are -- have enough information for a follow-up investigation.

Q.   Uh-huh.

Page 9

A.   So instead of just drowning the detectives in tips that don't go anywhere, at the supervisor level, we tend to try to triage those to a certain extent for tips that are actionable.

Q.   Okay.  And what makes a tip actionable?  Is it like an identifiable suspect that you can -- you can locate?

A.   Those are great tips, sure.  Yeah, if -- if we know who the bad guy is when the tip comes in, that's -- that's a great start.

Q.   Okay.  Do you evaluate whether or not the particular image is or is not of a minor at the time that you're assigning these tips?

A.   Yes.

Q.   And tell me, how do you do that?

A.   Just based on kind of a common sense approach.  If it looks like a duck and walks like a duck, then we call it a duck.

Q.   So we were talking to Detective Greene, and he described something called age-difficult as a category.  Are you familiar with that?

A.   I don't know that it's a category, more of a description, but, yes, I understand what you're referring to.

Q.   What do you understand that term to mean?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 10

A. So for instance, in -- in -- and I don't want to get ahead of you, but I think I'm answering your question. But in Mr. Lawshe's case, we received two separate tips on Mr. Lawshe. One of those images I did not assign out because I deemed it to be age-difficult. The second image that we received, I did assign out because I deemed it to be decent.

Q. Okay. Is it sometimes that investigators in your office disagree about what is age-difficult or what is CSAM?

A. I wouldn't say we have a deliberate conversation about it. I can't really remember a time that there was a delineated disagreement. I suppose it's possible that there would be a disagreement, but I just don't remember a time when someone said, No, I don't agree with you.

Q. Okay. Would you -- if something was age-difficult, I mean, do you ever investigate age-difficult images?

A. We do, yes.

Q. Yeah. So do you recall whether or not the images involved in Mr. Lawshe's case were age-difficult?

A. So the initial tip that did not get assigned out, I did deem that to be age-difficult. The second

Page 11

tip that we received in Mr. Lawshe's case, we felt like it was CSAM, but we inquired about a second opinion.

Q. And the reason I ask is, I asked Detective Greene, and in his opinion, all of the images on Mr. Lawshe's phone were age-difficult. Is that just you guys disagree about that, or some people have a different definition of what age-difficult means?

A. No. So I think it's really based on the personal experience in kind of -- so I have two daughters, obviously, you know, there is a point of reference there. Everybody might not have that point of reference when, you know, reviewing these things. I don't know what Detective Greene's point of reference is, so I can't speak to that. But from my point of reference, I felt that it was an actionable tip. But as I said, we did seek a second opinion through Dr. Dully at the Child Protection Team.

Q. Did you communicate to Detective Preston at the time that you communicated the tip that you felt like the image -- image constituted child sexual abuse material?

A. Yes.

Q. Did you ask her to investigate that?

A. Yes.

Q. And -- all right. Were you a part of the

Page 12

investigation?

A. So as far as the -- I went with Detective Preston to see Dr. Dully when we presented the images to the doctor.

Q. Okay.

A. It was more of a -- kind of a let's just get it done and take care of this kind of deal as opposed to kind of holding her hand, so to speak. But that's just kind of how it worked out. It wasn't really that, you know, I had any skin in the game. I just kind of tagged along.

Q. So you went with Detective Preston to the meeting with Dr. Dully?

A. Correct.

Q. All right. I want to -- I'll ask you some more detailed questions about that in a minute.

So other than, you know, the fact that you have two daughters, what training do you have in determining if a particular individual displayed on a -- a photograph is, let's say, the difference between 17 and 18 years old?

A. I don't know that we would get into those leads in an investigation. By that point, you're -- you're kind of past puberty, and those are going to be very difficult images to kind of hash out, between a 17

Page 13

and 18 year old, unless we have some kind of specific information to the identity of the child. So that's probably not a scenario that we would be involved with.

Q. So you say "puberty." What do you mean by that?

A. So I mean, everybody hits puberty a little differently, but it's generally the development of -- like for females it's generally the development of breast buds, you know, body hair, things like that.

Q. And so generally it was y'all's practice if someone had developed pubic hair that you would not get into those weeds as to whether or not this was a 17 or 18 year old?

A. Not -- not in so many words. That might be something that we took the CPT if we -- if we felt a certain way about it, and we felt like that, you know, it presented as CSAM, we might get a second opinion from CPT, and that's what we did in this case.

Q. Yeah, I'm not trying to put words in your -- in your mouth. You said, you know, if someone is experiencing puberty -- I'm trying to understand what training. The original question I asked was, What training do you have to distinguish whether someone is 16, 17, 18, 19, what training do you have to make that determination, other than you have two daughters?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 14

A.   Just me being on this earth for 48 years.  So there's -- there's not a class that I have taken. There's not a seminar that I have attended that says that this person is 16 versus this person is 17, so...

Q.   So you have no specialized training or knowledge in understanding -- in -- in estimating someone's age other than what we all have, just living on the earth?

A.   Yeah, I mean, generally speaking, you know, as a layperson, if you're out in public, you can generally look at a person, even an adult, and approximate their age.  And that's just based on, you know, your interaction with society, things that you have experienced in your lifetime, you're drawing on all those things, you know, as it is generally termed law enforcement training experience, you know, that personal experience in life weighs heavily in that as well.  So...

Q.   Right.  And -- but I'm just a lawyer, and I'm trying to be, you know -- you have all of that life experience, but you don't have any specialized training; you haven't taken classes or been educated on estimating someone's age in this regard?

A.   So, no.  But like I said before, I don't know how to better answer your question, so, you know, if

Page 15

you look at a duck, you can usually tell a duck is a duck.  I don't mean to be facetious, but this is the best way I can explain it.  So if you have a question as to, you know, any further detail, then you might need to dig deeper.  And that's what we did in this scenario when we reached out to Dr. Dully and the CPT team.  So obviously Dr. Dully has a medical background. She has specialized training and things like that.  She has references she can refer to as far as literature to give us a better estimate of age.  But it's really just kind of a, you know, this one looks like this and this one looks like that initial assessment of the case.

Q.   Okay.  So does the fact that you took the image to Dr. Duly mean that there was some question about the -- the model's age?

A.   No.  So if we didn't feel like it could be CSAM, we wouldn't have taken it to Dr. Dully to begin with.  So as I said, in -- in Mr. Lawshe's case, we got two tips.  The first tip we deemed not -- to not be actionable right off the bat.  We did not take that to Dr. Dully.  I just closed that tip out.  The second tip I felt like was actionable.  We took that tip to Dr. Dully.  Dr. Dully agreed that it appeared to be a child, and then we went forward with the investigation from there.

Page 16

Q.   Yeah, and I -- and I -- so I'm just -- I'm trying to understand.  So sometimes you don't take images to Dr. Dully, correct?

A.   That's correct.

Q.   If something is obviously a child, you -- you don't take it to -- to Dr. Dully, correct?

A.   Correct.

Q.   And that's what I'm trying to understand is, in this case, doesn't it say that this was not obviously a minor because you took it to Dr. Dully?

A.   I mean, I don't know how to better answer your question.  I felt it was a minor when I reviewed the tip.  And, you know, to be fair, if we had taken it to Dr. Dully and Dr. Dully said, No, this is not a minor, then we would have went with what Dr. Dully said.  You know what I mean?  But on face value when I reviewed the tip, when I received the tip, I believed the image to be of a minor.  I assigned it to Detective Preston.

Q.   Right.

A.   And we took the image to Dr. Dully for a second opinion.

Q.   For a second opinion.  Okay.

A.   So I don't have a better answer than that.

Q.   Well, really, and you just keep answering the

Page 17

best you can.  Okay?

A.   Sure.

Q.   But -- but when you say you believed that this was a child, it -- it wasn't obviously a child, though, was it?

A.   So I can tell you this.  And I will give you a scenario.  If I --

Q.   I really just want you to answer the question, really.  I mean, it wasn't obviously a child. You wouldn't have taken it to Dr. Dully if it was obviously a child, would you?

A.   Well, it obviously wasn't a two year old, so I believed it to be an early teen child.

Q.   And if someone would have told you, no, this -- this is an 18 year old, you would have believed that too?

A.   If someone who had the expertise to give that opinion, then, yeah.

Q.   What if someone had a copy of her ID and said here's her ID, she's 18, would you have believed that?

A.   Oh, absolutely.  Yes.

Q.   Okay.  All right.  Okay.
   But I guess what I'm saying is, is the type and quality of imaging that we're -- that the model is, it's not something that you would look at and say

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

there's no way this person is 18 years old, correct?

A.   Well, I don't know that there is -- I kind of learned my lesson about absolutes in law enforcement.

Q.   Sure.

A.   So I -- I -- I don't know that there's really a scenario that I would want to submit to an absolute like that.

Q.   Right.  But you would accept either Dr. Dully's opinion that this particular model was 18, and you would accept that the model was 18 if she had said that it was 18?

A.   Absolutely, yes.

Q.   And if someone produced a photograph of an ID and said, Hey, she was 18 at the time of the photograph, you would have also accepted that as being she was 18?

MS. SHEVLIN:  Form.

THE WITNESS:  Considering the source, but, yes.

BY MR. ROBERTS:

Q.   Yeah, generally speaking, yes, right?

A.   Correct.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q.   So would you just agree with me, because, I

mean, I have the same life experience that you do, is, sometimes it is difficult to tell whether or not somebody is 16 or 19 years old?

A.   I agree.

Q.   Yeah.  Kind of seems like the older I get the harder it is to look at someone and say, Oh, no, that person's in college or that person -- is that your experience?

MS. SHEVLIN:  Form.

THE WITNESS:  Do I hear something in the background?  I'm not sure if it's --

MR. ROBERTS:  Someone is objecting.  Someone is just objecting for the record.

MS. SHEVLIN:  You may hear objections from time to time.

THE WITNESS:  I'm only hearing a blip, and I can't quit make out what it is.  I apologize.

MS. SHEVLIN:  It's just me objecting to form. You can ignore me.  It's just for the record.

THE WITNESS:  No problem.  No problem.

MR. CARSON:  If we could, for just -- if we could, for just a second, I -- I objected to the form of a question a few minutes ago, and I wasn't sure, I didn't see the green border of my Zoom window light up, so, Madam Court Reporter, could

you confirm that you can -- you can hear me object to the form previously?

THE COURT REPORTER:  I did not hear anything from you previously, and the green light didn't show up on my end.  So maybe if they pause a little bit, it will get it.

MR. CARSON:  Yeah, Sergeant Tolbert, if you don't mind making sure you just give us one second between the end of Mr. Roberts' question and you starting your answer, and that will allow Ms. Shevlin and myself to object to the form, if we deem it appropriate.  And you can still answer, if you can.  All right?

THE WITNESS:  Absolutely.

MR. CARSON:  Thank you, sir.

BY MR. ROBERTS:

Q.   So, I want to just kind of go through some -- some basic -- and I -- I'm not trying to -- I know you're a professional, and you do this for a living or you have done the ICAC investigation for a living, but I just want to just kind of confirm some things.  I'm a lawyer, that's my job.  Do you understand?

A.   No problem.

Q.   The private possession of adult pornography images is legal and protected by the Constitution of

the United States.  Do you agree with that statement?

A.   Yes.

Q.   And at the time of this investigation, that right was well-established, and you were aware of it?

A.   Yes.

Q.   You understand what probable cause means?

A.   I do.

Q.   What do you understand the term "probable cause" to mean?

A.   The facts and circumstances that would lead one to believe that a circumstance probably occurred.

Q.   Okay.  And in terms of probable cause that a crime was committed, can you tell me what that means?

A.   Facts and circumstances that would lead you to believe that circumstances or crimes probably occurred.

Q.   And you understood at the time of this investigation that the Constitution of the United States required a finding of probable cause prior to issuing a search warrant in this case?

A.   Correct.

Q.   And you also understood that the Constitution of the United States required a finding of probable cause prior to effectuating an arrest?

A.   Correct.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 22

Q.   Those rights and the requirement of probable cause were long established, and you were aware of them at the time of this investigation?

A.   Correct.

Q.   Okay.  You are familiar with Florida Statute Section 827.071, Subsection 5, which is the possession of child sexual abuse material statute?  Are you familiar with that statute?

A.   I have read it before.  I couldn't quote it to you.

Q.   You have -- you have arrested people based on that statute before?

A.   I have been involved in investigations based on that statute before.

Q.   I'm just going to read the statute and see if that -- if it purports with your recollection.  Okay?

        "It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction or other presentation which in whole or in part he or she knows to include any sexual conduct by a child."  Does that sound like the statute that you're familiar with?

A.   Yes.

        MR. CARSON:  I'm going to object to form.

Page 23

        MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q.   Do you understand and did you understand at the time of this investigation that Florida law required Mr. Lawshe to know that the images in his possession contained images of a child?

A.   Yes.

Q.   So in order to believe that an individual has committed the crime of possession of child pornography in Florida, the officer would have to believe that the person knew that the image in their possession depicted a child, correct?

A.   Correct.

        MR. CARSON:  Object to form.

        MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q.   The opposite of that is true as well.  If the law enforcement officer had reason to believe that the suspect believed that the image depicted an adult, then there would not be probable cause to believe that the suspect had committed the crime of possession of child sexual abuse material?

        MS. SHEVLIN:  Form.

        MR. CARSON:  Object to form.

        THE WITNESS:  I'm sorry, was that a question?

Page 24

I thought you were just making a statement.

BY MR. ROBERTS:

Q.   No, it's a question.

A.   I apologize.  I'm sorry, can you repeat it?

Q.   Yeah.  If -- and that usually signifies the question, "if."  If a law enforcement officer had reason to believe that the suspect believed the image depicted an adult, then there would not be probable cause to believe that the suspect had committed the crime of possession of child sexual abuse material?

        MR. CARSON:  Object to form.

        MS. SHEVLIN:  Join.

        THE WITNESS:  Generally speaking, yes.

BY MR. ROBERTS:

Q.   You would agree that it is important to understand the context in which an image is published to understand what the suspect may or may not have believed at the time that they possessed the image?

A.   I'm not quite sure what you mean by "context."

Q.   Do you not understand the word "context"?

A.   I do.  I just don't know what you're -- what you're referring to by context.  You mean like by the means, like be it the internet or -- I'm not quite following what you mean by that.

Page 25

Q.   So like a picture of a naked baby that a mom has taken of her own child in a bathtub, probably not possession of child sexual abuse material?

A.   I think it could be innocently possessed, but I -- I think it could be innocently possessed, but I think that could also be a criminal situation.  I think it really depends on what the circumstances are.

Q.   I mean, did -- you have two daughters.  I mean, I have kids.  I mean, sometimes my wife will take pictures, and my kids are naked in the pictures.  I'm not committing a crime of possession of child sexual abuse material, am I?

        MS. SHEVLIN:  Form.

        THE WITNESS:  So in -- in that context, to use your words, no.

BY MR. ROBERTS:

Q.   Okay.  So the -- but if someone else was trading or selling it on the dark web, that very well may be, that same image very well may constitute a crime of possession of child sexual abuse material, correct?

A.   Correct.  And that's kind of what I was getting at, is just because the image itself being innocent doesn't necessarily mean that it is innocent.  So the context is important in that scenario.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 26

Q.   Right.  You also agree that if an image such as the one that Mr. Lawshe was viewing was available on a public website with a disclaimer that the model was verified to be an adult, that would be an important context to consider before making a probable cause determination?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Well, I -- I think generally, yes, but I don't know what website that image was posted to, so there is -- I just don't have that information listed here, so...

BY MR. ROBERTS:

Q.   Okay.  And I understand you were not intimately involved with the investigation of this image, correct?

A.   Correct.

Q.   Right.  You, as we sit here today, don't recall having the information of what website it was published on?

A.   I do believe there was a watermark on the photo for Metart, if memory serves me correctly.  I don't want to get my wires crossed, but I don't know what website that that image was received from.

Q.   Okay.  Did you ever investigate -- did you

Page 27

personally ever go to that website to see the context and the disclaimers in which that image was published?

A.   No.

Q.   Did you go to any website where any of the images that Mr. Lawshe was charged with were published on the internet?

A.   No.

Q.   Are you aware today that -- that all three of the images were published on the public internet?

A.   No, I'm not.

Q.   Have you ever seen photographs of these two models with their IDs, pictures of holding their IDs?

A.   I have not.

Q.   You have not.  Okay.  All right.  Are you aware of whether or not Detective Preston ever visited metart.com or any other website to investigate the context in which these images were published?

I didn't hear your answer.  I'm sorry.

THE COURT REPORTER:  I didn't either.

THE WITNESS:  I almost wonder if we need to take just two minutes and let me swap this microphone, if you're having a really hard time.  I'm leaning into the microphone, and if you still can't hear me, I don't know what else I can do.  Can we just hit pause for like a minute, and I'll

Page 28

just --

MR. ROBERTS:  Absolutely.

THE WITNESS:  I'll pop out and go on my laptop.

MR. ROBERTS:  Absolutely.

(Off record)

THE WITNESS:  I'm not aware of that, no.

BY MR. ROBERTS:

Q.   So you indicated that you went with Detective Dully to -- I'm sorry, Detective Preston to Dr. Dully's office, and you participated in that meeting.  Other than that, what else, if anything, did you do in this investigation?

A.   I reviewed a search warrant for the -- I think it was Synchronoss.  Hang on a second.  I've got the case file right here.  Is Synchronoss correct?

Q.   Yeah, that's right, Verizon --

A.   Yeah.

Q.   -- Synchronoss, or something like that.

A.   Yeah.  So I reviewed the search warrant for Synchronoss, and I participated in the ruse when Lee came into the sheriff's office and was interviewed.

Q.   Did you -- did you reach out to Mr. Lawshe to get him to come in to the office?

A.   I did, yes.

Page 29

Q.   Did you know Mr. Lawshe?

A.   Professionally because of a prior investigation, yes.

Q.   Tell me about what you knew of Mr. Lawshe before this.

A.   So back in 2013 I was working a homicide case, and Mr. Lawshe was working for FWC at the time, and he participated in a search out in the Flagler Estates area in the southwest corner of our county, and he actually located the remains of our homicide victim.

Q.   Did you form any impressions about him as a law enforcement officer during that interaction?

A.   No, not really.  So I mean, we didn't know each other intimately, like we didn't hang out on the weekends, drink beer together or anything like that.  I didn't know anything about him.  That was really my only interaction with him.

Q.   When did you first learn that this investigation that we're here talking about involved Mr. Lawshe?

A.   When I opened the cyber tip.

Q.   You knew that that cyber tip involved a law enforcement officer, local law enforcement officer at that moment?

A.   I did.  I recognized his name.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 30

Q.   Did you communicate that information to Detective Preston?

A.   I did.

Q.   So the entire time she investigated this case, she was aware that Mr. Lawshe was a law enforcement officer?

A.   Yes.

Q.   Okay.  So you participated in the interview. I understand that his supervisor at FWC had been informed about this investigation prior to him being brought in or the arrest.  First of all, do you know who informed his supervisor at FWC of this investigation?

A.   Captain Bill Werle.

Q.   And that's -- that's the St. Johns County Sheriff's officer?  And you said Werle; is that correct?

A.   Yeah.  It's W-E-R-L-E.  His first name is William.  He goes by Bill.

Q.   And how did Mr. Werle find out about this investigation?

A.   He's the captain of criminal investigations at the Sheriff's office.

Q.   I mean, does he know about every criminal investigation, or did someone bring this to him saying

Page 31

that this was a law enforcement officer?

A.   Both.  So he is the chain of command for criminal investigations.  So any large scale investigation or any sensitive investigation, like in this situation involving a law enforcement officer, he would be briefed on.

Q.   This was a -- you considered this a sensitive investigation?

A.   Yes.

Q.   Is the only reason that he was a law enforcement officer --

A.   I --

Q.   I'm just trying to say, are all -- are all investigations of CSAM sensitive, or is it just the fact that he was a law enforcement officer that made this particular investigation sensitive?

A.   No.  All investigations are sensitive, but this one, like, it adds a little bit more to it by the fact that he's a law enforcement officer.

Q.   Was this investigation treated any differently because Mr. Lawshe was a law enforcement officer?

A.   Other than who had access to the information being limited, no.

Q.   Nothing was done or not done in the

Page 32

investigation because he was a law enforcement officer?

A.   Well, I would say that the contact with his agency was done because he was a law enforcement officer, but I -- I wasn't party to that.  I just know it happened.

Q.   I understand that media was contacted upon his arrest.  Do you know how they were contacted?

A.   I'm not positive that the sheriff's office contacted the media.  If I remember correctly, and I could be mistaken because we're going back in time a little bit, I believe that media contacted us because someone had saw his name and recognized his name on the booking log, and then a release was made after that.

Q.   Were you involved with that at all?

A.   No.

Q.   Okay.  So you were part of the interview and were you the one that communicated to Captain Werle about this case involving a law enforcement officer?

A.   I communicated to my lieutenant, who is Jose Jimenez, and then the chain of command kind of goes from there.  I did have conversations with Captain Werle, but I'm not the person who told him about it.

Q.   Tell me about those conversations.  What did you guys talk about?

A.   They just wanted to be kept abreast of the

Page 33

investigation as it went forward.  And then when Lee came in during the ruse, we actually met in Bill's office.

Q.   Okay.  All right.  So other than assigning the tip, going with Detective Preston to Dr. Dully's office, participating in the interview, are there any other tasks that you performed on this investigation?

A.   I never said I participated in the interview. I'm not sure where you got that from, but I did not -- I did not --

Q.   I thought you said you were there.  Yeah, I'm sorry.

A.   No, I was involved in the ruse when he was --

Q.   Okay.

A.   -- taken into custody.  I didn't participate in the interview, no, sir.

Q.   My bad.  So you did not participate in the interview?

A.   No, sir.

Q.   All right.  Whose decision was it to make an arrest?

A.   I got to be honest with you, I don't know.

Q.   That's okay.  Would that usually be the lead detective's decision?

A.   It's generally a kind of a -- a combination

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 34

of the lead detective and the chain of command kind of supporting the decision. We were in a little bit of a transition during that timeframe, so we had two layers of chain of command. So that's why I don't know whose decision it was.

Q. As we sit here today, do you have an independent recollection of a conversation that you had with anyone regarding the decision to make an arrest of Mr. Lawshe?

A. I don't. I was just informed that it happened.

Q. Okay. All right. Who informed you?

A. I don't remember. I -- it was -- at that point, there were a lot of moving parts. I just -- I don't remember who actually told me that he was going to be arrested. It might have been Captain Werle. It might have been my lieutenant. I don't remember.

Q. At that time, it sounds like you were responsible for receiving and disseminating the NCMEC cyber reports. Did I understand that correctly?

A. Correct, yes.

Q. How many reports do you think you would get back first quarter of -- of 2023? And you can estimate by week or month, if you can.

A. It's kind of hard to estimate because some

Page 35

weeks were busier than others.

Q. Uh-huh.

A. So some weeks we would get upward of 50. Some weeks we would get two. So really it -- there was really no rhyme or reason to it. It's just kind of, you know, however we received them.

Q. And is there a way for you to estimate how many of those you -- we used the word culled, but did not assign because you felt like they weren't actionable just by looking at the image?

A. I tried to weed out as many as possible just to keep the detectives' case loads manageable. If I had to put an estimate on it, I would say probably somewhere around 50 percent. But, you know, there's wiggle room on both sides there, so...

Q. Was it a relatively common thing that you would get a NCMEC report and it would not be actionable?

A. Correct, yes.

Q. All right. Whether it was 60 or 40, I understand you can't testify to that?

A. Correct.

Q. Are you familiar with the NCMEC term "Unconfirmed child pornography"?

A. I am, yes.

Page 36

Q. What do you understand that term to mean?

A. Just -- so, to me it can be a couple of different things, but generally speaking, it hasn't been viewed independently by someone from the center, meaning the national center, or some other review process.

Q. So is it your understanding or your position, I guess, that if you received a NCMEC report of unconfirmed child pornography, that report in and of itself would not constitute probable cause that the image was child sexual abuse material?

A. I agree with that.

Q. Okay. That would require some level of investigation by either you or your subordinates?

A. That's correct.

Q. So I know that you have talked about assigning this to Detective Preston, and I know that you've talked about going to Dr. Dully's office with her. Are you aware of any steps that she took to investigate this image other than going to Dr. Dully?

A. Off the top of my head -- I can read a report but I know she went to Dr. Dully, and I know -- can you hear me okay?

Q. I can.

A. Okay. I know she went to Dr. Dully and I

Page 37

know that she did the search warrant for Synchronoss and got some data back there. I'm not sure if there's -- she might have did a cell cite search warrant. I'm vaguely remembering something about that. I'm trying to skim over the report right now.

Q. Other than what's contained in the report, are you aware of any steps that she took to complete her investigation into whether or not these images constituted child sexual abuse material?

A. No, I'm not aware of anything outside of what is documented in her report.

Q. Okay. Do you agree that any reasonable investigation of -- that a purported depiction of CSAM would include visiting the website where that image was published, if that information was available?

MR. CARSON: Object, form.

THE WITNESS: No, I don't --

MS. SHEVLIN: Join.

THE WITNESS: -- I don't agree with that.

BY MR. ROBERTS:

Q. You don't agree with that?

A. No, I don't.

Q. Okay. So do you agree that ICAC's purpose is to prevent the proliferation and spread of child sexual abuse material?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 38

A.  I think that's one of their goals, yes.

Q.  I mean, is that St. Johns County, is that your goal, the sheriff's office, is to prevent the exploitation of children?

A.  Correct, yes.

Q.  All right.  So I mean, would you agree that an investigator should have taken reasonable steps to obtain the identity of someone that they believed was being sexually exploited?

A.  I do, yes.

Q.  Wouldn't that information potentially be found on the website where the image was published?

A.  Well, it's -- so the reason why I said not necessarily that I don't agree with that is, it's not -- it's not really a hard no.  It's more of a situation context type scenario.  Generally speaking, the -- the -- the download of the device when the search warrant is down on the device would give us clues as to the origin or the -- kind of the path that that image took.

Q.  Right.

A.  And that might lead to additional information as far as being able to investigate that, but if we can't identify where the image originated from, in some circumstances, then that might be something that would

Page 39

be prohibitive to pursue that, so...

Q.  Detective Greene has testified that he located, along with counsel for Mr. Lawshe, both of the models that are in question here within about 20 to 30 minutes based solely on the information that was contained in the images.  He found those images and models on the internet.  Do you have any reason to disagree with that?

MS. SHEVLIN:  Form.

THE WITNESS:  If that's what Detective Greene said, that's fine.  I'm not aware of that.

BY MR. ROBERTS:

Q.  Okay.  But if that's true, don't you believe that a reasonable investigation would include going to that website to investigate the context or potential identity of the victim?

MR. CARSON:  Object to form.

THE WITNESS:  Again, not in every scenario, so...

BY MR. ROBERTS:

Q.  But in this scenario where you had information that told you where they were being published, don't you think that that should be a reasonable part of the investigation?

A.  So I remember having a conversation with

Page 40

Detective Greene about this case and him making a reference -- he's been doing ICAC investigations for quite a bit longer than I have -- and him telling me that Metart that had the watermark on the image or one of the images, I'm not sure if it was on all of them or not, but I remember at least one of them having that watermark, that that website had had -- previously had issues with displaying images of underage females.  Now, beyond that, whether or not someone should have gone to Metart to investigate that, I don't know if that occurred.  I certainly don't think it would have been a bad idea, but, again, context-wise, you know, not in every scenario.

Q.  Okay.  And I appreciate your answer.  And I appreciate that you do not know exactly what was done, but my question to you is, do you agree that given the context that you know or have information that leads you to believe that it was published on particular websites, that it would be reasonable to go to those websites to investigate the publication or identity of the victims contained in those images?

MR. CARSON:  Object to form.

THE WITNESS:  I don't think it's unreasonable.  Again, like I said, it's situational based upon, you know --

Page 41

BY MR. ROBERTS:

Q.  Well, I mean, if your goal is to end or to stop the proliferation of online sexual abuse material, wouldn't the publisher of that website be committing a crime but publishing this image?

A.  Oh, agreeable.  But not all websites are housed within the borders of the United States.  We frequently in an ICAC investigation more often than not run into companies that are overseas where, you know, unfortunately, it's -- it kind of just comes to a dead end.  So again, like I said, I don't think it's unreasonable at all, but it might not be feasible in every scenario, so...

Q.  But you would have to go to the website to determine whether it was an offshore website or housed in the United States, wouldn't you?

A.  Not necessarily.  There may be a legal process that you could do to the company.  You know, there's a couple of different avenues that you can pursue, so...

Q.  But going to the internet would probably be the -- the website itself would probably be the first step in that investigation, wouldn't you agree?

A.  Well, I mean, you know, typically speaking, we don't want to go to, you know, an illicit website on

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 42

a, you know, county computer that's on a sheriff's office network that can be infected by mal-ware or something along those lines to kind of, you know, just willy-nilly go fishing around. So there are ways to do that. It might not be on our, you know, network computers. It might be on a -- on a -- on a different interface, but -- but, yes, that is one way to do it, is to go to the website, so...

Q.   And do you have any information -- I can represent to you Metart's record custodian is a barred attorney in the State of California. Have you ever heard that?

A.   No, I haven't heard that.

Q.   Okay. Are you familiar -- and let me just ask this. Did Detective Greene do anything wrong by using a St. John's County Sheriff's Office computer to search these websites to find these models on the internet?

A.   No, he has forensic machines that are on a protected network that are not on the Sheriff's Office network, so he has the ability to do that.

Q.   And Detective Greene has access -- I mean, I'm sorry -- Detective Preston has access to ask Detective Greene for assistance in her investigation anytime she feels free to, correct?

Page 43

A.   She does, yes.

Q.   Right. So has St. John County Sheriff's office ever pursued or referred publication of child sexual abuse material to another law enforcement agency in another jurisdiction to prosecute the publisher of that image?

A.   Well, you used the word "ever." I don't know. I'm not familiar with a scenario where that has happened. But I can't answer the "ever" part of your question.

Q.   Do you know why not, why it hasn't happened under when you were the supervisor?

A.   I don't know that the scenario has presented itself.

Q.   Well, this scenario presented itself, right? I mean, there is a website that purports to own this image. And it's a ww.com. I mean, that's the scenario that we're talking about, right?

A.   Again, I can't tell you. The only thing I can tell you is, I'm not familiar with that ever occurring.

Q.   Okay.

A.   Now, whether or not it has ever occurred, I don't know.

Q.   All right. So getting your ICAC training,

Page 44

investigative experience, you are familiar with federal age verification laws?

A.   Yes.

Q.   That federal government has laws that publishers of pornography under certain circumstances are required to keep age-verification documents of the models; you're aware of that, correct?

A.   Yes.

Q.   All right. Have you ever utilized that statute to obtain identification or age confirming information from a website?

A.   I have not.

MR. CARSON: Object to form.

BY MR. ROBERTS:

Q.   Do you know --

MR. CARSON: Hold on a second. Madam Court Reporter, did you get my objection?

THE COURT REPORTER: Yes. Yes.

MR. CARSON: Thank you, ma'am. I'm sorry to interrupt. Go ahead.

MR. ROBERTS: That's okay.

BY MR. ROBERTS:

Q.   Do you know how this case was ultimately disposed of?

A.   I don't know the details. Again, like right

Page 45

as this case was coming to a culmination, I transferred out of ICAC and moved back to major crimes, so I don't know the details, the kind of behind the scenes, if you will. But I know the charges got dropped, so...

Q.   You know the charges got dropped?

A.   Correct.

Q.   You don't know why the charges got dropped?

A.   I don't know all the details.

Q.   Do you know any of the details?

A.   Not enough to say that it's reliable information, so...

Q.   You made a comment about what you heard from Detective Greene regarding metart.com. Do you recall that testimony?

A.   I do, yes.

Q.   Do you have -- or at the time, right, when you got -- at the moment that you got the cyber tip, did you have any information or opinions about metart.com?

A.   I never heard of it before this investigation.

Q.   Okay. And I think I know the answer to this, but I'm just going to make sure. You never investigated metart.com as part of your work in this investigation?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 46

A.   Correct.

Q.   **ICAC provides training to investigators, correct?**

A.   They do.

Q.   **One of the things that they are trained to do is to attempt to identify victims of child sexual abuse?**

A.   Yes.

Q.   **All right.  I mean, to the extent that Detective Preston never attempted to identify these individuals, would you agree that that would be a violation of her duty as a law enforcement officer at St. John's County Sheriff's Office?**

MR. CARSON:  Object to form.

THE WITNESS:  I think it's sloppy police work.

BY MR. ROBERTS:

Q.   **You're aware of federal age verification statutes.  You've testified to that.  Would you agree if that information was available to a detective such as Detective Preston, she should inquire with the records custodian of the website to see if they have age verification documentation of the models in question?**

A.   Well, again, you're kind of talking in

Page 47

absolute terms, and I would say it's situational.  So when you say should she have, I don't know that she should have.  Could she have, yes, she could have.  So...

Q.   **Right.  If she had the ability to be able to go to the website, and that website said, Hey, we -- we complied with federal age verification statutes, she could have asked for that documentation, correct?**

A.   She could have, yes.

Q.   **I mean, do you think it's sloppy police work to not do that, in this case?**

A.   So I can tell you that I'm not aware in the year and-a-half, just under two years that I was in ICAC, of us in -- I could just not be remembering a scenario, but I'm not aware of us ever pursuing that information in an investigation.  So is it one of those things that you could do, yes, but when you say -- you know, when you use the word "should," well, we have quite a few cases that we've investigated successfully prosecuted, closed out, that that was never done in.  So is it a necessity for an investigation, no, not necessarily.

Q.   **It's not necessary to obtain a conviction, but is it necessary to at least get all of the information that's available?**

Page 48

A.   Well, again, I think it's a circumstantial scenario, you know, based on the circumstances, the contact of the investigation.  And like I said, I'm not familiar with a case where we have pursued that information in the past from a website.

Q.   **But you agree, if someone, as you say, was successfully prosecuted and convicted of possession of child pornography, and it turned out that that individual was an adult, that would be a travesty, a miscarriage of justice, correct?**

A.   Oh, I agree with that.  Yes.

Q.   **It is not just your goal as a detective just to convict people.  It's to seek justice, correct?**

A.   Correct.

Q.   **All right.  You would agree that sometimes -- and I think we have already said that this -- it is difficult to look at an image and determined with any sort of certainty the age of the model depicted, correct?**

A.   The best you can probably get is an estimation, an age range, correct.

Q.   **The federal age verification laws, would you agree, are a powerful tool at your disposal in order to attempt to verify someone's age through government issued ID?**

Page 49

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  I would agree, yes.

BY MR. ROBERTS:

Q.   **You would agree, correct?**

A.   Yes.

Q.   **All right.  You are getting these cyber tip reports, and I think you would agree, that as a detective, it's your job prior to making any probable cause decisions to determine the credibility of that tip before taking any actionable steps?**

A.   Yes.

Q.   **In this cyber tip report, and I -- I don't -- and I know you looked at it probably multiple times, isn't it true that this cyber tip report describes the image as prepubescent?**

A.   I have it right here.  I can verify that.

Q.   **Yeah, please do.**

A.   Can you point to me to where you're referring to?

Q.   **Yeah, and actually, you know, rather than making you do that, I can -- what I can do is, I can share my screen, and we can attach this as Exhibit 1.**

(Plaintiff's Exhibit No. 1 was marked for Identification.)

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 50

THE WITNESS:  If it's further information on uploaded files, I see where it says, Prepubescent minor is a -- Is that what you're referring to?

BY MR. ROBERTS:

Q.   Yeah.  You see where it says A-2?

A.   Yeah.

Q.   A-2.

A.   I just want to make sure that's what we were talking about, yeah.

Q.   Right.  And the A stands for prepubescent, correct?

A.   I'm assuming.

Q.   What does it say right under there?

A.   Yes.

MS. SHEVLIN:  I don't -- I don't want to interrupt you, but can you screen share anyway so we can --

MR. ROBERTS:  Sure.

MS. SHEVLIN:  -- make sure we know exactly what he's referring to?

MR. ROBERTS:  Absolutely.

MS. SHEVLIN:  Thank you.  And you're marking this as Exhibit 1, you said?

MR. ROBERTS:  Yes.

MS. SHEVLIN:  Okay.

Page 51

BY MR. ROBERTS:

Q.   Detective Tolbert, were you looking at this document that I just shared on the screen?

A.   Yes.

Q.   All right.  And you agree that when you received this tip, the tip to you was that the -- that the final contained one image of a prepubescent minor in a lascivious expedition -- exhibition.  I don't know why I can't say that word.  I'm sorry.

A.   Lascivious, yes, sir.

Q.   Lascivious exhibition.  That was what you were told?

A.   That's what the tip says, yes.

Q.   Right.  As we sit here today, though, do you recall that the image actually was of a pubescent individual?

A.   No, I don't.  I don't have the image in front of me, though.  There's two different cyber tips, but can we verify we're talking about the one in 9160?

Q.   Yeah, that was the one I was just showing you.

A.   Okay.  All right.

Q.   Would it -- would it -- would it be important if that was incorrect and this was actually a pubescent image, an image of a pubescent individual?

Page 52

A.   No, it's not important.  We don't rely on that information.

Q.   Well, do you attempt to verify the credibility of a tip, especially when it's been an unconfirmed tip?

A.   So I -- when I was reviewing tips, I didn't look at that information at all, that category.

Q.   Okay.

A.   That meant very little to me.  The thing that I wanted to look at was kind of like a -- you know, kind of firsthand scenario is the image itself.  And then the suspect information as far as assigning out tips.

Q.   Okay.

A.   In theory, if that was a -- and I'm not suggesting this never happens, but in theory, if that was a pubescent minor or adult pornography, we shouldn't have received a tip to begin with.  So in my experience, most, if not all of the tips that we received, I'm trying to think of a scenario where it would be different, I'll say that.  So does that make sense?

Q.   Yeah, I mean, some of them say pubescent.  I mean, it's A or B, right?

A.   Sure.

Page 53

Q.   Yeah, yeah.  But I think you said 50 percent or somewhere around 50 percent you call out as being either age-difficult or not actionable?

A.   The non-actionable could be as simple as it's very clear CSAM, but there is no information or follow-up on as far as pursuing a suspect.

Q.   But you also call out that some age-difficult images as well?

A.   You're correct, yes.

Q.   So you know that -- I mean, just because you get a cyber tip doesn't mean that it's actually CSAM?

A.   Correct.

Q.   And did you hear through the grapevine or any other way that one of the reasons or at least the defendant or Mr. Lawshe's attorney presented government-issue ID, photographs, something like that, to the State Attorney?

A.   So I remember having a conversation -- I never saw the documents about, I want to say it was passports, but I don't know the details as far as how that flushed out.

Q.   Let me ask you a question.  This is a hypothetical question.  If prior to making a decision to let's start with seek a search warrant, if you would have had an image of government-issued ID and

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 54

information that the model was 18 or older at the time of the photo shoot, would you have sought a search warrant, and would you have claimed to have had probable cause to search Mr. Lawshe's data?

A.   No.

Q.   Same question.  If you had images of the models in question with a government issued ID and an affidavit stating their age or information from a records custodian stating their age at the time of the photographs, would you have supported an affidavit, or would you have supported the decision for probable cause to make an arrest of Mr. Lawshe?

A.   No.

Q.   Do you have any reason to believe in this case that those documents were not easily assessable to Detective Preston?

A.   I mean, in hindsight, so...

Q.   In hindsight.  I mean, look, we're talking about things that happened in the past.

A.   Sure.

Q.   That information was readily available to Detective Preston at the time she made the decision or at the time the arrest was made?

A.   In hindsight, correct.

Q.   Correct.  One of the images that Mr. Lawshe

Page 55

was charged with -- first of all, did you ever see all of the images -- there were three images that we were charged with.  Did you see all three of those?

A.   No.

Q.   Okay.  Did you only see the numbering NCMEC tip image?

A.   Correct.

Q.   Okay.  It's my understanding he actually wasn't charged with that.  Do you have any knowledge about that?

A.   I do not.

Q.   Okay.  Well, I can relate to you that one of the images only showed the vantage point of bellybutton to genital area, vaginal area of the model, there was no face, no breast, it was just that cross-section.  Is that -- is that ordinarily the type of image that would be picked out to charge someone with possession of CSAM?

A.   If that image alone was the only image you had, probably not.

Q.   Okay.  So if that was the only image of that model, would you agree that that should not have been charged in this case against Mr. Lawshe?

MR. CARSON:  Object to form.

THE WITNESS:  It's kind of difficult to say

Page 56

without having the advantage of seeing the image, you know.

BY MR. ROBERTS:

Q.   But it at least raises a question in your mind about the charge of a -- of a picture that doesn't show the face or breast of the model?

A.   I mean, it certainly makes it more challenging.  So I don't know the circumstances in which that decision was made, so I don't know if there's more information available that I'm not aware of.

Q.   Okay.

A.   Like I said, based on not having seen the image, I couldn't really say one way or another.

Q.   Okay.  Doctor Dully, do you know Dr. Dully?

A.   I mean, we don't hang out on the weekends, but I have met her probably a half a dozen times or so when I was in iTech.

Q.   And was it all under similar circumstances where you were investigating possession of child pornography?

A.   Yes, correct.

Q.   I heard that sort of the office policy or custom was that if an image was age-difficult and there was a disagreement about the age of the individual,

Page 57

that the procedure was to take it to Dr. Dully and let her be the tiebreaker.  Is that true?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  I don't know that that's a fair characterization of it.

BY MR. ROBERTS:

Q.   Just tell me what -- what circumstances would Dr. Dully be brought in on a case?

A.   Sure.  So if it's one of those things where you're just looking for, I guess, an extra layer of confirmation, you know, I think we all can kind of look at something and say, Oh, that appears to be this to me, but maybe I want a second opinion.  You know, there's plenty of things in life that you can refer to in that, so in those scenarios, we would reach out to Dr. Dully or someone from CPT.  I only ever dealt with Dr. Dully, but I'm sure CPT has someone else that you could also, you know, speak to, so...

Q.   Did you ever review her reports in this case?

A.   So she didn't do a report.  She did like a memo.  I'm not familiar with an actual report, but it was like a kind of a letter memo kind of deal.  I'm not sure if you're calling that a report.

Q.   Yeah, I -- I -- I don't -- yeah, yeah -- no,

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 58

all I have are three separate, I guess you could call them even a letter.  It's all on letterhead, with her opinions in them.

A.   Correct, yes, I am -- I guess it's semantics. I guess you could call it a report.  I wouldn't refer to it as a report, but I remember looking at them.  I don't remember them in any great detail at this point. I might have copies of them.  I printed everything out from this case and kind of held onto it.  I do have copies of them.

Q.   So I just want to ask you a couple of questions.  Are you generally familiar with the sexual maturity rating that it goes from 1 to 5?

A.   I don't know the details behind that.  I've had very little exposure to it as far as the medical side of it.

Q.   Okay.

A.   I mean, I -- I -- I put a great deal of weight in the fact that a medical professional is telling us their opinion on something, so I don't know the signs behind that, so...

Q.   Okay.  Well, I just want to look right here. I mean, other than -- let me just ask you this.  Other than the fact that she has a medical license, do you have any reason to trust Dr. Dully?

Page 59

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

BY MR. ROBERTS:

Q.   I mean, is there something -- do you understand what I'm saying?  I mean, is she just a resource, and you say you don't hang out with her.  I mean, you just implicitly -- you trust her, that she's telling you the truth?

MR. CARSON:  Form.

THE WITNESS:  Well, I trust the process in that she has consulted on cases before.  She works for the child protective team with the University of Florida.  You know, she obviously is a medical professional, would obviously be able to give her expert opinion in situations, where we as lay people can't, and I trust that a court would give her latitude with that, and from my understanding, has in the past.  So I'm not aware of any issues, you know, with any -- any kind of -- you know, for me to doubt that process or for me to doubt her reliability.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. ROBERTS:

Q.   Right.  Okay.  So I just want to show you,

Page 60

this is a letter from April 5th, 2023.  I'm sharing it from the screen, and we'll make all three of her letters Exhibit 2.  It's a composite exhibit to this deposition, okay?  Can you see it?

A.   I can.  And I'm looking at it in my case file as well.

Q.   Right.  So I'm showing you the first paragraph.  Today you've provided me with two images for review displayed on a law enforcement laptop.  The first is -- and then there's a file number and depicts a female child with no pubic hair development.  She does not appear to be shaved.  Her breasts are partially visible and could be SMR 4 to 5; however, her genitals are plainly visible, with her thighs displayed widely apart and showing she is an SMR 1 with respect to pubic hair.  This developmental appearance is nine to 13 years -- 13 and-a-half -- less than nine to 13 years of age.  Did I read that correctly?

A.   Yes, you did.

Q.   And you were there for this meeting?

A.   No, I wasn't, not for the April one.  I was there in February.  There's a letter dated February. That's the one that I -- that was the initial meeting when we met with Dr. Dully.

Q.   Thank you for that clarification.  I

Page 61

appreciate it.

So you were not there --

A.   I apologize for the misunderstanding.

Q.   No, no, it's my fault.  I knew that there were two meetings, or I should have known there was two meetings.  So you know that this was a digital image, correct?

A.   I do.  Well, I mean, I'm assuming it was. My -- on the April one, the one from February that I can speak to personally was a digital image.

Q.   Right.  So you understand -- and I'm sure you're not a doctor, but you understand what Dr. Dully was saying is that it does not appear -- there is no pubic hair development on the model, you understand what that means, right?

A.   Yes.

Q.   Okay.  I'm sure in your -- your experience as an investigator, you see a lot of images of pornography, adult pornography, age-difficult pornography, you see a lot of that, don't you, or you did back when you were doing the ICAC investigations?

A.   Yes, correct.

Q.   You agree that it is common for adult models to have groomed themselves so that there is no appearance of a pubic hair?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 62

A.   I vote yes, but okay.  Yeah.

Q.   Okay, yeah.

You're familiar with that; you know that, right?

A.   Yes.

Q.   And as a -- I mean, as an investigator of pornographic images, that would be something that you really have to be familiar with, correct?

A.   Yes.

Q.   So you, as an ICAC trained investigator and a major crimes investigator, you understand that apart from grooming, images can be digitally altered or touched up to improve the esthetics of that -- of that image, correct?

A.   Correct.

Q.   You have no belief that Dr. Dully is an expert in determining if an image has been touched up or digitally altered, do you?

MS. SHEVLIN:  Form.

THE WITNESS:  No, but there's not a requirement in the Florida Statute for that delineation to be made.  For instance, if the image is intentionally altered for the purposes of trying to put a particular person's face on a particular body, and that still represents a

Page 63

child, it doesn't matter that that image has been altered.  It still depicts child sexual abuse material, so I mean, the --

BY MR. ROBERTS:

Q.   But it is relevant -- you agree it is relevant given her opinion about whether or not this model is grooming or altering the photograph to have no pubic hair, or if she has not developed pubic hair because she's prepubescent, you agreed that that's like the heart of the matter from an investigative standpoint, correct?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

THE WITNESS:  I mean, I don't know that that is solely what she relies on.  I have to assume that she takes other factors into consideration.

BY MR. ROBERTS:

Q.   Did she put any other factors in her letter?

A.   No, I've read the letter, and --

Q.   No.  Do you know -- do you know what --

MS. SHEVLIN:  The witness is still trying to answer the question.

THE WITNESS:  I said, I've read the letter, and you just read it out loud, is what I said.

Page 64

BY MR. ROBERTS:

Q.   Do you know -- do you understand that an SMR 4 to 5, a 5 is an adult breast; are you aware of that?

A.   No, I don't think I've ever known that before, no.

Q.   Do you think that an ICAC investigator prosecuting crimes, investigating crimes of child pornography, should know the basics of the SMR rating?

A.   I do think there's some value in understanding that language, yes.

Q.   Would it give you concern to know that this model had potentially adult breasts, but because she did not have pubic hair, according to Dr. Dully, she was less than nine to 13 and-a-half years old.  Does that give you concern as an investigator?

MS. SHEVLIN:  Form.

THE WITNESS:  Well, to kind of correct what counsel said, I don't think it says less than nine.  I think it's a range between nine and 13 and-a-half.

BY MR. ROBERTS:

Q.   Does your copy have that -- that angle that -- that -- with a line under it?

A.   Yeah, yeah, so it's greater than or --

Q.   That's less than or equal to.  Yeah.

Page 65

A.   It does, yes.  Yes.  Greater than or equal to.

Q.   Well, I think it's -- the way I interpret that is her appearance is less than or equal to nine to 13 and-a-half years old?

A.   Oh, I'm sorry.  You're correct.  Yes, I stand corrected.  Yes.

Q.   Okay.  Does that give you concern as an investigator, that this model has what may be interpreted as adult breasts, but this doctor, because of the lack of appearance of pubic hair, is saying that she is prepubescent, does that give you concern, as an investigator?

A.   As we sit here --

MS. SHEVLIN:  Object to form.

MR. CARSON:  I join.

MS. SHEVLIN:  I objected to form, and I --

MR. CARSON:  I joined.

MS. SHEVLIN:  Yes, counsel joined.

THE WITNESS:  So it's certainly a conversation I would want to have with her, to try to get that hashed out.  I came across my --

(Plaintiff's Exhibit No. 3 was marked for identification.)

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 66

BY MR. ROBERTS:

Q. I'm going to share -- I'm going to share the photograph of the ID. I don't think you've seen this before. We'll mark this as Exhibit 3.

In any world or interpretation, would you interpret the model that's depicted in Exhibit 3 as being less than nine to 13 years old?

A. No.

Q. Would you look at this model and say that it is entirely possible that she is 18 or older?

A. I do believe it's a possible -- it's possible she's 18 or older.

Q. Okay.

MS. SHEVLIN: Are you attaching that as an exhibit, Michael?

MR. ROBERTS: Exhibit 3.

BY MR. ROBERTS:

Q. During this deposition, Detective Greene testifies that he wished that the investigators had spent a little bit more time on this case prior to making a decision for arrest. Would you agree with that comment?

A. I do agree with that comment.

MR. CARSON: Object to form.

Page 67

BY MR. ROBERTS:

Q. You do agree with that comment?

A. I don't know what just happened, but I just got a lot of feedback. Can you say that again?

Q. Did you agree with that comment?

A. I do agree with that comment, yes.

Q. Okay. One of the things that you -- I want to understand -- one of the things in taking more time is Detective Preston could have gone to the website and requested the age documentation information, correct?

A. Yes, she could have.

Q. And had she done that, at least in your opinion, there would not have been probable cause to believe that these two images constituted probable cause for an arrest for possession of child sexual abuse material?

MR. CARSON: Object to form.

MS. SHEVLIN: Join.

THE WITNESS: Correct.

BY MR. ROBERTS:

Q. You agree with that statement?

A. Yes, correct.

Q. I want to use -- you understand the implications of an allegation like this against Mr. Lawshe, don't you?

Page 68

A. Of course.

Q. He was -- you understood that he was like a decorated law enforcement officer?

A. I know he's a law enforcement officer. I don't know, you know, what his background is, so...

Q. Okay. All right. You knew the moment that you saw this cyber tip, that if he was charged or arrested with this crime, it would end his law enforcement career?

A. Yes.

Q. You knew that it would devastate his reputation in the community?

A. Yes.

Q. You know that the allegation alone, whether or not he was guilty or not, would be enough to irreparably damage his reputation?

A. Yes.

Q. I mean, I can tell you, I mean, I don't know if you care, but Mr. Lawshe, I mean, this has -- this has changed his life. Do you have any reason to believe that it hasn't?

A. No, I don't have a reason to believe it hasn't, no.

Q. I mean, do you think that St. John's County owes him an apology or something for what it's done to

Page 69

him?

MR. CARSON: Object to the form.

THE WITNESS: No, I do not.

BY MR. ROBERTS:

Q. You just think -- what do you think in that regard? This is the way it should happen, it should have happened to him?

A. No. I think that the case happened the way it happened. I think that there are aspects of the case that give me a great deal of concern as far as I wasn't involved in the investigation in the aftermath, but it was my understanding that there was some evidence that his phone had been wiped.

Q. Yeah. Who said that? Who said that?

A. Who told me that?

Q. Yeah, who told you that?

A. I don't know who told me that.

Q. And you didn't remember who told you that?

A. I don't know who told me that.

Q. Because it's a defamatory statement that somebody is perpetuating in law enforcement or at the State Attorney's Office. Are you aware of any evidence that he wiped his phone?

A. Do I? No, that's just -- that's just something that I was told. I just don't remember

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 70

specifically who told me that, so...

Q.   Did they say they had evidence of that, or was it just an allegation?

A.   I -- I got to be honest with you, I don't remember the details of it.

Q.   But this individual was publishing this statement to whoever would listen?

A.   Well, I mean, I was told it, so --

Q.   And was it told you -- did you interpret it as meaning, well, he really is a pedophile; we just couldn't prove it?  Is that the way you took it?

A.   So like I said, it causes some concerns as far as like, you know, there's that kind of wonderance as far as what did we miss, so to speak.

Q.   Yeah.  Makes you think maybe he was guilty, doesn't it?

A.   Well, I don't know.  So, I mean --

Q.   That's a very damaging statement --

A.   Yes.

Q.   -- and it makes you think -- makes you think --

It's a very damaging statement, isn't it?

A.   Well, I guess in the grand scheme of things I don't know enough about the case, the aftermath of the case, to even know if that was true or not.  I just

Page 71

know that that's what I was told.  I don't remember the circumstances in which I was told that.

Q.   Do you know Kevin Greene?

A.   I do know Kevin Greene.

Q.   Is he a competent forensic investigator?

A.   Based on my interaction with him, yeah, he's worked plenty of cases for me in the past.

Q.   Have you reviewed his report?

A.   I have not.

Q.   If somebody had wiped a device, don't you think that would be something that would be included in his forensic report?

A.   I have to assume, but I don't know if it's there or not.  So I'm assuming --

Q.   You're not --

A.   I'm sorry.

Q.   You're not telling anybody that Mr. Lawshe has wiped a phone or anything like that, are you?

A.   I'm sorry.  Repeat that.

Q.   You're not telling people that Mr. Lawshe has wiped a phone or destroyed evidence, are you?

A.   No, beyond the conversation that I've had with you guys about the deposition, I haven't talked about this case since it happened.

Q.   But you haven't repeated that comment that

Page 72

you were told, Oh, he -- there's evidence that he wiped a device, you haven't repeated that to anybody?

A.   No.  I don't remember telling anybody that.

Q.   Has there been any sort of after action report or investigation into Detective Preston's conduct in this investigation?

A.   I don't know the answer to that.

Q.   Is she still a special victims unit investigator?

A.   ICAC, yes.

Q.   ICAC.  Okay.

Let me just go through my notes.  I think I'm done, but just give me one second.  Okay?

A.   Sure.  Sure.  No problem.

MR. ROBERTS:  Thanks, Detective.  I don't have any other questions.  I appreciate your time.

THE WITNESS:  All right.

CROSS-EXAMINATION

BY MS. SHEVLIN:

Q.   I have a couple of questions for you, sir. My name is Amy.  I represent Dr. Dully in this case, and I have a couple of follow-up questions for you based on your prior testimony.

I want to make sure I understood you.  I believe you said you were at only one of the meetings

Page 73

that took place with Dr. Dully.  Did I hear you correctly?

A.   Yeah, the first one is the one I remember going to.

Q.   Okay.  And when was that?

A.   Her letter is dated February 22nd.  I have to assume that's reliable.  I know she would generally type the letter right there and give it to us before we would leave in the past.  I just don't remember if she did that in this particular case.

Q.   Okay.  But safe to say it was a meeting that took place in February of 2023?

A.   Correct.

Q.   Okay.  At that meeting, the February 2023 meeting, how many images were presented to Dr. Dully?

A.   I believe one.

Q.   And how were they presented to her or shown to her?

A.   On a laptop.

Q.   And whose laptop was that?

A.   Detective Preston.

Q.   And who physically showed her the image on the laptop?  Was that you or Detective Preston?

A.   Detective Preston.

Q.   Do you remember what that image looks like?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 74

A.   Vaguely.

Q.   Can you describe it for me?

A.   If I remember correctly, it's a little girl, kind of seated with her legs spread.  I think that's the one where she's wearing white socks or like little lacy socks, is the only thing that she has on.

Q.   And can you see the -- you said "little girl," but can you see the little girl's face in the image?

A.   Yes, yes, you could.

Q.   And when Dr. Dully was shown this image, was she given a copy, or was she shown the image on the computer, and then the computer left with you and Detective Preston, and Dr. Dully does not have access to that?

A.   No, she doesn't have access to it.  We -- we -- it was only on the computer, and we took the computer with us.

Q.   Okay.  At the time of this meeting, was Dr. Dully informed of the identity of Mr. Lawshe?

A.   I don't remember.

Q.   Would it be typical that Dr. Dully be informed of who the subject of investigation is?

A.   No.

Q.   More likely than not she was not informed

Page 75

regarding the name or identity of the subject of the investigation, meaning Mr. Lawshe?

A.   Yeah, she wouldn't really have a reason to know that, so...

Q.   Would she have been informed of Mr. Lawshe's status as a law enforcement officer during this meeting?

A.   No, again, she really wouldn't have a reason to know that.

Q.   And Dr. Dully was not paid for this service, correct?

A.   No, she's part of the CPT, so they offer this service to law enforcement.

Q.   And can you define "CPT" for the record?

A.   Child protection team at the University of Florida.  They have an office in Jacksonville, and they handle abuse cases.  They have doctors that are forensically trained to provide law enforcement support for abuse investigations.

Q.   And you testified earlier you had some prior interactions with Dr. Dully.  I think you said you've met her approximately six times.  Am I remembering that testimony correctly?

A.   Five or six, yes.  I don't remember the exact number.  But that's a fair estimate.

Page 76

Q.   And on those five or six occasions that you had previously met Dr. Dully, were they all within the context of investigations regarding probable CSAM?

A.   Yes.

Q.   Give me one moment.  I'm just looking through my notes here.

I misunderstood your testimony earlier.  I want to ask you again to make sure the record is clear, prior to the investigation regarding Mr. Lawshe, were you familiar with the website metart.com?

A.   No.

Q.   Okay.  Do you know what the MET in Metart stands for?

A.   I do not.

Q.   If I told you it stood for most erotic teens, would that surprise you, based on the content that you saw?

A.   No, there's often, like in ICAC investigations, there's often hidden meanings in different terms.

Q.   And were you aware that metart.com refers to their models as teens and girls?

A.   I'm not aware of that, no.

Q.   Would it surprise you?

A.   No, it doesn't surprise me.

Page 77

Q.   Now, I know you said you stated you never saw the passports that Mr. Roberts had referred to earlier on his questioning of you.  Do you know what country those passports were issued from?

A.   I don't.

Q.   Do you know if they were issued in the United States?

A.   I don't.

Q.   If those passports -- passports were not issued in the United States, would that cause you some concern regarding verification of the ages of the models?

A.   I don't know that them being issued in the United States or outside the United States really matters.  Any ID can really be manipulated, so I guess to answer your question is -- I guess the simple answer is yes.

Q.   The purported ages of the models using the passports for identification that was issued for them would not prove to you that the images in question were taken at a time that the models were 18 or older; is that correct?

A.   That's correct.

Q.   I want to refer you back to Exhibit 2, which was the April 5th, 2023 report of Dr. Dully.  I know

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 78

you said you were not present at that meeting, but we did discuss that.

And Michael, just for ease of use, could you throw Exhibit 2 back up there, the April 5th report.

Much appreciated.  Okay.

In the letter that we're looking at, the same one that you discussed with Mr. Roberts earlier, there are descriptions of the images that Dr. Dully reviewed, correct?

A.   If you are referring to paragraph 2, the second image is imprinted with the word "script" saying "big heart."  Is that what you're referring to?

Q.   Correct.

A.   Yes, correct.

Q.   Okay.  And it also -- it describes the images in terms of it shows, you know, a female child with a black top, underwear down.  It describes what she's seeing in the images, correct?

A.   Correct.

Q.   Okay.  And you just noted that there is an indication that there is white script on the image, saying, "big heart," correct?

A.   Correct.

Q.   And it also indicates what the file names are for these two images, correct?

Page 79

A.   Correct.

Q.   Okay.  Nowhere in this letter does it indicate that there is any type of watermark on any of these images, correct?

A.   Not on this one.

Q.   Okay.  And nowhere in this letter does it indicate that there's any other text on these images other than what she's noted with the quote/unquote, big heart in the second image, correct?

A.   That is correct.

Q.   And Dr. Dully was not asked to provide an opinion as to whether any of these images appeared altered, correct?

A.   That's correct.

Q.   And Dr. Dully was not asked to provide an opinion regarding the potential grooming habits of any of these models, correct?

A.   That's correct.

Q.   Now, Mr. Roberts asked you about the sexual maturity rating scale, the SMR, and he made a representation to you that Stage 5 was an adult.  Do you remember that earlier in your testimony?

A.   I do.

Q.   Okay.  Now, Stage 5, which is fully developed, does not necessarily mean that a fully

Page 80

developed sexually mature person is in fact over the age of 18, correct?

A.   I'm not familiar with the SMR scale, like I told Mr. Roberts, so I took for granted what he said was true.  I don't -- I don't know the answer to that.

Q.   Okay.  Let me ask it a different way.  In your experience with these investigations, would it be possible for an image of a breast to appear to be fully developed and that breast belonged to a person who is still under the age of 18?  So, for example, a 16 or 17 year old may have a fully developed looking breast?

A.   Yes.

MS. SHEVLIN:  Michael, could you put Exhibit 3 back up, please.  It was the image of the model holding the passport.

BY MS. SHEVLIN:

Q.   Thank you.  Mr. Roberts asked you earlier while were you looking at this picture if you could believe that she was 18 or older, and you answered in the affirmative.  Do you remember that?

A.   Yes.

Q.   Looking at this image, could you also believe that she was under the age of 18?

A.   I think she could be.

Q.   I'm looking through my notes here.

Page 81

A.   Not that it matters, but where is that passport from?

Q.   My understanding is it is from the Ukraine.  Have you seen this before?

A.   No, I've never seen it before, and I didn't recognize the wording.

MR. ROBERTS:  It's actually Lat --

MS. SHEVLIN:  It says Latvia.  Excuse me.  It says Latvia.

Have you seen a Latvian passport before?

THE WITNESS:  I have not.  I'm not worldly traveled, so...

BY MS. SHEVLIN:

Q.   And in fact, this passport in this image is redacted in several spots, correct?

A.   Yes, that's correct.

Q.   And we're looking at this image again, and I think you answered me already, but the passport in question in this image is redacted in several places, correct?

A.   Correct.

Q.   Okay.  So we do see some alteration in this photograph, which is apparent, correct?

A.   Correct.

Q.   Okay.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 82

MS. SHEVLIN:  Michael, you can take it down.  Thank you.

I believe that is all I have for you, sir.  I appreciate your time.  Some of the other counsels may have questions for you.

MR. ROBERTS:  I just have a little bit of redirect on that, but...

MR. CARSON:  Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.   Detective Tolbert, you understand that probable cause for possession of child pornography cannot be based on the mere possibility that the model is underage, correct?

A.   Correct.

Q.   Unless the evidence satisfies a reasonable person that a crime has likely occurred, correct?

A.   Correct.

Q.   When I asked you about the way that model looked, I asked you if that model, if a reasonable person can believe that that model was 18 and you testified yes, that had nothing to do with her passport, did it?

A.   No, it was just visually looking at the photo that was displayed on the screen.

Page 83

Q.   Well, actually, you understand that it's not Mr. Lawshe's burden to prove his innocence to St. Johns County for the State of Florida, correct?  It's the state's burden to prove that he committed a crime?

MR. CARSON:  Object to form.

THE WITNESS:  Yes.

MR. ROBERTS:  Okay.  No further questions.

MR. CARSON:  Sergeant Tolbert, I'm Matt Carson.  I'm an attorney representing Detective Preston in this action.  I have no questions for you today.  Mr. Roberts, are you ordering?

MR. ROBERTS:  I will order.

MR. CARSON:  Yeah, he'll read through me.

THE COURT REPORTER:  And do you want a copy?

MS. SHEVLIN:  Yes.

MR. CARSON:  Same order.  Thank you.

(Thereupon, the deposition was concluded at 2:47 p.m. and the signature and formalities were not waived.)

Page 84

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, the undersigned authority, certify that the aforementioned witness Eugine Tolbert, personally appeared before me via remote teleconference and was duly sworn on Tuesday, December 17, 2024.

Dated this 27th day of December, 2024

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida
My Commission Expires:  3/17/25
My Commission No.:  HH065896
Identification presented by Deponent: License

Page 85

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

Dated this 27th day of December, 2024.

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

**Page 86**

EUGINE TOLBERT
C/O MATTHEW JOSEPH CARSON, ESQUIRE
SNIFFEN & SPELLMAN, P A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
mcarson@sniffenlaw.com

   IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK,
MIKAYLA PRESTON AND KATHLEEN DULLY,
   CASE NO.:  3:24-cv-00044-MMH-MCR

Dear Mr. Carson,

  The deposition of Eugine Tolbert, taken in the above-styled cause on December 17, 2024 is now ready for signature of the witness.  Please contact our office to make arrangements for the witness to sign the same; or, if you wish to waive the signature of the deposition, please so advise.

  If this deposition has not been signed by January 27th, 2025, or the signature thereto waived, we shall consider such delay a refusal to sign under Rule 1.310(e) of the Florida Rules of Civil Procedure.

  If you have any reason which you would like for me to place on the deposition as to the witness' failure to sign the same, please advise.

    Very truly yours,
    HUSEBY COURT REPORTING, COURT REPORTER

    By:_____
     Maureen Hall, RPR, FPR

Dated:  December 27, 2024
cc:  Counsel of Record

**Page 87**

    E R R A T A   S H E E T

IN RE:  WILLIAM LEE LAWSHE VS. ROBERT HARDWICK, MIKAYLA PRESTON AND KATHLEEN DULLY

DEPO OF:  EUGINE TOLBERT

DATE TAKEN:  12/17/24

  DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

  Page No._____Line No._____Change to:_____

  _____

  Reason for change:_____

  Page No._____Line No._____Change to:_____

  _____

  Reason for change:_____

  Page No._____Line No._____Change to:_____

  _____

  Reason for change:_____

  Page No._____Line No._____Change to:_____

  _____

  Reason for change:_____

  Please forward the original signed errata sheet to this office so that copies may be distributed to all parties.

  DATE:_____

  SIGNATURE OF DEPONENT:_____

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Index: 1..age

---
**1**
---

**1** 49:23,24 50:23 58:13 60:15

**13** 60:17,18 64:14,19 65:5 66:7

**16** 13:24 14:4 19:3 80:10

**17** 12:21,25 13:12,24 14:4 80:10

**18** 12:21 13:1,13,24 17:15,20 18:1,9,10, 11,14,16 54:1 66:10, 12 77:21 80:2,10,19, 23 82:21

**19** 13:24 19:3

---
**2**
---

**2** 59:22 60:3 77:24 78:4, 10

**20** 39:4

**2001** 6:12

**2009** 6:12,14

**2013** 29:6

**2018** 6:18

**2020** 6:20

**2023** 5:12 8:10 34:23 60:1 73:12, 14 77:25

**21** 6:7,21

**22nd** 73:6

**23** 6:7

**2:47** 83:19

---
**3**
---

**3** 65:23 66:4, 6,16 80:14

**30** 39:4

---
**4**
---

**4** 60:13 64:3

**40** 35:20

**48** 14:1

---
**5**
---

**5** 22:6 58:13 60:13 64:3 79:21,24

**50** 35:3,14 53:1,2

**5th** 60:1 77:25 78:4

---
**6**
---

**60** 35:20

---
**8**
---

**827.071** 22:6

---
**9**
---

**9160** 51:19

---
**A**
---

**A-2** 50:5,7

**ability** 42:21 47:5

**abreast** 32:25

**absolute** 18:6 47:1

**absolutely** 17:21 18:12 20:14 28:2,5 50:21

**absolutes** 18:3

**abuse** 11:20 22:7 23:22 24:10 25:3, 12,20 36:11 37:9,25 41:3 43:4 46:7 63:2 67:16 75:17,19

**accept** 18:8,10

**accepted** 18:15

**access** 31:23 42:22,23 74:14,16

**action** 72:4 83:10

**actionable** 9:4,5 11:15 15:20,22 35:10,18 49:11 53:3

**actual** 57:22

**additional** 6:19 38:22

**adds** 31:18

**adult** 14:11 20:24 23:19 24:8 26:4 48:9 52:17 61:19,23 64:3,12 65:10 79:21

**advantage** 56:1

**affidavit** 54:8,10

**affirmative** 80:20

**aftermath** 69:11 70:24

**afternoon** 4:9

**age** 14:7,12, 23 15:10,15 44:2,10 46:18,23 47:7 48:18, 21,22,24 54:8,9 56:25 60:18 67:10

80:2,10,23

**age-difficult**
9:20 10:5,9,
18,19,23,25
11:5,7 53:3,
7 56:24
61:19

**age-verification**
44:6

**agency** 7:6
32:3 43:4

**ages** 77:11,18

**agree** 10:16
18:25 19:4
21:1 24:15
26:1 36:12
37:12,19,21,
23 38:6,14
40:16 41:23
46:11,19
48:6,11,15,
23 49:3,5,8
51:5 55:22
61:23 63:5
66:21,23
67:2,5,6,21

**agreeable** 41:6

**agreed** 15:23
63:9

**ahead** 10:2
44:20 82:8

**allegation**
67:24 68:14
70:3

**allegations**
4:24

**alteration**
81:22

**altered** 62:12,
18,23 63:2
79:13

**altering** 63:7

**Amy** 72:21

**and-a-half**
6:17 47:13
60:17 64:14,
20 65:5

**angle** 64:22

**answering** 10:2
16:25

**anytime** 42:25

**apologize** 8:21
19:17 24:4
61:3

**apology** 68:25

**apparent** 81:23

**appearance**
60:16 61:25
65:4,11

**appeared** 15:23
79:12

**appears** 57:13

**appreciated**
78:5

**approach** 9:17

**approximate**

14:12

**approximately**
75:22

**April** 60:1,21
61:9 77:25
78:4

**area** 29:9
55:14

**arrest** 21:24
30:11 32:7
33:21 34:8
54:12,23
66:21 67:15

**arrested** 22:11
34:16 68:8

**aspects** 69:9

**assessable**
54:15

**assessment**
15:12

**assign** 10:5,6
35:9

**assigned** 5:8
7:7,12,13,20
10:24 16:18

**assigning** 8:15
9:13 33:4
36:17 52:12

**assistance**
42:24

**assume** 63:15
71:13 73:7

**assuming** 50:12

61:8 71:14

**attach** 49:23

**attaching**
66:14

**attempt** 46:6
48:24 52:3

**attempted**
46:10

**attended** 14:3

**attorney** 42:11
53:15,17
83:9

**Attorney's**
69:22

**avenues** 41:19

**aware** 21:4
22:2 27:8,15
28:7 30:5
36:19 37:7,
10 39:11
44:7 46:18
47:12,15
56:10 59:18
64:3 69:22
76:21,23

---

**B**

---

**baby** 25:1

**back** 5:11,21,
25 6:20,23
29:6 32:10
34:23 37:2
45:2 61:21
77:24 78:4

80:14

**background**
15:7 19:11
68:5

**bad** 9:9 33:17
40:12

**barred** 42:10

**barrel** 7:21

**based** 9:16
11:8 14:12
22:11,13
39:5 40:25
48:2 56:13
71:6 72:23
76:16 82:13

**basic** 20:18

**basics** 64:8

**bat** 15:20

**bathtub** 25:2

**beer** 29:15

**begin** 15:17
52:18

**beginning** 5:12

**belief** 62:16

**believed** 16:17
17:3,13,15,
20 23:19
24:7,18 38:8

**bellybutton**
55:13

**belonged** 80:9

**big** 78:12,22

79:8

**Bill** 30:14,19

**Bill's** 33:2

**bit** 20:6
31:18 32:11
34:2 40:3
66:20 82:6

**black** 78:17

**blip** 19:16

**body** 13:9
62:25

**booking** 32:13

**border** 19:24

**borders** 41:7

**breast** 13:9
55:15 56:6
64:3 80:8,9,
11

**breasts** 60:12
64:12 65:10

**briefed** 31:6

**bring** 30:25

**brought** 30:11
57:9

**buds** 13:9

**burden** 83:2,4

**busier** 35:1

---
**C**
---

**California**
42:11

**call** 4:11,12
8:16,21 9:18
53:2,7 58:1,
5

**called** 4:3,14
9:20

**calling** 57:24

**captain** 30:14,
22 32:17,21
34:16

**care** 12:7
68:19

**career** 68:9

**Carson** 19:21
20:7,15
22:25 23:14,
24 24:11
26:7 37:16
39:17 40:22
44:13,16,19
46:14 49:1
55:24 57:3
59:2,9 63:13
65:16,18
66:24 67:17
69:2 82:8
83:5,8,9,14,
17

**case** 4:21
5:13,14 7:2,
10,11,20
10:3,22 11:1
13:18 15:12,
18 16:9
21:20 28:16
29:7 30:5

32:18 35:12
40:1 44:23
45:1 47:11
48:4 54:15
55:23 57:9,
20 58:9 60:5
66:20 69:8,
10 70:24,25
71:24 72:21
73:10

**cases** 47:19
59:11 71:7
75:17

**category** 9:21,
22 52:7

**cell** 37:3

**center** 36:4,5

**Centers** 8:3

**certainty**
48:18

**chain** 31:2
32:20 34:1,4

**challenging**
56:8

**changed** 6:16
68:20

**characterization**
57:6

**charge** 55:17
56:5

**charged** 27:5
55:1,3,9,23
68:7

**charges** 45:4, 5,7

**child** 4:24 11:17,20 13:2 15:24 16:5 17:4,9, 11,13 22:7, 22 23:6,9, 12,21 24:10 25:2,3,11,20 35:24 36:9, 11 37:9,24 43:3 46:6 48:8 56:20 59:12 60:11 63:1,2 64:7 67:15 75:15 78:16 82:12

**children** 5:20 8:4 38:4

**circumstance** 21:11

**circumstances** 21:10,14,15 25:7 38:25 44:5 48:2 56:8,19 57:8 71:2

**circumstantial** 48:1

**cite** 37:3

**claimed** 54:3

**clarification** 60:25

**class** 14:2

**classes** 14:22

**clear** 53:5 76:8

**client** 4:21

**closed** 15:21 47:20

**clues** 38:19

**college** 19:7

**combination** 33:25

**command** 31:2 32:20 34:1,4

**comment** 45:12 66:22,23 67:2,5,6 71:25

**committed** 21:13 23:9, 21 24:9 83:4

**committing** 25:11 41:4

**common** 9:16 35:16 61:23

**communicate** 11:18 30:1

**communicated** 11:19 32:17, 19

**community** 68:12

**companies** 41:9

**company** 41:18

**competent** 71:5

**complete** 37:7

**complied** 47:7

**composite** 60:3

**computer** 22:20 42:1,16 74:13,17,18

**computers** 42:6

**concern** 64:11, 15 65:8,12 69:10 77:11

**concerns** 70:12

**concluded** 83:18

**conduct** 22:22 72:6

**confirm** 20:1, 21

**confirmation** 57:12

**confirming** 44:10

**consideration** 63:16

**considered** 31:7

**constitute** 25:19 36:10

**constituted** 11:20 37:9 67:14

**Constitution**

**consulted** 59:11

**contact** 32:2 48:3

**contacted** 32:6,7,9,11

**contained** 23:6 37:6 39:6 40:21 51:7

**content** 76:16

**context** 24:16, 20,21,23 25:14,25 26:5 27:1,17 38:16 39:15 40:17 76:3

**context-wise** 40:12

**control** 22:18

**conversation** 10:12 34:7 39:25 53:18 65:21 71:22

**conversations** 32:21,23

**convict** 48:13

**convicted** 48:7

**conviction** 47:23

**copies** 58:8,10

**competent** 71:5

**20:25 21:18, 22**

**copy**  17:19 64:22 74:12 83:15

**corner**  29:9

**correct**  6:8,11 7:14,15,25 12:14 16:3, 4,6,7 18:1, 22 21:21,25 22:4 23:12, 13 25:21,22 26:16,17 28:16 30:17 34:21 35:19, 22 36:15 38:5 42:25 44:7 45:6 46:1,3 47:8 48:10,13,14, 19,21 49:5 50:11 53:9, 12 54:24,25 55:7 56:22 58:4 61:7,22 62:8,14,15 63:11 64:17 65:6 67:10, 19,22 73:13 75:11 77:22, 23 78:9,13, 14,18,19,22, 23,25 79:1, 4,9,10,13, 14,17,18 80:2 81:15, 16,20,21,23, 24 82:14,15,

17,18 83:3

**corrected**  65:7

**correctly** 26:22 32:9 34:20 60:18 73:2 74:3 75:23

**counsel**  39:3 64:18 65:19

**counsels**  82:4

**country**  77:3

**county**  5:9 7:17 29:9 30:15 38:2 42:1,16 43:2 46:13 68:24 83:3

**couple**  36:2 41:19 58:11 72:20,22

**court**  19:25 20:3 27:19 44:16,18 59:16 83:15

**CPT**  13:15,18 15:6 57:17, 18 75:12,14

**credibility** 49:10 52:4

**crime**  21:13 23:9,21 24:10 25:11, 20 41:5 68:8 82:17 83:4

**crimes**  5:9,20, 21 6:10,16, 24 21:15 45:2 62:11 64:7

**criminal**  25:6 30:22,24 31:3

**CROSS-EXAMINATION** 72:18

**cross-section** 55:15

**crossed**  26:23

**CSAM**  10:10 11:2 13:17 15:17 31:14 37:13 53:5, 11 55:18 76:3

**cull**  8:14,18, 20,22

**culled**  35:8

**culmination** 45:1

**custodian** 42:10 46:22 54:9

**custody**  33:15

**custom**  56:24

**cyber**  7:5,24 8:9,11,14 29:21,22 34:20 45:17

49:7,13,15 51:18 53:11 68:7

---

**D**

---

**damage**  68:16

**damaging** 70:18,22

**dark**  25:18

**data**  22:20 37:2 54:4

**dated**  60:22 73:6

**daughters** 11:10 12:18 13:25 25:8

**dead**  41:10

**deal**  12:7 57:23 58:18 69:10

**dealing**  7:23

**dealt**  57:17

**decent**  10:7

**decision** 33:20,24 34:2,5,8 53:23 54:11, 22 56:9 66:21

**decisions** 49:10

**decorated**  68:3

deem   10:25 20:12

deemed   10:5,7 15:19

deeper   15:5

defamatory 69:20

defendant 53:15

define   75:14

definition 11:7

deliberate 10:11

delineated 10:13

delineation 62:22

depends   25:7

depicted 23:11,19 24:8 48:18 66:6

depiction 22:20 37:13

depicts   60:10 63:2

deposition 4:17,18 8:2 60:4 66:18 71:23 83:18

deputy   6:12

describe   7:1 74:2

describes 49:15 78:15, 17

description 9:23

descriptions 78:8

destroyed 71:21

detail   15:4 58:7

detailed   12:16

details   44:25 45:3,8,9 53:20 58:14 70:5

detective   4:9, 10,11,15 6:17 7:12, 14,16,20 8:3,11 9:19 11:4,13,18 12:2,12 16:18 27:15 28:9,10 30:2 33:5 34:1 36:17 39:2, 10 40:1 42:15,22,23, 24 45:13 46:10,20,21 48:12 49:9 51:2 54:16,

22 66:18 67:9 72:5,15 73:21,23,24 74:14 82:11 83:10

detective's 33:24

detectives   7:7 8:15 9:1

detectives' 35:12

determination 13:25 26:6

determine 41:15 49:10

determined 48:17

determining 12:19 62:17

devastate 68:11

developed 13:11 63:8 79:25 80:1, 9,11

development 13:7,8 60:11 61:14

developmental 60:16

device   38:17, 18 71:10 72:2

difference 12:20

differently 13:7 31:21

difficult 12:25 19:2 48:17 55:25

dig   15:5

digital   61:6, 10

digitally 62:12,18

dinner   4:12

DIRECT   4:7

disagree   10:9 11:6 39:8

disagreement 10:13,14 56:25

disclaimer 26:3

disclaimers 27:2

discuss   78:2

discussed   78:7

displayed 12:19 60:9, 14 82:25

displaying 40:8

disposal   48:23

disposed   44:24

**disseminating** 34:19

**distinguish** 13:23

**doctor** 12:4 56:15 61:12 65:10

**doctors** 75:17

**document** 51:3

**documentation** 46:23 47:8 67:10

**documented** 37:11

**documents** 44:6 53:19 54:15

**doubt** 59:20

**download** 38:17

**dozen** 56:17

**drawing** 14:14

**drink** 29:15

**dropped** 45:4, 5,7

**drowning** 9:1

**duck** 9:17,18 15:1,2

**Dully** 11:17 12:3,13 15:6,7,17, 21,23 16:3, 6,10,14,15, 21 17:10

28:10 36:20, 22,25 56:15 57:1,9,17,18 58:25 60:24 61:12 62:16 64:13 72:21 73:1,15 74:11,14,20, 22 75:10,21 76:2 77:25 78:8 79:11, 15

**Dully's** 18:9 28:10 33:5 36:18

**duly** 4:4 15:14

**duty** 46:12

———————

**E**

———————

**earlier** 75:20 76:7 77:2 78:7 79:22 80:17

**early** 17:13

**earth** 14:1,8

**ease** 78:3

**easily** 54:15

**easy** 6:12

**educated** 14:22

**effectuating** 21:24

**end** 20:5,9

41:2,11 68:8

**enforcement** 14:16 18:3 23:18 24:6 29:12,23 30:6 31:1,5, 11,15,19,21 32:1,3,18 43:4 46:12 60:9 68:3,4, 9 69:21 75:6,13,18

**entire** 30:4

**equal** 64:25 65:1,4

**erotic** 76:15

**established** 22:2

**Estates** 29:9

**esthetics** 62:13

**estimate** 15:10 34:23,25 35:7,13 75:25

**estimating** 14:6,23

**estimation** 48:21

**EUGINE** 4:3

**evaluate** 9:11

**evidence** 69:13,22

70:2 71:21 72:1 82:16

**exact** 75:24

**EXAMINATION** 4:7 82:9

**Excuse** 81:8

**exhibit** 49:23, 24 50:23 59:22 60:3 65:23 66:4, 6,15,16 77:24 78:4 80:14

**exhibition** 22:19 51:8, 11

**expedition** 51:8

**experience** 11:9 14:16, 17,21 19:1,8 44:1 52:19 61:17 80:7

**experienced** 14:14

**experiencing** 13:21

**expert** 59:15 62:17

**expertise** 17:17

**explain** 15:3

**exploitation**

38:4

**exploited** 8:4
38:9

**exposure** 58:15

**extent** 9:3
46:9

**extra** 57:11

---

### F

**face** 16:16
55:15 56:6
62:24 74:8

**facetious** 15:2

**fact** 12:17
15:13 31:15,
19 58:19,24
80:1 81:14

**factors** 63:16,
18

**facts** 21:10,
14

**fair** 16:13
57:5 75:25

**familiar** 4:22
9:21 22:5,8,
23 35:23
42:14 43:8,
20 44:1 48:4
57:22 58:12
62:3,8 76:10
80:3

**fault** 61:4

**feasible** 41:12

**February** 60:22
61:9 73:6,
12,14

**federal** 44:1,4
46:18 47:7
48:22

**feedback** 67:4

**feel** 15:16

**feels** 42:25

**felt** 11:1,15,
19 13:15,16
15:22 16:12
35:9

**female** 60:11
78:16

**females** 13:8
40:8

**file** 28:16
60:5,10
78:24

**files** 50:2

**final** 51:7

**find** 30:20
42:17

**finding** 21:19,
23

**fine** 39:11

**firsthand**
52:11

**fishing** 42:4

**Flagler** 29:8

**Florida** 7:6

22:5 23:4,10
59:13 62:21
75:16 83:3

**flushed** 53:21

**follow-up** 7:8
8:12,24 53:6
72:22

**force** 7:7

**forensic** 42:19
71:5,12

**forensically**
75:18

**form** 18:17,23
19:9,18,23
20:2,11
22:25 23:14,
23,24 24:11
25:13 26:7
29:11 37:16
39:9,17
40:22 44:13
46:14 49:1
55:24 57:3
59:1,9 62:19
63:12 64:16
65:15,17
66:24 67:17
69:2 83:5

**formalities**
83:19

**forward** 15:24
33:1

**found** 38:12
39:6

**free** 42:25

**frequently**
41:8

**front** 51:17

**fully** 79:24,
25 80:8,11

**FWC** 29:7
30:9,12

---

### G

**game** 12:10

**general** 7:8

**generally**
13:7,8,10
14:9,11,15
18:21 24:13
26:9 33:25
36:3 38:16
58:12 73:7

**genital** 55:14

**genitals** 60:14

**get all** 47:24

**girl** 74:3,8

**girl's** 74:8

**girls** 76:22

**give** 6:3
15:10 17:6,
17 20:8
38:18 59:14,
16 64:11,15
65:8,12
69:10 72:13

73:8 76:5

**goal** 38:3 41:2 48:12

**goals** 38:1

**Good** 4:9

**government** 44:4 48:24 54:7

**government-issue** 53:16

**government-issued** 53:25

**grand** 70:23

**grandmother** 8:18

**granted** 80:4

**grapevine** 53:13

**great** 9:8,10 58:7,18 69:10

**greater** 64:24 65:1

**green** 19:24 20:4

**Greene** 8:2,3 9:19 11:4 39:2,10 40:1 42:15,22,24 45:13 66:18 71:3,4

**Greene's** 11:13

**groomed** 61:24

**grooming** 62:12 63:7 79:16

**ground** 4:19

**guess** 17:23 36:8 57:11 58:1,4,5 70:23 77:15,16

**guessing** 6:6

**guilty** 68:15 70:15

**guy** 4:22 9:9

**guys** 11:6 32:24 71:23

---

**H**

**habits** 79:16

**hair** 13:9,11 60:11,16 61:14,25 63:8 64:13 65:11

**half** 56:17

**hand** 12:8

**handle** 75:17

**hang** 28:15 29:14 56:16 59:6

**happen** 69:6

**happened** 32:5 34:11 43:9,

11 54:19 67:3 69:7,8, 9 71:24

**hard** 27:22 34:25 38:15

**harder** 19:6

**hash** 12:25

**hashed** 65:22

**he'll** 83:14

**head** 36:21

**hear** 4:25 19:10,14 20:1,3 27:18,24 36:23 53:13 73:1

**heard** 42:12, 13 45:12,20 56:23

**hearing** 19:16

**heart** 63:10 78:12,22 79:9

**heavily** 14:17

**held** 58:9

**Hey** 18:14 47:6

**hidden** 76:19

**hindsight** 54:17,18,24

**hit** 27:25

**hits** 13:6

**Hold** 44:16

**holding** 12:8 27:12 80:15

**homicide** 6:17 29:6,10

**honest** 33:22 70:4

**housed** 41:7,15

**hypothetical** 53:23

---

**I**

**ICAC** 5:20,23 6:4,7,22 7:4,6,16 20:20 40:2 41:8 43:25 45:2 46:2 47:14 61:21 62:10 64:6 72:10,11 76:18

**ICAC's** 37:23

**ID** 17:19,20 18:13 48:25 53:16,25 54:7 66:3 77:15

**idea** 40:12

**identifiable** 9:6

**identification** 44:10 49:25 59:23 65:24

77:19

**identify**  38:24 46:6,10

**identity**  13:2 38:8 39:16 40:20 74:20 75:1

**IDS**  27:12

**ignore**  19:19

**illicit**  41:25

**image**  9:12 10:6 11:20 15:14 16:18, 21 22:20 23:11,19 24:7,16,18 25:19,23 26:1,10,16, 24 27:2 35:10 36:11, 20 37:14 38:12,20,24 40:4 41:5 43:6,17 48:17 49:16 51:7,15,17, 25 52:11 53:25 55:6, 16,19,21 56:1,14,24 61:6,10 62:14,17,23 63:1 73:22, 25 74:9,11, 12 78:11,21 79:9 80:8,

14,22 81:14, 17,19

**images**  10:4, 19,22 11:4 12:3,25 16:3 20:25 23:5,6 27:5,9,17 37:8 39:6 40:5,8,21 53:8 54:6,25 55:2,13 60:8 61:18 62:7, 12 67:14 73:15 77:20 78:8,15,18, 25 79:4,7,12

**imaging**  17:24

**implications** 67:24

**implicitly** 59:7

**important** 24:15 25:25 26:4 51:23 52:1

**impressions** 29:11

**imprinted** 78:11

**improve**  62:13

**include**  22:21 37:14 39:14

**included**  71:11

**incorrect**

51:24

**independent** 34:7

**independently** 36:4

**indication** 78:21

**individual** 12:19 23:8 48:9 51:16, 25 56:25 70:6

**individuals** 46:11

**infected**  42:2

**information** 8:24 13:2 26:12,19 30:1 31:23 37:15 38:11, 22 39:5,22 40:17 42:9 44:11 45:11, 18 46:20 47:16,25 48:5 50:1 52:2,7,12 53:5 54:1,8, 21 56:10 67:10

**informed** 30:10,12 34:10,12 74:20,23,25 75:5

**initial**  10:24 15:12 60:23

**innocence**  83:2

**innocent**  25:24

**innocently** 25:4,5

**inquire**  46:21

**inquired**  11:2

**instance**  10:1 62:22

**intentionally** 22:18 62:23

**interaction** 14:13 29:12, 17 71:6

**interactions** 75:21

**interface**  42:7

**internet**  5:20 24:24 27:6,9 39:7 41:21 42:18

**interpret**  65:3 66:6 70:9

**interpretation** 66:5

**interpreted** 65:10

**interrupt** 44:20 50:16

**interview**  30:8 32:16 33:6,

8,16,18

**interviewed**
28:22

**intimately**
26:15 29:14

**introduced**
4:15

**investigate**
10:18 11:23
26:25 27:16
36:20 38:23
39:15 40:10,
20

**investigated**
30:4 45:24
47:19

**investigating**
7:11 56:20
64:7

**investigation**
4:23 7:2,8,9
8:12,24
12:1,23
15:24 20:20
21:3,18 22:3
23:4 26:15
28:13 29:3,
19 30:10,13,
21,25 31:4,
8,16,20 32:1
33:1,7 36:14
37:8,13
39:14,24
41:8,23
42:24 45:21,

25 47:16,21
48:3 69:11
72:5,6 74:23
75:2 76:9

**investigations**
6:14 22:13
30:22 31:3,
14,17 40:2
61:21 75:19
76:3,19 80:7

**investigative**
44:1 63:10

**investigator**
7:11 8:11
38:7 61:18
62:6,10,11
64:6,15
65:9,13 71:5
72:9

**investigators**
10:8 46:2
66:19

**involved**  10:22
13:3 22:13
26:15 29:19,
22 32:14
33:13 69:11

**involvement**
7:2

**involving**  31:5
32:18

**irreparably**
68:16

**issued**  48:25
54:7 77:4,6,

10,13,19

**issues**  40:8
59:18

**issuing**  21:20

**itech**  56:18

---

### J

**Jacksonville**
75:16

**Jimenez**  32:20

**job**  5:6,11
20:22 49:9

**John**  43:2

**John's**  42:16
46:13 68:24

**Johns**  5:9
7:17 30:15
38:2 83:2

**join**  23:1,15
24:12 26:8
37:18 49:2
57:4 59:2
63:13 65:16
67:18

**joined**  65:18,
19

**Jose**  32:19

**jurisdiction**
43:5

**justice**  48:10,
13

---

### K

**Kevin**  71:3,4

**kids**  25:9,10

**kind**  4:19 6:3
9:16 11:9
12:6,7,8,9,
10,24,25
13:1 15:11
18:2 19:5
20:17,21
25:22 32:20
33:25 34:1,
25 35:5
38:19 41:10
42:3 45:3
46:25 52:10,
11 55:25
57:12,23
58:9 59:19
64:17 70:13
74:4

**knew**  23:11
29:4,22 61:4
68:6,11

**knowingly**
22:17

**knowledge**  14:6
55:9

---

### L

**lack**  65:11

**lacy**  74:6

**language**  64:10

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: laptop..makes

laptop   28:4
  60:9 73:19,
  20,23

large   31:3

lascivious
  51:8,10,11

Lat   81:7

late   4:12

latitude   59:17

Latvia   81:8,9

Latvian   81:10

law   14:16
  18:3 23:4,18
  24:6 29:12,
  22,23 30:5
  31:1,5,10,
  15,19,21
  32:1,3,18
  43:4 46:12
  60:9 68:3,4,
  8 69:21
  75:6,13,18

laws   44:2,4
  48:22

Lawshe   4:22,23
  10:4 23:5
  26:2 27:5
  28:23 29:1,
  4,7,20 30:5
  31:21 34:9
  39:3 54:12,
  25 55:23
  67:25 68:19
  71:17,20

74:20 75:2
  76:9

Lawshe's   7:2,
  11 10:3,22
  11:1,5 15:18
  53:15 54:4
  75:5 83:2

lawyer   14:19
  20:22

lay   59:15

layer   57:11

layers   34:3

layperson
  14:10

lead   7:10
  21:10,14
  33:23 34:1
  38:22

leads   12:23
  40:17

leaning   27:23

learn   29:18

learned   18:3

leave   73:9

Lee   4:22
  28:21 33:1

left   74:13

legal   20:25
  41:17

legs   74:4

lesson   18:3

letter   57:23
  58:2 60:1,22
  63:18,19,23
  73:6,8 78:6
  79:2,6

letterhead
  58:2

letters   60:3

level   9:2
  36:13

license   58:24

lieutenant
  32:19 34:17

life   14:17,20
  19:1 57:15
  68:20

lifetime   14:14

light   19:25
  20:4

limited   31:24

lines   42:3

listed   26:12

listen   70:7

literature
  15:9

living   14:7
  20:19,20

loads   35:12

local   29:23

locate   9:7

located   29:10
  39:3

log   32:13

long   5:22 6:2
  22:2

longer   40:3

looked   49:14
  82:20

lot   34:14
  61:18,20
  67:4

loud   63:24

---

**M**

---

machines   42:19

Madam   19:25
  44:16

made   31:15
  32:13 45:12
  54:22,23
  56:9 62:22
  79:20

major   5:9,21
  6:10,16,24
  45:2 62:11

make   13:24
  19:17 33:20
  34:8 45:23
  50:8,19
  52:21 54:12
  60:2 72:24
  76:8

makes   6:12
  9:5 56:7
  70:15,20

making   20:8
 24:1 26:5
 40:1 49:9,22
 53:23 66:21

mal-ware   42:2

manageable
 35:12

manipulated
 77:15

mark   66:4

marked   49:24
 59:22 65:23

marking   50:22

material   11:21
 22:7 23:22
 24:10 25:3,
 12,20 36:11
 37:9,25 41:3
 43:4 63:3
 67:16

Matt   83:8

matter   63:1,10

matters   77:15
 81:1

mature   80:1

maturity   58:13
 79:20

meaning   36:5
 70:10 75:2

meanings   76:19

means   11:7
 21:6,13
 24:24 61:15

meant   52:9

media   32:6,9,
 11

medical   15:7
 58:15,19,24
 59:13

meeting   12:13
 28:11 60:20,
 23 73:11,14,
 15 74:19
 75:7 78:1

meetings   61:5,
 6 72:25

memo   57:22,23

memory   26:22

mere   82:13

met   33:2
 56:17 60:24
 75:22 76:2,
 12

Metart   26:22
 40:4,10
 76:12

Metart's   42:10

metart.com
 27:16 45:19,
 24 76:10,21

metart.com.
 45:13

Michael   4:16
 66:15 78:3
 80:13 82:1

microphone

27:22,23

mind   20:8
 56:5

minor   9:12
 16:10,12,15,
 18 50:3 51:7
 52:17

minute   12:16
 27:25

minutes   19:23
 27:21 39:5

miscarriage
 48:10

Missing   8:4

mistaken   32:10

misunderstanding
 61:3

misunderstood
 76:7

model   17:24
 18:9,10 26:3
 48:18 54:1
 55:14,22
 56:6 61:14
 63:7 64:12
 65:9 66:6,9
 80:15 82:13,
 19,20,21

model's   15:15

models   27:12
 39:4,7 42:17
 44:7 46:23
 54:7 61:23
 76:22 77:12,

18,21 79:17

mom   25:1

moment   29:24
 45:17 68:6
 76:5

month   34:24

motion   22:19

mouth   13:20

moved   45:2

moving   34:14

multiple   49:14

---

**N**

naked   25:1,10

named   4:22

names   78:24

national   8:3
 36:5

NCMEC   8:6
 34:19 35:17,
 23 36:8 55:5

necessarily
 25:24 38:14
 41:17 47:22
 79:25

necessity
 47:21

network   42:2,
 5,20,21

non-actionable
 53:4

North 7:6

noted 78:20 79:8

notes 72:12 76:6 80:25

number 60:10 75:25

numbering 55:5

---

### O

object 20:1,11 22:25 23:14, 24 24:11 26:7 37:16 39:17 40:22 44:13 46:14 49:1 55:24 57:3 65:15 66:24 67:17 69:2 83:5

objected 19:22 65:17

objecting 19:12,13,18

objection 44:17

objections 19:14

obtain 38:8 44:10 47:23

occasions 76:1

occurred 21:11,16

40:11 43:23 82:17

occurring 43:21

offer 75:12

office 5:10 7:17 10:9 28:11,22,24 30:23 32:8 33:3,6 36:18 38:3 42:2, 16,20 43:3 46:13 56:23 69:22 75:16

officer 23:10, 18 24:6 29:12,23 30:6,16 31:1,5,11, 15,19,22 32:1,4,18 46:12 68:3,4 75:6

offshore 41:15

older 19:5 54:1 66:10, 12 77:21 80:19

online 41:3

opened 29:21

opinion 11:2, 4,16 13:17 16:22,23 17:18 18:9 57:14 58:20

59:15 63:6 67:13 79:12, 16

opinions 45:18 58:3

opposed 12:7

opposite 23:17

order 23:8 48:23 83:13, 17

ordering 83:12

ordinarily 55:16

origin 38:19

original 13:22

originated 38:24

overseas 41:9

owes 68:25

---

### P

p.m. 83:19

paid 75:10

paragraph 60:8 78:10

part 11:25 22:21 32:16 39:24 43:9 45:24 75:12

partially 60:13

participate 33:15,17

participated 28:11,21 29:8 30:8 33:8

participating 33:6

parts 34:14

party 32:4

passport 80:15 81:2,10,14, 18 82:23

passports 53:20 77:2, 4,9,19

past 12:24 48:5 54:19 59:18 71:7 73:9

path 38:19

patrol 6:12, 20,21

pause 20:5 27:25

pedophile 70:10

people 11:6 22:11 48:13 59:16 71:20

percent 35:14 53:1,2

performed 33:7

perpetuating
  69:21

person  14:4,11
  18:1 19:7
  22:17 23:11
  32:22 80:1,9
  82:17,21

person's  19:7
  62:24

personal  11:9
  14:17

personally
  27:1 61:10

phone  11:5
  69:13,23
  71:18,21

photo  26:22
  54:2 82:24

photograph
  12:20 18:13,
  15 22:18
  63:7 66:3
  81:23

photographs
  27:11 53:16
  54:10

physically
  73:22

picked  55:17

picture  22:19
  25:1 56:5
  80:18

pictures  25:10
  27:12

place  73:1,12

places  81:19

plainly  60:14

Plaintiff  4:4

plaintiff's
  49:24 59:22
  65:23

plenty  57:15
  71:7

point  5:19
  11:10,11,13,
  14 12:23
  34:14 49:19
  55:13 58:7

police  46:15
  47:10

policy  56:23

pop  28:3

pornographic
  62:7

pornography
  4:24 20:24
  23:9 35:24
  36:9 44:5
  48:8 52:17
  56:21 61:19,
  20 64:8
  82:12

position  36:7

positive  32:8

possess  22:18

possessed
  24:18 25:4,5

possession
  4:24 20:24
  22:6 23:6,9,
  11,21 24:10
  25:3,11,20
  48:7 55:17
  56:20 67:15
  82:12

possibility
  82:13

posted  26:11

potential
  39:15 79:16

potentially
  38:11 64:12

powerful  48:23

practice  13:10

prepubescent
  49:16 50:2,
  10 51:7 63:9
  65:12

present  78:1

presentation
  22:20

presented  12:3
  13:17 43:13,
  15 53:15
  73:15,17

Preston  7:14,
  20 11:18
  12:3,12
  16:19 27:15
  28:10 30:2
  33:5 36:17

42:23 46:10,
  21 54:16,22
  67:9 73:21,
  23,24 74:14
  83:10

Preston's  72:5

prevent  37:24
  38:3

previously
  20:2,4 40:7
  76:2

printed  58:8

prior  6:6,9,
  11 8:14
  21:19,24
  29:2 30:10
  49:9 53:23
  66:20 72:23
  75:20 76:9

private  20:24

probable  21:6,
  8,12,19,23
  22:1 23:20
  24:8 26:5
  36:10 49:9
  54:4,11
  67:13,14
  76:3 82:12

problem  19:20
  20:23 72:14

procedure  4:20
  57:1

PROCEEDINGS
  4:1

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024　　　　Index: process..received

process 7:23
36:6 41:18
59:10,20

produced 18:13

professional
20:19 58:19
59:14

Professionally
29:2

prohibitive
39:1

proliferation
37:24 41:3

promoted 6:18

prosecute 43:5

prosecuted
47:20 48:7

prosecuting
64:7

prosecution
4:23

protected
20:25 42:20

protection
11:17 75:15

protective
59:12

prove 70:11
77:20 83:2,4

provide 75:18
79:11,15

provided 60:8

puberty 12:24
13:4,6,21

pubescent
51:15,24,25
52:17,23

pubic 13:11
60:11,16
61:14,25
63:8 64:13
65:11

public 14:10
26:3 27:9

publication
40:20 43:3

published
24:16 26:20
27:2,5,9,17
37:15 38:12
39:23 40:18

publisher 41:4
43:5

publishers
44:5

publishing
41:5 70:6

purported
37:13 77:18

purports 22:16
43:16

purpose 37:23

purposes 62:23

pursue 39:1
41:20

pursued 43:3
48:4

pursuing 47:15
53:6

put 13:19
35:13 58:18
62:24 63:18
80:13

---

**Q**

quality 17:24

quarter 8:10
34:23

question 10:3
13:22 14:25
15:3,14
16:12 17:9
19:23 20:9
23:25 24:3,6
39:4 40:16
43:10 46:24
53:22,23
54:6,7 56:4
63:22 77:16,
20 81:19

questioning
77:3

questions
12:16 58:12
72:16,20,22
82:5 83:7,11

quit 19:17

quote 22:9

quote/unquote

79:8

---

**R**

raises 56:4

range 48:21
64:19

rating 58:13
64:8 79:20

reach 28:23
57:16

reached 15:6

read 22:9,15
36:21 60:18
63:19,23,24
83:14

readily 54:21

reason 7:19
11:3 23:18
24:7 31:10
35:5 38:13
39:7 54:14
58:25 68:20,
22 75:3,8

reasonable
37:12 38:7
39:14,24
40:19 82:16,
20

reasons 53:14

recall 10:21
26:19 45:13
51:15

received 7:5

Case 3:24-cv-00044-JAR-SJH    Document 67-3    Filed 08/12/25    Page 40 of 45 PageID 756
WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024                    Index: receiving..Roberts

10:3,6 11:1
16:17 26:24
35:6 36:8
51:6 52:18,
20

**receiving**
34:19

**recognize**   81:6

**recognized**
29:25 32:12

**recollection**
22:16 34:7

**record**   4:16
19:13,19
28:6 42:10
75:14 76:8

**records**   46:22
54:9

**redacted**
81:15,19

**redirect**   82:7,
9

**refer**   8:10
15:9 57:15
58:5 77:24

**reference**
11:11,12,13,
15 40:2

**references**
15:9

**referred**   6:15
43:3 77:2

**referring**   5:13

8:5 9:24
24:23 49:19
50:3,20
78:10,12

**refers**   76:21

**regard**   14:23
69:6

**relate**   55:12

**release**   32:13

**relevant**   63:5,
6

**reliability**
59:21

**reliable**   45:10
73:7

**relies**   63:15

**rely**   52:1

**remains**   29:10

**remember**
10:12,15
32:9 34:13,
15,17 39:25
40:6 53:18
58:6,7
69:18,25
70:5 71:1
72:3 73:3,9,
25 74:3,21
75:24 79:22
80:20

**remembering**
37:4 47:14
75:22

**repeat**   24:4
71:19

**repeated**   71:25
72:2

**report**   35:17
36:8,9,21
37:5,6,11
49:13,15
57:21,22,24
58:5,6 71:8,
12 72:5
77:25 78:4

**Reporter**   19:25
20:3 27:19
44:17,18
83:15

**reports**   34:20,
22 49:8
57:20

**represent**
42:10 72:21

**representation**
22:19 79:21

**representing**
83:9

**represents**
62:25

**reputation**
68:12,16

**requested**
67:10

**require**   36:13

**required**
21:19,23

23:5 44:6

**requirement**
22:1 62:21

**resource**   59:6

**respect**   60:15

**responsible**
34:19

**retired**   6:25

**review**   36:5
57:20 60:9

**reviewed**   7:5
16:12,17
28:14,20
71:8 78:8

**reviewing**
11:12 52:6

**rhyme**   35:5

**rights**   22:1

**robbery/homicide**
6:15

**Roberts**   4:8,17
18:20,24
19:12 20:16
23:2,16
24:2,14
25:16 26:13
28:2,5,8
37:20 39:12,
20 41:1
44:14,21,22
46:17 49:4
50:4,18,21,
24 51:1 56:3
57:7 59:3,24

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024          Index: Roberts'..situation

63:4,17 64:1,21 66:1,16,17 67:1,20 69:4 72:15 77:2 78:7 79:19 80:4,17 81:7 82:6,10 83:7,11,13

**Roberts'** 20:9

**room** 35:15

**rotated** 6:20

**rules** 4:20

**run** 41:9

**ruse** 28:21 33:2,13

---

**S**

**safe** 73:11

**satisfies** 82:16

**scale** 31:3 79:20 80:3

**scenario** 13:3 15:6 17:7 18:6 25:25 38:16 39:18, 21 40:13 41:13 43:8, 13,15,17 47:15 48:2 52:11,20

**scenarios** 57:16

**scenes** 45:3

**scheme** 70:23

**screen** 49:23 50:16 51:3 60:2 82:25

**script** 78:11, 21

**search** 21:20 28:14,20 29:8 37:1,3 38:18 42:17 53:24 54:2,4

**seated** 74:4

**Section** 22:6

**seek** 11:16 48:13 53:24

**selling** 25:18

**semantics** 58:4

**seminar** 14:3

**sense** 9:16 52:22

**sensitive** 31:4,7,14, 16,17

**separate** 10:4 58:1

**sergeant** 4:10, 11 6:18,24 20:7 83:8

**sergeants** 5:8

**serves** 26:22

**service** 75:10, 13

**sexual** 11:20 22:7,22 23:22 24:10 25:3,11,20 36:11 37:9, 24 41:3 43:4 46:6 58:12 63:2 67:15 79:19

**sexually** 38:9 80:1

**share** 49:23 50:16 66:2

**shared** 51:3

**sharing** 60:1

**shaved** 60:12

**sheriff's** 5:10 7:17 28:22 30:16,23 32:8 38:3 42:1,16,20 43:2 46:13

**Shevlin** 18:17, 23 19:9,14, 18 20:11 23:1,15,23 24:12 25:13 26:8 37:18 39:9 49:2 50:15,19,22, 25 57:4 59:1 62:19 63:12, 21 64:16 65:15,17,19

**66:14 67:18 72:19 80:13, 16 81:8,13 82:1 83:16**

**shoot** 54:2

**show** 20:5 22:19 56:6 59:25

**showed** 55:13 73:22

**showing** 51:20 60:7,15

**shown** 73:17 74:11,12

**shows** 78:16

**side** 58:16

**sides** 35:15

**signature** 83:19

**signifies** 24:5

**signs** 58:21

**similar** 56:19

**simple** 53:4 77:16

**sir** 5:3 20:15 33:16,19 51:10 72:20 82:3

**sit** 5:6 26:18 34:6 51:14 65:14

**situation** 25:6

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: situational..tagged

31:5 38:16

**situational** 40:25 47:1

**situations** 59:15

**skim** 37:5

**skin** 12:10

**sloppy** 46:15 47:10

**SMR** 60:13,15 64:2,8 79:20 80:3

**society** 14:13

**socks** 74:5,6

**solely** 39:5 63:15

**someone's** 14:7,23 48:24

**sort** 48:18 56:23 72:4

**sought** 54:2

**sound** 22:22

**sounds** 6:9 34:18

**source** 18:18

**southwest** 29:9

**speak** 11:14 12:8 57:19 61:10 70:14

**speaking** 14:9 18:21 24:13

36:3 38:16 41:24

**special** 72:8

**specialized** 14:5,21 15:8

**specific** 13:1

**specifically** 70:1

**spent** 66:20

**spots** 81:15

**spread** 37:24 74:4

**St** 5:9 7:17 30:15 38:2 42:16 43:2 46:13 68:24 83:2

**Stage** 79:21, 24

**stand** 65:6

**standpoint** 63:11

**stands** 50:10 76:13

**start** 9:10 53:24

**starting** 20:10

**State** 42:11 53:17 69:22 83:3

**state's** 83:4

**stated** 77:1

**statement** 21:1 24:1 67:21 69:20 70:7, 18,22

**States** 21:1, 19,23 41:7, 16 77:7,10, 14

**stating** 54:8,9

**status** 75:6

**statute** 22:5, 7,8,12,14, 15,23 44:10 62:21

**statutes** 46:19 47:7

**step** 41:23

**steps** 36:19 37:7 38:7 49:11

**stood** 76:15

**stop** 41:3

**stuff** 4:20

**subject** 74:23 75:1

**submit** 18:6

**subordinates** 36:14

**Subsection** 22:6

**successfully** 47:19 48:7

**suggesting** 52:16

**supervise** 5:9

**supervised** 6:19

**supervision** 7:8

**supervisor** 5:19,23 6:4, 7,22,24 7:4 9:2 30:9,12 43:12

**support** 75:18

**supported** 54:10,11

**supporting** 34:2

**suppose** 10:13

**surprise** 76:16,24,25

**suspect** 9:6 23:19,21 24:7,9,17 52:12 53:6

**swap** 27:21

**sworn** 4:4

**Synchronoss** 28:15,16,19, 21 37:1

—————————
**T**
—————————

**tagged** 12:11

**takes** 63:16

**taking** 49:11 67:8

**talk** 32:24

**talked** 8:3 36:16,18 71:23

**talking** 7:24 8:9 9:19 29:19 43:18 46:25 50:9 51:19 54:18

**task** 7:7

**tasks** 33:7

**team** 11:17 15:7 59:12 75:15

**teen** 17:13

**teens** 76:15, 22

**telling** 40:3 58:20 59:8 71:17,20 72:3

**ten** 6:17

**tend** 9:3

**term** 9:25 21:8 35:23 36:1

**termed** 14:15

**terms** 21:12 47:1 76:20 78:16

**testified** 4:4 39:2 46:19 75:20 82:22

**testifies** 66:19

**testify** 35:21

**testimony** 45:14 72:23 75:23 76:7 79:22

**text** 79:7

**theory** 52:15, 16

**thighs** 60:14

**thing** 4:13 35:16 43:19 52:9 74:6

**things** 8:19 11:12 13:9 14:13,15 15:8 20:21 36:3 46:5 47:17 54:19 57:10,15 67:7,8 70:23

**thought** 8:20 24:1 33:11

**throw** 78:4

**tiebreaker** 57:2

**time** 5:25 6:10 9:12 10:12,15 11:19 18:14

19:15 21:3, 17 22:3 23:4 24:18 27:22 29:7 30:4 32:10 34:18 45:16 54:1, 9,22,23 66:20 67:8 72:16 74:19 77:21 82:4

**timeframe** 6:3, 7 8:9 34:3

**times** 49:14 56:17 75:22

**tip** 8:9,11 9:5,9 10:24 11:1,15,19 15:19,21,22 16:13,17 29:21,22 33:5 45:17 49:7,11,13, 15 51:6,13 52:4,5,18 53:11 55:6 68:7

**tips** 7:5,7,24 8:14,23 9:2, 4,8,13 10:4 15:19 51:18 52:6,13,19

**title** 5:6

**today** 4:17 5:7 26:18 27:8 34:6 51:14 60:8

83:11

**Tolbert** 4:3 20:7 51:2 82:11 83:8

**told** 17:14 32:22 34:15 39:22 51:12 69:15,16,17, 18,19,25 70:1,8,9 71:1,2 72:1 76:15 80:4

**tool** 48:23

**top** 36:21 78:17

**touched** 62:13, 17

**trading** 25:18

**trained** 46:5 62:10 75:18

**training** 12:18 13:22,23,24 14:5,16,22 15:8 43:25 46:2

**transferred** 45:1

**transition** 5:18 34:3

**transitioned** 6:21,23

**transitioning** 5:19,21

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024                    Index: traveled..website

traveled    81:12

travesty    48:9

treated    31:20

triage    9:3

true    23:17
  39:13 49:15
  57:2 70:25
  80:5

trust    58:25
  59:7,10,16

truth    59:8

turn    7:21

turned    48:8

type    17:23
  38:16 55:16
  73:8 79:3

typical    74:22

typically
  41:24

_____

**U**
_____

Uh-huh    8:25
  35:2

Ukraine    81:3

ultimately
  44:23

unconfirmed
  35:24 36:9
  52:5

underage    40:8
  82:14

understand
  4:18 7:13,23
  8:5 9:23,25
  13:21 16:2,8
  20:22 21:6,8
  23:3 24:16,
  17,21 26:14
  30:9 32:6
  34:20 35:21
  36:1 59:5
  61:11,12,14
  62:11 64:2
  67:8,23
  82:11 83:1

understanding
  14:6 36:7
  55:8 59:17
  64:10 69:12
  81:3

understood
  21:17,22
  68:2 72:24

underwear
  78:17

unit    5:9,20,
  21,23 6:4,
  10,19 7:16
  72:8

United    21:1,
  18,23 41:7,
  16 77:6,10,
  14

University
  59:12 75:15

unlawful    22:17

unreasonable
  40:24 41:12

uploaded    50:2

upward    35:3

utilized    44:9

_____

**V**
_____

vaginal    55:14

vaguely    37:4
  74:1

vantage    55:13

verification
  44:2 46:18,
  23 47:7
  48:22 77:11

verified    26:4

verify    48:24
  49:17 51:19
  52:3

Verizon    28:17

versus    14:4

victim    29:10
  39:16

victims    40:21
  46:6 72:8

view    22:18

viewed    36:4

viewing    26:2

violation
  46:12

visible    60:13,
14

visited    27:15

visiting    37:14

visually    82:24

vote    62:1

_____

**W**
_____

W-E-R-L-E
  30:18

waived    83:20

walks    9:17

wanted    32:25
  52:10

warrant    21:20
  28:14,20
  37:1,4 38:18
  53:24 54:3

watermark
  26:21 40:4,7
  79:3

ways    42:4

wearing    74:5

web    25:18

website    26:3,
  10,19,24
  27:1,4,16
  37:14 38:12
  39:15 40:7
  41:4,14,15,
  22,25 42:8
  43:16 44:11
  46:22 47:6

48:5 67:9 76:10

**websites** 40:19,20 41:6 42:17

**weed** 35:11

**weeds** 13:12

**week** 34:24

**weekends** 29:15 56:16

**weeks** 35:1,3, 4

**weighs** 14:17

**weight** 58:19

**well-established** 21:4

**Werle** 30:14, 16,20 32:17, 22 34:16

**white** 74:5 78:21

**widely** 60:15

**wife** 25:9

**wiggle** 35:15

**William** 4:22 30:19

**willy-nilly** 42:4

**window** 19:25

**wiped** 69:13, 23 71:10,18, 21 72:1

**wires** 26:23

**wished** 66:19

**wonderance** 70:13

**word** 24:21 35:8 43:7 47:18 51:9 78:11

**wording** 81:6

**words** 13:14, 19 25:15

**work** 45:24 46:16 47:10

**worked** 12:9 71:7

**working** 29:6,7

**works** 59:11

**world** 66:5

**worldly** 81:11

**worst** 4:13

**wrong** 42:15

**ww.com.** 43:17

___

**Y**
___

**y'all's** 13:10

**year** 6:21 13:1,13 17:12,15 47:13 80:11

**years** 6:5,6, 17,19,23

12:21 14:1 18:1 19:3 47:13 60:17, 18 64:14 65:5 66:7

___

**Z**
___

**Zoom** 19:24