UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE, an individual,

                                    CASE NO.:
                    Plaintiff,      3:24-cv-44-MMH-MCR

        vs.

MIKAYLA PRESTON, in her individual capacity as a detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

                    Defendants.
_____

                VIDEO-RECORDED DEPOSITION OF

                    **MIKAYLA PRESTON**

                Taken on behalf of Plaintiff


        DATE TAKEN:   Thursday, March 13, 2025

        TIME:         1:01 p.m. - 6:38 p.m.

        PLACE:        St. Augustine Court Reporters
                      1260 North Ponce De Leon Boulevard
                      Suite E
                      St. Augustine, Florida 32084




        Examination of the witness taken before:

                    Nicole Medlock
        Registered Professional Reporter and FPR-C

A P P E A R A N C E S


MICHAEL KEITH ROBERTS, II, Esquire

Nooney, Roberts, Hewett, & Nowicki
1680 Emerson Street
Jacksonville, Florida 32207-6104
904-398-1992
mroberts@nrhnlaw.com

appearing on behalf of Plaintiff.


MATTHEW JOSEPH CARSON, Esquire
CHRISTEN ANN PETRUZZELLI, Esquire (via Zoom)

Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
850-205-1996
mcarson@sniffenlaw.com
cpetruzzelli@sniffenlaw.com

appearing on behalf of Defendant Mikayla
Preston.


AMY R. SHEVLIN, Esquire (via Zoom)

Buchanan & Buchanan, P.A.
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471-8237
352-629-4099
ashevlin@rbtrial.com

appearing on behalf of Defendant Kathleen
Dully.


ALSO PRESENT:

ANDREW CUSIMANO, Videographer
AUTUMN ZEPF, Paralegal for Plaintiff

I N D E X

Witness                                                          Page

MIKAYLA PRESTON

     Direct Examination By Mr. Roberts.............    5

     Cross Examination By Ms. Shevlin.............. 263

     Redirect Examination By Mr. Roberts.......... 287

     Certificate of Oath.......................... 308

     Certificate of Reporter...................... 309

     Errata Sheet................................. 310


                    PLAINTIFF'S EXHIBITS

  Number    Description                              Page

  1         Cyber tip line report                     14

  2         Affidavit for search warrant              38

  3         Deposition of Mikayla Preston on          43
            November 21, 2023

  4         met-art.com Google search results         45

  5         2018 Florida Statute 817.071              85

  6         Letters to Mikayla Preston from          107
            Kathleen Dully, M.D.

  7         Photograph                               161

  8         Photographs                              223

  9         Photograph                               241


                    DEFENDANTS' EXHIBITS

                    (None marked.)

THE VIDEOGRAPHER: This begins Media Unit Number 1 to the video-recorded deposition of Mikayla Preston in the matter of William Lee Lawshe versus Mikayla Preston, et al., being heard before the United States District Court, Middle District of Florida, Jacksonville Division, Case Number 3:24-cv-00044-MMH-MCR. This deposition is being held at 1260 North Ponce De Leon Boulevard, Suite E, in St. Augustine, Florida. Today's date is March 13th, 2025, and the time is 1:01 p.m.

My name is Andrew Cusimano, and I am the videographer.

The court reporter is Nicole Medlock.

Counsel, will you please introduce yourselves, your affiliations, and the witness will then be sworn in.

MR. ROBERTS: Michael Roberts. I represent the plaintiff, Mr. Lawshe.

MR. CARSON: Matthew Carson, representing Detective Mikayla Preston.

MS. SHEVLIN: Amy Shevlin, representing Dr. Dully.

**MIKAYLA PRESTON,**

having been produced and first duly sworn as a witness on behalf of Plaintiff, and after responding "Yes, ma'am" to the oath, testified as follows:

THE VIDEOGRAPHER:  Before we start, I forgot to ask you --

THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q   All right.  Good afternoon.  Can you just state your name for the record, please?

A   Yes, Mikayla Preston.

Q   And, Ms. Preston, we're here today to take your deposition.  I introduced myself earlier.  As you know, I represent a gentleman named William Lawshe in a case that he's brought against you and another individual.

Are you currently employed?

A   Yes, sir, I am.

Q   And what's your current employment?

A   I'm an ICAC detective -- excuse me -- ICAC detective.  I don't know (unintelligible).

Q   With St. Johns County?

A   Yes, sir.

Q   All right.  And how long have you been an ICAC

Hold on.  I'm sorry.  I'm confused.  Are you saying that I can't believe what I saw on Google?

Q    You testified that you can't believe everything you see on Google.

A    Yes.

Q    Correct?

And so when you read that on Google, you knew that it may or may not be a credible thing that you saw?

A    Yes.

Q    And what I'm asking you is why would you swear under oath that it was credible?

A    Based off the other investigators and their dealings with MetArt.  I guess that's the right term, not really dealings but I guess prior cases that they've had and stuff like that.

Q    What investigator told you that they had a prior case with MetArt?

A    I believe it was Corporal Greene.

Q    We've taken Corporal Greene's deposition. He's testified that he's never had a case with MetArt.

A    Well, he told me differently, unfortunately.

Q    He told you that he had investigated a case involving an image from met-art.com?

A    Yes, when we originally had this case.

Q    You haven't reviewed his testimony?

history with it.

Q    You said:  This site has a known history of displaying CSAM images of teenage girls.

A    Yes, and has been encountered by other ICAC investigators in past investigations.

Q    And the only investigator that you can identify is Detective Greene?

A    Yes, sir.

Q    And you don't know if what he was telling you was reliable or not?

A    That I don't know because it was before I was even in law enforcement, if I'm not mistaken.

Q    Did he know that you put this statement in your affidavit?

A    I don't recall.  I don't know if we've ever discussed that.

Q    Tell me about this conversation with Detective Greene.  I mean, how did this come about?

A    When I was asking him about MetArt and if he's ever heard of it and anything he knows about it.

Q    Why were you asking him about MetArt?

A    Because I had never heard of it.

Q    Did you believe there was a connection between this image and met-art.com?

A    That -- like I stated before, I don't know.

THE WITNESS:  You're saying scientifically? That's the thing.  I don't know, I guess, how to answer it based off, like, that term being used.

BY MR. ROBERTS:

Q   So --

A   I don't want to misspeak.

Q   -- you -- you were the -- ultimately responsible for this investigation; correct?

A   Yes, sir.

Q   And you understand that when you apply for a search warrant, you have the obligation of only presenting reliable information to the court; correct?

A   Yes, sir.

Q   All right.  So we've talked about, you know, whether or not it was reliable that this website actually has a history of -- of child pornography. We've talked about that; correct?

A   Yes, sir.

Q   All right.  What I'm asking you is how did you satisfy yourself, being in charge of the investigation, that Dr. Dully's opinion about the age was reliable such that you could present it to a court?

MS. SHEVLIN:  Form.

MR. CARSON:  I'll join.

You can answer.

THE WITNESS:  And I'm sorry.  I'm thinking back to obviously when I went to her office, just because I don't recall specifically what she used to determine the age.  But her being a doctor in the medical field working with children, I think that also played into why I felt comfortable utilizing her.

BY MR. ROBERTS:

Q    So you met with her twice?

A    Yes, for this case.

Q    Okay.  The first time you met with her on February 22nd, did -- did she tell you that she could -- yeah, I can accurately, reliably estimate the age of the individual in this digital photograph?

A    I don't remember verbatim what she said.

Q    Do you remember getting that sense from her, that she was going to give you reliable information about the age?

A    Yes.

Q    Okay.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    All right.  Now, prior to showing her the image, you told her that this image came from a cyber tip; correct?

A    Not that I recall.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Okay.  That's okay.  I don't --

A    Yeah.

Q    -- have any record that you did.  I'm just trying to verify that I'm not missing anything.

A    No.  Sorry.  I'm just -- that's why my face kind of scrunched up.  I was thinking back to it.

Q    Sure.

All right.  And so you -- in this affidavit, you quote directly from Dr. Dully's letter; correct?

A    Yes, sir.

Q    And so you -- we've already asked you questions about the reliability of Dr. Dully's opinion.  But at that point, did you believe that Dr. Dully was a reliable source of information in estimating the age?

A    Yes, sir.

Q    Okay.  All right.  So is there anything other than Dr. Dully's report and the NCMEC tip that you submitted to the court -- well, strike that.

It looks like you submitted the information from the NCMEC report.  You submitted your -- your statement that met-art.com was a known -- has a known history of displaying CSAM.  And then the third thing

Q    Okay.  But did you -- did you -- that's what I'm asking you.

A    Yes.

Q    Did you do any -- did you submit anything other than the affidavit for the search warrant in support of probable cause to seek the search warrant?

A    Not that I recall, anything other than this.

Q    Okay.

A    I just know that we don't submit, obviously, NCMEC images.

Q    Well, you could show the -- I mean, do you -- do you believe that it would be improper for you to show a judge the image?

A    So all of our, like -- excuse me.  All of our search warrant stuff is electronic-based.  So I wouldn't be able to submit that electronically, that image.

Q    You don't have the ability to go to chambers to a judge to obtain a search warrant in person?

A    I mean, we can go in person.  It's just the judges prefer to do it electronically based.

Q    Okay.  But you have the ability to bring your laptop there --

A    Yes.

Q    -- if you wanted to show the image?

A    Yes.

pornography, would they?

A    What are you talking -- like, what are you referring --

Q    This officer that -- your colleague who looked at this and said, ah, this -- this is -- this could be age-difficult or an adult, however they characterize it, if they possessed this particular image, it would not be a crime; right?

A    That I can't say.

Q    Well, they don't believe that it's a minor, do they?

A    Yes.  But if somebody else was to -- let's say, had that investigation and investigated that officer and they felt the same way that I felt, it would be a crime.

Q    So you -- you're -- you're the determiner of what's a crime and not a crime?

A    No.  But I'm saying that they could have felt, hey, I have probable cause for this specific crime.

Q    But -- but this is what I'm struggling with, is you've acknowledged you've got no expertise as anybody else in this room, yet you get to determine what is and is not CSAM and what is or is not potentially a crime.  And that doesn't seem right to me.  But is that what you're saying; that's what it is?

MR. CARSON:  Object to form.

THE WITNESS:  That's not what I'm saying.  I'm not saming -- excuse me -- saying that I'm the judge and executioner of what is a crime.  What I'm saying is that I felt that this depicted a child, and I had that probable cause.  I had it reviewed by another doctor.  I had it reviewed by a state attorney, and that is why we proceeded with the investigation.  But I'm not saying that I am the end all/be all, no, sir.

BY MR. ROBERTS:

Q    Do you think that you conducted a reasonable investigation prior to arresting my client?

A    Yes, sir, I do.

Q    And why -- explain to me why that investigation did not include going to the website met-art.com.

A    Because at that point in my investigation, when I am trying to obtain probable cause for an arrest, going to MetArt was not during that point in my investigation.

Q    You knew that med-art.com potentially had exculpatory information.

MR. CARSON:  Object to form.

THE WITNESS:  No, I did not.

Q    Right.

So tell me, when did you make the decision to arrest Mr. Lawshe?

A    This was after everything was reviewed by both my sergeant, lieutenant, and then the state attorney.

Q    Okay.   If Dr. Dully would have told you that she could not help you, would you have pursued charges against Mr. Lawshe?

A    The case --

MS. SHEVLIN:   Form.

THE WITNESS:   -- wouldn't have stopped there.

BY MR. ROBERTS:

Q    So in a way, I guess your position is Dr. Dully -- really, her -- her opinion was the deciding factor in whether or not to proceed to -- pursue the charges or not pursue the charges?

MR. CARSON:   Object to form.

MS. SHEVLIN:   Form.

THE WITNESS:   I can't say that.

MS. SHEVLIN:   Mischaracterization of prior testimony.

BY MR. ROBERTS:

Q    Okay.   Well, let's just say -- I guess then, if I'm mischaracterizing it, just to confirm, if Dr. Dully, on February 22nd, would have told you, look,

I just can't help you for whatever reason, you would not have sought a search warrant in this matter?

A    That I can't say because --

MS. SHEVLIN:   Form.

THE WITNESS:   -- it would have been reviewed by my sergeant.   So I would have went back to the office, informed my sergeant of everything that occurred, and then it would have been his deciding factor.

BY MR. ROBERTS:

Q    If, on April 5th, you had gone to Dr. Dully and she would have said, I can't help you, would you have made the decision to arrest?

A    It would have been the same answer.   I would have gone back to my sergeant.

MS. SHEVLIN:   Form.

BY MR. ROBERTS:

Q    So when you said earlier that the investigation which would have ended, that wasn't true.

A    I'm saying that I would have went back to my sergeant, and he would have been the deciding factor. So I'm sorry.   I misspoke on that.

Q    Right.

MR. CARSON:   If -- if I could, I think you misheard what she said.

Q    Who -- who was responsible for making the decision to effectuate the arrest in this case?

A    That was something, like I said, that it was a group discussion, where it passed multiple points.  It passed not only the sergeant, the lieutenant as well as the state attorney.  It wasn't solely just one person.

Q    You were involved in that decision?

A    Yes, because it passed multiple points.

Q    And was Sergeant Tolbert part of that decision?

A    Yes, sir.

Q    Who was the -- who was the person in St. Johns County Sheriff's Office that was responsible for that decision?

A    I don't understand your question because --

Q    Where does the buck stop for that decision in ICAC at the time that this arrest was made?

A    I guess I'm a little confused.  And please correct me if I'm not going down the right path.

Q    Don't want you to.

A    But what I'm saying is it's not just one person.  Like, it doesn't just stop at one buck.  Like, it's multiple different people, including the state attorney, that it has to go through before we even get to that point.  So I can't just say, yeah, it's one

person because it's not, if that makes sense.

Q    But it wasn't you?  Was it you that made the decision to make this arrest?

A    What I'm saying is it's multiple people.  I agreed, if that's what you're saying, with the arrest as well as everybody else that was reviewing it, if that answers your question.  I don't know.

Q    Okay.  Did you make a recommendation to your supervisors?  How did you present that to your supervisors?

A    By doing the probable cause.  So I --

Q    So you did your probable cause affidavit for the search warrant.

A    Yes, uh-huh.

Q    You stated there was probable cause, and then you asked them to sort of sign off on that?

A    So they review it, yes.  But we also do have to have somebody sign off on it.  But they review it as well as the state attorney is reviewing the investigation and obviously Dr. Dully's statements, everything in its entirety.

Q    Okay.  So really, if there were this information that we're talking about, the passports and the website record custodian, Detective Tolbert's opinion or testimony about that would be relevant on

A    Yes.

Q    Not every case that you have do you present to the state attorney, do you?

A    If it's one that we're going to try to do a physical arrest day of, yes.

Q    But if you make the decision that we're not going to arrest, you don't -- do you have to get the state attorney's involvement in that?

A    They do.  Especially if we're going to be eventually forwarding charges, they're going to involved in it.

Q    I'm sorry.  I'm asking actually a different question.

A    Okay.  Sorry.

Q    If you make the decision that you're not going to -- there was another image that was the subject of the NCMEC report in this.  You're familiar?

A    Yes, uh-huh.

Q    You looked at it, and you discarded it.  You said, no, this is not CSAM; correct?

A    Uh-huh, yes.

Q    Was that your decision?

A    Yes.

Q    Did you run that by Sergeant Tolbert?

A    Yes.  He reviewed the image as well.

CERTIFICATE OF OATH

STATE OF FLORIDA      )

COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, Notary Public, State of Florida, certify that **MIKAYLA PRESTON** personally appeared before me on March 13, 2025, and was sworn.

Signed this 4th day of April, 2025.

/s/ Nicole Medlock_____
Nicole Medlock, RPR and FPR-C
Notary Public, State of Florida
My Commission No. HH 285922
Expires:  July 24, 2026

Personally known _____
OR Produced Identification _____X_____
Type of Identification Produced Driver's License

C E R T I F I C A T E

STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

            I, Nicole Medlock, Registered Professional

Reporter, certify that I was authorized and did

stenographically report the deposition of **MIKAYLA**

**PRESTON;** that a review of the transcript was requested;

and that the transcript is a true and complete record of

my stenographic notes.

            I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

            Signed this 4th day of April, 2025.


                /s/ Nicole Medlock_____
                Nicole Medlock, RPR and FPR-C