UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case 3:24-cv-00044-MMH-MCR

WILLIAM LEE LAWSHE, an individual,

      Plaintiff,

-vs-

ROBERT HARDWICK, in his official capacity as Sheriff of St. Johns County, MIKAYLA PRESTON, in her individual capacity as a Detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

      Defendants.

_____/

REMOTE DEPOSITION OF EUGINE TOLBERT

Taken on Behalf of the Plaintiff

DATE TAKEN:   Tuesday, December 17, 2024
TIME:         1:01 p.m. - 2:47 p.m.
PLACE:        Remotely via Zoom

Deposition of the witness taken before:

Maureen Hall, RPR, FPR

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

APPEARANCES:

Counsel for Plaintiff:


          MICHAEL K. ROBERTS, ESQUIRE
          LAW OFFICES OF NOONEY, ROBERTS, HEWETT, AND
          NOWICKI
          1680 Emerson Street
          Jacksonville, Florida 32207
          mroberts@nrhnlaw.com

Counsel for Defendants, Robert Hardwick and Mikayla
Preston:

          MATTHEW JOSEPH CARSON, ESQUIRE
          SNIFFEN & SPELLMAN, P.A.
          123 Monroe Street
          Tallahassee, Florida 32301-1509
          mcarson@sniffenlaw.com


Counsel for Defendant, Kathleen Dully:

          AMY K. SHEVLIN, ESQUIRE
          BUCHANAN & BUCHANAN, P.A.
          1900 Southeast 18th Avenue, Suite 300
          Ocala, Florida 34471-8237
          ashevlin@rbtrial.com

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 3

INDEX

REMOTE ZOOM DEPOSITION OF EUGINE TOLBERT

DIRECT EXAMINATION BY MR. ROBERTS:                    4

CROSS EXAMINATION BY MS. SHEVLIN:                    72

REDIRECT EXAMINATION BY MR. ROBERTS:                82

EXHIBITS

Plaintiff's Ex. No. 1  CyberTipline Report         49

Plaintiff's Ex. No. 2  4-5-23 Letter              59

Plaintiff's Ex. No. 3  Photo ID                   65

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
Eugene Tolbert on 12/17/2024

Page 4

PROCEEDINGS

Whereupon,

EUGINE TOLBERT, called as a witness by the Plaintiff, having been first duly sworn, testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q.  Good afternoon, Detective.  Is it detective? I saw -- are you sergeant detective or detective?

A.  Yeah, detective sergeant.  Call me anything, just don't call me late for dinner.

Q.  It won't be the worst thing you've been called, right?

Okay.  So Detective, I introduced myself just before we got on to the record.  My name is Michael Roberts.  I'm here to take your deposition today.  I understand that you have had your deposition taken before, so I won't go through the -- the kind of ground rules and procedure stuff with you.

We're here about a case, it's a -- my client is a guy named William Lee Lawshe.  Are you familiar with the investigation or the prosecution of Mr. Lawshe for allegations of possession of child pornography?

A.  Can you hear me?

I am.

Q.   You are.  Okay.

A.   Yes, sir.

Q.   Yeah, sorry.

So first of all, tell me, what -- what's your -- your title, your job title, as we sit here today?

A.   So currently I'm of two sergeants assigned to supervise the major crimes unit at the St. Johns County Sheriff's Office.

Q.   And what was your -- your job back in the beginning of 2023?

A.   When this case was going?  Are you referring to when this case --

Q.   Yeah.

A.   -- was going on?

Q.   Yes.

A.   I was in -- I was in transition at that point.  I was transitioning as the supervisor of the Internet Crimes Against Children Unit, ICAC, transitioning back to major crimes unit.

Q.   So how long were you -- I think you -- were you the supervisor of the ICAC unit --

A.   Yeah.

Q.   -- back at that time?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 6

A.    Yes.

Q.    And how long had you done that?  And just give me kind of the timeframe of when you were the supervisor of the ICAC unit.

A.    About two years.

Q.    And prior to that two years, so I'm guessing '21 to '23 timeframe, you were the ICAC supervisor?

A.    Correct.

Q.    Prior to that, it sounds like you were in the major crimes unit at that time, too?

A.    Correct, prior to.  So I was -- I was a patrol deputy from 2001 to 2009, if this makes it easy.

Q.    Yeah.

A.    2009 I came to investigations in what was then referred to as robbery/homicide is now referred to as major crimes, so it's changed its name.  I was there for ten and-a-half years as a homicide detective. While I was there, I got promoted to sergeant in 2018 and supervised that unit for two additional years.  And then in 2020, I rotated back to patrol.  I did just a little over a year in patrol.  In '21 I transitioned to ICAC as a supervisor of ICAC.  I was there for about two years, and then I transitioned back to the supervisor of major crimes because the other sergeant retired.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 7

Q. So can you just describe for me what your involvement in the investigation of Mr. Lawshe's case was?

A. Yeah. So as the ICAC supervisor, I reviewed -- received and reviewed the cyber tips that were sent to our agency through the North Florida ICAC task force. And I assigned tips out to detectives for follow-up investigation and then general supervision of the investigation.

Q. In this case, did -- were you the lead investigator investigating Mr. Lawshe's case?

A. I was not, no. I assigned it to a detective.

Q. Now, I understand you assigned it to Detective Preston; is that correct?

A. Yes, correct.

Q. And she was the detective in the ICAC unit at St. Johns County Sheriff's Office?

A. She was, yes. She still is.

Q. Is there any particular reason that you assigned this case to Detective Preston?

A. It was her turn in the barrel.

Q. So let me ask you this. I just want to understand your -- your process of dealing with the -- the -- the cyber tips. That's what we're talking about, correct?

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 8

A.   Yes.

Q.   We just had a deposition with Mr. Greene or Detective Greene, and we talked about National Centers for Missing & Exploited Children.  That's what we're -- you understand that's what I'm referring to when I say "NCMEC"?

A.   Yes.

Q.   All right.  And do you, when you get the cyber tip -- and we're talking about in the timeframe, let's just say first quarter of 2023, do you refer every cyber tip to an investigator or detective for what you say, further follow-up investigation?

A.   No.

Q.   Did you cull out any cyber tips prior to assigning them to the detectives?

A.   When you say "call out," I'm not quite sure what you mean by that.

Q.   Yeah.  So cull, my grandmother used to cull things, but --

A.   Oh, I'm sorry, cull.  I thought you said "call."  I apologize.

Q.   No, no, cull.

A.   Yeah.  So not all tips are -- have enough information for a follow-up investigation.

Q.   Uh-huh.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 9

A.   So instead of just drowning the detectives in tips that don't go anywhere, at the supervisor level, we tend to try to triage those to a certain extent for tips that are actionable.

Q.   Okay.  And what makes a tip actionable?  Is it like an identifiable suspect that you can -- you can locate?

A.   Those are great tips, sure.  Yeah, if -- if we know who the bad guy is when the tip comes in, that's -- that's a great start.

Q.   Okay.  Do you evaluate whether or not the particular image is or is not of a minor at the time that you're assigning these tips?

A.   Yes.

Q.   And tell me, how do you do that?

A.   Just based on kind of a common sense approach.  If it looks like a duck and walks like a duck, then we call it a duck.

Q.   So we were talking to Detective Greene, and he described something called age-difficult as a category.  Are you familiar with that?

A.   I don't know that it's a category, more of a description, but, yes, I understand what you're referring to.

Q.   What do you understand that term to mean?

Page 10

A.   So for instance, in -- in -- and I don't want to get ahead of you, but I think I'm answering your question.  But in Mr. Lawshe's case, we received two separate tips on Mr. Lawshe.  One of those images I did not assign out because I deemed it to be age-difficult.  The second image that we received, I did assign out because I deemed it to be decent.

Q.   Okay.  Is it sometimes that investigators in your office disagree about what is age-difficult or what is CSAM?

A.   I wouldn't say we have a deliberate conversation about it.  I can't really remember a time that there was a delineated disagreement.  I suppose it's possible that there would be a disagreement, but I just don't remember a time when someone said, No, I don't agree with you.

Q.   Okay.  Would you -- if something was age-difficult, I mean, do you ever investigate age-difficult images?

A.   We do, yes.

Q.   Yeah.  So do you recall whether or not the images involved in Mr. Lawshe's case were age-difficult?

A.   So the initial tip that did not get assigned out, I did deem that to be age-difficult.  The second

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 11

tip that we received in Mr. Lawshe's case, we felt like it was CSAM, but we inquired about a second opinion.

Q.   And the reason I ask is, I asked Detective Greene, and in his opinion, all of the images on Mr. Lawshe's phone were age-difficult.  Is that just you guys disagree about that, or some people have a different definition of what age-difficult means?

A.   No.  So I think it's really based on the personal experience in kind of -- so I have two daughters, obviously, you know, there is a point of reference there.  Everybody might not have that point of reference when, you know, reviewing these things.  I don't know what Detective Greene's point of reference is, so I can't speak to that.  But from my point of reference, I felt that it was an actionable tip.  But as I said, we did seek a second opinion through Dr. Dully at the Child Protection Team.

Q.   Did you communicate to Detective Preston at the time that you communicated the tip that you felt like the image -- image constituted child sexual abuse material?

A.   Yes.

Q.   Did you ask her to investigate that?

A.   Yes.

Q.   And -- all right.  Were you a part of the

Page 12

investigation?

A.   So as far as the -- I went with Detective Preston to see Dr. Dully when we presented the images to the doctor.

Q.   Okay.

A.   It was more of a -- kind of a let's just get it done and take care of this kind of deal as opposed to kind of holding her hand, so to speak.  But that's just kind of how it worked out.  It wasn't really that, you know, I had any skin in the game.  I just kind of tagged along.

Q.   So you went with Detective Preston to the meeting with Dr. Dully?

A.   Correct.

Q.   All right.  I want to -- I'll ask you some more detailed questions about that in a minute.

So other than, you know, the fact that you have two daughters, what training do you have in determining if a particular individual displayed on a -- a photograph is, let's say, the difference between 17 and 18 years old?

A.   I don't know that we would get into those leads in an investigation.  By that point, you're -- you're kind of past puberty, and those are going to be very difficult images to kind of hash out, between a 17

Page 15

you look at a duck, you can usually tell a duck is a duck.  I don't mean to be facetious, but this is the best way I can explain it.  So if you have a question as to, you know, any further detail, then you might need to dig deeper.  And that's what we did in this scenario when we reached out to Dr. Dully and the CPT team.  So obviously Dr. Dully has a medical background.  She has specialized training and things like that.  She has references she can refer to as far as literature to give us a better estimate of age.  But it's really just kind of a, you know, this one looks like this and this one looks like that initial assessment of the case.

**Q.   Okay.  So does the fact that you took the image to Dr. Duly mean that there was some question about the -- the model's age?**

A.   No.  So if we didn't feel like it could be CSAM, we wouldn't have taken it to Dr. Dully to begin with.  So as I said, in -- in Mr. Lawshe's case, we got two tips.  The first tip we deemed not -- to not be actionable right off the bat.  We did not take that to Dr. Dully.  I just closed that tip out.  The second tip I felt like was actionable.  We took that tip to Dr. Dully.  Dr. Dully agreed that it appeared to be a child, and then we went forward with the investigation from there.

Page 16

Q.   Yeah, and I -- and I -- so I'm just -- I'm trying to understand.  So sometimes you don't take images to Dr. Dully, correct?

A.   That's correct.

Q.   If something is obviously a child, you -- you don't take it to -- to Dr. Dully, correct?

A.   Correct.

Q.   And that's what I'm trying to understand is, in this case, doesn't it say that this was not obviously a minor because you took it to Dr. Dully?

A.   I mean, I don't know how to better answer your question.  I felt it was a minor when I reviewed the tip.  And, you know, to be fair, if we had taken it to Dr. Dully and Dr. Dully said, No, this is not a minor, then we would have went with what Dr. Dully said.  You know what I mean?  But on face value when I reviewed the tip, when I received the tip, I believed the image to be of a minor.  I assigned it to Detective Preston.

Q.   Right.

A.   And we took the image to Dr. Dully for a second opinion.

Q.   For a second opinion.  Okay.

A.   So I don't have a better answer than that.

Q.   Well, really, and you just keep answering the

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 17

best you can.  Okay?

A.    Sure.

Q.    But -- but when you say you believed that this was a child, it -- it wasn't obviously a child, though, was it?

A.    So I can tell you this.  And I will give you a scenario.  If I --

Q.    I really just want you to answer the question, really.  I mean, it wasn't obviously a child. You wouldn't have taken it to Dr. Dully if it was obviously a child, would you?

A.    Well, it obviously wasn't a two year old, so I believed it to be an early teen child.

Q.    And if someone would have told you, no, this -- this is an 18 year old, you would have believed that too?

A.    If someone who had the expertise to give that opinion, then, yeah.

Q.    What if someone had a copy of her ID and said here's her ID, she's 18, would you have believed that?

A.    Oh, absolutely.  Yes.

Q.    Okay.  All right.  Okay.

But I guess what I'm saying is, is the type and quality of imaging that we're -- that the model is, it's not something that you would look at and say

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

Page 28

just --

MR. ROBERTS:  Absolutely.

THE WITNESS:  I'll pop out and go on my laptop.

MR. ROBERTS:  Absolutely.

(Off record)

THE WITNESS:  I'm not aware of that, no.

BY MR. ROBERTS:

Q.  So you indicated that you went with Detective Dully to -- I'm sorry, Detective Preston to Dr. Dully's office, and you participated in that meeting.  Other than that, what else, if anything, did you do in this investigation?

A.  I reviewed a search warrant for the -- I think it was Synchronoss.  Hang on a second.  I've got the case file right here.  Is Synchronoss correct?

Q.  Yeah, that's right, Verizon --

A.  Yeah.

Q.  -- Synchronoss, or something like that.

A.  Yeah.  So I reviewed the search warrant for Synchronoss, and I participated in the ruse when Lee came into the sheriff's office and was interviewed.

Q.  Did you -- did you reach out to Mr. Lawshe to get him to come in to the office?

A.  I did, yes.

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 33

investigation as it went forward.  And then when Lee came in during the ruse, we actually met in Bill's office.

Q.   Okay.  All right.  So other than assigning the tip, going with Detective Preston to Dr. Dully's office, participating in the interview, are there any other tasks that you performed on this investigation?

A.   I never said I participated in the interview. I'm not sure where you got that from, but I did not -- I did not --

Q.   I thought you said you were there.  Yeah, I'm sorry.

A.   No, I was involved in the ruse when he was --

Q.   Okay.

A.   -- taken into custody.  I didn't participate in the interview, no, sir.

Q.   My bad.  So you did not participate in the interview?

A.   No, sir.

Q.   All right.  Whose decision was it to make an arrest?

A.   I got to be honest with you, I don't know.

Q.   That's okay.  Would that usually be the lead detective's decision?

A.   It's generally a kind of a -- a combination

**Page 34**

of the lead detective and the chain of command kind of supporting the decision.  We were in a little bit of a transition during that timeframe, so we had two layers of chain of command.  So that's why I don't know whose decision it was.

Q.   As we sit here today, do you have an independent recollection of a conversation that you had with anyone regarding the decision to make an arrest of Mr. Lawshe?

A.   I don't.  I was just informed that it happened.

Q.   Okay.  All right.  Who informed you?

A.   I don't remember.  I -- it was -- at that point, there were a lot of moving parts.  I just -- I don't remember who actually told me that he was going to be arrested.  It might have been Captain Werle.  It might have been my lieutenant.  I don't remember.

Q.   At that time, it sounds like you were responsible for receiving and disseminating the NCMEC cyber reports.  Did I understand that correctly?

A.   Correct, yes.

Q.   How many reports do you think you would get back first quarter of -- of 2023?  And you can estimate by week or month, if you can.

A.   It's kind of hard to estimate because some

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 35

weeks were busier than others.

Q.   Uh-huh.

A.   So some weeks we would get upward of 50. Some weeks we would get two.  So really it -- there was really no rhyme or reason to it.  It's just kind of, you know, however we received them.

Q.   And is there a way for you to estimate how many of those you -- we used the word culled, but did not assign because you felt like they weren't actionable just by looking at the image?

A.   I tried to weed out as many as possible just to keep the detectives' case loads manageable.  If I had to put an estimate on it, I would say probably somewhere around 50 percent.  But, you know, there's wiggle room on both sides there, so...

Q.   Was it a relatively common thing that you would get a NCMEC report and it would not be actionable?

A.   Correct, yes.

Q.   All right.  Whether it was 60 or 40, I understand you can't testify to that?

A.   Correct.

Q.   Are you familiar with the NCMEC term "Unconfirmed child pornography"?

A.   I am, yes.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

**Page 37**

know that she did the search warrant for Synchronoss and got some data back there.  I'm not sure if there's -- she might have did a cell cite search warrant.  I'm vaguely remembering something about that. I'm trying to skim over the report right now.

Q.   Other than what's contained in the report, are you aware of any steps that she took to complete her investigation into whether or not these images constituted child sexual abuse material?

A.   No, I'm not aware of anything outside of what is documented in her report.

Q.   Okay.  Do you agree that any reasonable investigation of -- that a purported depiction of CSAM would include visiting the website where that image was published, if that information was available?

MR. CARSON:  Object, form.

THE WITNESS:  No, I don't --

MS. SHEVLIN:  Join.

THE WITNESS:  -- I don't agree with that.

BY MR. ROBERTS:

Q.   You don't agree with that?

A.   No, I don't.

Q.   Okay.  So do you agree that ICAC's purpose is to prevent the proliferation and spread of child sexual abuse material?

Page 39

be prohibitive to pursue that, so...

Q.   Detective Greene has testified that he located, along with counsel for Mr. Lawshe, both of the models that are in question here within about 20 to 30 minutes based solely on the information that was contained in the images.  He found those images and models on the internet.  Do you have any reason to disagree with that?

MS. SHEVLIN:  Form.

THE WITNESS:  If that's what Detective Greene said, that's fine.  I'm not aware of that.

BY MR. ROBERTS:

Q.   Okay.  But if that's true, don't you believe that a reasonable investigation would include going to that website to investigate the context or potential identity of the victim?

MR. CARSON:  Object to form.

THE WITNESS:  Again, not in every scenario, so...

BY MR. ROBERTS:

Q.   But in this scenario where you had information that told you where they were being published, don't you think that that should be a reasonable part of the investigation?

A.   So I remember having a conversation with

**Page 40**

Detective Greene about this case and him making a reference -- he's been doing ICAC investigations for quite a bit longer than I have -- and him telling me that Metart that had the watermark on the image or one of the images, I'm not sure if it was on all of them or not, but I remember at least one of them having that watermark, that that website had had -- previously had issues with displaying images of underage females. Now, beyond that, whether or not someone should have gone to Metart to investigate that, I don't know if that occurred. I certainly don't think it would have been a bad idea, but, again, context-wise, you know, not in every scenario.

**Q. Okay. And I appreciate your answer. And I appreciate that you do not know exactly what was done, but my question to you is, do you agree that given the context that you know or have information that leads you to believe that it was published on particular websites, that it would be reasonable to go to those websites to investigate the publication or identity of the victims contained in those images?**

MR. CARSON: Object to form.

THE WITNESS: I don't think it's unreasonable. Again, like I said, it's situational based upon, you know --

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 47

absolute terms, and I would say it's situational.  So when you say should she have, I don't know that she should have.  Could she have, yes, she could have. So...

Q.   Right.  If she had the ability to be able to go to the website, and that website said, Hey, we -- we complied with federal age verification statutes, she could have asked for that documentation, correct?

A.   She could have, yes.

Q.   I mean, do you think it's sloppy police work to not do that, in this case?

A.   So I can tell you that I'm not aware in the year and-a-half, just under two years that I was in ICAC, of us in -- I could just not be remembering a scenario, but I'm not aware of us ever pursuing that information in an investigation.  So is it one of those things that you could do, yes, but when you say -- you know, when you use the word "should," well, we have quite a few cases that we've investigated successfully prosecuted, closed out, that that was never done in. So is it a necessity for an investigation, no, not necessarily.

Q.   It's not necessary to obtain a conviction, but is it necessary to at least get all of the information that's available?

Page 56

without having the advantage of seeing the image, you know.

BY MR. ROBERTS:

Q.   But it at least raises a question in your mind about the charge of a -- of a picture that doesn't show the face or breast of the model?

A.   I mean, it certainly makes it more challenging.  So I don't know the circumstances in which that decision was made, so I don't know if there's more information available that I'm not aware of.

Q.   Okay.

A.   Like I said, based on not having seen the image, I couldn't really say one way or another.

Q.   Okay.  Doctor Dully, do you know Dr. Dully?

A.   I mean, we don't hang out on the weekends, but I have met her probably a half a dozen times or so when I was in iTech.

Q.   And was it all under similar circumstances where you were investigating possession of child pornography?

A.   Yes, correct.

Q.   I heard that sort of the office policy or custom was that if an image was age-difficult and there was a disagreement about the age of the individual,

Page 59

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

BY MR. ROBERTS:

Q.   I mean, is there something -- do you understand what I'm saying?  I mean, is she just a resource, and you say you don't hang out with her.  I mean, you just implicitly -- you trust her, that she's telling you the truth?

MR. CARSON:  Form.

THE WITNESS:  Well, I trust the process in that she has consulted on cases before.  She works for the child protective team with the University of Florida.  You know, she obviously is a medical professional, would obviously be able to give her expert opinion in situations, where we as lay people can't, and I trust that a court would give her latitude with that, and from my understanding, has in the past.  So I'm not aware of any issues, you know, with any -- any kind of -- you know, for me to doubt that process or for me to doubt her reliability.

(Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. ROBERTS:

Q.   Right.  Okay.  So I just want to show you,

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 74

A.    Vaguely.

Q.    Can you describe it for me?

A.    If I remember correctly, it's a little girl, kind of seated with her legs spread.  I think that's the one where she's wearing white socks or like little lacy socks, is the only thing that she has on.

Q.    And can you see the -- you said "little girl," but can you see the little girl's face in the image?

A.    Yes, yes, you could.

Q.    And when Dr. Dully was shown this image, was she given a copy, or was she shown the image on the computer, and then the computer left with you and Detective Preston, and Dr. Dully does not have access to that?

A.    No, she doesn't have access to it.  We -- we -- it was only on the computer, and we took the computer with us.

Q.    Okay.  At the time of this meeting, was Dr. Dully informed of the identity of Mr. Lawshe?

A.    I don't remember.

Q.    Would it be typical that Dr. Dully be informed of who the subject of investigation is?

A.    No.

Q.    More likely than not she was not informed

WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.
Eugene Tolbert on 12/17/2024

Page 75

regarding the name or identity of the subject of the investigation, meaning Mr. Lawshe?

A. Yeah, she wouldn't really have a reason to know that, so...

Q. Would she have been informed of Mr. Lawshe's status as a law enforcement officer during this meeting?

A. No, again, she really wouldn't have a reason to know that.

Q. And Dr. Dully was not paid for this service, correct?

A. No, she's part of the CPT, so they offer this service to law enforcement.

Q. And can you define "CPT" for the record?

A. Child protection team at the University of Florida. They have an office in Jacksonville, and they handle abuse cases. They have doctors that are forensically trained to provide law enforcement support for abuse investigations.

Q. And you testified earlier you had some prior interactions with Dr. Dully. I think you said you've met her approximately six times. Am I remembering that testimony correctly?

A. Five or six, yes. I don't remember the exact number. But that's a fair estimate.

**Page 76**

Q.   And on those five or six occasions that you had previously met Dr. Dully, were they all within the context of investigations regarding probable CSAM?

A.   Yes.

Q.   Give me one moment.  I'm just looking through my notes here.

I misunderstood your testimony earlier.  I want to ask you again to make sure the record is clear, prior to the investigation regarding Mr. Lawshe, were you familiar with the website metart.com?

A.   No.

Q.   Okay.  Do you know what the MET in Metart stands for?

A.   I do not.

Q.   If I told you it stood for most erotic teens, would that surprise you, based on the content that you saw?

A.   No, there's often, like in ICAC investigations, there's often hidden meanings in different terms.

Q.   And were you aware that metart.com refers to their models as teens and girls?

A.   I'm not aware of that, no.

Q.   Would it surprise you?

A.   No, it doesn't surprise me.

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

**Page 84**

                    CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF JACKSONVILLE


        I, the undersigned authority, certify that

the aforementioned witness Eugine Tolbert, personally

appeared before me via remote teleconference and was

duly sworn on Tuesday, December 17, 2024.

        Dated this 27th day of December, 2024




_____

MAUREEN HALL, RPR, FPR
Notary Public – State of Florida
My Commission Expires:  3/17/25
My Commission No.:  HH065896

Identification presented by Deponent:
License

**WILLIAM LEE LAWSHE vs ROBERT HARDWICK, ET AL.**
**Eugene Tolbert on 12/17/2024**

**Page 85**

C E R T I F I C A T E

STATE OF FLORIDA

COUNTY OF JACKSONVILLE

I, MAUREEN HALL, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Florida at Large, do hereby certify that I was authorized to and did stenographically report the foregoing remote deposition; and that the transcript is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, parties' attorney, or counsel connected with the action, nor am I financially interested in this action.

Dated this 27th day of December, 2024.

_____

MAUREEN HALL, RPR, FPR
Notary Public - State of Florida