UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE, an
individual,

                                    CASE NO.:
                Plaintiff,          3:24-cv-44-MMH-MCR

      vs.

MIKAYLA PRESTON, in her
individual capacity as a
detective for St. Johns County
Sheriff's Office, and KATHLEEN
DULLY, in her individual
capacity as medical director
of the UF Child Protection
Team,

                Defendants.
_____

                VIDEO-RECORDED DEPOSITION OF

                    **MIKAYLA PRESTON**

                Taken on behalf of Plaintiff


        DATE TAKEN:  Thursday, March 13, 2025

        TIME:        1:01 p.m. - 6:38 p.m.

        PLACE:       St. Augustine Court Reporters
                     1260 North Ponce De Leon Boulevard
                     Suite E
                     St. Augustine, Florida 32084




        Examination of the witness taken before:

                Nicole Medlock
        Registered Professional Reporter and FPR-C

A P P E A R A N C E S


MICHAEL KEITH ROBERTS, II, Esquire

Nooney, Roberts, Hewett, & Nowicki
1680 Emerson Street
Jacksonville, Florida 32207-6104
904-398-1992
mroberts@nrhnlaw.com

appearing on behalf of Plaintiff.


MATTHEW JOSEPH CARSON, Esquire
CHRISTEN ANN PETRUZZELLI, Esquire (via Zoom)

Sniffen & Spellman, P.A.
123 North Monroe Street
Tallahassee, Florida 32301-1509
850-205-1996
mcarson@sniffenlaw.com
cpetruzzelli@sniffenlaw.com

appearing on behalf of Defendant Mikayla
Preston.


AMY R. SHEVLIN, Esquire (via Zoom)

Buchanan & Buchanan, P.A.
1900 SE 18th Avenue, Suite 300
Ocala, Florida 34471-8237
352-629-4099
ashevlin@rbtrial.com

appearing on behalf of Defendant Kathleen
Dully.


ALSO PRESENT:

ANDREW CUSIMANO, Videographer
AUTUMN ZEPF, Paralegal for Plaintiff

I N D E X

Witness                                                      Page

MIKAYLA PRESTON

     Direct Examination By Mr. Roberts.............  5

     Cross Examination By Ms. Shevlin.............. 263

     Redirect Examination By Mr. Roberts.......... 287

     Certificate of Oath.......................... 308

     Certificate of Reporter...................... 309

     Errata Sheet................................. 310

PLAINTIFF'S EXHIBITS

Number    Description                                    Page

1         Cyber tip line report                          14

2         Affidavit for search warrant                   38

3         Deposition of Mikayla Preston on               43
          November 21, 2023

4         met-art.com Google search results              45

5         2018 Florida Statute 817.071                   85

6         Letters to Mikayla Preston from               107
          Kathleen Dully, M.D.

7         Photograph                                    161

8         Photographs                                   223

9         Photograph                                    241

DEFENDANTS' EXHIBITS

(None marked.)

THE VIDEOGRAPHER:  This begins Media Unit Number 1 to the video-recorded deposition of Mikayla Preston in the matter of William Lee Lawshe versus Mikayla Preston, et al., being heard before the United States District Court, Middle District of Florida, Jacksonville Division, Case Number 3:24-cv-00044-MMH-MCR.  This deposition is being held at 1260 North Ponce De Leon Boulevard, Suite E, in St. Augustine, Florida.  Today's date is March 13th, 2025, and the time is 1:01 p.m.

My name is Andrew Cusimano, and I am the videographer.

The court reporter is Nicole Medlock.

Counsel, will you please introduce yourselves, your affiliations, and the witness will then be sworn in.

MR. ROBERTS:  Michael Roberts.  I represent the plaintiff, Mr. Lawshe.

MR. CARSON:  Matthew Carson, representing Detective Mikayla Preston.

MS. SHEVLIN:  Amy Shevlin, representing Dr. Dully.

**MIKAYLA PRESTON,**

having been produced and first duly sworn as a witness on behalf of Plaintiff, and after responding "Yes, ma'am" to the oath, testified as follows:

THE VIDEOGRAPHER:  Before we start, I forgot to ask you --

THE WITNESS:  Yes.

DIRECT EXAMINATION

BY MR. ROBERTS:

Q    All right.  Good afternoon.  Can you just state your name for the record, please?

A    Yes, Mikayla Preston.

Q    And, Ms. Preston, we're here today to take your deposition.  I introduced myself earlier.  As you know, I represent a gentleman named William Lawshe in a case that he's brought against you and another individual.

Are you currently employed?

A    Yes, sir, I am.

Q    And what's your current employment?

A    I'm an ICAC detective -- excuse me -- ICAC detective.  I don't know (unintelligible).

Q    With St. Johns County?

A    Yes, sir.

Q    All right.  And how long have you been an ICAC

detective?

A     Since 2022, if I'm not mistaken, yeah.

Q     Now, for the court reporter, let's say what ICAC -- can you -- that's an acronym, I understand. What is that an acronym for?

A     Yes.  It's for Internet crimes against children.

Q     And you've been deposed in this case before, not in this case but in the case of Mr. Lawshe, the State versus Mr. Lawshe; correct?

A     Yes, sir.

Q     And have you had an opportunity to review that deposition?

A     Yes, sir.

Q     All right.  I'm not going to go through the rules of a deposition because I know you've had your deposition taken multiple times.  But from time to time, I may remind you if we start, you know, talking over one another or something like that.  Okay?

A     Yes, sir.

Q     All right.  Now, we sit here today.  It's March 13th, 2025.  What day did you effectuate this arrest on Mr. Lawshe?

A     I do not recall the specific date.

Q     Okay.  April of 2023 sound correct?

A    Yes.  It does sound around that time.

Q    All right.  So as we sit here today, have you had an opportunity to review some of the documents in this case?

A    Yes, sir.

Q    Can you tell me what you've reviewed in preparation for today's deposition?

A    So I reviewed the images, the NCMEC images --

Q    Uh-huh.

A    -- and then the images that were charged.

Q    Anything else?

A    Also my report.

Q    When you say your report, can you be a little bit more specific?

A    Yes, sir.  It was my initial -- what we call a narrative.

Q    All right.  Did you review any other documents?

A    Not that I recall.

Q    All right.  I know that you -- you completed and executed several affidavits in this case for search warrants.  Did you review any of that in preparation for today?

A    The only search warrant would have been the one I provided my attorney, which would have been the

Synchronoss.

Q    Okay.  That was the first search warrant that you sought in this matter?

A    Yes, sir.

Q    Okay.  Now, do you understand that the charges against Mr. Lawshe were dropped?

A    Yes, sir, I do.

Q    Okay.  As we sit here in today in March of 2025, do you agree that the models that were the subject of this case were, in fact, adults at the time these photographs were taken?

A    Do I agree --

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    From time to time, somebody may object.  You still have to answer the question but --

A    Okay.  Do I agree that they were adults?

Q    Yes.

A    In my opinion, no, I don't.

Q    Okay.  So as we sit here today, you believe that the models depicted in the charged images -- there were three charged images; correct?

A    Yes, sir.

Q    -- were minors at the time that these photographs were taken?

A    In my personal opinion?  Is that --

Q    Well, I'm asking just your opinion, I mean --

A    Yes.  In my --

Q    -- what your belief it is.

A    Yes.  In my personal opinion, I do believe that they are minors.

Q    Okay.  And are you under -- do you know why the charges were dropped against Mr. Lawshe?

A    The specific reason, no, sir.

Q    Were you given any reason?

A    Not that I recall.

Q    All right.

MR. CARSON:  Can we take a real quick break?  Is that all right?

MR. ROBERTS:  Sure.

MR. CARSON:  We don't have to go off the record.  Can we just admit my partner?

MR. ROBERTS:  Oh, great.  Yeah.

MR. CARSON:  Sorry about that.  Thank you.

(Ms. Petruzzelli enters the deposition.)

MR. ROBERTS:  Are we back -- still on the record.  Okay.

BY MR. ROBERTS:

Q    So we're going to get into that a little bit, but I wanted -- that kind of helps me on the road of how

we're going to address all of this.  Okay?

So what's the last investigative thing that you did on this case?

A    Sorry if it takes me a while to think back, just because it was, like, two years ago.

Q    So it's been two years since you've done anything on the case?

A    Yes, sir.  Because that was in 2023, and we're now in 2025.  So it was about two years ago.

Offhand, I do not remember, and I don't want to guess on anything.

Q    Well, let's just -- I don't want you to guess either.

Have you done anything since the charges were dropped in December of 2023?

A    Not that I recall.

Q    Okay.  At the time that -- and we're going to get into this in more detail -- the charges were dropped, were you shown photographs of the -- the subject models with photographic ID?

A    You're talking about, like --

MS. SHEVLIN:  Form.

THE WITNESS:  -- the passport?

BY MR. ROBERTS:

Q    With passports, yes.

A     Yes.  I was shown a redacted version.

Q     Right.

And what was your reaction to seeing those?

A     I didn't really have a reaction just because I didn't have a lot of information to go off of.

Q     Did you ask for any other information?

A     Ask who?

Q     I'm just asking, did you ask anybody for more information?

A     I do not remember.  And you're saying it was December of 2023?

Q     Yeah.

A     Yeah.  I don't recall.  I don't remember.

Q     Safe to say that you did not take any other investigative action after seeing those photographs with --

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q     -- with the -- when I say photographs, you understand I'm talking about the photographs --

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q     -- with the passports in them?

A     That I don't recall.

Q     You don't recall doing anything?

A    No, sir.

Q    Okay.  When the charges were dropped, did you close your investigative file?

A    Yes, sir.

Q    Did you disagree with the decision to drop the charges?

A    I wouldn't say that I disagreed.

Q    Did you agree that the charges should be dropped?

A    To be honest, I didn't really have a concrete opinion on it.

Q    At that time, did you believe that there was probable cause to continue to charge Mr. Lawshe with a crime of possession of child sexual abuse material?

A    And at what time are you referring to, at --

Q    The time the charges were dropped.

A    Do I believe that we had probable cause?

Q    At the time the charges were dropped.

A    I believe that we had probable cause to charge for what we charged him for, if that makes sense.  I hope I'm not rewording it.

Q    It's okay.

A    Okay.

Q    But you're not answering the question.  So the question is at the time the charges were dropped, do you

believe that probable cause still existed?

A    Yes, sir, I do.

Q    At that time?

A    Yes, sir, I do.

Q    With images of the models holding passports, you believed that there was still probable cause to believe that there was possession of child pornography?

A    Yes, sir, I do.

Q    Okay.  Do you feel strongly about that?

A    Yes, sir, I do.

Q    Okay.  We're going to pick back up there in a minute.

A    Okay.

Q    So what began your investigation into this case?

A    We received a NCMEC cyber tip.

Q    Okay.  What is a NCMEC cyber tip?  Explain what NCMEC stands for.

A    Sorry for using the acronym.  It's the National Center for Missing & Exploited Children.

Q    I'm going to show you what we'll mark as Plaintiff's Exhibit 1 and a copy for your counsel.

MR. ROBERTS:  And I -- Amy, I did not print out a copy for you.

THE WITNESS:  Thank you.

MS. SHEVLIN:  Can you tell me what document we're looking at?  Because I've got a bunch of stuff in front of me.

MR. ROBERTS:  Yeah.  It's the cyber tip line report, Number 1537.

MS. SHEVLIN:  Got it.  Thank you.

MR. ROBERTS:  Yep.  Okay.  All right.

(Plaintiff's Exhibit 1 was marked for identification.)

BY MR. ROBERTS:

Q    Okay.  What have -- what have I shown you?

A    You've shown me a NCMEC cyber tip.

Q    And is this the cyber tip that began your investigation?

A    Yes, sir.

Q    Okay.  And does this report indicate -- tell me, as a detective, what did this report tell you?

A    So this report told us who the ESP, which is just an electronic service provider, was that reported the CSAM as well as some suspect identifiers, which would have been the phone number and then the file that was reported.

Q    Okay.  And do you -- do you get -- you say the file.  Is that a photograph?

A    Yes, sir.

Q    And did you --

A    In this case.

Q    And did you receive and review that photograph?

A    Yes, sir.

Q    I see that the incident type is described as child pornography on Page 2 of the cyber tip line report?

A    Yes, sir.

Q    And there's an incident time.  What is that?

A    That is the date and time that the ESP documented as when the crime would have occurred.

Q    Okay.  What's important about the incident date and time for you?

A    It gives us, I guess in laymen's terms, kind of like a starting point of when we think that the crime would have occurred.

Q    So you see the incident date and time as the date that he uploaded the file or when the crime occurred.

A    Yes, sir.  That's what it goes off.

Q    And so when you went to seek for a subpoena, I think you asked for seven days before and after that date.

A    If I'm not mistaken.

Q    We'll get to it in a minute.

But you would have used that date as the date to communicate with Synchronoss in this case about getting documents and photographs; correct?

A    If I don't -- I don't recall the specific date that I put in my search warrant.

Q    We'll get to that in a minute.  But that's what you understand that to mean is, like, that's the date that he downloaded the image?  That's the date that the crime occurred?

A    Yes, sir.

Q    Okay.  All right.  Do you review the entire NCMEC report as part of your investigation?

A    And you're referring to, like, all the pages in it?

Q    All the pages in it.

A    Yes, sir.

Q    Okay.  Let's continue down on Page 2.  There's a file name.

A    Okay.

Q    I see a couple of things.  MD5, what is MD5?

A    So in laymen's terms, the MD5 is just pretty much, like, the photo ID of a photograph or, like, a video.

Q    We refer -- sometimes I hear hash matching and

stuff like that.  Is --

A    Yeah, like, the hash value of it.

Q    Okay.  Did the service provider communicate to you how they identified this image, this -- this suspected image?

A    No, sir.

Q    All right.  Was it by hash match?

A    That I don't know because I didn't communicate with them.

Q    Does it have in the report as to whether or not it was a hash match or not?  And I'm not trying to trick you.  I -- but I think it indicates that it was a hash match.

A    But you're saying a hash match for what, like --

Q    For the image.

A    So you're -- I guess I'm confused by your question.

Q    Okay.

A    I'm sorry.

Q    Do you have any information -- did the service provider communicate to you in this report how they identified this particular image as potential or suspected child pornography?

A    No, sir, not that I recall.

Q    Okay.  I see image categorization by ESP, A2.
Was does that mean?

A    So that's based off the electronic service
provider, how they would classify an image.

Q    And what does that mean, A2?

A    So if you flip to -- I guess this would be
Page 3 -- it will say -- it's kind of halfway down
Page 3.  And it's -- A is for prepubescent minor.  And
then A1 is sex act.  A2 is just the lascivious
exhibition.  Sorry.

Q    Okay.  All right.

MS. SHEVLIN:  I don't mean to interrupt.  But
a Christie Petruzzelli just signed on.  I just want
to make sure that that person is supposed to be in
this deposition.

MR. CARSON:  She is.  That's -- that's my law
partner, Amy.

MS. SHEVLIN:  Okay.  I just wanted to make
sure.  Someone popped up, and I didn't recognize
the name.  All right.  Go ahead.  Sorry.

BY MR. ROBERTS:

Q    All right.  So at the outset of the
investigation, I think you said that you identified --
in any investigations, not this investigation, when you
begin an investigation, do you -- you identify

potential -- a target of the investigation?

A    I'm sorry.  What?

Q    A suspect or a target of the investigation if a crime occurred?

A    So -- but what is your question, I guess?  I'm sorry.

Q    Is that something that you do?

A    Yes, sir.

Q    That's part of your investigation, is to identify --

A    Yes, sir.

Q    -- a suspect?

A    Yes, sir.

Q    All right.  And did you do that in this case?

A    Yes, sir.

Q    Okay.  What did your initial investigation reveal as potential suspect or suspects?

A    It was based off of the phone number.

Q    Okay.  All right.  And in your initial investigation, did you identify that as William Lee Lawshe?

A    Yes, sir.

Q    How did you do that?

A    We -- if I'm not -- excuse me.  We sent off legal compliance to the suspect identifier, which in

this case was a phone number.  And that came back.

Q    Have you reviewed the deposition of any of your colleagues in this case?

A    No, sir.

Q    Detective Tolbert, Detective Greene?

A    No, sir.

Q    Detective Camden?

A    No, sir, not that I recall.

Q    Okay.  If Detective Tolbert told you that -- when he gave you this cyber tip, he also told you that the suspect was Lee Lawshe and a Florida Fish and Wildlife officer, would that ring a bell?

A    Yes, sir.

Q    Okay.  So you knew the suspect.  You were given the suspect before you even got the cyber tip?

A    So no, sir.  I didn't personally know him.  I had never heard of him before.

Q    No.  But --

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    But Detective Tolbert gave you the information at the time of giving you the tip?

A    He stated that that's who he believed the suspect was, but I still had to send off for that compliance --

Q    Okay.

A    -- to confirm it.

Q    Okay.  What other suspects or targets of your investigation did -- did you identify?

A    Just that, just William Lawshe, sir.

Q    So the image that -- that you described has a website across the -- the image; correct?

A    Yes, sir.

Q    What was the name of the website?

A    The MetArt.

Q    met-art --

A    I believe it's just --

Q    -- .com?

A    met-art.com.  Sorry.

Q    Okay.  You did not identify them as a potential suspect?

A    At that time, no, sir.

Q    Have you ever identified them as a target of your investigation?

A    No, sir.

Q    So it's March 13th, 2025.  You believe that met-art.com currently has child pornography on their website, and you have not done anything about it?

MR. CARSON:  Object to form.

You can answer, if you can.  You can answer.

Yes, ma'am.

THE WITNESS:  Have I done anything further in the investigation?  No, sir, due to it being closed.

BY MR. ROBERTS:

Q    Why don't you open an investigation into this publisher of child pornography?

MR. CARSON:  Object to form.

THE WITNESS:  Am I --

MR. CARSON:  Yeah, yeah.  Unless I -- unless I tell you don't answer --

THE WITNESS:  Okay.  Sorry.

MR. CARSON:  -- you'll be allowed to answer.  No worries.  No worries.

THE WITNESS:  Well, I wouldn't personally have the resources.  I would have to forward that to another government agency, whether it be, like, FBI or HSI.

BY MR. ROBERTS:

Q    Okay.  Or -- or the state where the company that owns this website is located?

A    Yes.  But that would still have to be forwarded to, like, the FBI or HSI --

Q    But you have --

A    -- as, like, a connection.

Q    But you have not done that?

A    No, sir.

Q    Why not?

A    I do not have an answer.

Q    Do you care about the proliferation of child sexual abuse material?

A    Yes, sir, I do.

Q    And you say you don't have an answer.  But that's your job; right?

A    Yes, sir.

Q    Any explanation as to why you're not doing your job?

A    I am still doing my job but --

Q    But you're allowing a website to disseminate -- continuing to disseminate -- disseminate an image that you, as we sit here today, believe is child sexual exploitation material.  Why?

MR. CARSON:  Object to -- object to form.

THE WITNESS:  I don't have --

BY MR. ROBERTS:

Q    It doesn't make any sense to you, the question?

A    I didn't say that it didn't make any sense.  I just don't have an answer.

Q    Well, explain to me.  Why don't you have an

answer?

A    If I had an answer, I would be --

Q    Do you really --

A    -- able to explain it.

Q    Do you really believe that these are minors?

A    Yes, sir, I do.

Q    So there's a child victim out there.  Have you made any attempt to identify who that is?

A    We have attempted, but I have been unsuccessful.

Q    You have a copy of her passport, both of them.

A    I have a redacted form.

Q    And you also have a name of the record custodian who has a presumably non-redacted copy of that?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

MR. CARSON:  Object to form.

THE WITNESS:  Well, I can't say correct because I can't assume that he would have an un-redacted.

BY MR. ROBERTS:

Q    But you're an investigator.  It's your job to find out if he has an un-redacted copy; right?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    Yes, if I'm able to.

Q    Well, Mr. Pierce -- you know Mr. Pierce, Crawford Pierce, the attorney?

A    Yes.

Q    You -- you know that he simply e-mailed the records custodian of met-art.com and that records custodian, who is a licensed attorney in California, responded to his e-mail.  You know that; correct?

A    Yes, sir.

Q    You know that's how Mr. Crawford Pierce got the images of the passports; correct?

A    Yes, sir.

Q    There's nothing preventing you as we sit here today from contacting the records custodian, is there?

A    No, sir.

Q    But you haven't done that?

A    No, sir.

Q    But you believe that he's a criminal; correct?

A    Believe who is a criminal?

Q    That anyone who has any sort of publishing interest or ownership interest in met-art.com is a criminal in your mind; correct?

MR. CARSON:  Object to form.

THE WITNESS:  Yeah.  That's a very broad statement that I --

BY MR. ROBERTS:

Q    There is --

A    -- don't feel comfortable.

Q    Okay.  Well, let's back up a little bit.  Are you aware that publishing images child -- of child sexual abuse online is a crime?

A    Yes, sir.

Q    And you currently here believe that met-art.com is publishing child sexual abuse material; correct?

MR. CARSON:  Object to form.

THE WITNESS:  Do I believe that MetArt is currently publishing CSAM --

BY MR. ROBERTS:

Q    Yes.

A    -- which is -- sorry -- child porn --

Q    Yes.

A    -- if I use the term CSAM.

Q    Yeah.

A    I don't know if I know how to answer that actually.

Q    Well, why don't you know how to answer that?

A    And sorry if it takes me a minute to think --

Q    It's okay.

A    -- just because --

Q    It's okay.

A    -- I'm processing your question.  So I do apologize if I take a while.

I don't know.

Q    Do you have any reason to believe that they've taken images of this model down from their website?

MR. CARSON:  Object to form.

THE WITNESS:  That I do not know.

BY MR. ROBERTS:

Q    Do you have any idea how long this image has been on the website?

MR. CARSON:  Object to form.

THE WITNESS:  That I do not know.

BY MR. ROBERTS:

Q    So let's just go through this.  Do you have any idea why this specific image was flagged?

A    Unfortunately, I don't work for Synchronoss, so I don't know.

Q    What does the characterization, from NCMEC, unconfirmed child pornography mean?

A    So for NCMEC, unconfirmed means that they have not had a confirmed -- like, this is, like, a reported

child victim, I guess in laymen's terms.

Q    They through their review or information that they have cannot confirm that the person in the image is a minor?

A    No.  Based off the unconfirmed, it just means that the person has not been identified as a minor, which is why it's unconfirmed.

Q    So that -- when you say that person, you're talking about the model depicted in the subject photograph?

A    The female, yes.

Q    Right.

So you understand unconfirmed means that NCMEC has not been able to confirm that this model was a minor; correct?

A    No.  It's not that she's not a minor.  It's that they cannot confirm that this is an identified, like, in a sense, child victim.

Q    So you believe -- I'm sorry.  I didn't mean to cut you off.

A    You're good.

Q    You believe that NCMEC has tried to identify who this model is?

A    No.  I cannot say that because I don't know.

Q    Where are you getting NCMEC's definition of

unconfirmed from?

A    So it all -- it should be in here, but I don't want to speak out of turn.  So --

Q    I can represent to you I do not see any definition of the term unconfirmed in there, but you can sit and look if you want.

A    No, sir.  I don't see it.

Q    Okay.  Do you actually know what NCMEC means by unconfirmed?

A    Yes, sir.  Because they have spoken to it -- about it in our training.

Q    So when you received this photograph and you looked at the photograph, you immediately identified met-art.com as having some association with this image?

A    Did I immediately identify it?  No, sir.

Q    Tell me, how did met-art.com appear on the image?

A    Like, where is it listed on the image?

Q    Yeah.

A    It should be at the bottom right-hand -- the photograph.

Q    You describe it as watermark.

A    Yes.

Q    What do you mean by the word watermark?

A    Just, like, a -- I guess a text that's pretty

much inputted in the photograph.

Q    Right.

So that, like, other people can't reproduce it without that being on there?

MR. CARSON:  Object to form.

THE WITNESS:  That's sometimes one of the functions of watermarks, not always.

BY MR. ROBERTS:

Q    What are some of the other functions?  Other than copyright, what are -- what are some of the other functions of a -- of a watermark?

A    One function could be for further contact, like if somebody wants to input their own information for another person, let's say, to reach out to them further, if that's not too confusing.

Q    Yeah.  I don't understand that.  Yeah.

A    Sorry.  So, like, another function of a watermark could be where -- let's say I could input your e-mail address on the photo so somebody could use that as a form of contact for you.

Q    In relation to the subject matter of the image?

A    It could be that, or it could be a multitude of things.

Q    What -- what other kinds of things?

A    One could be, like, payment.  It could be pretty much anything.

Q    At what point did you connect this image and the source of this image as met-art.com?

A    After further reviewing it.

Q    But before you did anything else, just while you were looking at the image.

A    What do you mean, before I did anything else?

Q    Did you make that determination upon your initial evaluation of the image, that this -- most likely, this image was related to met-art.com?

A    No.  That wasn't my initial.

Q    Okay.  What I'm asking is when.  After your initial, when did you come to that conclusion?

A    Ooh, that was -- I would say probably after sending off the legal compliance.

Q    When you say legal compliance, are you talking about a subpoena, the -- the subpoena?

A    And the search warrants.

Q    And the search warrants.

So you, in your mind, did not make any connection between met-art.com and this image prior to getting the return on the subpoena?

A    No.  I did.  It was during that time.  Sorry. I don't want to misstate.

Q    Okay.  So I -- that's what I'm asking.  Like --

A    Yes, sir.

Q    -- was it before you sought the subpoena?

A    I don't recall if it was before or after.

Q    What made you connect this particular image with the website met-art.com?

A    Just looking at the watermark.

Q    Okay.  But you saw that initially when you first looked at it.  You saw the watermark when you first looked at the photograph; correct?

A    I don't recall if I noticed it right off --

Q    Okay.

A    -- immediately.

Q    Okay.  But it was nothing other than the watermark that led you to believe that that website had some sort of connection with this image.

A    Oh, you're saying -- let me make sure I'm answering this correctly.  Are you saying that the watermark is the connection to -- that I had with the website?

Q    Yeah.

A    Yes.

Q    There was no other research or investigation that you did that revealed some other fact that led you

to believe that this photograph was connected with met-art.com?

A    Not that I recall.

Q    Okay. Now, you -- at this time in -- you received this tip, it looks like, in February of 2023. How long had you been an -- an ICAC investigator at that time?

A    For about a couple months.

Q    All right. You were aware at the time that not all cyber tips contained child pornography?

A    Yes, sir.

Q    And that regularly, you would get a NCMEC cyber tip report, and someone would look at that image and determine that that was not a minor in that image?

A    It wouldn't be regularly, but it can occur.

Q    Can you quantify for me how -- how often that occurred?

A    Honestly, I couldn't.

Q    Occurs today. How often does it occur today?

A    Like, you're talking 2025?

Q    Yeah. Like, currently, how often does it happen that you get a cyber tip and you look at it and you go, hmm, I just don't know?

A    Honestly, this year, we haven't had a lot. There haven't been actual CSAM and child pornography

starting.

Q    And to be fair, you think this is CSAM, these images.  You think these images are CSAM?

A    Yes, sir.

Q    Okay.  So you wouldn't categorize these images, these -- this one image, anyway, that was the cyber tip report image with the met-art.com.  You would not characterize that as a false report of child pornography?

A    No, sir, I wouldn't.

Q    But there was another cyber tip that -- that was associated with this.  It was a prior cyber tip; correct?

A    Yes, sir.

Q    And you looked at that image, and you did determine that that appeared to be an adult?

A    Yes, sir.

Q    Okay.  So from an investigative standpoint, you would agree with me that as an investigator, you -- you do have to exercise caution when getting a NCMEC report to make some determination that this is actually child pornography and not a mistaken report?

A    Yes, sir.

Q    All right.

You immediately -- or I -- let me say, between

the time that you looked at the image that was the

subject of the cyber tip report that we're talking about

and the time that you applied for the search warrant,

you determined that the characterization of the image as

A2 was incorrect; correct?

A    I'm just referring back to the A2.  The

prepubescent minor?

Q    Yes.

A    Yes.  Because she looked like she hit puberty.

So yes.

Q    Right.  So that was a false statement in the

NCMEC report; correct?

MR. CARSON:  Object to form.

THE WITNESS:  Based off their categorization.

BY MR. ROBERTS:

Q    It was a false statement to categorize this

model as prepubescent; correct?

A    That -- I don't want to say it's a false

statement because we don't go based off of that.  We go

based off of our own.

Q    I understand what you're saying.  But what I

am saying is this report -- the information in this

report, not your opinion but the characterization in

this report as A2 was incorrect according to your

assessment?

A    In my opinion, yes.

Q    And your opinion is based on the presence of pubic hair?

A    Not solely the presence of pubic hair.

Q    There were other factors that led you to believe that this was a -- a pubertal --

A    I know what --

Q    -- female; correct?

A    Yes, sir.

Q    All right.  And so the characterization of prepubescent was incorrect in your opinion?

A    In my opinion, yes, sir.

Q    Yeah.  Okay.

Now, prior to seeking a search warrant, you determined that the likely source of this image was met-art.com; correct?

MR. CARSON:  Object to form.

THE WITNESS:  I'm sorry.  Can you repeat the question?

BY MR. ROBERTS:

Q    You made a determination, an investigative determination that the likely source of this image, the subject image, was met-art.com?

A    No, sir.  I can't say that.

Q    How would you characterize that?

A    You're asking me based off the photo that I think the likely source was MetArt?

Q    Yeah.  You did not think that the likely source was MetArt.

A    Oh, I'm sorry.  That I did not think that it was the likely source.  Okay.  Sorry.  I got confused.

Q    All right.  Let's start over.  I asked you the question, between the time that you initially viewed the image and when you applied for the search warrant, you had determined that the likely source of the image was met-art.com.

A    No.

Q    So the converse is at the time you applied for a search warrant, you did not believe that the likely source of the image was met-art.com.

A    It's not that I did not believe.  It's just I don't know what -- the likely source of that CSAM image because it could be from anywhere.

Q    So at the time you applied for the search warrant, it was your -- what you believed was that this image could be from anywhere?

A    Yes, sir.

Q    Okay.

Now, earlier, you said that you did make some connection between the image and met-art.com.  What

connection did you -- did you place on that?  What did you understand that connection -- or what did you believe that connection was?

A    It was just solely based off of the watermark.

Q    But, I mean, did you, as an investigator, think that there was a connection between MetArt and this -- this image?

A    No, sir.

Q    You didn't think that?

A    (Shakes head.)

Q    Okay.  We're going to come back to this, but I'm just going to just skip forward a little bit.  I'm going to give you what we'll mark as Exhibit 2, just because we're on this thought.

MR. ROBERTS:  Exhibit 2 is the affidavit for the search warrant to Synchronoss and -- Amy.

(Plaintiff's Exhibit 2 was marked for identification.)

BY MR. ROBERTS:

Q    So I just want you to take a second.  Flip over to -- first of all, can you identify this?

A    Yes, sir.

Q    All right.  What is it?

A    It's the search warrant.

Q    Right.  Okay.

So you just testified that you did not believe that there was a connection between the image and met-art.com; correct?

A    Yes, sir.

Q    Why did you swear under oath to a court that there was a connection between this image and met-art.com?

A    Because like --

MR. CARSON:  Object to form.

You can answer if you can.

THE WITNESS:  Like I stated, based off the watermark.

BY MR. ROBERTS:

Q    Well, you just testified unequivocally that you did not believe that the likely source of this image was met-art.com; correct?

A    Yes.  Sorry.

Q    Okay.  You understand when you fill out an affidavit and present that to a court, you have to be truthful?

A    Yes, sir.

Q    You understand it's a third-degree felony to make false statements to a court?

A    Yes, sir.

Q    And false statements include statements that

you don't believe to be true; correct?

A    Yes.  Yes, sir.

Q    Now you've just testified that you did not believe that this image came from met-art.com; correct?

A    No.  I said that it can come from a likely source, but I don't know the actual source for MetArt. It could be from anywhere.

Q    No.  I asked you, did you believe that met-art.com was the likely source of the image, and you testified no.  Do you recall that?

A    Yes.  But I should say that I don't know.  I'm sorry for misspeaking, but it's I don't know.

Q    But you agree that you gave a statement to a court under oath that would lead the court to believe that it was the likely source of the image; correct?

MR. CARSON:  Object to form.

THE WITNESS:  I would have to review what --

BY MR. ROBERTS:

Q    Let me read it.  To note, there is a watermark of www.met-art.com on the offending image.  This site has a known history of displaying CSAM images of teenage girls and CSAM content from this site has been encountered by other ICAC investigators in past investigations.

Correct?

A    Yes.

Q    Well, if it didn't come from that website and has no connection to that website, why would you tell the judge about a history of CSAM on that website?

A    Because when describing the photo, I'm describing what is listed on the photo.  Just like I have a description for the photograph, like, hey, it depicts a female at X, Y, and Z, I'm also going to notate the watermark on the photo.

Q    You're not actually notating the watermark, though.  You're -- you're telling the court much more than there's just a watermark on there, aren't you?

MR. CARSON:  Object to form.

THE WITNESS:  But I --

BY MR. ROBERTS:

Q    You say this --

A    -- did note there is a watermark.

Q    Yeah.  This site has a known history of displaying CSAM images of teenage girls; correct?

A    Yes, sir.

Q    But you didn't believe that this image came from met-art.com.

A    I don't know where it came from.

Q    Okay.  But you've reviewed your deposition; right?

A    Yes, sir.

Q    Okay.  I think your testimony -- your prior testimony is that you Googled met-art.com?

A    No, sir.  So I did an open source search of MetArt, but I also consulted with other ICAC investigators.

Q    What's open source?  What do you mean?

A    It's not using, like, the Google search engine, but it's just pretty much what we call, like, open source and phrase -- you're just researching, I guess, in simple terms, not really using law important -- law enforcement -- excuse me -- databases. But you're utilizing stuff to, I guess, search whatever term, if that makes sense.  I feel like that was kind of confusing, the way I described it.

Q    Well, it's confusing because under oath in your prior deposition, you said you Googled it.

A    I don't recall using Google, but I could have.

Q    Well, if you testified back in 2023, November of 2023, that you Googled met-art.com, you think that would be the most accurate answer?

A    It could potentially.  I just don't recall.

Q    You don't recall what you did, or you don't recall your testimony?

A    No.  I don't recall what actual, I guess,

database I utilized to query MetArt.

Q    I'm going to hand you a deposition.

A    Okay.

Q    This will be Exhibit 3.

(Plaintiff's Exhibit 3 was marked for identification.)

MR. ROBERTS:  Got a copy for you.

MS. SHEVLIN:  What's the date on the depo, Michael?

MR. ROBERTS:  November 21st, 2023.

MS. SHEVLIN:  Thank you.

And are you marking this as an exhibit, or are you just refreshing her recollection?

MR. ROBERTS:  No.  It's Exhibit 3.

MS. SHEVLIN:  Gotcha.

BY MR. ROBERTS:

Q    So just -- if you will, just turn to Page 30.

A    30?  Okay.  I'm there.

Q    Yeah.

A    Yes.

Q    And I'll just read your answer on Line 10.  It says:  I actually searched it on Google.  And it was showing -- because he's heard it before in the past. Obviously -- excuse me -- MetArt -- I don't know why I keep saying MetaArt.  But MetArt using underage females

in the past on their sites. And I've been -- and I've seen different links on Google. Obviously, you can't -- can't believe everything you see on Google stating that underage females were used on the site, but I couldn't obviously locate that specific image on met-art.com or MetArt.

Did I read that close enough?

A    Yes, sir.

Q    Okay. So fair to say -- I mean, is it your testimony that you did Google?

A    I don't recall using Google, but if I stated that I used Google back in 2023, then I could have used Google.

Q    And I'm assuming if you Googled, you would, like, Google met-art.com, child porn, something like that?

A    I would have just probably done MetArt. I wouldn't type in child porn on Google just because of the job I do.

Q    Uh-huh. Okay. Well, I've done that. I'm going to -- I'm going to -- I'm going to mark something as --

A    Okay.

Q    -- Plaintiff's Exhibit 4.

(Plaintiff's Exhibit 4 was marked for identification.)

BY MR. ROBERTS:

Q   I've actually Googled it.  And I'm going to represent to you there are no such links on Google talking about met-art.com publishing child pornography. The only thing that actually comes up are our case and a -- and a -- like, an intellectual property case.  Did you actually --

MR. CARSON:  Hold on.  So Exhibit 4 to Detective Preston's deposition --

MR. ROBERTS:  Yeah.

MR. CARSON:  -- is a printout of what you purport to be your Google search?

MR. ROBERTS:  That's correct.

MS. SHEVLIN:  Were we provided with this ahead of time?

MR. ROBERTS:  I just did it.

MS. SHEVLIN:  Did you Google (unintelligible)?

MR. ROBERTS:  Here.  I can -- we can Google it right now.  I've got my computer.

BY MR. ROBERTS:

Q   Are you sure there's a link on Google that says met-art.com?

MR. CARSON:  Hold on.  Hold on.  We're still

talking about this exhibit that's been dropped on our lap for the first time.  So --

MR. ROBERTS:  Okay.  Well, we won't attach it. If you have a problem with it, we won't attach it.

MR. CARSON:  No.  We're going to attach it.

MR. ROBERTS:  Okay.

MR. CARSON:  Because -- because here's the problem.  Yours shows three hits.  Mine shows considerably more than that.

MR. ROBERTS:  Uh-huh.

MR. CARSON:  So --

MR. ROBERTS:  Probably different search terms.

MR. CARSON:  No.  met-art.com, in parens, child pornography case.

MR. ROBERTS:  Okay.

MR. CARSON:  Oh, I'm sorry.  That's what shows up at the top, but in the header, it's child pornography case, accused criminal.

So okay.  We're going to attach this as Exhibit 4 to --

MR. ROBERTS:  Yeah.

MR. CARSON:  -- Detective Preston's deposition.

MR. ROBERTS:  Yeah.

BY MR. ROBERTS:

Q   Detective, are you sure that there was a link on Google that described this website as a source of child pornography?

A   Yes, sir.

Q   You're sure, under oath?

A   Yes, sir, under oath.

Q   I've got my laptop right here.  Do you want to use my laptop?

A   For?

Q   Finding it.

MR. CARSON:  I'm going to advise my client not to engage in this exercise of searching on Google right now.  That's highly irregular.  It's highly inappropriate to put her on the spot and say, while you're being video-recorded and while the court reporter's taking down everything you say, perform this little stunt for us.  I'm going to advise her not to do it.

MR. ROBERTS:  Okay.  Stunt.

MR. CARSON:  And I'll say -- let me just say this too, Michael:  I've given you a fair amount of leeway, but it's -- it's taken a decidedly unsavory turn.  There's no reason to treat Detective Preston with this level of disrespect.  I'm going to ask

you respectfully to rein it in.

MR. ROBERTS:  Could you articulate how I've been disrespectful?

MR. CARSON:  If -- if you don't understand how you've been disrespectful, then I'm not sure I can explain it to you in a way that you'll understand. But there's a way to speak to her without calling her professionalism into question, without calling her intelligence into question, without calling her competence into question.  There's a way to try this case and to litigate this case without making it personal, and I was hoping we could get there.

MR. ROBERTS:  I -- I appreciate that.  I'm going to move to strike your commentary but --

MR. CARSON:  Well, it's a deposition transcript.  It doesn't need to be stricken.  I just wanted you to know --

MR. ROBERTS:  So --

MR. CARSON:  -- I'm getting close to the point where it's starting to seem like you're badgering, harassing the witness.

MR. ROBERTS:  Well, it's hard for me to respond, Matt, because you haven't objected to any questions, so I don't know which questions you find to be badgering or offensive.  I think that I'm

asking fair questions.  Based on the evidence, I'm showing her exhibits and asking why she has or has not done anything.

So please object to my questions, and I will respond to the objection.  But I can't, in hindsight, change a question because you find it to be offensive.  Frankly, I believe you don't like the answers, and you don't like the questions.  But that's all commentary, and we don't need to be doing that.

BY MR. ROBERTS:

Q    So you agree that you put this statement under oath in the search warrant to Synchronoss; correct?

A    Yes, sir.

Q    And you understand that you have to make truthful statements to the court?

A    Yes, sir.

Q    All right.  And your testimony today is that your Google search did reveal some -- was it an article?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    What was it?

A    I don't recall a specific -- what it pulled up, but it was in reference to MetArt having CSAM.

Q    Okay.  Was it a news article?

A    Like I said, I don't recall specifically what it was.

Q    Can you give me any description of what it was?

A    I don't recall.  That was over two years ago, unfortunately.

Q    Is there any way that I could use different search terms or any way to identify what you're talking about?

A    If I remembered the specific search terms, then I would be happy to disclose.  I just don't recall.

Q    So I read your testimony in your deposition, and you said, quote:  You can't believe everything you read on Google.

Is that correct?

A    Yes, sir.

Q    Do you believe that?

A    Yes.  That's with everything.

Q    But a court should be able to believe what you tell them; correct?

A    Yes, sir.

Q    So you didn't actually believe -- or you knew that you really couldn't believe what you saw on Google on the search results; correct?

A    I was using it.  So you're saying -- okay.

Hold on.  I'm sorry.  I'm confused.  Are you saying that I can't believe what I saw on Google?

Q    You testified that you can't believe everything you see on Google.

A    Yes.

Q    Correct?

And so when you read that on Google, you knew that it may or may not be a credible thing that you saw?

A    Yes.

Q    And what I'm asking you is why would you swear under oath that it was credible?

A    Based off the other investigators and their dealings with MetArt.  I guess that's the right term, not really dealings but I guess prior cases that they've had and stuff like that.

Q    What investigator told you that they had a prior case with MetArt?

A    I believe it was Corporal Greene.

Q    We've taken Corporal Greene's deposition. He's testified that he's never had a case with MetArt.

A    Well, he told me differently, unfortunately.

Q    He told you that he had investigated a case involving an image from met-art.com?

A    Yes, when we originally had this case.

Q    You haven't reviewed his testimony?

A    No, sir.

Q    So if he testified to me that he had heard of met-art.com through some -- he could not remember where or if it was credible or not credible but that was his only relation to met-art.com, that would have been a false statement that he made to me?

A    I can't say that.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    That's not what he told you?

A    I can't say what he stated to you was a false statement, and I can't say that what he stated to me was a false statement.  I'm just going solely based off what he told me.

Q    Okay.  So what he told you was there was a known history of displaying CSAM images on teenage -- of teenage girls on met-art.com?

A    Yes, sir.

Q    Do you know what the source of his information was?

A    No, sir, I do not.

Q    And then you Googled it.  And your testimony today is that you found some unknown source that you cannot identify that confirmed or had some information that met-art.com was connected with CSAM?

A    Yes, sir.

Q    And on that basis, you felt comfortable swearing under oath that this site has a known history of displaying CSAM images?

A    Yes, sir.

Q    Can you describe to me what you feel like your obligation to -- let me ask it a different way.  Strike that.

Do you believe that you have an obligation to present reliable information to a court?

A    Yes, sir.

Q    And do you believe that these Google searches that you reference, is that a reliable source?

A    I believe that it can be.

Q    Was it in this case?

A    I don't really know the answer to that, if it was in this case.  I don't really know how to answer.

Q    So are you saying that the only source -- did you use it as a source to make this statement to the court?

A    You're talking about the Google search?

Q    Yeah.

A    Is that what is put in my search warrant? Because I'm pretty positive my search warrant states based off obviously the other detectives and their

history with it.

Q    You said:  This site has a known history of displaying CSAM images of teenage girls.

A    Yes, and has been encountered by other ICAC investigators in past investigations.

Q    And the only investigator that you can identify is Detective Greene?

A    Yes, sir.

Q    And you don't know if what he was telling you was reliable or not?

A    That I don't know because it was before I was even in law enforcement, if I'm not mistaken.

Q    Did he know that you put this statement in your affidavit?

A    I don't recall.  I don't know if we've ever discussed that.

Q    Tell me about this conversation with Detective Greene.  I mean, how did this come about?

A    When I was asking him about MetArt and if he's ever heard of it and anything he knows about it.

Q    Why were you asking him about MetArt?

A    Because I had never heard of it.

Q    Did you believe there was a connection between this image and met-art.com?

A    That -- like I stated before, I don't know.

Q    Okay.  How would you find that out?

A    How would I find what out?

Q    How would you find out if there was a connection between this image and met-art.com?  As an investigator, just what are some of the ways you could have done that?

A    Oh, I'm sorry.  I was confused about where your question was going.

You can try to search the site.  That's probably the -- the main way that I would think.

Q    Did you do that?

A    No, sir.

Q    Have you ever been to met-art.com?

A    No, sir.

Q    Why -- why did you not go to the website?

A    At that point in my investigation, I was focused on confirming that obviously this is a child and speaking with Dr. Dully.

Q    Detective Greene, in his deposition, described the models as being age-difficult.  Would you agree or disagree with that?

A    I would disagree.

Q    Okay.  Do sometimes you guys disagree about what age-difficult is and what underage is?

A    Yes, sir.

Q    Was this a case of where there was a disagreement?

A    Yes, if I'm not mistaken.

Q    So there was a disagreement?

A    Honestly, I cannot remember.  I don't want to say yes because clearly, I don't remember.  So I'm sorry for saying not mistaken but honestly don't remember.

Q    If someone did characterize all of these images containing age-difficult individuals, that would be a reasonable position for that person to take?

A    What are you -- like, what is your question? If you're saying if they -- both of these images, if they did it as age-difficult?

Q    Well, let's just start with the image that we're currently talking about.

A    Okay.

Q    It's easy to get off track.  But the image that was attached to the NCMEC report, you understand the image I'm talking about.

A    Yes, sir.

Q    All right.  Could a reasonable person look at that model and believe that that was age-difficult?

A    That would be an opinion that I can't speak on because I can only speak on my personal opinion.

Q    Okay.  But your recollection may be that other

people looked at this image and thought that person -- it could be an age-difficult image?

A    In my office, not that I can recall.

Q    Okay.  When you say not in your office, are you talking, like, Detective Greene?

A    I'm talking about, like, my office, like, the ICAC investigators.

Q    Okay.

A    Yes.

Q    Detective Greene's not an ICAC investigator?

A    No, sir.

Q    He's a former ICAC investigator?

A    Yes, sir.

Q    You're not saying that he did not disagree about whether or not it was obviously a child or an age-difficult image?

A    I don't recall what his opinion of it was.

Q    Okay.  Well, and let's just talk about age-difficult because that's a term of art in your industry; correct?

A    It's a term that people can use, but it's not a category, I guess --

Q    Right.

A    -- of an image, if that makes sense.

Q    What does age-difficult mean to you?

A    For me personally, it just means that a person could easily be underage, or they could be, like, 18, 19, that range.

Q    So is it fair to say that all 18- or 19-year-olds could fairly be categorized as age-difficult?

A    No.  Because everybody's body is different.

Q    No.  But, I mean, like, there's no such thing as an 18-year-old that's not age-difficult?

A    I'm confused by your question.

Q    Well, and maybe this is a little basic.

A    Okay.

Q    But you could be 17 -- right? -- and 11 months old.  And if there was a nude image of me, it was -- that would be child sexual abuse material; correct?

A    You're 17, so you're under the age of 18, yes.

Q    Right.

That person doesn't look any different when they turn 18 and they're 18 and a month old; right?

A    That I can't speak on because everybody's body develops differently.

Q    Yeah.  But when you -- I mean, there's a joke. Like, when you go to sleep on the night before your bed -- your birthday and you wake up, you know, you don't look different -- right? -- from one day to the

next.

A    Like I said, I can't speak on it because everybody is different.  Like, every case is different, so I can't say, yeah, that's going to be the same across the board.

Q    You -- you're not comfortable saying that any 18-year-old that you look at, someone might think that they look like a 17-year-old?

A    Every person is different so --

Q    Well, I certainly appreciate that, that everybody is different, I mean.  But I -- I guess what I'm saying is if someone is 18, you think -- do you have the ability to look at some people who are 18 and go, definitely, they're 18 and not 17?

A    No.  Because everybody is different.

Q    So you can't do that; right?  You don't have the ability to do that, do you?

A    No.

Q    Right.

So I guess what I'm saying -- that's what my point is is, like, every 18-year-old is age-difficult because you really can't look at somebody and tell if they're 17 or 19.  You really can't just look at somebody and tell that, can you?

A    I wouldn't say that every person is

age-difficult because like I said, everybody is different.

Q    Okay.

A    So trying to classify just because a person is 18 is age-difficult, that doesn't seem correct.

Q    But like most 18-year-olds, if you looked at them, you'd be like, they could be age-difficult; right?

A    No.

Q    Most 18-year-olds?

A    I can't say that.

Q    Okay.  But, I mean, you do this for a living, though; right?

A    (Nods head.)

Q    Fair to say you're not an expert in determining who is under 18 or who is over 18?

A    No.  I'm not a doctor.

Q    You're not.  Well, we'll get into that.

But, I mean, you don't have any ICAC training or any specialized training in, like, what is -- what does an 18-year-old look like versus what does a 17-year-old look like?

A    No.  Because every person is different.

Q    Every person is different; right?

A    Yes.

Q    Every human individual is different, and every

observer has a different set of perspectives; correct?

A    Yes.

Q    Right.

And you don't have the ability to know what other people perceive as looking young or not young, do you?

A    No, I do not.

Q    Okay.  Now, this image that we are discussing, which was the cyber tip image, this was a professionally produced photograph; correct?

A    That I do not know if it was professionally produced.

Q    Did it appear to be professionally produced?

A    It appeared to be of higher -- higher quality. Like, it didn't seem like a phone took it.

Q    Right, yeah.  It looked like a photo shoot, like, a part of a photo shoot; is that correct?

A    That I don't know.

Q    It was in a studio setting?

A    That -- I honestly don't know where that photo was taken.

Q    Okay.

A    So I can't say that it was in a studio.

Q    All right.  But it wasn't, like, a cell phone picture?

A    It didn't appear to be a cell phone to me.

Q    It had a website on it, like, listed on it as a watermark?

A    Uh-huh.

Q    All right.  It was a female; correct?

A    Yes.

Q    All right.  There was nothing -- no -- no props or other sort of nonverbal descriptions of the image that would have signalled that this is a minor?

A    What do you mean?

Q    So -- and I've read your testimony. Sometimes, like, there will be, like, pictures in the bathroom or, like, child's underwear in a child's bedroom.  Are you familiar with images like that?

A    Uh-huh.

Q    Yes?

A    We do have -- we have some images -- excuse me -- like that.

Q    Yeah.  Or it's, like, you know, seventh grade, after class or something like that that would indicate or tell the viewer that this is a minor.  You -- so you know what I'm saying?

A    Yes.

Q    There was nothing like that in the image?

A    Not that I recall.

Q    Okay.  I've characterized it as like a centerfold-type image.  Do you know what a centerfold is?

A    No.

Q    Have you ever looked at, like, a Playboy or --

A    No.

Q    -- Penthouse?

A    Sorry.  No.

Q    Have you ever looked at pornography?

A    What do you mean, just, like, in a magazine?

Q    Magazine, on your phone?

A    I've never viewed pornography on my cellular phone.

Q    Okay.  I mean, it's not -- I'm not -- like, have you ever seen the Pornhub statistics on, like, how many adult Americans look at pornography?

A    No, I have not.

Q    It's, like, way over half.

A    I know Florida --

Q    It's, like, the majority --

A    -- they said is off the --

Q    It's, like, the majority of people.

A    But no.  I --

Q    So I'm not trying to be mean or ugly.  Like, I just --

A    No.  I know.

Q    What I'm trying to do is, like, get a sense of, like, how much do you know about the world of pornography?  It sounds like not a lot.

A    I don't view, like I said, like, magazine, if that's what you're talking -- like, Playboy.  Like, I haven't bought Playboy magazines.  That's what I'm referring to.

Q    Do you have, like, a brother?

A    Yes.  But --

Q    Did he ever have a Playboy or anything?

A    That I don't know.

Q    Okay.  All right.

A    I didn't go in his room.

Q    So you don't really -- so you don't really know what I mean when I say centerfold?

A    No.

Q    So, like, a centerfold in a Playboy, when it would come every month or so, like, it would just have, like, a spread.  It would just be, like, still photographs of, like, a model pose.  And it might be partial nudity.  It might be full nudity.  But it was, like, a still photograph that was, like, taken by a photographer, and it's just, like, on the page.  That's what a centerfold is.

A    Okay.

Q    All right.  Does this appear to be, like, a centerfold-type picture?

A    It appeared to be just, like, a regular photo taken.

Q    Right.  And it was partial nudity?

A    Yes.

Q    Okay.  I want to -- I do want to -- I mean, I'm not -- and I'm seriously not -- I mean, I'm not trying to pry into your personal life.  I -- if -- do you really not know that much about the world of, like, what is on pornographic websites?

A    No.  What I'm saying is I don't know about Playboy.  Like, you're saying, have I ever viewed Playboy --

Q    Yeah.

A    -- if I had a Playboy -- like, I don't.  So I can't speak on Playboy.  I can't speak on, you know, searching through Pornhub.

Q    Okay.  I mean, but, like -- that's what I'm trying to get a sense of is, like, do you understand, like, the way Pornhub is set up or, like, how -- how pornography is portrayed in the world?

A    Yes.  I understand that.  What I'm saying is I personally don't go on those sites.

Q    Sure.

MR. CARSON:  And -- and if I could, maybe --

MR. ROBERTS:  Yeah.

MR. CARSON:  -- maybe that's where we draw the line.  Instead of asking Detective Preston whether she or any members of her family have looked at this stuff, maybe speak more generally to her understanding of how it operates.

BY MR. ROBERTS:

Q    Well, I mean, I -- I -- you only look at pornographic images at work that have been the subject of, like, a NCMEC report or some other -- right?

A    Yes.

Q    So your -- your view through work is very myopic, like, short-sided, on images that might be characterized by somebody as child pornography; correct?

A    Yes.

Q    So, I mean, you're not really an expert on, like, what pornography looks like in general, legal pornography?

A    Legal pornography, yes, I am.

Q    Okay.  How do you get that expertise?

A    Because obviously basing it off of, yes, we view child pornography, and we have to go to these sites.  But sometimes there can be, within those sites,

illegal pornography, which would be child pornography.

Q    Now, you just said you have to go to those sites.

A    I'm sorry.  Not have to go to those sites, but we do sometimes go to those sites.

Q    Why didn't you go to this site in this case?

A    I don't know.

Q    No -- no explanation?

A    No.

Q    I mean, do you wish that you would have?

A    I think at that point in my investigation, I was focused on the victim in the photograph, not going to the site.

Q    You had reason to believe that this image was published on a public website, though; correct?

A    Yes.

Q    Yes.

And you've been to those websites?

A    Some of them.

Q    Do you know that most public websites make disclosures and disclaimers about the age of the models?

A    Yes, sir.

Q    So you're aware that virtually all of the pornography that is published on a public website, the website is at least telling the public that these images

contain images of adults?

A    That the website is telling them that these should be adults?  Yes.

Q    Yeah.  So when you got this tip, you knew that Mr. Lawshe, when he viewed this image, most likely was being told that this was an adult?

A    That I can't speak on because I don't know where he viewed it.

Q    It was easy enough for you find out where he viewed it, though; right?

A    No, sir.

Q    Did you attempt to find out where he viewed it?

A    That would be a digital forensic examiner because they're the ones, like, going through the search terms and all of that, not me.

Q    So you don't -- you don't -- you don't ever go to the websites?

A    I don't say that I don't ever go, but I have in the past.

Q    So you had the ability to go the website in this case?

A    Yes, sir.

Q    Yeah.  You could have verified that this model was a model on -- on the website very easily?

A    Yes, sir.

Q    Okay.  Do you agree if you would have done that, you would have known for sure that the model was being portrayed as a verified adult?

A    No, sir.

Q    Why do you say that?

A    Because I can't go based off just what the site is telling me on their public forum.  Like, hey, this should be an adult, that that is confirmed an adult.

Q    I'm not asking that question.  My question is about what Mr. Lawshe would have been told about this model when he viewed it.  Do you understand the perspective that I'm talking about now?

A    Yes.

Q    So here's the question.  If you would have gone to the website, you would have been able to confirm that Mr. Lawshe was being told by the website that this model was a verified adult?

MR. CARSON:  Object to form.

THE WITNESS:  No, I wouldn't have been able to because I don't know if that's how he got the photograph.  So I can't speak on saying, yes, that is a verified minor, and that's what he saw before he viewed the photograph because I don't know how

he viewed it.

BY MR. ROBERTS:

Q    But do -- did you have reason to believe that he viewed it on the Internet?

A    No.  I can't speak on how he -- because I didn't have his device.  I wasn't there with him.

Q    Now, you're a -- you're an expert in investigating Internet crimes against children; correct?

A    Yes, sir.

Q    You didn't look at this image and take from this image reasonable suspicion that he got this image off of the Internet?

        MR. CARSON:  Object to form.

        THE WITNESS:  That would be me speculating, and I cannot speculate that he got it from that site, that he went on to that site and pulled that image.

BY MR. ROBERTS:

Q    Did you determine -- seek to determine where he got it from?

A    That I do not recall.

Q    You don't recall whether or not you -- you made an attempt to do that?

A    I don't recall.  I don't remember.

Q    Okay.  So you agree that -- that there's at

least a probability that he got it from a website connected with met-art.com?

A    That he could have.  He could have not.  I can't speak on how he did it.

Q    Right.  But, I mean, there was evidence on the photograph of a website; right?

A    Uh-huh.  Yes, sir.

Q    And so the only evidence was that this was connected to met-art.com; right?

A    What do you mean?

Q    That the image was connected with met-art.com.  That was the only evidence that you had.

A    You're talking about the watermark is the only evidence --

Q    That you had of where it might have come from.

A    It's a possibility, where it could have come from, yes, based off that watermark.

Q    But such that you -- you included it in your -- in your search warrant; correct?

A    Yes, sir.

Q    All right.  So did you -- do you believe, as we sit here today, that that website portrayed the model as a verified adult?

A    That I do not know.

Q    Does that concern you?

A     What do you mean?

Q     You've testified that you believe this is a minor; correct?

A     Yes, uh-huh.

Q     Does it concern you as a law enforcement officer that there's a website that is publishing images telling the public that they're adults but they're really not adults?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q     Does that concern you as a law enforcement officer?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know how to answer that.

BY MR. ROBERTS:

Q     Would that be a crime?

A     You're talking about if they are illegally posting minors?

Q     And calling them adults.

A     Yes.  That could --

Q     That would be a crime?

A     Yes.  It could be a crime.

Q     What has to happen in St. Johns County in order for you to take that and investigate it?

A     What do you -- what do you mean, for --

Q    Do you have the freedom to investigate crimes as you see fit?

A    I don't understand your question.  Like, can I pick and choose?  Is that what you're --

Q    Well, do you have to get permission?  If -- if we leave here today and you say, you know what; he's right, you know; this is a child on this website and they're most likely telling people that it's an adult, we should do something about that.  I mean, how would you make that happen?

A    I would contact one of our federal agencies, whether it be the FBI or, like, HSI.

Q    Okay.  But you haven't done that?

A    No, sir.

Q    All right.  You don't have a reason why?

A    No, sir.

Q    All right.  So the sole basis of you believing that this was a minor was just your personal opinion about this model looked young?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.

BY MR. ROBERTS:

Q    What was the basis of your opinion when you looked at this image to determine that this was a minor or not?

A    Based off my personal experience and obviously me being a female, that, and then also going the extra step and getting it certified by Dr. Dully.

Q    What do you mean by that?

A    By which part?

Q    You -- let -- let's just go to -- if I can direct your --

A    Yeah.

Q    -- attention to your -- your deposition.  And I'm just going to have you read your testimony on Page 38.

A    Okay.  Just one second.  Sorry.

MR. ROBERTS:  And, Matt, I'm not trying to be rude.  I'm having her read her testimony from a deposition.  It is awkward.  But I did not make this to be awkward.

BY MR. ROBERTS:

Q    I'd like you to read Line 14 --

A    14?

Q    Yep, on 38.  Can you -- can you read your answer?

A    Yes.  Yes, sir.  And obviously, the main difference with me is, which is also super weird to say, if you were to get me naked and I was to be photographed naked, you would be able to tell.  Okay.  Even though

the face looks young, her body is way more mature than a child, which is what we go based off -- excuse me -- go based off.  We don't go based off the edited photos, if it's just their -- of their face edited.  We go based off of the totality and their body.

Q    What do you mean by that?

A    That statement was in reference to a previous question for me using certain photos, like, edited photos of my face.

Q    It was about determining who looks to be a minor and who is not a minor; correct?

A    Uh-huh.

Q    Because you -- you have posed in sting operations as a -- as a minor; correct?

A    Yes, sir.

Q    As a 13-year-old?

A    Yes.

Q    And pictures of your face unedited?

A    No.  They're edited because I don't look 13.

Q    How are they edited?

A    They're edited through an app that we utilize.

Q    I mean, I can tell you I've seen a picture.  It looks just like you.

A    Like I said, (unintelligible), but I do not look like --

Q    You put a hat on.  You slick your hair back.  You wear a sweatshirt.

A    No.

Q    You -- you never had a hat on?

A    Not --

Q    Luring people in to tell them you're 13?

A    No.  We edit our face.  But with, like, hats and stuff, if I'm not mistaken, it's hard for it to pick up, like, your facial features to edit it.

Q    Okay.  All right.  I'm not trying to give you a compliment.

A    No.

Q    But, I mean --

A    I'm like --

Q    -- your -- your image, you -- you're portraying yourself as a 13-year-old.

A    Yes.

Q    Okay.  And we'll get into the editing here in a minute.  But I think what you were trying to -- to articulate in your testimony was that it's not just the way someone's face looks as how you determine whether or not someone's a minor or not.

A    Yes.

Q    And my question to you is what are you talking about there?  And I'm not trying to make you feel

awkward or weird.  But I'm just trying to say, like, what do you mean?

A    The totality of it, like, saying that. Because I guess in laymen's terms, with my edited photos, it's just my face.  I am fully clothed.  So obviously, when we get a CSAM image, we're not getting an image of a fully clothed person, and we're not just looking at a face, which could easily be edited to appear younger.  We're looking at the totality of everything in that photograph.

Q    So you acknowledge that the photograph in this -- in this case, it -- the face could have been edited in some way?

A    That I don't know.

Q    But it could have been?

A    It could, yes.

Q    And -- and you know that images are easily digitally altered?

A    Yes.

Q    And even with genital or pubic region, I mean, hair is one of the most easy things to remove from a -- from a digital image, isn't it?

A    It could be, yes.

Q    I mean, that happens all the time in -- in the world.

A    But it could be.  I can't speak for it because I don't know.

Q    Okay.  But, like --

A    But it could.

Q    Yeah.  You -- you understand that's a fairly easy thing to do?

A    Yes.

Q    All right.  Do you know whether or not this image was altered in any way?

A    No, sir, I don't.

Q    Okay.  Did you do anything to try to determine whether it had been altered or not?

A    Like, anything like what, like, I guess?

Q    Talk to the forensic guys about it.

A    They reviewed the image, but they didn't tell me that it appeared altered from my recollection.

Q    Did you ask them that question?

A    I don't recall verbatim if that was one of my questions.

Q    Okay.  But as we sit here today, you don't know whether it was altered or not?

A    No, sir, I do not.

Q    And that's not just for the face, but that's also for the appearance of pubic hair.

A    Yes.  That's for everything.  I don't know.

Q    Right.

So, I mean, I -- and I'm not trying to be crude.  But what was it about this image that you looked at, and you're like, no, that's definitely someone who's under 18?

A    The totality of it, everything involved in that photograph, the entire person, like, from top to bottom.

Q    You have to be a little bit more specific than that.

A    So face, her body, everything down to --

Q    So she's squatting.  So you don't see her breasts.  Knees to chest.

A    Yes.

Q    Correct?

A    Uh-huh.

Q    So you can't see her breasts.  I think maybe she's partially clothed?

A    If I remember -- I'd have to refer back to the image.

Q    Okay.  So really, all you can see is her face and, I think, her genitals?

A    Yes.

Q    All right.  Not -- this is not -- let me -- what about her genitals looked under 18?

A    So I'm not a doctor.  So I can't --

Q    Right.

A    -- you know, speak like, hey, it was this part of her genitals that looked young.

Q    You did not have an opinion that her genitals look anything different than anyone else's genitals?

A    What do you mean?

Q    I'm asking you, did you look at this image and go, oh, no, there's definitely something young-looking about her genitals?

A    Yes.

Q    What is it?

A    That I don't remember specifically, just because I'm not a doctor, so I don't know specific doctor terms.

Q    I mean, can you use layperson's terms?

A    Personally, everything but -- about her vaginal region.  And I know that's not super specific for you, but that's just my opinion of it based off looking at that photo.

Q    I mean, do you have any sort of expertise to -- to make that opinion?

A    No.  Because I'm not a doctor.

Q    Okay.  So let me -- let me just ask you this: I mean, what in your opinion does your evidentiary --

like, your opinion, what weight does that have for a court?

A    That I do not know.

Q    I mean, is your opinion better or worse than anyone else sitting in this room?

A    That I can't speak on, I guess.

Q    You don't know?

A    Yeah.  I don't know.

Q    I don't have any training in determining if someone is 18 or 16 or 19 or -- do you have specific training on that?

A    On determining the specific age, no, sir, I do not.

Q    Okay.  So I don't -- there's nothing special about your opinion that this model looked below the age of 18?

A    I wouldn't call my opinion special.

Q    There -- there's no weight -- there's no extra weight that we should give that opinion because you're a detective?

A    That I don't know.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Okay.  All right.  Well, you don't know.  And I guess what that means is as we sit here today, you do

not see your own opinion as being expert in any way?

A    What do you mean?

MS. SHEVLIN:  Form.

THE WITNESS:  In a body, in classifying a specific age?  No.  Because I'm not an expert in that.  So no, I cannot say --

BY MR. ROBERTS:

Q    Okay.

A    -- my opinion --

Q    Okay.

A    -- in reference to that.

MR. ROBERTS:  All right.  Do you guys want to take a break?  We've been going, like, an hour.

MR. CARSON:  I was just going to ask.

MR. ROBERTS:  Yeah, yeah, yeah.  That's fine.  Yeah, perfect.

MS. SHEVLIN:  Yeah, sounds great.

MR. ROBERTS:  Yeah.

THE VIDEOGRAPHER:  This is the end of Media Unit Number 1.  We are going off the record at 2:22 p.m.

(Recess from 2:22 p.m. to 2:32 p.m.)

THE VIDEOGRAPHER:  This is the beginning of Media Unit Number 2.  We are back on the record at 2:32 p.m.

BY MR. ROBERTS:

Q    Okay.  So just going over some notes, kind of pick up where we are, your -- your testimony is that you've never been to met-art.com?

A    Yes, sir.

Q    Even after sort of the revelations from Mr. Pierce in the criminal case, you never went back and checked on anything?

A    No, sir.

Q    All right.  I want to just -- you to pull to Page 37 on your -- your deposition.  And Mr. Pierce asked a question.  Aside from any of -- this is Line 6. Aside from any of those conclusions about sexual maturity, is there anything about the image in particular that says this is definitely a minor?  I mean, is it in a child's bedroom?  Does --

Then you say:  So no.

Question:  Look like a selfie in a bathroom by a teen?

Can you read your answer at Line 13?

A    Especially on MetArt because it's that overseas.  They're all posed.  And it's done, I'm assuming, by a professional photographer.  So they're usually in, like, staged studios, which is what it appeared to be.

Q    Okay.  So especially on MetArt, how -- where did you get this information about what models are usually like on met-art.com?

A    That was from Detective Greene.

Q    So Detective Greene told you that he had been on met-art.com?

A    Yes, sir.

Q    And told you that these were professional photographers?

A    Yes, sir.

Q    Told you they were in staged studios?

A    Yes, sir.

Q    All right.  You never verified that information?

A    Not that I can recall.

Q    All right.  Is it true that -- and I think I may have asked this.  But is it true, as an investigator of Internet crimes against children, that most public websites describe the models as adults and verified adults?

A    What do you mean?  I'm sorry.

Q    Most public pornographic websites describe the models on those websites as adults?

A    Yes, sir.

Q    Okay.  All right.  I think I already went

through that.  Now that reminds me.

A    Okay.

Q    All right.  What was the -- what was the charge that you -- actually, let's -- let's continue.  Do you have your -- your search -- your affidavit for the search report there?

A    You're talking about which one?

Q    Search warrant.  This is the search warrant and affidavit for Synchronoss.

A    Yes.  I think we're at the same one, the (unintelligible).  This one?

Q    Yes.  That's correct, yes.

A    Okay.

Q    And so in this -- in this affidavit, you cite a -- a statute, 827.015.  What is that statute?

A    So this one is 827 -- you mean .071?  You said .1.

Q    .071(5).

A    Yes, sir, the possession of child sexual abuse imagery.

Q    Okay.  And I've got a copy of that.  We can just attach it for the record.

(Plaintiff's Exhibit 5 was marked for identification.)

BY MR. ROBERTS:

Q    You're familiar with that statute?

A    Yes, sir.

Q    All right.  And --

A    Thank you.

Q    -- (5), can you read (5)(a), the first sentence?

MR. CARSON:  Can you give me -- can you give me just one second?

MR. ROBERTS:  Yeah.

MR. CARSON:  I'm going to object to form.

You can answer.

THE WITNESS:  And you said just the first sentence?

BY MR. ROBERTS:

Q    Yes.

A    It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation which in whole or in part he or she knows includes any sexual conduct by a child.

Q    And is that the statute that you are referencing in your affidavit for a search warrant?

A    Yes, sir.

Q    All right.  And you requested, from Verizon -- I see that here.  We're looking at the search warrant exhibit, which I think is Exhibit 2.

A    Yes.  It should be because your NCMEC tip was 1.

Q    Yeah.

And we talked about this earlier.  I'm just confirming that -- the dates that you sought for the subpoena, 1/22/23 through 1/28/23.  Did I read that correctly?

A    Yes, sir.

Q    And were those dates based on three days before the incident date and three days after the incident date?

A    Yes, sir.

Q    So including the incident date, that would be seven days total?

A    If my math is correct, yes.

Q    I think it is.  I think that's at least what you put in your --

A    Yes.

Q    -- in your search warrant.

You go through your background.  And you say that you have over five years of law -- law enforcement experience and that your affiant is currently assigned

to the special victims unit.

How long had you been assigned to the special victims unit at the time of this affidavit?

A   So it's technically just ICAC, but we were under special victims, if that makes sense.

Q   Okay.  How long had you been ICAC?

A   Just a couple months.

Q   All right.  Had you been the lead detective on cases prior to this one?

A   Yes, sir.

Q   All right.  Can you estimate how many?

A   Oh.  I don't know an exact number -- sorry -- just because that was back from 2023 and '22.  I can't -- I do not remember an exact number.

Q   Fair to say that you were pretty new?

A   Yes, sir.

Q   All right.  Had you completed all of your training by that time?

A   No, sir.

Q   All right.  Had you started your training at that time?

A   Yes, sir.

Q   Can you tell me how -- how far along you were in your training?

A   Just being a couple months in, it was pretty

much right at the beginning stages.

Q    Okay.

A    Yes, sir.

Q    All right.  I want to go to the facts which establish probable cause, that section.

A    Okay.

Q    All right.  And you reference the -- the cyber tip in the same number that we've previously marked as Exhibit 1; correct?

A    Yes, sir.

Q    All right.  You quote, looks like word for word, from portions of that cyber tip, file name through the image categorization by ESP.  Is that a sort of copy and paste from the NCMEC report?

A    Yes, sir.

Q    All right.  Now, at the time you did this affidavit, you knew that A2 was incorrect?

A    That it was their description.  And so what I'm copying and pasting is the ESP's description and their information.  So what I put was just the information provided by the ESP.

Q    But you knew that the model was not prepubescent?

A    In my opinion.  But in their opinion, she was.

Q    Let's talk just a little about what you

understand to be pubescent or prepubescent.  We're obviously talking about puberty; correct?

A    Yes, sir.

Q    What is your definition of prepubescent versus pubescent?

A    I guess the easiest way to describe it is obviously, the prepubescent is you haven't hit puberty, so you have usually no kind of development to you.

Q    Pubic hair?

A    Not just pubic hair.

Q    But pubic hair is one of those things?

A    It can be, yes, one of those things, yes, sir.

Q    The presence of pubic hair would alert you that someone has begun to experience puberty?

A    Yes, sir.

Q    Okay.  And this model had pubic hair?

A    Yes, sir.

Q    Did you make any -- any opinions about the appearance of her pubic hair in relation to her age?

A    That I don't recall.  I would have to refer back to this to see if I did, but I don't recall.

Q    Refer back to what?

A    If it was in the description.

Q    Okay.  Yeah.

A    Yeah.  I just don't recall.

Q    We'll go through this.

A    Okay.

Q    So we can -- yeah.

It says you have viewed the image attached to the cyber tip.  And then additionally, on February 22nd, 2023, your affiant consulted with Dr. K. Dully of the First Coast Child Protection Team --

A    Yes, sir.

Q    -- who also reviewed the offending image.

Did I read that sentence correctly?

A    Who also reviewed the -- yes, sir.

Q    Yeah.

You actually did not express -- and you can take a minute if you would like -- your opinion in this affidavit that this was a minor or an adult.

A    No.  So usually, we put what the image depicts.  But in this one, I did not put my opinion of what the image depicts.  I just put Dr. Dully's statement.

Q    When the -- and unfortunately -- right? -- I mean, unfortunately, sometimes you see images of what is obviously a child; correct?

A    Yes, sir.

Q    And when it is obviously a child, you don't consult with Dr. Dully usually, do you?

A    That would be correct.

Q    And so --

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    -- in those cases where it's obviously a child, you would express your opinion in the affidavit that this is obviously a child of, you know, a certain, I guess, age range?

A    We describe the --

MS. SHEVLIN:  Form.

THE WITNESS:  Sorry.

BY MR. ROBERTS:

Q    Yeah.

A    We describe the photograph and what it depicts and I say, like, for example, it appears to depict CSAM, which is just the child sexual abuse material.

Q    And in those cases, it's just obvious?

A    Yes, sir.

Q    Right?

A    Uh-huh.

Q    You'll agree that this case, it was not just obvious that this was a minor?

A    In my opinion, it was.

Q    But you didn't treat it like other cases where it is obvious, and you would have not consulted with

Dr. Dully; correct?

A    Yes.

Q    All right.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    So it is a little different than those circumstances where it's obviously a child.  You treated it differently anyway.

A    Yes.  In my opinion, yes.

Q    Right.

Do you agree that some people could have looked at this model and said, oh, she's 18?

A    That could be.

Q    Some people could say that; right?

A    Yeah.

Q    Detective Greene could come to that conclusion?

A    Yes.

Q    You -- you wouldn't testify under oath that Dr. Greene -- I mean that Detective Greene is wrong in his opinion that this person could have been 18 years old?

A    No.

Q    All right.

All right.  Let's -- this is a good point for

us to -- to kind of break out of this.

A    Okay.

Q    And I'm going to show you what we'll mark as --

MR. ROBERTS:  Where are we?  4, 5?

MR. CARSON:  6.

MR. ROBERTS:  6?  Okay.

BY MR. ROBERTS:

Q    I'm going to mark, as Exhibit 6 -- and what I'll do is I'll -- I'll make this a composite of three different things.

A    Okay.

Q    But we're just going to talk about one right now.

A    All right.

Q    This is the three --

MR. ROBERTS:  Here you go, Matt.

BY MR. ROBERTS:

Q    This is the report from Detective -- I mean -- sorry -- Dr. Dully.

A    Yes.

Q    There's three separate reports.  I just want to talk about -- let's start with the February 22nd report.

A    Okay.

Q    How many times prior to this had you met with Dr. Dully in the two months that you had been working?

A    Personally, this was my first time.

Q    This was your first time.  Okay.

How is it that you came to know about Dr. Dully?

A    So I was referred to her by Sergeant Tolbert.

Q    Okay.  And what did Sergeant Tolbert say?

A    That she had previously reviewed other ICAC detectives', like, images and that I would have to go to her.

Q    Now, you had had other -- let's just -- Detective -- I'm sorry.  Sergeant?

A    Tolbert.

Q    Tolbert.  And I've called him Detective.  I guess it's Detective Sergeant?

A    Yes.

Q    Yeah.  Sounds like a British crime show.

So Sergeant Tolbert, this was the first time that he had referred you to Dr. Dully; correct?

A    Yes, sir.

Q    But this was not the first investigation that you had worked on where there was an allegation of possession of child pornography?

A    Yes, sir.  That would be correct.

Q    You had done other investigations?

A    Yes, sir.

Q    And those other investigations included obvious child pornography that you did not need to go to a doctor; correct?

A    Yes, sir, correct.

Q    All right.  And so was -- tell me about that conversation.  Did Dr. -- why did it come up that Dr. Dully should or could be involved in this case?

A    So with this one, I reviewed it.

MS. SHEVLIN:  Form.

THE WITNESS:  I -- oh, sorry.  The background is making me -- I viewed it as being CSAM.  I don't remember for certain who it was.  I know it wasn't Sergeant Tolbert because he also reviewed the image before he assigned it to me, and he also viewed it as CSAM.  But I believe that there was somebody else in the office who thought that it could be age-difficult.  So that's when we decided, just to make sure we covered our bases, to have it verified.

BY MR. ROBERTS:

Q    And when you say age-difficult, what you mean is this could -- somebody believed that it could potentially be an adult?

A    Yes, uh-huh.

Q    All right.  So -- and this is in some of the other testimony, that when there's a disagreement about the -- whether the model is an adult or a minor that the kind of policy of the department is to go to a Child Protection Team doctor.  In this case, it was Dr. Dully?

MR. ROBERTS:  Object to form.

THE WITNESS:  I wouldn't say it's in policy.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    It wasn't in policy.

So sometimes you would, and sometimes you wouldn't?

A    This is the first case, so I can only speak on this that I've had.

Q    You've -- you've done subsequent cases; correct?

A    Uh-huh.

Q    Where you've gone to Dr. Dully?

A    Not that I recall.  Yeah.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Okay.  So this is --

MS. SHEVLIN:  Excuse me.  Form.

MR. ROBERTS:  I'm sorry.  Yep.

BY MR. ROBERTS:

Q    This is the only case that you have consulted with Dr. Dully on?

A    Yes, sir.

Q    Okay.  Other cases, you've chosen not to pursue because you thought this person could very well be an adult?

A    No.  It was just other cases have not either been CSAM, or they have been CSAM.

Q    Right.  So I guess there was a second part to my --

A    Oh, sorry.

Q    Sometimes when you don't go to Dr. Dully, it's because you've looked at the image, and you've said this is not CSAM or it's age-difficult -- correct? -- sometimes.  Sometimes you don't go to her because it's obvious --

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    -- that it's a child?

MR. CARSON:  Object to form.

THE WITNESS:  No.

BY MR. ROBERTS:

Q    Okay.  Yeah.

So -- so have you taken every cyber tip that

you've gotten since this and ultimately, that led to charges?

A    If I haven't, like, investigated -- or excuse me.  I guess I should say every cyber tip that I've had post this, you're referring to?

Q    Let me just back up because I think we're ships passing in the night.  Earlier in the deposition, you testified that you have looked at other images that you, yourself, determined were not CSAM.

A    Yes.

Q    Another way of saying that is you looked at an image, and it was age-difficult to the point where you just did not think it was a valid case to pursue.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Is that true?

A    No, not necessarily.  Because --

Q    So -- okay.  So explain that to me.  Would you pursue age-difficult cases?

A    No.  If I feel like it is age-difficult, then I would not pursue it.

Q    Okay.

A    Yes.

Q    And if you felt that it was age-difficult, you wouldn't go to Dr. Dully?

A    No.  I -- depending on the circumstances.  If it was one that I felt, hey, this is a child and I had somebody like in this case that had a difference of opinion, just to cover our bases, I would go to Dr. Dully.

Q    But in those cases, you -- you thought that it was a child?

A    Yes, like in this case.

Q    Right.

What I'm saying is in cases where you felt like that it was not a child; right?  So image -- a tip comes in.  You look at it.  You go, I don't think that's a child.  You would not take that to Dr. Dully.

MS. SHEVLIN:  Form.

THE WITNESS:  It's hard for me to say because I haven't had a case where I've been on the border, where it's like, ooh, could this be a child; could this not be a child?  Like, I've had cases where it's clear, like, that is not a child or cases that don't even have CSAM at all.

BY MR. ROBERTS:

Q    Okay.  Okay.  All right.  So what is -- you've never had an opportunity to go to Dr. Dully since this incident?

A    Yes.

Q    Okay.  All right.  So do you know -- I think you said it was Sergeant Tolbert that suggested that you go see Dr. Dully?

A    Yes.

Q    And your recollection is that because there was some disagreement about whether or not this was a child or an adult?

A    I believe it was a disagreement --

MS. SHEVLIN:  Form.

THE WITNESS:  -- on somebody thinking it could be potentially age-difficult and then us thinking, like, no, this is for sure a child.

BY MR. ROBERTS:

Q    Okay.  So there was some disagreement about how to interpret the photograph?

A    Yes.

Q    All right.  What was explained to you by anyone at St. Johns County, Dr. Dully's qualifications to determine whether some -- a model was an adult or a child?

A    What do you mean?  Like, her qualifications?  Like?

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    However you take that qualifications.  I mean,

did -- let me ask it this way:  Did Detective -- or Sergeant Tolbert tell you that she was qualified to tell you or to render an opinion about whether or not a particular model was an adult or a minor?

A    Oh, like, why we should be going to her at all?

Q    Right.

A    Is that what you're referring to?

Q    Right.

A    I don't recall the specific conversation.  I believe -- honestly, I don't remember verbatim, and I don't want to guess.  So I just don't recall the specific conversation we had about, like, I guess her background in medical.

Q    So you don't recall, before you first met her, what her -- being told what her specific qualifications were?

A    No, sir, I don't.

Q    Okay.  When you met with Detective -- with Dr. Dully, did she tell you what her qualifications were?

A    Honestly, I don't recall because it was so long ago.

Q    All right.  What makes you think that Dr. Dully has a scientific ability to determine whether

an image of a model on the Internet is or is not an adult?

MS. SHEVLIN:  Form.

THE WITNESS:  I don't know how to answer that, like, because I don't want to speak for Dr. Dully but to, like, say that, hey, she has a scientific, you know, I guess, method.

BY MR. ROBERTS:

Q    Do you know if she has a scientific method?

A    And by scientific method, like, what are you referring to?

Q    A reproducible method of accurately estimating the chronological age of a particular model in a particular digital photograph.

MR. CARSON:  Object to form.

You can answer.

THE WITNESS:  I don't recall specifically what she did.

MS. SHEVLIN:  Join.

THE WITNESS:  But I don't want to say, you know, accurately or inaccurately because obviously, that's a difference of opinion.

BY MR. ROBERTS:

Q    Well, as we sit here today, do you believe Dr. Dully has the ability to estimate within some degree

of scientific reliability the age of an individual by looking at a digital photograph?

A    Yes.

Q    Okay.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    What is that based on?

A    The specific?  I don't know what it's based on, but that's why we went to her.

Q    Why do you believe she has the ability to simply look at a digital photograph and estimate the age of that person?

MS. SHEVLIN:  Form.

THE WITNESS:  This would be just me going based off my personal opinion --

BY MR. ROBERTS:

Q    Uh-huh.

A    -- which I don't know.

Q    Uh-huh.

Well, I mean, tell me.  You have a personal opinion that -- that -- that doctors have a scientifically reliable way of looking at someone and telling their age.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  You're saying scientifically? That's the thing.  I don't know, I guess, how to answer it based off, like, that term being used.

BY MR. ROBERTS:

Q    So --

A    I don't want to misspeak.

Q    -- you -- you were the -- ultimately responsible for this investigation; correct?

A    Yes, sir.

Q    And you understand that when you apply for a search warrant, you have the obligation of only presenting reliable information to the court; correct?

A    Yes, sir.

Q    All right.  So we've talked about, you know, whether or not it was reliable that this website actually has a history of -- of child pornography. We've talked about that; correct?

A    Yes, sir.

Q    All right.  What I'm asking you is how did you satisfy yourself, being in charge of the investigation, that Dr. Dully's opinion about the age was reliable such that you could present it to a court?

MS. SHEVLIN:  Form.

MR. CARSON:  I'll join.

You can answer.

THE WITNESS:  And I'm sorry.  I'm thinking back to obviously when I went to her office, just because I don't recall specifically what she used to determine the age.  But her being a doctor in the medical field working with children, I think that also played into why I felt comfortable utilizing her.

BY MR. ROBERTS:

Q    So you met with her twice?

A    Yes, for this case.

Q    Okay.  The first time you met with her on February 22nd, did -- did she tell you that she could -- yeah, I can accurately, reliably estimate the age of the individual in this digital photograph?

A    I don't remember verbatim what she said.

Q    Do you remember getting that sense from her, that she was going to give you reliable information about the age?

A    Yes.

Q    Okay.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    All right.  Now, prior to showing her the image, you told her that this image came from a cyber tip; correct?

A    I don't recall what I stated exactly.

Q    Well, if you will, just look at the Exhibit 6.

(Plaintiff's Exhibit 6 was marked for identification.)

BY MR. ROBERTS:

Q    And I -- February --

A    This one?

Q    Yeah, yeah, February 22nd.

A    Okay.

Q    This is a letter that Dr. Dully wrote to you; correct?

A    Yes, uh-huh.

Q    All right.  And she writes that she -- single color photograph displayed on law enforcement laptop. And she has the file number --

A    Uh-huh.

Q    -- provided to me by yourself following a cyber tip from NCMEC.

Correct?

A    Yes.

Q    She would have had no way to know whether or not this was a cyber tip image without you telling her, would she?

A    No.

Q    All right.  So fair to say you -- you probably

told her that this was a NCMEC cyber tip report?

A    Yes.

Q    Did you tell her that it was unconfirmed?

A    I don't think I remember what, verbatim, we talked about.

Q    In your deposition with Mr. Pierce, you talk about understanding what confirmation bias is.

A    Uh-huh, yes.

Q    And what is confirmation bias to you?

A    To me, in laymen's terms, it's -- like, I'll use for an example if I tell you, hey, the guy across the street just stole something from McDonald's and he's wearing a blue baseball cap and you see a guy matching that description, you're already going to have bias. Like, okay, he's a thief, based off what I just told you.

Q    Do you believe that there's a risk, applying that same thing, when you told Dr. Dully at the time that she reviewed it that NCMEC, the National Center for Missing & Exploited Children, had already flagged this in a cyber tip?  Do you think that that created the potential for confirmation bias?

A    No.  Because I can't speak for Dr. Dully and say, like, yeah, she had confirmation bias.

Q    But that's exactly the scenario you just

described about someone robbing something; correct?

A    Uh-huh.

Q    Correct?

A    Yeah.

Q    Yeah.

You told her -- you gave her information that there was already a suspicion that this was a child at the time or prior to her opinion being formed; correct?

A    No.  I don't recall specifically what I stated or if, hey, this is a child; can you confirm.  So I don't recall what was said.

Q    But -- but clearly, you did tell her that it was from a cyber tip?

A    Yeah, from the National Center for Missing & Exploited Children.

Q    Did she -- did she act like she knew what that was?

A    I don't recall if she did or didn't.

Q    Okay.

A    Sorry.

Q    Do you agree that there might have been a different outcome if you would have told Dr. Dully that this was an 18-year-old?

A    No.  Because I can't speak for her, if she would have changed her opinion on it.

Q    Okay.  But when you brought the image to her, you realized or you at least acknowledged the possibility that someone had represented this individual as an adult?

MR. CARSON:  Object to form.

THE WITNESS:  What do you mean, that somebody represented her as an adult?

BY MR. ROBERTS:

Q    This -- the image that's the subject of the NCMEC report, cyber tip report.

A    Yeah.

Q    The website that it was on most likely represented this as an adult?

MR. CARSON:  Object to form.

THE WITNESS:  But like I stated, I can't say that that came specifically from that website.

BY MR. ROBERTS:

Q    But you knew that it came from the Internet; right?

MR. CARSON:  Object to form.

THE WITNESS:  That I can't say.

BY MR. ROBERTS:

Q    Well, where else would it have come from?

A    I don't know.

Q    Well, you're a detective, Internet crimes

against children.  I mean, what are the possible sources that this digital photograph with a website stamped on it -- what are the other potential sources that this came from?

A    There could be a multitude of different sources that it could come from.

Q    Like what?

A    Like, honestly, anywhere.

Q    Could it have come from the moon?  I mean, that's silly.  But you're saying anywhere.  I mean, like --

A    Yeah.

Q    -- don't you agree that, like -- I mean, you've heard it's like -- it walks like a duck, talks like a duck.  I mean, doesn't this appear to be an image from the Internet?

A    Yes.  It appears to be one that's a digital image, if that's what you're referring to, yes.

Q    Right.  It appears to be a pornographic picture from the Internet; right?

MR. CARSON:  Object to form.

THE WITNESS:  It appears to me to be a digital image.  That's what I see.

BY MR. ROBERTS:

Q    Right.

A    I don't automatically constitute it as, okay, this person got it off an Internet-based site.

Q    Even though --

A    (Unintelligible).

Q    Even though it has, like, the website on the image?

A    Yes.  But that does not mean that it came from the website is only what I'm saying.

Q    Okay.  Where else would this image -- how else -- and you're an expert -- right? -- in crimes -- Internet crime against children.  Where else would a digital, what we've said, professionally produced photograph --

A    Like I said, I don't know -- I can't say for certain that it's professionally produced, so I don't want to say, yes, this was professionally produced.

Q    It appears -- you said it appears to be taken by a photographer.

A    Yes.

Q    Right?

A    Uh-huh.

Q    Where else would someone, on their phone, get a picture like that?

MR. CARSON:  Object to form.

THE WITNESS:  Honestly, anywhere.  Like, our

phones can do so much.

BY MR. ROBERTS:

Q   They can't get things, though, that are not from the Internet.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   Can they?

A   What I'm saying is that I agree that it's a digital photograph, but to say that it came from a specific site solely based off a watermark, I can't say that.

Q   And I'm not saying a specific site.  I'm just saying the Internet, like, a -- a website.

A   Yes.  Like, any website, yes, it can come from any website.  It can come from any type of social media site.  It could come from a -- a text message.  It can come from anywhere.  That's all I'm saying, yes.

Q   Okay.  You made no effort to determine where it came from?

A   I don't recall.

Q   Okay.  So you -- you meet with Dr. Dully. Tell me about that meeting.

A   So I met at her office in Jacksonville.  And I brought in my agency laptop, showed her the image, and then that's when she reviewed it.

Q     Did she make any comments when she reviewed it?

A     I don't recall specifically what she said.

Q     How long did you guys meet this first time, February 22nd?

A     Yeah.  I don't know because I just wasn't keeping track of time.  So --

Q     I mean, do you -- do you think you did have a meeting with her, or was it just -- you just showed her the image and left?

A     No.  I had a meeting with her.

Q     Exchanged words, like, had a conversation of some sort?

A     That I don't remember specifically.  Like, if -- our conversation, like, what we stated, you know, or talked about, I honestly can't recall.

Q     Do you remember if she gave you her opinion while you were there?

MS. SHEVLIN:  Form.

THE WITNESS:  I don't recall, no.

BY MR. ROBERTS:

Q     Did she make reference to any book or handbook or anything like that?

A     Not that I recall.  I can't remember.

Q     What did she do?  Did she just look at the

photograph?

A    No.  I remember her reviewing the photograph, but the specifics, just because it's honestly been so long, I don't remember.

Q    So you really don't remember anything about the meeting other than you brought a laptop.  She looked at the laptop, and then you left?

A    Yeah.

Q    Anybody else there with you?

A    No.  It was in her office.  I do remember that, yeah.  It was just me and her in her office.

Q    Sergeant Tolbert didn't go with you?

A    No, sir.

Q    Okay.  You can't tell me anything else about that meeting?

A    Not that I remember.  And I'm sorry.  It's just been so long.

Q    You get the report on February 22nd.  Is that the same day that you -- you met with her, or did you meet with her before that?

A    The date on this report would have been the date I met with her.

Q    How do you remember that?

A    Because I remember getting a printed-out copy of it, of the report.

Q    While you were still at the office?

A    Yes.

Q    Okay.  So sounds like you're there.  She forms all of her opinions while you're there, and she prints out a letter for you.

A    Yes, sir.

Q    Is that correct?

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    All right.  Did you read this?

A    Yes, sir.

Q    All right.  What is SMR?

A    Offhand, I don't remember specifically what the acronym stands for.

Q    Do you know what it means?  You don't know what the acronym stands for.  Do you know what it is?

A    Offhand, I'm -- I can't recall.

Q    Do you think you knew at the time and you've forgotten, or, like, maybe you never knew?

A    No.  I would assume at the time, she would have explained to me what SMR stood for and what it is.

Q    Do you know what SMR 4 -- what that means?

A    No, sir, not offhand.

Q    Okay.  The last sentence of the main paragraph, it says:  She does not appear to be shaved,

as her anterior pubic hair is still present.

What does that mean to you?

A    What do you mean?  Like --

Q    She says:  She does not appear to be shaved, as her anterior pubic hair is still present.

What do you take that sentence to mean?

A    Like, what do I think Dr. Dully meant by it?

Q    Yeah.  Or what did you take it to mean?

A    That she doesn't, like, shave, like, her pubic region.

Q    Because she has anterior -- still has anterior pubic hair.  Does that make sense to you, that sentence, the way it's written?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    It's okay if it does.  I'm just -- to me, if you said, I still have hair -- right? -- it almost denotes that I have shaved some.  But I'm just trying to understand if I'm misunderstanding it.  It says:  She does not appear to be shaved, as her anterior pubic hair is still present.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Do you know what she meant by that?

A    Not the way you're breaking it down.  It has me confused.  I'm not even going to lie to you.

Q    Right.  It is a little confusing -- right? -- the way it's written.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  Not the way it's written.  I guess the way, like, you broke it down, like, you explain, like, I guess I get confused, kind of --

BY MR. ROBERTS:

Q    All right.

A    -- confused me in the process.

Q    Okay.  I'm not trying to confuse you.  I'm trying --

A    (Unintelligible).

Q    -- to understand what it means.

A    It's just the way, like, you, I guess, kind of explained it as you were breaking it down kind of made me --

Q    Right.

A    -- like, what?

Q    Right.

A    So sorry.

Q    Right.

Do you -- do you believe that Dr. Dully is an expert in what grooming techniques are available for women?

A    That I don't know.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    You have no idea; right?

A    No.

Q    You -- you know --

A    I don't know how I would know.

Q    Yeah.

You -- you know that there are lots of different grooming methods.

A    Uh-huh.

Q    Right?

A    Yes.

Q    Shaving's just one of them?

A    Yes.

Q    You know that -- waxing?

A    Uh-huh.

Q    You've heard of that?

A    Yes.

Q    There -- there are chemicals; right?  Nair?

A    Oh, yeah.

Q    People used to use things like that, you know.

A    Yes, yeah.

Q    And there's electrolysis.  You've heard of that?  Like, use electro -- like, laser hair removal?

A    Yes, laser, uh-huh.

Q    Right.

And you would agree with me that each -- those all have maybe different appearances afterwards.  Like, electrolysis may appear differently after you've done that than shaving?

A    I mean, I think it could appear differently.

Q    Right.  I mean, sometimes you can get, like, a razor burn or, like, a rash from shaving; right?

A    Yes, uh-huh.

Q    You can have a different type of skin irritation, I think, from, like, waxing?

A    Yes.

Q    But they might appear differently; is that right?

A    Yes, on the person.  Yeah.

Q    Okay.  Yeah.

So you don't know whether or not Dr. Dully is an expert on determining whether a digital photograph accurately depicts whether someone has been shaved or not shaved?

A    No.  Because I don't know her experience --

Q    Right.

A    -- in that aspect of grooming.  I don't think that was --

Q    Right.

A    -- ever discussed.

Q    Right.

A    Yeah.

Q    And that's not something traditionally -- I mean, you're a detective, but you're also a female in the world.  Like, you don't go to a doctor to be groomed?

A    No.

Q    Right.  I mean, you don't expect even a pediatrics to be an expert in, like, being able to look at a -- a digital photograph and say, is that person groomed or not?

A    That I couldn't speak on.

Q    Yeah.

You -- you acknowledge that, like, a lot of young women do groom their pubic regions?

A    Uh-huh, yes.

Q    Yes?

I mean, you, like -- I know you have very limited experience on pornographic websites.  But, I

mean, is it your understanding that, like, a lot of the women on pornographic websites do not have any pubic hair?

MR. CARSON:  Object to form.

THE WITNESS:  No.

MS. SHEVLIN:  Join.

THE WITNESS:  So that is completely different just because some men or let's say women, depending on what you're looking at, may be into people who have pubic hair.  So it just depends.

BY MR. ROBERTS:

Q    That's right.  I mean, like, it's actually just called a fetish; right?

A    Yes, exactly.

Q    You're -- you're --

A    So it all depends.

Q    Right.  So it's, like, a fetish if you're not groomed.

A    Yes.

Q    Right?

A    It could be, yes.

Q    It could be; right?  Yeah, yeah, yeah.  This is weird stuff to talk about, but, I mean, this is your job; right?

A    Yes.

Q    Right?  I mean -- okay.

So -- but you -- you're aware that, like, a lot of women choose to groom themselves so that they don't have any pubic hair?

MR. CARSON:  Object to form.

THE WITNESS:  Some women can.

BY MR. ROBERTS:

Q    Some of them can.

And that's not an indication to you as a detective that they are under the age of 18, is it?

A    Just them being groomed?  Is that what you're saying?

Q    Right.  Just the lack of pubic hair, that's not a reason for you to say, oh, no, that's -- that person's under the age of 18?

MS. SHEVLIN:  Form.

THE WITNESS:  I don't think that would be the only determination, if that's what you're -- like, if that's the question that you're asking.  Is that the only determination that I would use?

BY MR. ROBERTS:

Q    What I'm --

A    Sorry.

Q    What I'm saying is the fact that a model does not have visibly apparent pubic hair does not by itself

tell you whether or not they are an adult or a minor.

A    No.  I don't think that would be the only thing that I would go based off.

Q    Right.  I mean, that -- that would be dangerous; right?  Because there's lot of adults that don't have any visible pubic hair on a digital photograph; correct?

A    There could be, yeah.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Yeah.  All right.

So did you get a sense from Dr. Dully that, like, the appearance of the pubic hair was a -- was a contributing factor or a major factor in her opinion about the age?

A    No, sir.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Did she -- did she tell you why she came to the opinion that she came to?

A    I can't remember verbatim what she stated specifically about how she formulated her opinion.

Q    Okay.  All right.  So did -- did you -- at the time, February 22nd, did you consider Dr. Dully to be an expert in determining age?

MS. SHEVLIN:  Form.

THE WITNESS:  Yes, sir.

BY MR. ROBERTS:

Q    You did?

A    Uh-huh.

Q    You believed that she had more qualifications than you to determine who's -- what the age of an individual is on a digital photograph?

A    Yes, sir.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    And was it true that, I mean, that expertise -- did you get the understanding that that expertise was sort of the reason why, when there was disagreement, that you guys would kind of go and defer to Dr. Dully?

A    What do you mean?

MS. SHEVLIN:  Form.

THE WITNESS:  Like, her, I guess, opinion was kind of like our -- I guess are you saying, like, the reason that pushed us further into continuing with the case?

BY MR. ROBERTS:

Q    Yes.

A    Yes, uh-huh.

Q    You guys might have disagreed, but you've said that you're not really an expert on determining if someone is an adult or a minor; correct?

A    Yes, sir.

Q    But if this doctor, who has specialized knowledge, can say whether it was an adult or a minor, then -- then you would rely on that?

A    Yes, sir.

Q    Okay.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    And that's what you did in this case?

A    Yes, sir.

Q    All right.  Now, are you aware that at some point, Detective Greene met with a guy named Aaron Weiss and Crawford Pierce down at St. Johns County Sheriff's Office about this case?

A    The name Aaron doesn't sound familiar, but obviously, Crawford Pierce does.

Q    Yeah.

Do you recall -- and I don't know that you -- you may have been present or not.  It was in October/November time frame of 2023, where Detective Greene was asked to search and locate this image and -- and the other images on the Internet.  Do -- are you

familiar with that meeting?

A    No, sir.  I don't think I was there.

Q    Did he tell you that he was able to locate these images on the Internet?

A    That who?

Q    Detective Greene.  Did Detective Greene tell you that he was able to locate both of the models that are involved in this case on the Internet on multiple websites?

A    Not that I recall.

Q    You don't recall him telling you that?

A    No, sir.

Q    Okay.

A    That would have been during their meeting, you said?

Q    Yeah.  And I don't know if you were there or not.  You don't recall being in that meeting?

A    No, sir.

Q    All right.  At some point later, you did learn, though, that these models had been located on a website?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Let me ask you a question.

A    Okay.

Q    You saw the photographs with them holding their passports?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    Yes.

Q    You were shown those.  Who showed those to you?

A    I believe it was Pierce, but I can't be for certain.  So I don't know offhand.

Q    Okay.  Was it maybe Kaitlyn Payne, the assistant state attorney?

A    I don't recall her ever showing me.

Q    Okay.

A    No.

Q    Do you think you got them in an e-mail or --

A    If I viewed them, I believe it was Crawford Pierce who showed me them.  But I don't remember how specifically I viewed them, but I think he provided them.

Q    Okay.  All right.  So -- and I'm going to have to circle back around when we talk about the other images but --

A    Okay.

Q    All right.  So you get this letter from

Dr. Dully, and then you go back to -- what do you do after you get this opinion from Dr. Dully?

A    Sorry.  I'm thinking back to -- after I got this opinion, I should have went back to the office, and I can't remember verbatim the next step in it.  I don't want to misspeak.

Q    Well, I've got this search warrant.  February 28th is the date that it looks to be signed, February 28th, 2023.  That's what's been previously marked as Exhibit 2.

A    The Verizon?

Q    Yeah.  Do you think that would have been the next thing you did in your investigation?

A    Yes, sir.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    After getting Dr. Dully's letter, did you do anything else in your investigation between obtaining this letter from Dr. Dully and seeking the search warrant?

MS. SHEVLIN:  Form.

THE WITNESS:  Other than probably waiting on the search warrant to return from Synchronoss.

BY MR. ROBERTS:

Q    Well, no, no.  I believe that you got

Dr. Dully's opinion before you sought the search warrant.

A    Yeah.  But I'm saying, like, after I got Dr. Dully's, it would have been on waiting on the Synchronoss return.

Q    But you -- you didn't send the subpoena until after you did the -- got the warrant; correct?

A    The subpoena to -- you're talking about Synchronoss?

Q    Yeah.

A    I don't recall sending a subpoena to Synchronoss.

Q    I mean -- I'm sorry -- to Verizon.  I'm just trying to get the time line.

A    Yes, sir.

Q    You -- you get Dr. Dully's report.

A    Uh-huh.

Q    And then is the next thing you do is you fill out and create the affidavit for a search warrant that's dated --

A    On the 28th.

Q    On the 28th.  That's the next thing you did?

A    Yes, sir.

Q    You didn't do any investigation between Dully's report and the affidavit?

A    Not that I recall.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Okay.  That's okay.  I don't --

A    Yeah.

Q    -- have any record that you did.  I'm just trying to verify that I'm not missing anything.

A    No.  Sorry.  I'm just -- that's why my face kind of scrunched up.  I was thinking back to it.

Q    Sure.

All right.  And so you -- in this affidavit, you quote directly from Dr. Dully's letter; correct?

A    Yes, sir.

Q    And so you -- we've already asked you questions about the reliability of Dr. Dully's opinion. But at that point, did you believe that Dr. Dully was a reliable source of information in estimating the age?

A    Yes, sir.

Q    Okay.  All right.  So is there anything other than Dr. Dully's report and the NCMEC tip that you submitted to the court -- well, strike that.

It looks like you submitted the information from the NCMEC report.  You submitted your -- your statement that met-art.com was a known -- has a known history of displaying CSAM.  And then the third thing

that you did was you quoted for Dr. Dully.  Is there anything else that you submitted to the court to establish probable cause at the time that you applied for this search warrant on February 28th, 2023?

MR. CARSON:  Object to form.

THE WITNESS:  I don't recall.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Was there anything else in the -- in -- I mean, I'm asking what you submitted to the court.  Did you submit anything to the court other than those three pieces of -- or the information that's contained in this subpoena?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't recall.  I don't remember if there was anything else.

BY MR. ROBERTS:

Q    You don't remember if you submitted anything other than the affidavit for the search warrant?

A    Yes, I don't remember.

Q    Did you submit the image?

A    The NCMEC image?

Q    Yes.

A    We don't, like, submit images into, like, a court forum.

Q   Okay.  But did you -- did you -- that's what I'm asking you.

A   Yes.

Q   Did you do any -- did you submit anything other than the affidavit for the search warrant in support of probable cause to seek the search warrant?

A   Not that I recall, anything other than this.

Q   Okay.

A   I just know that we don't submit, obviously, NCMEC images.

Q   Well, you could show the -- I mean, do you -- do you believe that it would be improper for you to show a judge the image?

A   So all of our, like -- excuse me.  All of our search warrant stuff is electronic-based.  So I wouldn't be able to submit that electronically, that image.

Q   You don't have the ability to go to chambers to a judge to obtain a search warrant in person?

A   I mean, we can go in person.  It's just the judges prefer to do it electronically based.

Q   Okay.  But you have the ability to bring your laptop there --

A   Yes.

Q   -- if you wanted to show the image?

A   Yes.

Q    All right.

And did -- did you get a return on -- on this -- was the -- was the search warrant issued?

A    Yes, sir.

Q    Okay.  And was there -- was it served, and was there a response?

A    Yes, sir.

Q    Okay.  What happened next?

A    We received the Synchronoss download.

Q    Okay.  And what did that download contain?

A    It contained numerous files linked to that phone number.

Q    All right.  And you got all the customer subscriber information?

A    I don't recall if they provided the customer subscriber information.  Usually, they have you reach out to Verizon.

Q    Okay.  I'm just looking down the list --

A    Yes, sir.

Q    -- of things that you requested for it.

A    Uh-huh.

Q    You requested device purchase information?

A    Yes.  Sorry.  Let me go back to that page.

Q    E-mail address -- yeah.  E-mail addresses associated with the account.

A    The call detail records?

Q    Call detail records.

Cell site information, what's the importance of that?

A    That will -- usually with cell site, if you request it fast enough, you should be able to kind of pinpoint, you know, where the phone was utilized during a specific time.

Q    And why is that important?

A    Because that can tell you, like, hey, were they in our county, or, hey, was it somewhere else, or, you know, like, where were they at specifically.  But usually, you have to do that fast, fast.

Q    Specifically at the time of the incident?

A    Yes.

Q    Okay.  All right.

All right.  And so you got the -- the download.  What happened next?

A    Then the next step is just to go through the download, review it, and see what all is contained in it.

Q    And what -- what was contained in it from your perspective?

A    That's when we located three other CSAM images, and then -- excuse me -- there was numerous

other kind of files that contained other pornographic images as well.

Q    Those were adult pornographic images?

A    To be honest, I do not know their specific age.

Q    That's true of any -- any -- any pornographic image; right?

A    Uh-huh.

Q    Correct, just for the court reporter?

A    Oh, sorry.  Yes.

Q    Yes.

A    Sorry.  I forget that.  I was -- uh-huh.

Q    So you found how many images that you thought were child pornography?

A    Total of three.

Q    Okay.  Total of three?

A    Yes.

Q    Was that unusual?

A    No.

Q    You write in your affidavit that often people hoard.  Is that true?

A    Yes.

Q    Was -- did you find any evidence of hoarding?

A    I can't recall specifically because there was a lot of files, like, a lot.

Q    Uh-huh.

A    But as it pertains to, like, the CSAM, I can't recall if there was, like, hoarding of images.

Q    Right.

You say in the affidavit that normally, people in possession of child pornography will try to hide or secret them away.

A    Uh-huh.

Q    Is that a yes?

A    Oh, yes.  Sorry.  I need to stop doing that. I'm sorry.

Q    There was no evidence that Mr. Lawshe was hiding or secreting away these -- these images; correct?

A    I don't recall offhand because I do know he was married, but I don't recall if he had them in, like, different folders specifically.

Q    But he -- but he didn't have them segregated from the other pornographic images on his phone?

A    That I don't recall.

Q    So you said there were three total images on his phone of child pornography?

A    No, three total that we, like, charged for.

Q    Were there other images of child pornography?

A    That I don't recall.  No.

Q    Okay.  So was one of those images the NCMEC

report image?

A    That we charged, one of the images, no, sir.

Q    Did you guys find that image on his phone?

A    I do not believe we located that image.

Q    I think you located an image of the same model, though?

A    Yes, sir.

Q    All right.  Actually, at least two images of the same model?

A    Yes.

Q    All right.  So I asked you earlier if this appeared to be part of a photo shoot.  Do you recall that?  Did the NCMEC image appear to be part of a photo shoot?

A    Sorry.  I'm just thinking back to the other two images, just trying to make sure that they were of the same model.  I know one, for sure, was of the same model, but two, I'm not certain.  I would have to review that image.

Q    And we have these images.

A    Yes.

Q    We're probably going to get to those a little bit later.

A    Uh-huh.

Q    But my question to you is there was a

different picture of the same model that was in the NCMEC image; correct?

A    Of the same female, yes.

Q    Same female?

A    Uh-huh.

Q    So I asked you if it was a photo shoot.  I mean, when you got that other image back, it confirmed that this was part of a photo shoot; correct?

A    No.  Because I don't know if it was a part of a photo shoot.

Q    It didn't appear to be part of the same photo shoot?

A    Not based off my personal opinion.

Q    Did it -- did it have website information on that image?

A    I don't recall.  I would have to look at it again.

Q    Okay.  Detective Greene has testified that he located the models on all of the images based on the information that was contained within the images themselves.  Do you have any reason to disagree with that?

A    That I don't know just because I wasn't there when we located them, so I can't speak on it.

Q    No.  But I'm not asking you --

A    Yeah.

Q    -- if that was a true statement or not.  What I'm asking you is he has testified --

A    Uh-huh.

Q    -- okay? -- that he was able to locate the two models in question using solely the information on the images themselves.  My question to you is do you have any reason to believe that that testimony is not accurate?

A    No.  I don't think I have any reason to believe that.  Yeah.

Q    You take -- you take Detective Greene for his word?

A    Yes, uh-huh.

Q    All right.  All right.  So he also testified that he located these models on websites within 20 to 30 minutes.  Do you have any reason to disagree with that testimony?

A    No, sir.

Q    All right.  He said when he located these models on the Internet that they were all portrayed as verified adults.  Do you have any reason to disagree with that?

A    That?  No, based off what he's saying.

Q    Okay.  And that wouldn't be unusual --

right? -- I mean, on a public website for a model to be described as a verified adult.  Like, that's the way it is; right?

MR. CARSON:  Object to form.

THE WITNESS:  It should be.

BY MR. CARSON:

Q    Should be; correct?  Right?

A    Yes.

Q    You're familiar with the federal age verification laws?

A    Not super familiar but --

Q    But you're an investigator with, you know, Internet crimes against children; correct?

A    Yes.

Q    You know that there are federal laws which require publishers to -- and producers to maintain age documentation; correct?

A    Yes.

Q    And you know that websites are supposed to have a records custodian to maintain that information?

A    Yes.

Q    All right.  And so you know that prior to you making the decision to arrest, you had all of the information that you needed to locate these models on a public website; correct?

MR. CARSON:  Object -- object to form.

THE WITNESS:  Did I have all of the information needed?  I wouldn't say that I did.

BY MR. ROBERTS:

Q  Well, Detective Greene had all of the information that he needed to do it; correct?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.

BY MR. ROBERTS:

Q  Well, I mean, he did.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q  You're not -- you're not disagreeing.  You're not saying that Detective Greene is lying, are you?

A  No, no.

Q  Okay.  What other information would you need to locate these models on a website that you didn't have prior to making the decision to arrest Mr. Lawshe?

A  So when we made the decision to arrest him, obviously based off the probable cause, we had the information that was available to us.  After -- well, I'm assuming it was months.  Don't quote me on that.  I don't -- I'm assuming it was.  So months later, that's when we were presented with, like, the passport, redacted form and stuff like that.

Q    But prior to making the arrest, you had all of the information necessary to go to the websites and locate these models; correct?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    I understand you didn't do that, but you had information to do that if you chose to do that?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    I don't think that I could have said for certain, like, yes, that specific image that I have on my NCMEC tip was the exact same image that was on the site.

Q    Do you believe that you had all the necessary information prior to arresting Mr. Lawshe in order to locate these models on the Internet?

MR. CARSON:  Object to form.

THE WITNESS:  No.  I wouldn't say that I had all the --

BY MR. ROBERTS:

Q    What did you not have?

MR. CARSON:  Object to form.

THE WITNESS:  What I just stated.

BY MR. ROBERTS:

Q    Well, I mean, Detective Greene -- and I think the images are going to speak for themselves.  All of the images had a website on them, listed on them in some way.

A    I don't recall all the images having a website listed on them.

Q    Okay.  Some of the images had websites on them; correct?

A    Yes.

Q    You -- you had the names of these -- and I think it was multiple websites; correct?

A    That I do not recall, if it was multiple.

Q    Okay.  You -- so you at least had met-art.com?

A    Yes.

Q    Right?

A    Uh-huh.

Q    So you -- you agree that you had all the information you needed to go to met-art.com; correct?

A    Could I have went to MetArt?  Yes.

Q    You had all the information that you needed prior to making the arrest to go to met-art.com; correct?  That's something that you do in the past; right?

A    What do you mean, do in the past?

Q    You have been to websites to follow up and investigate NCMEC tips.

A    Yes, previously.

Q    Yes.  You've done that before; right?

A    Uh-huh, yes.

Q    So you knew that you had the ability.

A    Yes.

Q    And you knew you had all of the information to go to met-art.com; correct?

A    To go to -- yes.

Q    Prior to arresting Mr. Lawshe; correct?

A    Yes.

Q    And you've never been to met-art.com.  But if that website identified a records custodian, you could have e-mailed that records custodian to request information about these images; correct?

A    Yes, uh-huh.

Q    All right.  Do you have any reason to believe that you as a law enforcement officer, if you would have e-mailed the record custodian, that he would not have responded to you?

A    That I can't speak on because it would be hypothetical, so I don't know.

Q    You -- you know that he responded to Mr. Pierce.

A     Another attorney, yes.

Q     Another attorney.

A     Yeah.

Q     Right?

You knew that you had the ability, even if you had to go the state attorney or somebody, you could get the information --

A     Yes.

Q     -- from the website; right?

A     I could have attempted, yes.

Q     Right.

So you had all of the information that you needed to actually get the passport information and photo session information from met-art.com prior to making the arrest of Mr. Lawshe, didn't you?

MR. CARSON:  Object to form.

THE WITNESS:  No.  I still would say no.

BY MR. ROBERTS:

Q     What -- what were you lacking?

A     Because what was provided to me, like I stated, which was well after the fact, was just redacted forms.

Q     Well, no.  But I'm just saying, you could -- you had everything you needed to get the images of the redacted passports prior to making the arrest of

Mr. Lawshe; correct?

MR. CARSON:  Object to form.

THE WITNESS:  Yes.  But I guess I'm just confused by your question because the redacted form wouldn't prove.

BY MR. ROBERTS:

Q    That's not my question.  I'm not -- I'll -- I will ask you -- and I promise I will ask you what you would have maybe hypothetically done with that information.

A    Okay.

Q    But what I am asking you is you had all of the information that you needed readily available in order to reach out to met-art.com's record custodian to request age verification information; correct?

A    Yes, to request it.

Q    And you had that information prior to making the arrest of Mr. Lawshe?

A    I had MetArt.  That's all I had, was the watermark, yes.

Q    And -- and you -- that's all you needed to go to that website and request, from the record custodian, age verification information; correct?

A    I would need to know that that photograph was housed on that server.

Q   And wouldn't -- as an investigator --
right? -- a way to find that out would be to e-mail that
image to them.

A   No, sir.  I wouldn't feel comfortable
e-mailing something that I viewed as child pornography
because now I'm transmitting child pornography via my
agency e-mail.

Q   So you believe it would have been illegal for
you to transmit that image in your investigation?

A   Yes.

Q   Okay.

A   Very much so.

Q   So when you -- you could have gone on the
website; right?

A   Uh-huh.

Q   You could have located.  You could identify
the model by name; correct?

A   (Nods head.)

Q   And then requested all the age verification by
the name of the model; right?

MR. CARSON:  Object to form.

THE WITNESS:  By her name, possibly.  I can't
say for certain if that's how they would locate
them.  I don't know how they do that.

BY MR. ROBERTS:

Q    You don't know because you didn't do it.

A    Yes.

Q    All right.  Okay.  So let's talk about what you would have done differently had you gotten the information from the records custodian.  Do you recall seeing an e-mail from the records custodian, attaching the documents?

A    I recall getting an e-mail from Crawford Pierce.

Q    Right.

A    And I don't know if he reached out to that person.

Q    Do you --

A    But I remember seeing --

Q    Do you remember seeing several attachments, and some of them were photographs of the -- of the passports?

A    Yes, sir.

Q    There's also an affidavit from the records custodian.  Do you recall seeing that?

A    There may have been.  I -- I don't know offhand.

Q    Okay.

A    Yeah.  But I do remember the passport.

Q    Okay.  Had you gotten that information, would it have affected the way you handled the investigation?

A    No.  Because I still felt that we had probable cause to do the arrest.  I would have attempted to see if they could provide the un-redacted, just so we could verify, just because with redacted, there's no way for me as a law enforcement officer to verify what they're providing me.

Q    So you -- but you wouldn't have just arrested Mr. Lawshe if you were in possession of an e-mail from a records custodian or an affidavit from a record custodian along with passport images which purported to prove that the models were adults?  You wouldn't have just arrested Mr. Lawshe after receiving that, would you?

MR. CARSON:  Object to form.

THE WITNESS:  There would have been no way to prove that what they gave me was authentic and valid based off of what they provided you guys.

BY MR. ROBERTS:

Q    You're law enforcement.  You could have gotten a subpoena.  You could have done lots of things to get un-redacted copies; correct?

MR. CARSON:  Object to form.

THE WITNESS:  That with it being entirely

another state, I don't know if me as a St. Johns County law enforcement officer would have been able to force them to provide those records.  So that I can't speak on.

BY MR. ROBERTS:

Q    And you don't know because you didn't try.

A    Exactly.

Q    All right.  You wouldn't have arrested Mr. Lawshe if, in fact, the girls were 18 or 19, would you?

MR. CARSON:  Object to form.

THE WITNESS:  If they were adults, then we wouldn't have viewed it as CSAM.  Then no.

BY MR. ROBERTS:

Q    It's kind of a ridiculous question; right?

A    Yeah, if they were adults.

Q    Do you see how it might be -- sound, like, outrageous that if a records custodian, a licensed attorney, in the state of California swore an affidavit and provided images of passports to -- that proved that these models were 18 that that wouldn't be enough to satisfy law enforcement that Mr. Lawshe was not in knowing possession of child pornography?

MR. CARSON:  Object to form.

THE WITNESS:  Do -- are you saying that do I

think that the redacted versions of that is enough?

Is that your question?

BY MR. ROBERTS:

Q    Well, don't you think that that creates a serious doubt as to whether or not these models are, in fact, minors?

MR. CARSON:  Object to form.

THE WITNESS:  No.

BY MR. ROBERTS:

Q    A sworn affidavit from an attorney licensed in California, that doesn't create any doubt in your mind that these are actually adults?

MR. CARSON:  Object to form.

THE WITNESS:  Honestly --

BY MR. ROBERTS:

Q    What would?  What would?  What would constitute reasonable evidence to you that these models were adults?

MR. CARSON:  Object to form.

THE WITNESS:  What would constitute evidence to me?

BY MR. ROBERTS:

Q    Right.

A    Is if they provided the un-redacted version, something that would allow us as law enforcement

officers or even any other agency to verify the records that they have.

Q    Well, let's say that they were actual real records and nobody tampered with the -- I mean, is that -- is that your theory right now, that the records custodian has manipulated or somebody has manipulated these passport documents?

MR. CARSON:  Object to form.

THE WITNESS:  I would hope that they wouldn't.

BY MR. ROBERTS:

Q    Well, if they didn't, then these -- then these models are -- are adults.

MR. CARSON:  Object to form.

THE WITNESS:  But like I said, I can't say that based off what I was given.

BY MR. ROBERTS:

Q    So the only way, in your mind, that Mr. Lawshe could not have been arrested is if somebody proved to you beyond a shadow of a doubt that these models were adults?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.  I'm not saying that's the only way that he wouldn't have been arrested.

BY MR. ROBERTS:

Q    But it's not enough to have passport IDs along

with the dates of the photo shoots from the records custodian.  That's not enough?

MR. CARSON:  Object to form.

THE WITNESS:  I'm saying that that didn't change probable cause that I was going off of.

BY MR. ROBERTS:

Q    You said that would not -- you still would have arrested him?

A    I'm saying what I had during that time that he was arrested was enough probable cause for me to initiate the arrest.

Q    What I'm asking, though, is a different question, is if you would have had the passports, the affidavit, and the e-mail from the record custodian, you still would have arrested him?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.  Like, I can't say because it obviously would have changed the entirety of the investigation, so I can't speak on just one aspect of the investigation.

BY MR. ROBERTS:

Q    Every one of your colleagues that have been deposed have said, absolutely, no, we would not have arrested him, if we'd had these images of the passports. Are you disagreeing with them?

MR. CARSON:  Object to form.

THE WITNESS:  I'm saying that that's their opinion.  But what I'm saying is I'm going to take everything in an investigation and look at it completely.  So I'm not going to go based off one piece of evidence and formulate an opinion.

BY MR. ROBERTS:

Q    But -- but you -- but you didn't do -- you didn't investigate these models' identity at all, did you?

MR. CARSON:  Object to form.

THE WITNESS:  You're talking about during the investigation?

BY MR. ROBERTS:

Q    During the investigation, you made no attempt to identify these, who you believe are child victims?

A    Uh-huh.

Q    Isn't it the stated goal of ICAC, is to protect and prevent the sexual abuse of minors?

A    Yes, sir.

Q    I mean, that's the --

A    That's one of the goals.

Q    But that's the number one priority -- right? -- for you is to, like, protect children.

A    Yes.

Q    And yet you took no effort to protect these children.  Why?

A    My effort was during my investigation because you're in an investigation is when obviously we work and do pretty much everything.

Q    But -- but you didn't make any effort to protect these models, did you?

A    Because at that point in my investigation, I had not gotten there.

Q    And -- and you still haven't gotten there.  It's March of 2025; correct?

A    Yes, it is March.

Q    All right.  So you find three other images -- or three total images of what you believe was child pornography on Mr. Lawshe's phone on the return from -- from Synchronoss; correct?

A    Yes, sir.

Q    How did you choose those images?

A    What do you mean, like, choose them?

Q    How did you pick them out of all of these photographs?  How did you choose these three?

A    Based off reviewing them.  I don't really know, like, what your question is.  Like --

Q    I mean, they just looked young to you?

A    No.  It was more than just looking young.

Looking young doesn't constitute CSAM.

Q    But, I mean, what about these -- because you're the one that chose the images; correct?

A    Yes, sir.

Q    You picked these three images out of a lot of different images.

A    Yes.

Q    Why did you pick these three images?

A    For the totality of the image.  So obviously, reviewing the entire image in its -- excuse me -- the image in its entirety.  That's how I formulated my opinion that it was CSAM.

Q    And when you say in the entirety, what do you mean?

A    Like, everything in the image, including the female.

Q    Like, breasts, face?

A    Everything, yep.

Q    Genitals?

A    Everything, yep.

Q    Okay.  Explain to me why the third image only has genitals.  And it's got no face.  It's got no breasts.  Why did you choose that image?

A    That is the -- you're talking about the Big Heart, right, that film?

Q    Right, yeah.  You charged that image; correct?

A    Yes.

Q    The only thing depicted in that image is a vagina.

A    Uh-huh.

Q    What made you drawn to this particular vagina?

MR. CARSON:  Object to form.

MR. ROBERTS:  What's the -- what's the objection?

MR. CARSON:  Did you ask what drew you to this vagina?

BY MR. ROBERTS:

Q    Well, it's a picture of a vagina, isn't it?  Am I mischaracterizing it?

A    It's the way in which, I guess, you worded the question because it's --

MR. ROBERTS:  I mean, it's a picture of a vagina, and I'm asking her what drew her to this particular vagina.

THE WITNESS:  I wouldn't say anything drew me to that specific vagina the way you worded it.  But that image does depict what I view to be CSAM.

BY MR. ROBERTS:

Q    I mean, it's not funny; right?  I mean, this ruined my client's life, and I want to know what

specifically about this image of this vagina led you to believe that the owner of the vagina was a minor.

A    And like I'm telling you, the image in its entirety, including that zoomed-in image of her vagina, is what made me believe that it was CSAM.

Q    What about the vagina made you believe that it was CSAM?

A    I don't know specific medical terminology if that's what you're looking for to describe it.  But I can only describe it the best way that I can.

Q    Describe it the best way you can.

A    That's what I'm saying.  The vagina in and of itself is what made me believe that it was CSAM.

Q    But you can't point to anything in particular about it that made you believe that it was a minor?

A    Not that I recall.  I can't specify a specific terminology if that's what you're saying.

Q    You took that image to Dr. Dully, did you not?

A    Uh-huh.

Q    And what did she have to say about it?

A    Do you want me to read it?

Q    Yeah, please.

A    Okay.  The second image is imprinted with script saying Big Heart and the file name, screenshot -- and then it has a list of numbers -- _duckduckgo.jpg.

This image shows a female child with her black top parted and underwear down around her parted thighs, exposing her genital area clearly.  She appears to have no pubic hair development.  She does not appear to be shaved.  This developmental appearance is also less than or greater than 9 to 13.5 years of age.

Q    So the only anatomical description is -- is that she says she appears to have no public hair development.  Do you agree with that?

A    Do I agree that that's what she wrote?  Yes. But --

Q    Okay.

A    -- her opinion, I can't speak for her opinion.

Q    Right.

And she does not appear to be shaved; correct?

A    That's what is written, yes.

Q    So, I mean, other than that, the only thing that Dr. Dully highlights in this to suggest that she's less than 9 to 13 years old is that she appears to have no public hair development?

A    That I don't know.  I just know that that's what is written in here.

Q    So I think -- and we'll mark this as Exhibit 7.  This is the -- this is the model, I think, in question.

MR. CARSON:  Object to form.

MS. SHEVLIN:  Michael, what's being marked as Exhibit 7?

MR. ROBERTS:  It's the picture of the model.

MS. SHEVLIN:  With the passport, with the Latvian passport?

MR. ROBERTS:  With the Latvian passport.

MS. SHEVLIN:  Thank you.

(Plaintiff's Exhibit 7 was marked for identification.)

BY MR. ROBERTS:

Q    Now, you never actually saw the face or breasts of this model; correct?

A    Nope.

Q    You just saw the -- is there a better word to use, genitals?  I guess we can use genitals.

A    That's fine.

Q    I'm sorry if vagina is -- is offensive.  I'm not trying to be.

Would you look at that person and say that they're less than 9 to 13 years old?

MR. CARSON:  Object to form.

THE WITNESS:  Just based off this photo, I wouldn't be able to give an age.

BY MR. ROBERTS:

Q    Right.

A    All I can see is just a face.

Q    She doesn't look nine, though; right?

A    I can't give a specific age just because I don't have much to go off of.

Q    I'm not asking for a specific age, I guess. I'm just saying, like --

A    Does she look less than 9?

Q    Does she look less than 9 to 13 and a half years old to you?

MS. SHEVLIN:  Form.

MR. CARSON:  Join.

THE WITNESS:  I don't know.

BY MR. ROBERTS:

Q    You don't know.  Okay.

Why didn't -- why didn't you -- I mean, you didn't try to find another image that -- I guess you felt comfortable charging someone with possession of child pornography based on an image that only showed, like, belly button to genitals?

A    Yes, sir.

Q    This is a weird question.  But does that seem fair to you?

MR. CARSON:  Object to form.

THE WITNESS:  Fair in what?

BY MR. ROBERTS:

Q    Like, if -- if Mr. Lawshe wasn't able to locate these images on the Internet, like, he would have never been able to, like, show the face of that individual.  Like, does it seem like you're hiding the ball at all by -- by charging an image that's clearly on a website -- right? -- but you choose an image that doesn't show any breasts and doesn't show a face?

MR. CARSON:  Object to form.

THE WITNESS:  I don't understand, like, your question.  You're saying that it's not fair that we choose an image based off the focal point of the image?

BY MR. ROBERTS:

Q    Yeah.  Like, how would you ever defend yourself?  How would Mr. Lawshe ever defend himself?  It's just a picture of genitals, and there's no context to it.  How could he ever prove that that was an adult?

A    I'm not --

MR. CARSON:  Object to form.

THE WITNESS:  I'm not him, so I can't say how he would defend his reasoning for that image.

BY MR. ROBERTS:

Q    It makes it a lot harder, though -- right? --

if you don't include breasts or -- or a face --

right? -- to defend it?

A    I wouldn't say that it would make it harder or

easier to defend.

Q    Do you think it's a reasonable position that

the -- that the model depicted in Photograph 7 is less

than 9 to 13 years old?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know --

MS. SHEVLIN:  Join.

THE WITNESS:  -- because all I can go off is

based off of face.  Like, that's the thing.  You

want me to say --

BY MR. ROBERTS:

Q    So you can't say that?

A    That I don't know, based solely off her face.

MR. CARSON:  We've been going about another

hour and a half.

MR. ROBERTS:  Let me just ask this question.

Then we'll take a break.

MR. CARSON:  Thanks.

BY MR. ROBERTS:

Q    If you can't say that, then how can you sit

here and say that you believe that she's a minor?

MR. CARSON:  Object to form.

THE WITNESS:  Because I wasn't looking at her face in the --

BY MR. ROBERTS:

Q    No, no, no.  No, no, no, no, no, no, Detective.  I asked you when you sat down.  I said you've seen the pictures --

A    Yes.

Q    -- of them holding their passports.

A    Uh-huh.

Q    And you said you still, after seeing the picture in the passport, believe that they are minors. Do you recall that testimony?

MR. CARSON:  Object to form.

THE WITNESS:  Yes.

BY MR. ROBERTS:

Q    And now you've just testified that you have no -- you can't look at that and tell at all what age she is; correct?

A    Because your question was to, I think, that she is less than 9 years of age or 9 to 13.  What I'm saying is I can't say for certain if she's between that specific age range that you gave me.

Q    But you can say --

A    So I don't want to misspeak.

Q    But you can say that she is, in your opinion,

less than 18 years old?

A    I'm saying that she could be.

Q    She could be?

A    Yes, sir.

Q    She could also be 20; right?

A    Yes.

Q    Is that the real reason that you -- you haven't sought out these alleged victims of -- of child pornography because you really don't know that they're minors?

MR. CARSON:  Object to form.

THE WITNESS:  No.  That's not the reason that I wouldn't do my job.

BY MR. ROBERTS:

Q    You don't know why you haven't sought them out?

A    Why I haven't sought out?

Q    I mean, this individual right here, you -- you said earlier that you believed that she was a minor.

A    Yes.

Q    Do you still -- okay.  Now, a lot's happened in this testimony right now.  Do you still believe, after what we've just been through, that she is a minor?

MR. CARSON:  Object to form.

THE WITNESS:  That she could have been a minor

at the time the photos were taken, yes.  I don't
know, obviously, her age now.

BY MR. ROBERTS:

Q    She also could have been an adult at the time
the pictures were taken; correct?

MR. CARSON:  Object to form.

THE WITNESS:  That she could have been.  I
don't know.

MS. SHEVLIN:  Form.

THE WITNESS:  Just like she could have been a
minor.  She could have been -- I don't know.

BY MR. ROBERTS:

Q    But the only evidence is that they were an
adult; correct?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Currently, the only evidence -- actually,
there's -- there's a passport and there's a statement
from the records custodian.  That is the only evidence
of what their actual age is; correct?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know based off that
redacted passport what her age is.

BY MR. ROBERTS:

Q    Okay.  But as we sit here today, isn't it true

that the reason you're not pursuing these cases is because you believe that both of these models very well may have been adults at the time the photographs were taken?

MR. CARSON:  Object to form.

THE WITNESS:  No.

BY MR. ROBERTS:

Q    They could have been adults.

MR. CARSON:  Object to form.

THE WITNESS:  In my opinion, no.

BY MR. ROBERTS:

Q    They could not have been adults?

A    In my opinion, I don't think that they are adults.

Q    You do not believe that this person could have been an adult on the day that this picture was taken.

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.

MR. ROBERTS:  Okay.  We'll take a break.

THE VIDEOGRAPHER:  We are going off the record at 3:56 p.m.

(Recess from 3:56 p.m. to 4:06 p.m.)

THE VIDEOGRAPHER:  This is the beginning of Media Unit Number 3.  We are back on the record at 4:06 p.m.

BY MR. ROBERTS:

Q Okay. I want to circle back to -- now that we've talked about all three images, I want to circle back to the -- the idea that there was some disagreement between -- or at least a question in the St. Johns County office by -- I think you maybe recalled Detective Greene questioning whether or not this was clearly a minor or age-difficult?

A I don't recall, like, who specifically.

Q But someone. Someone questioned that this may be age-difficult or -- or an adult is another way to say that?

A Just age-difficult but yes.

Q Right. But age-difficult means that it might be an adult?

A It could be, yes.

Q Right.

So I want to go back to the exhibit, and I've done a terrible job of writing them down. But the statute, Florida Statute 27.071 [sic]?

A Yes. This?

Q Correct. And part of that --

MS. SHEVLIN: Michael, I'm sorry. What exhibit number was this?

MR. CARSON: I have it as 5, but --

                    MR. ROBERTS:  I think that's right.

                    MR. CARSON:  I'm not sure.

                    MR. ROBERTS:  I think that's right.

                    MS. SHEVLIN:  Thank you.

BY MR. ROBERTS:

        Q    This is the Florida statute that we've

referenced.

             So you're familiar with the idea that crimes

have elements?

        A    Yes, sir.

        Q    And there are, would you agree with me, two

requirements in this statute that, one, the possession

of the image must be knowing?

        A    Uh-huh.

        Q    Do you agree with that?

        A    Yes, sir.

        Q    And that the -- the individual who has

possession of it must know that it includes sexual

conduct by a child?

                    MR. CARSON:  Object to form.

BY MR. ROBERTS:

        Q    Well, let's just read it because I'm just --

you know, let's just do this.

                    MR. CARSON:  Object to form.

                    MR. ROBERTS:  For me reading the statute?

MR. CARSON:  Yeah.  You can.  Go ahead.

MR. ROBERTS:  Okay.

BY MR. ROBERTS:

Q    You -- you -- this is the statute that you -- you charged Mr. -- that you sought the search warrant for; correct?

A    Yes.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    You cited this statute?

A    The 827.071(5)?

Q    Yes.

A    Yes.

Q    And so you -- you were familiar with the statute at the time that you sought the search warrant?

A    Yes, sir.

Q    And you didn't put a statute in there without knowing what it was?

A    Yes, sir.

Q    Right?

And so at the time, you were familiar with what was required to prove that someone was in possession of child sexual abuse material?

A    Yes, sir.

Q    All right.  And I'll just read it real quick.

It is unlawful for any person to knowingly possess, control, or intentionally view a photograph, motion picture, exhibition, show, representation, image, data, computer depiction, or other presentation which in whole or part he or she knows to include any sexual conduct by a child.

Did I read that correctly?

A    Yes.

Q    All right.  What evidence did you have that Mr. Lawshe knew that this was a minor?

A    So that would be just based off of my opinion, just like you're saying based off somebody else's opinion, they can view that as age-difficult.

Q    So -- okay.  You've already testified that it was your opinion that it looked to be a minor; correct?

A    Yes, uh-huh.

Q    You didn't know what age, but it looked to be a minor to you?

A    Yes, sir.

Q    But you agree that someone else in the sheriff's department expressed concern that it might look like an adult; correct?

MR. CARSON:  Object to form.

THE WITNESS:  Age-difficult but yes.

BY MR. ROBERTS:

Q    Age-difficult but that means that it may be an adult; correct?

MR. CARSON:  Object to form.

THE WITNESS:  And it may be a child.  So age-difficult, like we said, it's -- it could be a child, or it could potentially be an adult.  That's why it's age-difficult.  We don't know what age range it is.

BY MR. ROBERTS:

Q    Correct.

So what evidence did you have that made you believe that Mr. Lawshe did not think that this was an adult?

A    So he could have gone off the same opinion as me, that that looked like a child.

Q    Right.  But we've already said that, like, you know, everybody's different, a point that you made earlier; correct?

A    Uh-huh, yes.

Q    And that's not only physically, but we also made the point that people's perception of age and aging other people is different; correct?

A    Yes.

Q    All right.  What I'm saying is what evidence

did you have that led you to believe that Mr. Lawshe thought that this was a minor?

A    So I can't speak on his opinion because I'm not him.  So I can't say that yes, he for sure thought that that was an adult or he for sure thought that that was something else.  Like, I can't speak on somebody else's opinion because I'm not them.

Q    Right.

A    So I don't want to speculate.

Q    But at the time, you knew that it was at least a possibility that he had obtained this off of a website?

A    That?  I don't know where he obtained it.

Q    You have to acknowledge that it was possible that he got this off of a website.

A    He could have gotten it off of anywhere.  So that -- I can't say, like, yes, he got it off that site or yes, he could have -- he could have gotten it off anywhere.  Yes, I will agree to that.

Q    But he could have gotten that off met-art.com?

A    Could have.

Q    Right.

And -- and if he had, he would have been told that this was an adult; correct?

A    That I can't say because I don't know if

that's what pops up when you first go on that site.  I can't speak on that.

Q    But if you'd have gone to the site -- I mean, Detective Greene -- we went through this -- has been to the site in this investigation.  And he's testified that it -- it does disclaim that the models are verified adults.  Do you have any reason to disagree with that?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is I don't know if that's same across the board.  I can't say what Mr. Lawshe saw when he went to that site, just like I can't say what Detective Greene -- I can only speak on what I know.

BY MR. ROBERTS:

Q    But if Mr. Lawshe got that image from that website, do you agree that it would be very difficult for you to establish that he knew that this was a minor?

A    That I don't know because when I review a case, it doesn't tell me where a person is getting an image from.

Q    Well, you have the ability to do that; right?  You have the forensic guy that can help you understand where each image is coming from; correct?

A    That's not --

MR. CARSON:  Object to form.

THE WITNESS:  That's not always the case.

BY MR. ROBERTS:

Q    It's the case in this -- in Mr. Lawshe's case, though.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    That I do not recall.

Q    I mean, you -- you had the availability -- Detective Greene testified to ability to access search terms, websites.  He could see the websites that he went to.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Do you have any reason to disagree that Detective Greene had the ability to see what websites Mr. Lawshe went to?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is just because you see what site somebody visited -- visits doesn't mean that that's the site that the image came off of or that's how they got it.  That's all I'm saying.  So I don't know how he got it.

BY MR. ROBERTS:

Q    That's correct.  But -- but what I'm saying to

you, what I'm asking you is -- and let's just frame it as a hypothetical.  All right?  If Mr. Lawshe viewed this on a website and was told that it was a verified adult, wouldn't you agree that it would be very difficult for you to show or believe that he thought that it was a minor?

A    That I don't know because I can't speak on a hypothetical what if because there are so many other variables that can be hypothetically brought into it.  So I can't answer that.  Like, I don't know.

Q    Was there any evidence that you -- you had of what he believed about this image?

A    What do you mean?

Q    Like, so you agree, like, in order for him to be guilty of this crime, he would have to have no -- he would have to know that the person is a minor?

MR. CARSON:  Object to form.

THE WITNESS:  Like, knowingly and intentionally possessing it.  Like, that person in his mind is a minor.

BY MR. ROBERTS:

Q    That's your understanding?

A    That's -- yes.

Q    And so the only basis, if I'm understanding you correctly, is your personal belief that this was a

minor.  That's the only reason that you have to think that he might have thought that it was a minor?

A    No, sir.

Q    What's the other basis?

A    I'm going based off the totality of it. Obviously, my viewpoint and viewing as CSAM, having a doctor certify that as CSAM, having multiple other people in the office have the same viewpoint that yes, this is CSAM.  Obviously, it is opinions.

Q    Okay.  So that's a great point.  You don't -- you had no idea -- I mean, you don't believe -- or did you believe at the time that Mr. Lawshe was an expert in aging individuals?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know anything about him, so I couldn't tell you.

BY MR. ROBERTS:

Q    Well, you know that he was a Florida Fish and Wildlife officer; correct?

A    That was learned after I started this investigation.  I didn't know prior to this investigation who he was or what his job class was.

Q    But at the beginning of the investigation, you were told that he was a Florida Fish and Wildlife officer.

A   I don't remember verbatim if they told me where exactly he worked.

Q   Okay.  I think it's -- if it's included in your -- your papers, will you agree that you knew that he was a --

A   During the course of the investigation, yes.

Q   You learned that he was a --

A   Yes, of course.

Q   Right.  Prior to his arrest, you knew that.

A   Yes, uh-huh.

Q   All right.  I'm trying to understand how -- and this is a little bit of a hard concept, but I -- I'm trying to articulate it.  If you have a specific illness, would you ever -- you'd go to a doctor to diagnose that illness; right?

A   Are --

Q   It's just a general question.

A   Okay.  Like, are you saying if I had, like, let's say, cancer, I would go to a cancer doctor?

Q   You'd go to a cancer doctor; right?

A   Yes.

Q   And that cancer doctor could give you a diagnosis of what your problem was; right?  Correct?

A   Yes.

Q   Because he's an expert on cancer; right?

A    Yes.

Q    But you wouldn't go to somebody who is not a cancer doctor to diagnose your cancer, would you?

A    I can't say I -- I wouldn't.  That probably -- if I'm sick, I would go to a doctor.

Q    A doctor; right?

A    Yeah.

Q    But not a -- but not someone who's not a doctor?

A    Not a doctor, yes.

Q    Right?

A    Not someone who's not a doctor, yes.

Q    Right.

Here's what I'm getting at, is if it takes a doctor to determine the age of someone, how can you expect just an ordinary guy to be able to know what their age is?

A    So I guess the easiest way to answer that is it didn't take a doctor for me to be like, hey, this person looks like a child, appears to be a child.  But I did refer to a doctor as just an extra step to further and kind of beef up the investigation, so to speak, so there couldn't be, like, hey, did you take your extra steps that you could have done, especially if there is something that you're questioning.

Q    And so -- but officer -- officer or officers in your department took the -- the opposite approach and said, ah, I don't know.  This could be age-difficult. It could be an adult.  Right?

MR. CARSON:  Object to form.

THE WITNESS:  That, what they specifically stated I can't say because I don't know verbatim.

BY MR. ROBERTS:

Q    But -- but you remember something -- right? -- that they disagreed with the assessment that this was clearly a child?

A    I do recall one person, yes, disagreeing, but I just don't remember who specifically it was.

Q    Right.

And there's probably, like -- we're only talking about, like, four people that would have been involved in this?

A    No.  Because I -- oh, gosh.  I don't know at the time because there was some movement in the office of people going to different divisions, so I don't remember offhand, like, how many people were still in the unit.

Q    So if -- whoever this person was that disagreed, if they were in possession of that, they -- they would not have been in knowing possession of child

pornography, would they?

A     What are you talking -- like, what are you referring --

Q     This officer that -- your colleague who looked at this and said, ah, this -- this is -- this could be age-difficult or an adult, however they characterize it, if they possessed this particular image, it would not be a crime; right?

A     That I can't say.

Q     Well, they don't believe that it's a minor, do they?

A     Yes.  But if somebody else was to -- let's say, had that investigation and investigated that officer and they felt the same way that I felt, it would be a crime.

Q     So you -- you're -- you're the determiner of what's a crime and not a crime?

A     No.  But I'm saying that they could have felt, hey, I have probable cause for this specific crime.

Q     But -- but this is what I'm struggling with, is you've acknowledged you've got no expertise as anybody else in this room, yet you get to determine what is and is not CSAM and what is or is not potentially a crime.  And that doesn't seem right to me.  But is that what you're saying; that's what it is?

MR. CARSON:  Object to form.

THE WITNESS:  That's not what I'm saying.  I'm not saming -- excuse me -- saying that I'm the judge and executioner of what is a crime.  What I'm saying is that I felt that this depicted a child, and I had that probable cause.  I had it reviewed by another doctor.  I had it reviewed by a state attorney, and that is why we proceeded with the investigation.  But I'm not saying that I am the end all/be all, no, sir.

BY MR. ROBERTS:

Q    Do you think that you conducted a reasonable investigation prior to arresting my client?

A    Yes, sir, I do.

Q    And why -- explain to me why that investigation did not include going to the website met-art.com.

A    Because at that point in my investigation, when I am trying to obtain probable cause for an arrest, going to MetArt was not during that point in my investigation.

Q    You knew that med-art.com potentially had exculpatory information.

MR. CARSON:  Object to form.

THE WITNESS:  No, I did not.

BY MR. ROBERTS:

Q   You didn't know that websites like met-art.com purport to have age verification documentation?

A   I did not know that that image would be on MetArt, so I can't say for certain that yes, that image would be on MetArt or that's where he got that image, is what I'm saying.

Q   But the only reason you don't know that is because you didn't conduct an investigation.

A   I did conduct.  Sorry.

Q   I think your answer was you did conduct an investigation?

A   Yes, sir.

Q   No.  But your -- and forgive me, but your argument is -- is, I think, circular.  You're saying you didn't investigate because there was no connection between the image and the website.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q   And then you're saying what is -- I'm sorry. So you're -- why didn't you investigate the website? Why didn't you go to the website?

A   Because I'm saying at that point in time when I was establishing my probable cause, at that point in time in my investigation, the website in, I guess,

itself was not at the forefront of my investigation.  My investigation was establishing probable cause.  That image alone, based off the watermark, doesn't mean that that's where the suspect could have gotten it from, is all I'm saying.

Q    But you would only know that unless you, like, went to the website or did an investigation into the website and a little bit deeper into where the image came from; right?

MR. CARSON:  Object to form.

THE WITNESS:  But what I'm saying is even if -- going to that website doesn't automatically mean that that image is going to be on it or that is the same image that he viewed that I am viewing.

BY MR. ROBERTS:

Q    But you wouldn't know unless you -- unless you went; right?

A    Yes.  But what I'm saying is --

Q    Right.

A    -- it's not a determining factor.

Q    Do you see how that's circular, though?  Like, you're saying I didn't know because I didn't go, but I didn't go because I didn't know.

A    No.  That's not what I'm trying to say.

Q    So sometimes you've said in your

investigations, you do go to websites like this; right?

A    Yes, sir.

Q    What's the difference in those cases and this case?

A    Nothing that I can recall.

Q    Do you think it's reasonable to go to the websites in those cases?

A    I wouldn't say that it's unreasonable, and I wouldn't say that it's reasonable.

Q    But you can't articulate for me why you would go to a website in one investigation but not in another.

A    Have a specific reason?  Not that I can recall.

Q    You -- you've said several times now that your -- that you were building probable cause.  Did I understand you correctly?

A    No.  What I mean is in the course of my investigation, establishing, obviously, probable cause during that investigation.

Q    Is that your goal, is to establish probable cause?

A    No.  It's to investigate the crime in its entirety.

Q    That did not happen in this case, though, did it?  You did not investigate the crime in its entirety

in this case, did you?

A    I feel like I investigated the crime.

Q    You -- you didn't investigate the known potential source of the image, did you?

A    No.

Q    You didn't contact the website that you had reason to believe was publishing this image, did you?

A    No.  Because at the time, there was nothing telling me that, hey, this website for a fact published this image.

Q    And the only way you know you would have known that, though, would be to investigate it, which you didn't do, did you?

A    No, sir.

Q    The victims in this case, you made no attempt to locate or identify the victims in this case, did you?

A    I don't recall offhand.  I would have to go back.

Q    Okay.  So you said you did a complete investigation, but you didn't do a complete investigation into the circumstances of these images on this NCMEC report, did you?

MR. CARSON:  Object to form.

THE WITNESS:  I felt as though I did.

BY MR. ROBERTS:

Q    But, I mean, as we sit here today, there are major gaps in your investigation, aren't there?

MR. CARSON:  Object to form.

THE WITNESS:  I don't think so, but it's solely my opinion.

BY MR. ROBERTS:

Q    Do you think -- do you think that Mr. Lawshe deserved to be arrested like this and for these things to happen to him?

A    I felt that I had probable cause to arrest him, yes, sir.

Q    But now, knowing everything that you had, now that we've done the investigation -- Mr. -- Mr. Pierce did the investigation and contacted the website.  With all of that information, you don't have any regrets about effectuating this arrest on Mr. Lawshe?

MR. CARSON:  Object to form.

THE WITNESS:  I think based off what I had and the probable cause that I still had probable cause to arrest him.

BY MR. ROBERTS:

Q    That's not my question.

A    What is your question?

Q    My question is just, like, as a human being,

knowing what you know now, you don't regret ruining this guy's life?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    You -- you understand that this ruined his career in law enforcement.  You understand that; right?

A    Like I said, I don't personally know him, and I did not personally follow up with him afterwards.  So I don't know what occurred.  So I can't speak on something that I don't know.

Q    FWC was actually in the room next to him when you were interrogating him; correct?

A    That -- if I'm in a different room, I don't know who's in the room next to me.  So --

Q    No one told you that his supervisors had been called and brought down to the station at the time that you were interrogating him?  No one told you that?

A    That I don't recall.  That would have been a command staff level.  I'm not command staff.

Q    Okay.  Well, I'm representing to you that he was fired.  Okay?  And I'm representing to you that this has been a catastrophic thing that's happened in his life.  Knowing what you know now, you don't -- you don't feel any regret about -- about what's happened?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know what answer you're looking for.

BY MR. ROBERTS:

Q    You can say no.

A    Like --

Q    You can say no, I don't have any regrets about this.

A    Well, what I'm -- my answer is do I think I had probable cause?  Do I still feel, knowing everything that I know now that I had probable cause to do the arrest, yes.  And that's my answer.

Q    And nothing here has told you, man, I -- I kind of wish I went to that website?

A    (Shakes head.)

Q    Nothing?

MR. CARSON:  Object to form.

THE WITNESS:  (Shakes head.)

BY MR. ROBERTS:

Q    Nothing that you've learned has told you, I should have -- I should have reached out to this record custodian?

A    Do I think that things could have been different?  That is with every investigation that I have.  You -- hindsight is 20/20.  When I look back at investigations, like, hey, I could have done this

differently or, hey, I could have done X, Y, and Z.
That's with every investigation.  That's the only way
you learn.

Q    You were still learning when you were doing
this investigation?

A    Yes, sir.

Q    Did, at any point, you feel like -- I mean,
this is the only time that you've ever used Dr. Dully;
correct?

A    Yes, sir, uh-huh.

Q    I mean, at any point in time, did you feel
like maybe -- maybe someone else with more experience
should have handled this investigation?

A    That --

MS. SHEVLIN:  Form.

THE WITNESS:  -- I don't know, solely because
I can't speak for my sergeant because he was the
one that assigns out the investigations and picks
who they go to.  So that would have to have been a
question for him.  I just can't speak for him.

BY MR. ROBERTS:

Q    He personally knew Mr. Lawshe.  Did you know
that?

A    That I don't know, just because he's been in
law enforcement way longer than I have.

Q    Right.

So tell me, when did you make the decision to arrest Mr. Lawshe?

A    This was after everything was reviewed by both my sergeant, lieutenant, and then the state attorney.

Q    Okay.  If Dr. Dully would have told you that she could not help you, would you have pursued charges against Mr. Lawshe?

A    The case --

MS. SHEVLIN:  Form.

THE WITNESS:  -- wouldn't have stopped there.

BY MR. ROBERTS:

Q    So in a way, I guess your position is Dr. Dully -- really, her -- her opinion was the deciding factor in whether or not to proceed to -- pursue the charges or not pursue the charges?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Form.

THE WITNESS:  I can't say that.

MS. SHEVLIN:  Mischaracterization of prior testimony.

BY MR. ROBERTS:

Q    Okay.  Well, let's just say -- I guess then, if I'm mischaracterizing it, just to confirm, if Dr. Dully, on February 22nd, would have told you, look,

I just can't help you for whatever reason, you would not have sought a search warrant in this matter?

A     That I can't say because --

MS. SHEVLIN:  Form.

THE WITNESS:  -- it would have been reviewed by my sergeant.  So I would have went back to the office, informed my sergeant of everything that occurred, and then it would have been his deciding factor.

BY MR. ROBERTS:

Q     If, on April 5th, you had gone to Dr. Dully and she would have said, I can't help you, would you have made the decision to arrest?

A     It would have been the same answer.  I would have gone back to my sergeant.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q     So when you said earlier that the investigation which would have ended, that wasn't true.

A     I'm saying that I would have went back to my sergeant, and he would have been the deciding factor.  So I'm sorry.  I misspoke on that.

Q     Right.

MR. CARSON:  If -- if I could, I think you misheard what she said.

MR. ROBERTS:  Oh.

MR. CARSON:  Yeah.

BY MR. ROBERTS:

Q    I thought you said -- and it's on video, but I thought you said, like, then this investigation would have ended.

A    I don't recall, but if I did say that, then I misspoke.  I would have went back to the office and spoke with my sergeant.

MR. CARSON:  I don't -- I don't mean to interrupt your questioning.

MR. ROBERTS:  No, no, no.  That's what I heard.

MR. CARSON:  I think she said it would not have ended.

MR. ROBERTS:  Oh.

MS. SHEVLIN:  That's why I said mischaracterization (unintelligible).

BY MR. ROBERTS:

Q    So -- so Kathleen Dully, if -- if she would have said, I can't help, you -- you -- you don't think the investigation would have ended?

A    Yes.  I would have still went back to my sergeant.  I would have reviewed everything again with him in its entirety, including Dr. Dully's statement

that she would have provided.

Q    Uh-huh.

A    And then we would have decided how to proceed forward.

Q    You can't say one or the other whether or not you would have proceeded or not proceeded?

A    No, sir, I cannot.

Q    All right.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    On the -- if you would have gone to the website, if you had the photograph of the passport and the information from the record custodian, can you say as we sit here today whether or not you would have proceeded in the investigation or not?

A    No.  Because there is more variables that would have been in play with all of that.

Q    It definitely would have changed your -- the -- the analysis in what to do with the case?

A    I don't know if it would have changed what to do with the case.

Q    It might have led to more investigations?

A    Yes.

Q    All right.  But do you agree that if prior to making the arrest, you were presented with the passport

photographs and the information from the website that you would have, at least, to have paused on a decision to make an arrest at that point?

A    I can't say for certain because it all depends on when we got that information, and there would be a lot of factors that would have been in play.  So I can't say if it would have been paused or if it would have been the exact same.

Q    Or if it would have been completely different?

A    Yeah, or completely different.

Q    And so I think this is a really good point. And I'm glad we're kind of going through this. Sometimes it seems pointless.

If you would have had this information from the website that Detective Greene got and Mr. Pierce got, the passports, statement from the records custodian and you had that in your investigative file prior to making the decision to effectuate arrest, I think I understand what you would have done is you would have taken that to your supervisors?

A    Yes.  Everything goes through my supervisors. So they see every part of that investigation because they have to approve the reports.

Q    So, I mean, really -- I mean, I've asked this question of Detective Tolbert.  He was your supervisor

at the time; correct?

A    Yes, sir.

Q    I mean, he said unequivocally, if I had these passport photographs and this information, I would not have arrested him.  You've got no way -- you didn't have the power to disagree with him at that time, did you?

MR. CARSON:  Object to form.

THE WITNESS:  That wasn't there.  So --

BY MR. ROBERTS:

Q    Right.  I mean, that didn't happen.  I get that.  No.  But I'm just saying, like, if you would have brought the passport information and the record custodian information, you would have brought that to your supervisor; correct?

A    Yes, as with all this other information.

Q    As with all the other information?

A    Uh-huh.

Q    And you would have allowed them to make the call?

A    It would have been a group discussion.  I don't know if it would have been just one person because I can't say, yeah, one person is solely making the call. It would have been something that we would have talked about with him, the attorneys, everybody involved in the investigation.

Q    Who -- who was responsible for making the decision to effectuate the arrest in this case?

A    That was something, like I said, that it was a group discussion, where it passed multiple points.  It passed not only the sergeant, the lieutenant as well as the state attorney.  It wasn't solely just one person.

Q    You were involved in that decision?

A    Yes, because it passed multiple points.

Q    And was Sergeant Tolbert part of that decision?

A    Yes, sir.

Q    Who was the -- who was the person in St. Johns County Sheriff's Office that was responsible for that decision?

A    I don't understand your question because --

Q    Where does the buck stop for that decision in ICAC at the time that this arrest was made?

A    I guess I'm a little confused.  And please correct me if I'm not going down the right path.

Q    Don't want you to.

A    But what I'm saying is it's not just one person.  Like, it doesn't just stop at one buck.  Like, it's multiple different people, including the state attorney, that it has to go through before we even get to that point.  So I can't just say, yeah, it's one

person because it's not, if that makes sense.

Q    But it wasn't you?  Was it you that made the decision to make this arrest?

A    What I'm saying is it's multiple people.  I agreed, if that's what you're saying, with the arrest as well as everybody else that was reviewing it, if that answers your question.  I don't know.

Q    Okay.  Did you make a recommendation to your supervisors?  How did you present that to your supervisors?

A    By doing the probable cause.  So I --

Q    So you did your probable cause affidavit for the search warrant.

A    Yes, uh-huh.

Q    You stated there was probable cause, and then you asked them to sort of sign off on that?

A    So they review it, yes.  But we also do have to have somebody sign off on it.  But they review it as well as the state attorney is reviewing the investigation and obviously Dr. Dully's statements, everything in its entirety.

Q    Okay.  So really, if there were this information that we're talking about, the passports and the website record custodian, Detective Tolbert's opinion or testimony about that would be relevant on

what ultimately happened with the case?

MR. CARSON:  Object to form.

THE WITNESS:  I don't understand the question.

BY MR. ROBERTS:

Q    If -- if Detective -- if -- if Sergeant Tolbert told you, we're not proceeding with this case; we're not effectuating an arrest on Mr. Lawshe, that would be the end of the story?

A    No.  I can't say that because it would still go to multiple people.  Like, we would all --

Q    Who?

A    -- review it.

Q    Who?

A    The people I just listed, me, the state attorney, my sergeant.  In that case, when we brought it in, it was the lieutenant.

Q    Who's the lieutenant?

A    Because it switched.  I cannot remember if it was -- oh.  I would have to refer back to that time because we -- we now have our third lieutenant.  So we've had different lieutenants during that time, so I would have to refer back to who was working during that time.

Q    Okay.  But you were responsible for presenting the information to your superior and the state attorney?

A    Yes.

Q    Not every case that you have do you present to the state attorney, do you?

A    If it's one that we're going to try to do a physical arrest day of, yes.

Q    But if you make the decision that we're not going to arrest, you don't -- do you have to get the state attorney's involvement in that?

A    They do.  Especially if we're going to be eventually forwarding charges, they're going to involved in it.

Q    I'm sorry.  I'm asking actually a different question.

A    Okay.  Sorry.

Q    If you make the decision that you're not going to -- there was another image that was the subject of the NCMEC report in this.  You're familiar?

A    Yes, uh-huh.

Q    You looked at it, and you discarded it.  You said, no, this is not CSAM; correct?

A    Uh-huh, yes.

Q    Was that your decision?

A    Yes.

Q    Did you run that by Sergeant Tolbert?

A    Yes.  He reviewed the image as well.

Q    And he agreed with you?

A    Yes.

Q    Did you run it by a state attorney?

A    I don't recall.  I can't remember if we did or didn't.

Q    Okay.  All right.

All right.  So I just want to encapsulate --

A    Okay.

Q    -- what -- what we've got here.  You've got the NCMEC report from Detective Tolbert; correct?

A    Yes, sir.

Q    At the time that he gave it to you, you do not recall whether or not he identified Mr. Lawshe as the subject of the investigation or not?

A    I don't recall offhand.

Q    Okay.  But by the time that you applied for a search warrant, you did understand that Mr. Lawshe was a law enforcement officer with FWC?

A    Yes.

Q    All right.  After viewing the image and reviewing the NCMEC report, you spoke with other detectives in the unit about their opinions about what this NCMEC -- initial NCMEC image showed?

A    Yes.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    And there was agreement between some people that it -- that it depicted a -- a child -- and there was some dissent from someone -- and you cannot remember that person's name -- that it may not be a child and it may be age-difficult?

A    Yes, if I'm recalling correctly.

Q    After that, the decision was made, and you were introduced to Dr. Dully by Sergeant Tolbert?

A    Yes, sir.

Q    You took the image, on February 22nd, to Dr. Dully?

A    Yes.

Q    You've already described the meeting that you've had with her.  You went back to the office, and sometime between then and February 28th, you executed an affidavit in support of a search warrant; correct?

A    Yes, sir.

Q    All right.  Search warrant was issued; correct?

A    Yes, sir.

Q    That was served on Verizon?

A    Synchronoss.

Q    Synchronoss?

A    Yes, sir.

Q    And they returned the data that you requested.

A    Yes, sir.

Q    You downloaded that data with Detective Greene, his assistance?

A    I don't recall.  He may have assisted.  I just don't recall for certain if he did or didn't.

Q    Okay.  You reviewed some of the pornographic images on the phone once the download was complete?

A    Yes.

Q    You chose three images that were not -- one of the -- those three images were not the original NCMEC tip report; correct?

A    That is correct.

Q    You -- you -- you made the determination that these appeared to be minors, in your opinion?

A    Yes, after reviewing them with Dr. Dully.

Q    Well, you made that determination, and then you took them to Dr. Dully.

A    Yes, sir.

Q    Right?

A    Uh-huh, yes.

Q    Now, there are images in Dr. Dully's report, and I'm glad we're talking about this.  Let's go to the second report.

A    Okay.

Q   It appears that some of the images that you had her review were not ultimately charged.  There's more than three images reviewed in these two -- in these reports.

A   Which one?

Q   So we've got the -- the February 22nd; correct?  That image was never charged; right?

A   No, sir.

Q   Right?

So there's an April 5th, which it deals with -- it sounds like you brought her additional images of the same female child.  This is what this is saying, from the NCMEC report.

A   And it's the one entitled D26?

Q   I previously examined a single color photograph on a laptop entitled, yes, D26; right?

A   Yeah.  That was the NCMEC image, yes, sir.

Q   Right?

A   Uh-huh, yes.

Q   Today -- so -- so basically, she -- she goes over her original opinion in the February 22nd.

A   Yes.

Q   Right?

A   Yes, sir.

Q   And then there's a -- a paragraph.  It says:

Today, you've shown me two additional images of the same female child.  And they confirm my previous determination that she is at most SMR 3 or 4 and, therefore, again, less than 12 to 15 years of age.

Correct?

A    Yes, sir.

Q    You don't know what SMR 3 or 4 means?

A    Not that I can recall, no, sir.

Q    All right.  You don't know that SMR 4 could be actually an adult?

A    Not that I can recall.  I don't know.

Q    Have you -- have you ever Googled that?

A    Not that I can recall.  I don't know.

Q    Have you ever looked into any just, like, online literature about the controversial nature of sexual maturity rating?

A    No, sir, not that I can recall.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Okay.  Those two images at the bottom of this letter dealing with the original NCMEC and the two additional images, those two images were charged.  Do I understand that?

A    Yes.

Q    All right.  On the second April 5th letter --

and there's really no way to delineate them other than this -- this deals with the Big Heart?

A    Yes.

Q    Right?

A    Uh-huh.

Q    The Big Heart is the only image here that was charged?

A    Yes, sir.

Q    That was the third image; correct?

A    Uh-huh.

Q    Why didn't you charge on the -- the image on the first paragraph, the YCBLVVFQ_0.jpg?

MS. SHEVLIN:  Form.

THE WITNESS:  I don't recall offhand why that one wasn't charged.

BY MR. ROBERTS:

Q    Was it because this model had adult breasts and --

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    -- because she did not have pubic hair? Dr. Dully said she was SMR 1, which is prepubescent.

A    That wouldn't be a reason not to charge.

Q    Have you ever met a child that has adult breasts and no pubic hair development?

A    That I can't recall off -- I can't remember each child that I've met.

Q    But, I mean, like, does it seem really weird to you that, like, a prepubescent child would have, like, adult breasts?

MS. SHEVLIN:  Form.

THE WITNESS:  No.  That doesn't seem weird.

BY MR. CARSON:

Q    Doesn't seem weird to you at all?

A    No, sir.

Q    No pubic hair development because I'm pre -- prepuberty, but I have fully developed breasts.  That doesn't seem odd to you?

A    Because I don't know if I'm --

MS. SHEVLIN:  Form, asked and answered.

THE WITNESS:  -- like you stated earlier, looking at a child who's shaved or not.  So I don't -- I can't say that just because I don't personally see it with my naked eye.

BY MR. CARSON:

Q    Oh, no, no, no, no.  Excuse me.  I'm not saying shaved.  I'm just saying this -- this child was not shaved.

A    Yes.  But what I'm saying is I can't --

Q    Appears -- appears to be not -- not shaved;

right?  So have you -- have you -- does that not -- does that strike you as normal or -- or odd that a 9- to 13-year-old child who is prepubescent and developed no pubic hair would have adult breasts?

A    No, that does not seem odd to me as a female.

MS. SHEVLIN:  Form, asked and answered.

BY MR. ROBERTS:

Q    Okay.  If it doesn't sound weird to you, it's fine.  That's okay.

All right.  Okay.  But in any event, you did not charge him with possession of this?

A    I can't recall specifically why that one didn't get charged.

Q    But it wasn't because it made no sense?

A    No.  We don't not charge --

MS. SHEVLIN:  Form.

THE WITNESS:  -- just because they have breast development.  That's not a reason not to charge.

BY MR. ROBERTS:

Q    Not breast development.  It's Grade 4, Grade 5.  Grade 5 is -- is -- that's an adult?

MR. CARSON:  Form.

BY MR. ROBERTS:

Q    That's as high as it gets?

MS. SHEVLIN:  Join, form.

THE WITNESS:  What I'm saying is I don't know what that terminology means, so that's not a reason for me not to charge for an image.

BY MR. ROBERTS:

Q   So -- but it's your lack of understanding in what these terms mean that would lead you to, I mean, make a filing decision?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q   How do you rely on these opinions if you don't have really any understanding of what they mean?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is I'm relying on a doctor --

MS. SHEVLIN:  Join.

THE WITNESS:  -- who has to attest to that.

BY MR. ROBERTS:

Q   So you're just --

A   I am not a doctor.

Q   You're just trusting that -- that Dr. Dully is providing you with medical opinions within a reasonable degree of medical probability?

MR. CARSON:  Form.

MS. SHEVLIN:  Form.

THE WITNESS:  Am I trusting her that she is accurately describing these females?  I would say yes, if that's --

BY MR. ROBERTS:

Q    Why?  Why do you trust her?

A    Why do I trust her?  Based off her experience.

MS. SHEVLIN:  Form.

BY MR. ROBERTS:

Q    Okay.  Do you know what her experience is?

A    I can't recall verbatim what her experience is offhand.

Q    Okay.  All right.  So what -- and I'm just going to ask you.  What would these images -- and the images are what they are, and we're going to look at them just here in a second.

A    Okay.

Q    What evidence would satisfy you that they are an adult?

MR. CARSON:  Object to form.

THE WITNESS:  What do you mean?

BY MR. ROBERTS:

Q    What evidence would satisfy you that the models depicted in these images --

A    Uh-huh.

Q    -- are, in fact, adults?  You say today that you don't believe that they are; correct?

MR. CARSON:  Object to form.

THE WITNESS:  Yes.

BY MR. ROBERTS:

Q    What evidence would satisfy you that they are, in fact, or were, in fact, adults at the time that the photographs were taken?

MR. CARSON:  Object to form.

THE WITNESS:  I think that's a hypothetical question.  I can't provide a hypothetical answer and say, like, yeah, that's for sure my reasoning because it would be hypothetically.  So I can't --

BY MR. ROBERTS:

Q    Well, it's your -- it was part of your job, at least, to determine whether they were adults or minors; right?

MR. CARSON:  Object to form.

THE WITNESS:  Not -- I don't -- I guess the way you're describing it, that would be hard for me to be, like, yeah, my job is to sit here and judge this person's age, like, because it's not my job. Because I can't determine, like, hey, that's for sure somebody that's 18 or 19.

BY MR. ROBERTS:

Q    You -- you've testified that you, currently, as we sit here with everything that you know, still believe that these are -- these two models were minors at the time the images were taken.

A    Yes, sir.

Q    My question to you is you've -- you've seen passport -- government-issued IDs and an affidavit from a record custodian.  That has not satisfied you that they were adults at the time of the -- of the photo shoot; correct?

A    I would say no, that it has not satisfied me.

Q    So what would?

A    Like I said, I can't speak on a hypothetical because you're saying I've seen passports, government-issued.  I don't know that they're government-issued.  All I've seen is a redacted copy.  I don't know.  So I can't speak on something that --

Q    What's -- what's redacted?

A    All of their personal information.

Q    Like, their name but not their birthday?

A    And the rest of the personal information.

Q    As we sit here today --

A    Yes.

Q    -- you believe someone has manipulated or

faked the IDs?

A    No, that's not what I'm saying.

Q    Well, enlighten me.  Is there a difference between you -- you don't believe the date -- the birth dates on the IDs but it's not fabricated?

A    No.  What I'm saying is I cannot formulate a concrete opinion based off the limited information that I have from that photograph.  That is what I'm saying.

Q    Which is you have the models' birthday, and you -- and you have the date of the photographs; correct?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    What more information would you need?

MR. CARSON:  Object to form.

THE WITNESS:  What I'm saying is I do not feel comfortable formulating an opinion based off the limited information that I had been provided.

BY MR. ROBERTS:

Q    And I'm just -- it's limited in -- in the name because I think there's some privacy laws that protect adults and -- and, you know, their choices that they make about, you know, what they do for a living.  But, I mean, you're a detective; right?  That's your job --

A    Uh-huh.

Q    -- is to determine and investigate what facts are and are not; right?

A    Yes.

Q    But you can't sit here today and tell me what -- what would satisfy you that these are or were adults at the time?

A    Because it's a hypothetical question, and I can't give you a hypothetical answer.

Q    Well, it's not a hypothetical question.  I mean, my client was arrested and lost his career because you did not verify their age.  And I'm asking you, what would have verified their age for you?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    It's not a hypothetical.

A    And what I'm saying is the limited information that I was provided I can't go based off of.

Q    Would you request a physical copy of their passport?  Would a physical copy of their passport satisfy you?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.

BY MR. ROBERTS:

Q    Would a birth certificate?  Would that satisfy you?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know because that would have been another variable added to the investigation that I would have reviewed.

BY MR. ROBERTS:

Q    How do you ever come to any sort of conclusions?  I mean, you literally -- I mean, you were a beat cop; right?  You worked as a patrol officer?

A    Yes, uh-huh.

Q    You just would pull people over and refuse to believe their age on their ID?  Did you do that?

A    Did I pull people over and refuse to believe their age?

Q    They produced an ID and maybe -- maybe -- did you ever stop anyone for underage drinking?

A    Probably in the past, yes.

Q    And did they produce a -- a driver's license?

A    I've had people produce fictitious driver's license.

Q    Okay.  Have you -- and real ones?

A    And real ones.

Q    And when they produced, did you believe the information on -- on the ID, or were you satisfied that that ID, like, accurately described their birthday?

A    That I can't speak on because that is a

completely different circumstance.  You're talking about a driver's license, and then you're talking about a passport.  And completely different.  So I can't say that yes, during that incident, as a road patrol officer, doing, let's say, a traffic stop --

Q    Right.

A    -- that that sufficed.  And this, doing an investigation that is occurring over the -- like, it's completely different.  So I can't speak on that.

Q    What's -- what's completely different as a law enforcement officer about verifying someone's age with a passport or a driver's license?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    What's different?

A    I just explained that.  It is completely different when I'm having something in hand, running it, doing X, Y, and Z or --

Q    Okay.

A    -- whatever the case may be.

Q    All right.  So --

A    It is a different circumstance --

Q    So --

A    -- as being on patrol.

MR. CARSON:  Don't interrupt her.  Let her

finish.

BY MR. ROBERTS:

Q    So if you had a physical copy or if you had, like, an un-redacted copy, you could do all of the things that you do with any other ID?

MR. CARSON:  Object to form.

THE WITNESS:  No.

BY MR. ROBERTS:

Q    You don't have access to Interpol/FBI resources?

A    I work for a local agency, so no, I do not.

Q    You do not believe that your ICAC membership gives you access to greater law enforcement resources than just St. Johns County?

A    I did not say that.  What I'm saying is I personally do not have access to Interpol and everything else that you just listed.

Q    But you -- you do.  You could call the FBI. You could call another law enforcement agency and say, hey, I've got these passports; I need to verify that they're real.  You can do that; right?

MR. CARSON:  Object to form.

THE WITNESS:  I could attempt to do that.

BY MR. ROBERTS:

Q    And if you did that, would that satisfy you

that these were adults at the time that the images were taken?

A    Like I said, I do not know.

Q    Okay.  Let's -- let's -- did you bring some documents with you today?

A    Yes.  There's thumb drives and the redacted images.

Q    And so for the record, I believe, based on government-issued ID and the affidavit of an attorney licensed in the state of California, that these images were taken of adults at the time that the image was taken.  That's based on all of the information and belief that I have.

You believe that you're holding child sexual abuse material; correct?

A    Which is why it's redacted, yes.

Q    Okay.  So I've made my statement on the record.  I believe this is legal based on all of the information.  Okay?  Thank you.

So is this the NCMEC image?

A    Yes.

Q    Who -- wait.  I didn't ask for redacted images.

A    The un-redacted are on this thumb drive.

Q    Okay.  Okay.  All right.  Okay.

A    I just don't feel comfortable printing out un-redacted --

Q    Okay.

A    -- due to me feeling that they are CSAM.

Q    You think this is an adult?

A    Yes.

Q    All right.  So no reason to -- to do that, redact anything, like --

A    I just redacted it because I don't know if you want to see --

Q    Okay.  You don't think that this -- you've testified that this is not a photo shoot; correct?

A    I said that I cannot confirm that is a photo shoot or not.

Q    She's wearing the same clothes.

A    Yes, she's wearing the same clothes.

Q    Same earrings?

A    Uh-huh.

Q    Background's the same.  Curtains are the same.

A    Yes.

Q    Correct?

A    But that doesn't constitute that it is a photo shoot.

Q    What do you mean by photo shoot?

A    You said that this is a photo shoot.  Just

that alone in my opinion doesn't mean that it's automatically a photo shoot.

Q    What -- what do you think a photo shoot is?

A    It could be a multitude of things to different people.  What I'm saying, just because somebody's in the same outfit does not mean it is automatically a photo shoot.

Q    This top image is the image you charged him with?

A    Uh-huh.

MR. CARSON:  Object to form.

THE WITNESS:  Yes, sir.

BY MR. ROBERTS:

Q    Let's write these down because we'll obviously have to attach these as exhibits but --

MR. CARSON:  For what it's worth, you can ask the witness, but I think there's identifying marks on the back.

THE WITNESS:  Yes.  You might not be able -- because my handwriting is really bad, but I tried to put the file name on it.

BY MR. ROBERTS:

Q    Sorry.  I can't read that.

A    Yeah.  It's -- it might be bad.

MS. SHEVLIN:  Is this the jump drive that --

there was one going to be delivered to our office and one that was going to be delivered to Michael's office?

MR. CARSON:  No.  Amy, this is Matt Carson. There's -- there's -- you're going to get a -- you're going to get a full hard drive of the investigative file that we provided to plaintiff's counsel.  I also have a thumb drive that has these photographs, both redacted and un-redacted, that we will get to you --

MS. SHEVLIN:  Okay.

MR. CARSON:  -- as soon as we can.  And maybe you and I can just touch base offline --

MS. SHEVLIN:  Okay.

MR. CARSON:  -- and figure out the best way to do that.

MS. SHEVLIN:  Sure.  Thank you.  Appreciate it.

BY MR. ROBERTS:

Q    So I've just -- just put, like, A through F here.

A    Okay.

Q    Okay?

A    Okay.

Q    So this is E.

A    Yes.

Q    Okay.  There's three images on that; correct?

A    Yes, sir.

Q    And you -- you charged him with the top image?

A    Yes, sir.

Q    All right.  Now, we'll attach this as -- it's a composite exhibit -- 8?

MS. ZEPF:  I have, like, six pages of that.

MR. ROBERTS:  Yeah.  It's --

MS. SHEVLIN:  That sounds right.

MR. ROBERTS:  It's 8.  It's 8, I think.

All right.  So this --

MS. SHEVLIN:  Is it -- is it a composite of all the images, Michael?

MR. ROBERTS:  Yeah.  So the exhibit will have, like, a bunch of pictures on it.  Like -- yeah.  So 8 has A through F.

MS. SHEVLIN:  It's a composite of all the images.

MR. ROBERTS:  That's correct.  It's A through F, so it will be 8A through F.  Okay?

MS. SHEVLIN:  Gotcha.

(Plaintiff's Exhibit 8 was marked for identification.)

BY MR. ROBERTS:

Q   All right.  So the top -- right?

A   Uh-huh.

Q   So this photograph identifies the model by name, Sanija?

A   That I don't know because I don't know if it's referring to obviously her, her, or another one.

Q   That's not true.  It says Big Heart right next to it, and you identified -- you -- you understood that Sanija was part of the Big Heart.

A   No.  What I understood was that it listed Big Heart, but I don't know if that's the model obviously presented as what they listed.  I don't know if that's Sanija.

Q   Well, who do you think Sanija is?

A   That I don't know.

Q   I mean, take a guess.

A   Like I stated, I don't know.

Q   You can't make an educated guess about -- it says AmourAngels Sanija/Big Heart, and then there's a picture that says Big Heart on it.  You don't know -- you had no idea who Sanija is?

A   What I'm saying is I can't say for certain that this person listed is what they view as Sanija. No, I do not.

Q    But you can say for certain that it's a minor?

A    Yes.

Q    But you can't say that that's Sanija?

A    Because I don't know who Sanija is.

Q    Well, one way would be to go to the website and search Sanija; right?

A    If that populates.

Q    Yeah.

You didn't do that?

A    No, sir.

Q    All right.  Detective Greene did that?

A    That I don't know.

Q    Okay.  This AmourAngels Karry chic, you don't think she's a minor, do you?

A    That, I would have to review the image, like, full on just because I can't tell based off this small snippet of it.

Q    Who do you think Karry is?

A    That I don't know.

Q    You don't know.  Okay.

A    No.

Q    All right.

All right.  Now, this AmourAngels here, this appears to be the cover of a print magazine.  Do you see that?

A    Yes.  I'm looking.

Q    Does it appear to be a cover of a print magazine?

A    I don't know if it's a magazine just because it's only one image.

Q    Down here, we have AmourAngels, heaven of sensuality.  That looks like the top of a -- of a magazine or a header, banner, I guess, maybe for a website.  What do you interpret that to be?

A    That, honestly, it could be anything because it's a watermark so --

Q    So how would you, like, figure out what that is?  If you wanted to figure out, like, what an AmourAngels is, like, what would you do?

A    I could try to do, like, an open source query on it.

Q    Okay.  Like, a Google search?

A    I don't know if I would do Google just because I don't know if I feel comfortable doing Google, but I could try to find another way to search it.

Q    I mean, you say you're not comfortable, but, I mean, you have to be comfortable searching pornography, and you are an ICAC investigator; right?

A    Yes.  But it's not just adult pornography.  If I think this is child pornography, I don't want to just

go on Google and type it in.

Q    But the statute explicitly excludes your possession of child pornography from the definition of criminal possession, doesn't it?

A    That, I would have to review the statute in its entirety.

Q    You know that -- I mean, you have the ability to take that laptop with these images, and sometimes you do have images of -- of actual child pornography; correct?

A    On what?

Q    Your computer.

A    No.

Q    Or some digital format?  You have possession of the images that you get through these various tips; correct?

A    We have it housed in a database, which is the IDS database.

Q    And you -- in this case, you put it on your laptop?

A    On a thumb drive.

Q    Right.  So, I mean, you were in possession of these images as you took them to Dr. Dully; right?

A    Yes.

Q    You did not think that you were committing a

crime, did you?

A    No.

Q    I mean, you understand that you have the ability to research these things.  You have to have that ability, or you couldn't research them; right?

A    Yes.

Q    So are you testifying that you hesitate to go on the Internet to research whether or not these images are actual CSAM or -- or they're adults?

A    No.  I wouldn't say hesitate.  I'd just be more cautious on what platform and what I'm utilizing to research this.  I just don't want to blindly go searching for something and it pop up with more CSAM, or it could potentially pop up with a virus.  You just -- you never know.

Q    Why would you want to avoid more CSAM popping up?

A    I wouldn't say it as in, like, me avoiding more CSAM.  It's me being cautious in what I'm doing.

Q    Aren't you looking for CSAM?  I mean, if you did this and you found this treasure trove of child pornography on a website, wouldn't you be like, oh, my God, we've got to call the FBI; we've got to get -- we've got to shut this website down?  Right?

A    So I wouldn't say that I'm looking for CSAM

because that would make me, like, a suspect.  I don't go out intentionally searching for CSAM, if that makes sense.

Q    It doesn't make sense.  You're an investigator.  Your job is to investigate the proliferation of child sexual abuse material; correct?

A    That is one part of our job, yes.

Q    And if you -- if you knew that AmourAngels not only had Sanija but other minors on it -- right? -- don't you feel compelled as a -- as a law enforcement officer to go and protect these victims of child sexual abuse and get their images taken down off the Internet?

A    Yes.

Q    But you didn't do that in this case?

A    Did I go searching for that site?  No, sir, I didn't.

Q    Right.

But if you wanted to know what AmourAngels was or what Sanija was, you could just Google or whatever open source you're talking about.  You could use the Internet to discover what that was.

A    I could have attempted, yes, to see if that populates.

Q    Most -- yeah.  Most likely, you could have just written out that line, September 27th, 2019.  You

could probably have just gotten the exact match; right?

Big Heart, AmourAngels Sanija, September 27th, 2019?

     A    I don't know if it would have been the exact match.

     Q    But, I mean, there's a good chance that it would be; right?

     A    That --

          MR. CARSON:  Object to form.

          THE WITNESS:  -- I can't say.

BY MR. ROBERTS:

     Q    Okay.  The only way you would know is if you actually did the investigation; right?

          MR. CARSON:  Object to form.

BY MR. ROBERTS:

     Q    The only way that you'd know is if you actually tried to discover it?

     A    If I went searching for that site.

     Q    Or this model, the name?

     A    Yes.

     Q    Right?

          Okay.

          Now, I don't see -- I mean, forgive me, but I don't see the watermark.  You have to open it up, and it says met-art.com down there?

     A    No.  So when you look at the image, you'll be

able to see it.  It's just the way this prints out, it only does, unfortunately, that small snippet.  I don't --

Q    Okay.

A    -- know why it doesn't try to take up the entire page but --

Q    So on the image, it's -- it's across the whole page?

A    No, sir.

Q    Okay.  How is it?

A    It's just like that, down at the bottom.

Q    Well, why does it not -- why are you saying it's different on the printout than in real life?

A    No.  What I'm saying is you see how you have the white?

THE WITNESS:  Sorry.

MR. CARSON:  Go ahead.

BY MR. ROBERTS:

Q    But you're saying that -- all right.  You're shaking your head.  I think she's trying to describe when you print it out, it prints out differently than what it looks on the thumb drive.

A    I'm just saying that it's not, like, a zoomed-in version.  When you print it out, it's only printing out that big.

Q     Right.

A     So you see how you still have white around the paper?

Q     Sure.

MS. ZEPF:  Would it be helpful to plug in the thumb drive?

MR. ROBERTS:  Well, no.

BY MR. ROBERTS:

Q     It's just -- what you're saying is it's more visible when you open it up on the thumb drive?

A     If you were to open it up, it would be, like, this full page.  The picture would be from top to bottom --

Q     Okay.

A     -- rather than just this small.

Q     I mean, my eyes are getting bad in my old age, but I can't read anything there.  But you could read that that was met-art.com?

A     When I looked at -- yeah.  I didn't print it out.  So yes, when you look at the digital.

Q     When you look at the digital image, it's -- it's clearly present that it says met-art.com?

A     Yes, sir.

Q     That was my question; right?

A     Yes, sir.

Q    And it's not that way when you print it out. It's not so obvious?

A    I don't know why it's not.  Yeah.

Q    Right.

A    I don't know why it didn't print out the full --

Q    Right, right.

So did you ever have any suspicion that Mr. Lawshe took these photographs?

A    That I can't say.  Yeah.  I don't know if that ever crossed my mind.

Q    Okay.  You never believed that there was an actual child that he was exploiting?  Like -- like --

A    That I don't know.

Q    You know what I'm saying?  But you didn't feel like there was a child in eminent harm that he was currently abusing?

A    Oh, like, in his home or something like that?

Q    Like, in his home or, like, a neighbor or something like that.

A    No.  I don't think so.

Q    Right.

Because all of these images seem to be digital images obtained from, I mean, most likely, the Internet; right?  I mean, they have websites on them.

A    Yes.  They all appear to be digital images.

Q    Right.  And they -- and they all have a website, like, literally written on the image?

A    Not all of them, I don't think.  So --

Q    So this one does.  I don't know.  I -- it's so hard for me to see.  This one is the same --

A    That one I don't think.

Q    This is the same model, I think.

A    Yes.

Q    Yeah.  These do.  These all have; right? So -- so let me just go through.

A    Okay.

Q    I think you're saying A does not have?

A    Yes.  I didn't see a watermark or anything listed on that photo.

Q    On A.

When you saw this image, did you recognize that it was the same image -- from the same model as in the NCMEC?

A    They appear to look the same.

Q    When you -- when you first picked it out, you said, like, oh, that looks like the same model as on the NCMEC image?

A    I don't know if that's the first thing I thought, but she does appear to be the same female.

Q    And it appears to be a different photo shoot than the NCMEC image?

A    A different photograph, yes.  I don't know if it's a photo shoot, so I can't say a different photo shoot.  But a different photograph, yes.

Q    Her hairstyle is different.

A    Yes, uh-huh.

Q    She is in a different room.

A    I --

Q    So there's red walls in this, wooden floor. So in B, we've got a wooden floor; correct?

A    Uh-huh.

Q    B is the NCMEC image; correct?

A    Yes.

Q    All right.

A    Yes, sir.

Q    And what I've got listed as A, that's a tile floor; correct?

A    It appears to be tile.

Q    All right.  And there -- there's some sort of, like, white columns in the background.  Can you see that, like --

A    It almost looked like a window to me, but it could be columns.

Q    Maybe.

A    I don't know.

Q    It looks completely different in the background and the curtains --

A    Yes, different background.

Q    -- in this room; right?

A    Uh-huh.

Q    So fair to say -- I mean, you're an investigator -- probably taken at different times?

A    That I don't know, if it would be taken at different times.

Q    I mean, her makeup's different; correct?

A    Yes.  But I'm saying I don't know if it's taken the same day and just -- you know, they switch out.  I don't know.

Q    Right.

A    So I can't say.

Q    But, I mean, even if it's later, I mean, like, she's changed her hair; correct?

A    Yes.  Different hairstyle, yes, sir.

Q    Different hairstyle.  Different jewelry.

A    Oh, yes, sir.

Q    Different makeup.

A    I don't know if they're wearing makeup but yes.

Q    Okay.  All right.  So did -- I mean, I'm not

trying to be -- but, like, do you ever try to make deductions from the evidence, like, deduce?

A    In what aspect?

Q    Like, that -- that this model, which is the subject of the -- the cyber tip, has been in multiple photo shoots.

A    But like I said, I don't know if it's photo shoots.

Q    Well, is she --

A    Are they in multiple photographs?  Yes.

Q    Yeah.  And there's three photographs where she's wearing the same outfit, same makeup in the same room; right?

A    Yes.  Yes, sir.

Q    Right?

A    Sorry.  Yes.

Q    B, C, and D; correct?

A    Uh-huh.

Q    And so, I mean, I don't know what you mean by photo shoot.  But this is -- it appears that she's posing; correct?

A    Yes.

Q    Right?

A    Uh-huh.

Q    It appears that there's a photographer taking

the picture?  They're not selfies?

A    I mean, she's not using --

Q    So there's a photographer in the room?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Right?

A    That -- I don't know if it's one in the room because I'm not there.

Q    But you're a detective.  Like, that's what I'm talking about, like, a deduction.  Like, you're deducing that someone is taking this photograph.

MR. CARSON:  Object to form.

THE WITNESS:  But what I'm saying is I can't speak on that because I'm not there.  So I can't say, yes, somebody's taking the photograph or, hey, is that a still video.  Like, I don't know because I'm not there.

BY MR. ROBERTS:

Q    Oh.  You mean, like, another person could be taking a video?

A    What I'm saying is I don't know.  There could be a multitude of things going on.

Q    Okay.  Does this have all the appearances of a photo shoot?

A    Honestly, I can't really say for certain.

Q    Have you ever -- has anyone ever taken your picture, like, professionally, like a headshot or --

A    Not offhand.

Q    -- school pictures?

A    School photos.

Q    Yeah.  They take, like, three or four pictures, and maybe you, like, do something differently; right?

A    Uh-huh, uh-huh.

Q    Would you consider that a photo shoot?  Maybe, maybe not?

I mean, we don't need to belabor the point. This -- this was a session where multiple photographs were taken presumably -- and maybe you're not comfortable presuming but presumably by a photographer in different poses?

A    That -- yeah.  I just --

Q    Correct?

A    I just don't know if it was a photographer or not.

Q    You're not comfortable presuming that there was a photographer involved?

A    No, sir, I'm not.

Q    Okay.  All right.  So I understand your position that -- I -- I guess what you're -- what you're

saying is is whoever presented these passports and the affidavit from the records custodian is somehow attempting to fool the ultimate consumer of this content?

A   No, sir.

MR. CARSON:  Object to form.

THE WITNESS:  That's not what I'm saying.

BY MR. ROBERTS:

Q   So -- and I'm not playing word games with you. Okay?

A   Yes, sir.

Q   You have seen pictures of the model depicted in Picture A.

A   Yes.

Q   You have seen a picture of her holding a passport; correct?

A   Yes, uh-huh.

Q   All right.  And there were representations made about the date of the photo shoot.  Do you know that?

A   What do you mean?

Q   So the record custodian says her birth date is X, as -- as shown on the passport.

A   Okay.

Q   And the photo shoot was on this date.  So you

can do the math.  She was an adult at the time of the photo shoot.  You're aware that that evidence exists?

MR. CARSON:  Object to form.

THE WITNESS:  That I cannot recall because I do not recall.

BY MR. ROBERTS:

Q   Okay.  All right.  If it did say that, would you accept that they're -- they were 18 at the time of the photo -- photographs?

A   Like I stated previously, there's more variables that would still be into play.  Given if they provided, let's say, that documentation, I would still go about my case the same, and I would present all of this information to obviously the state attorney --

Q   Right.

A   -- to my sergeant.

Q   So actually -- and I don't know -- we'll mark this as 9.

(Plaintiff's Exhibit 9 was marked for identification.)

BY MR. ROBERTS:

Q   What I think is -- of course, it's not what I think.

Do you remember seeing this photograph?

A   Yes.

Q    Okay.  Why -- and I want you to make a deduction.  You're an -- you're an investigator.

A    Uh-huh.

Q    Why does she have two passports?

A    That I don't know.  Because it appears to be from another country, so I don't know if that's how that country does it.  I don't know.

Q    Have you -- you've run into people with fake IDs?

A    Fake driver's license, yes.

Q    Fake -- fake ID; right?

A    Uh-huh.

Q    Okay.  Do they usually present two fake IDs to you at the same time?

A    I can't recall.

Q    That ever happening, can you?

A    That I don't know.  It could have happened.

Q    Right.

A    I just can't recall --

Q    Right.

A    -- because that was years ago.

Q    If I -- don't you agree, like, if -- if she was trying to deceive, this model was trying to deceive someone about her age, using manipulated passports, there would be no reason for her to show two passports?

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know because I don't know how that country operates or if that's the norm.  So I don't know.  I can't speak on that.

BY MR. ROBERTS:

Q    Did you notice that in the two -- did you ever look at the passport photographs?

A    Yes.

Q    Does she look appreciably younger to you in one of the passport photos?

A    In both of them, she looks pretty young.

Q    No, no, no.  Does she look younger in one of the passport photos than she does in the other passport photo?

A    Based off this, it's kind of hard to tell because it's in the black and white, so I -- I don't know.

Q    You can't -- you can't look at these and say, oh, she looks younger in one of the pictures than she does in the other picture?

MR. CARSON:  Object to form.

THE WITNESS:  Based off that photograph, no. Because they're -- it's in black and white, and it's kind of hard to see.

BY MR. ROBERTS:

Q   You -- you saw a digital copy of this photograph originally; right?

A   Yes, yes.

Q   Okay.  Did you take the chance to look at the photographs at that point in time?

A   Yes.  I do believe so.

Q   Do you recall looking at the images of the passports?

A   Yes.

Q   Did you see anything untoward about them?

A   Not that I recall.

Q   Anything on the passports that led you to believe that they had been faked?

A   That I don't know because I don't know how that country's passports are supposed to look.

Q   Okay.  All right.  And did you ever -- this was the only image that you ever saw on -- on Exhibit 8E, the top -- the Big Heart.  This was the only image of this particular model that you ever saw?

A   That I don't recall.

Q   There's a QR code on that image as well.  Do you see that?

A   Yes, I see it.

Q   Do you know what a -- a QR code is?

A    Yes.

Q    What is a QR code?

A    How to describe it in laymen's terms, it's --
I guess the easiest way is you can scan it, let's say,
on your phone or on an iPad, and it will usually take
you to another link.

Q    Did you ever try to use that QR code --

A    No.

Q    -- to see what link it took you to?

A    No, sir.

Q    Do you believe or do you have -- do you think
that there's a possibility that if you use that QR code,
it might take you to something that's related to that
image?

A    That I do not know.

Q    Do you think if I asked you to guess, like,
would you say that it could?

A    That I don't know because it would be a
hypothetical answer.

Q    You -- you would have to actually do that
investigation to know what that went to.

        MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    You'd have to scan it to know what it went to;
right?

A    You mean scan that QR code --

Q    Scan that QR code.

A    -- to know for certain?

Q    Yeah.

A    Yes, sir.

Q    All right.  Did you attempt to scan that QR code?

A    I just said no.

Q    Okay.

MR. ROBERTS:  Let's just take five, and I think we're -- I think we're done.  But let's take five minutes.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We are going off the record art 5:23 p.m.

(Recess from 5:23 p.m. to 5:32 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 5:32 p.m.

BY MR. ROBERTS:

Q    I'm going to show you Exhibit 8, Subsection E, and just take a look at that again.

A    Yes, sir.

Q    All right.  And the top image here is the one that was charged; correct?

A    Yes, sir.

Q    Now, this appears to be a screenshot from his phone?

A    I don't know if it's from his phone, but it does appear to be a screenshot.

Q    Right.

And are you comfortable acknowledging that this is most likely from the Internet?

A    This?

Q    These images were obtained most likely from the Internet?

A    That I don't know.

Q    So we've got a screenshot.  What other way do you think that a person could get an image like this on their phone, like, this particular array of images, if it wasn't a screenshot of, like, a website or something on the internet, social media, some Internet platform?

A    Because it could have been a screenshot sent from somebody else to them, so I don't know obviously where specifically this screenshot image came from.

Q    Fair enough.

Someone could have sent him a screenshot; correct?

A    Could have sent, yes, this image.

Q    But whoever -- whoever took the screenshot most likely got the images off of the Internet; right?

A    That I don't know.  I could speculate and say.

Q    Yeah.  Speculate for me.

A    Possibly but I don't know.

Q    How would you find out?

A    Based off this image?

Q    Right.  How would you find out?

A    With it being a screenshot, I would probably refer to one of our digital guys because they work in this realm a lot more than I do.

Q    You -- you wouldn't just go to an open source and just, like, Google that to see if it popped up on the Internet?

A    I don't know offhand.

Q    Okay.  All right.  Okay.  So there was a rumor that -- that Detective Tolbert repeated in his deposition that there was some evidence that Mr. Lawshe had scrubbed his phone.  Did you ever hear anything like that?

A    That I don't recall.

Q    He didn't recall who told him either.

A    Yeah.  I don't --

Q    Do you recall hearing something like that?

A    Honestly, I don't recall that information.

Q    Did you tell Sergeant Tolbert something like that?

A     That I do not recall, saying that he scrubbed his phone.

Q     Do you have any -- is there -- was there ever any suspicion that he scrubbed his phone of -- of illicit images?

A     That I do not know.

Q     But you're -- you're the investigator.  You're the detective in charge of this case; correct?

A     Yes, sir.

Q     And you don't know?  Who would I ask?  Who would I ask to know if there was a suspicion that he had scrubbed illegal images off of his phone?

MR. CARSON:  Object to form.

THE WITNESS:  I don't know specifically who stated that, so I don't know who you would ask to be able --

BY MR. ROBERTS:

Q     I'm asking you as the lead investigator in this case, did you ever have any concern that my client had deleted or scrubbed any files or images off of his phone?

A     What I'm saying is I don't know, and I don't recall hearing that.  So I can't speak on it.

Q     I'm not asking --

A     Yes.

Q    I'm going to ask the question until you answer it.  Okay?  Did you have any concerns or information that Mr. Lawshe scrubbed his phone or deleted any images from his phone that were illegal?

A    And what I'm saying is I don't recall hearing that or having information that that occurred, so I don't know.

Q    Okay.  So you say you don't know.  I'm asking if you had a concern.  Okay?  I'm not asking if you heard somebody else.  So the answer is I either had a concern or I didn't have a concern.  I mean, I guess you might say that I don't remember if I had a concern or not.

But my question is did you ever have a concern that he scrubbed or deleted any illegal images off of his phone or any electronic device?

A    Like I'm saying, I cannot recall that occurring or having that thought.  Like, I can't remember.  So I don't want to speak on something that I don't remember.

Q    So I guess your answer is you don't remember if there was any evidence that he had scrubbed illegal images off of his phone or not?

A    My answer is I don't recall that occurring, so I don't know.

Q    So you just don't remember if that was something you were concerned with or not?

A    What I'm saying is I don't recall, so I can't tell you if that's something that I was concerned with or something that I wasn't because I do not recall.

Q    Okay.  All right.  And you were the lead detective in charge?

A    Yes, sir.

Q    All right.

We -- you did seek another search warrant for his home; correct?

A    Yes, sir.

Q    And you obtained two additional devices from his home?

A    I don't recall.  I would have to review what was taken because I wasn't on scene when that occurred.

Q    Well, let me ask you this:  Did -- all of the three images that he was charged with were from his personal cell phone device?

A    I don't recall.  I would have to look back at the Cellebrite extraction.

Q    Okay.  Why did you not charge -- there's -- one, two, three -- four images of -- let's call her the model from the NCMEC.

A    Yes, uh-huh.

Q    Why did you not charge her [sic] with all of the images?

A    You're talking about all of the ones that we have on this table?

Q    No, all of the images of the model that was the subject of the NCMEC report.

A    Because, like, for instance, this image, I would have to go back to the Cellebrite report.  But if it was not on the device at the time that he physically had it, we wouldn't have charged for it.

Q    Why not?

A    Because he wouldn't have been physically in possession of that image.

Q    But Synchronoss had told you that he had downloaded it.

A    That, I don't know if they stated downloaded, but at some point in time, that image was viewed.

Q    Okay.  So there's three images.  Let's take out B.

A    Okay.

Q    Okay?  Because you're saying that you don't believe that was on the -- the download.  There's three images, A, D, and C.  You did not charge for those images, all of those images.  Which images did you charge and why not the other?

A    I would have to look back at the image names to be able to determine which ones were charged --

Q    Okay.

A    -- on it.

Q    Well, why would you have not charged all three?

A    All three of these?

Q    Correct.

A    This image, I do not believe that was one of the ones that was charged, but I would have to refer back.  But I don't recall why it wasn't.

Q    You don't recall?

A    Why this image was not charged, no.

Q    And -- but this top image in E was charged; correct?

A    Yes, sir, uh-huh.

Q    Can you tell me why that image was charged?

A    Because like I said, I viewed it as CSAM, and we also got that confirmed by Dr. Dully.

Q    Yeah.  But so -- so are these.

A    Uh-huh.

Q    And you didn't charge those.

MR. CARSON:  Object to form.

THE WITNESS:  I would have to review, but -- and I don't want to misspeak.  But I would have to

look back at the PC to see if these images were charged.

BY MR. ROBERTS:

Q    Well, there were only three images charged.

A    Yes.

Q    And -- and we're looking at a total of what, five, six images?

A    Yes.

Q    We know one, you just determined it was an adult.

A    Uh-huh.

Q    Right?

One wasn't on his phone.

MR. CARSON:  Object to form.

THE WITNESS:  That I don't know.

BY MR. ROBERTS:

Q    You don't know, but it wasn't charged.

A    No, it was not charged.

Q    You're not -- you're not sure why it wasn't charged?

A    No.  I'm saying I know that one was not charged.  I do not remember why this one was not charged.  But three images within this were charged, is what I'm saying.

Q    You didn't charge A?

A    I do not recall.  I would have to look back at the image name, the file name, on the PC.

Q    Isn't that the file name right there?

A    Yes.  But what I'm saying is I would have to refer back to my PC that lists the file names that were charged.

Q    On your arrest and booking report or on the charging document?

A    It should be on both.

Q    I mean, is there a reason -- can you -- whether you -- you charged that or not, is there a reason why you wouldn't have?

A    I think there's some confusion because within these images are the charged image.  So that's where I'm kind of confused by your question.  Because I included the NCMEC image -- the two NCMEC images, the three images that were charged and then another image.  So you're saying that I didn't charge on these images, but included within this pile are the charges.  So that's why I was --

Q    That's correct, yeah.  No, no.  And I --

A    That's why I'm a little confused by what you're saying.  Because you're saying that I didn't charge on these images, but what I'm saying is included in these images are the three that's charged.  So

something would have had to have been charged.

Q    Yeah.  And I guess you just don't know why you charged two but not three of those images of the NCMEC model?

A    What I'm saying is I don't recall why this one was not charged.  Yes, I don't recall.

Q    You're saying that the YCBLDV was not charged?

A    What I'm saying is that potentially, but I would have to review that to see.

Q    But I'm not really asking you which were charged and not.  I'm asking you why all three of these images were not charged.  Why did you just choose two and not three?

A    I'm very confused by what you're asking.

Q    Okay.  There are three pictures of this model.

A    Yes.

Q    Okay?

A    Yes.

Q    A, D, and C.

A    Uh-huh.

Q    Okay?  And it doesn't really matter which one was charged or not charged; right?  But only two of these images were charged; correct?

A    Yes, if these were the images that were charged.

Q    Well, I've asked you to bring all of the images; right?

A    Yes.  But what I'm saying is I would have to review the file name because I've looked at these images so much that I don't know what file name is associated with each image.  That's all I'm saying, is I would have to review the file name attached to that PC.

Q    You're just not understanding my question.  Okay?  I'm not asking which --

A    Probably.

Q    -- which images were charged on.  Okay?  I'm not asking that question.

A    Yes.

Q    But there are more images than there are charges.

A    Yes.  I get that.

Q    You understand.

A    Yes.

Q    One of these of the NCMEC model was not charged because you don't think you could find that on the phone.

A    Yes.

Q    Right?

So that leaves us with three images of the same model that was in the NCMEC picture; right?

A    Yes.

Q    And then you have a second model that we've already talked about; right?

A    Uh-huh.

Q    That's four images of what you consider to be CSAM on his phone.  I'm just asking why you would only charge three of those images and not all four of those images.

A    Yes.  But that's why I stated I don't recall why one of the images was not charged.  I would have to go back and review it.  I -- maybe that was not heard.

Q    Okay.  You think if I showed you which image it was that you would remember?

A    Why it was not charged?  No, just by seeing it.  Because I'm looking at them now.  Like, I still -- even with looking at them, I can't recall why a specific image --

Q    So it doesn't really matter if you know which images were charged or not.  You're not going to remember why a specific image was not charged?

A    Yes.  That's what I'm saying.  I thought you were saying why were these not charged, and that's why I was like, no, I'm pretty positive these were.  But --

Q    No.  I'm just -- for some unknown -- for some unknown reason, you just decided not to charge

Mr. Lawshe with possession of one of these images?

A    That, I don't know the reason.

Q    You just don't know the reason.  That's why I said unknown reason.

A    Yes.

Q    Right.  Okay.

A    Sorry.  I got confused with the way you asked it.

Q    That's okay.

All right.  I think those are for the court.

You were in no way part of the decision to drop the charges?

A    No, sir.  That was the State Attorney's Office.

Q    And I just -- I just want to make sure.  Your testimony today is that other detectives in -- in your department, that you ran these images by them after your initial review and they weighed in on whether they thought that it was CSAM or not?

A    What images are you referring to?

Q    The charged images.

A    Yes, sir.

Q    You -- after you looked at them, you took them to Detective Greene?

A    I don't remember verbatim who I took them to,

just because it was two years ago.  So I can't recall who specifically viewed them.

Q    In your deposition, you testified that for sure, you ran it by Detective Greene.

A    So maybe he viewed it.  I just don't recall.

Q    Detective Camden?

A    I don't recall if he was back from maternity leave at that point.

Q    Tolbert?

A    Sergeant Tolbert would have reviewed them.

Q    After your initial investigation?

A    What do you mean, like, after the initial --

Q    Like, after -- after you got the NCMEC to -- after you did your search warrants, he would have reviewed them --

A    Oh, yes.

Q    -- and been part of the decision that these are, in fact, CSAM images?

A    Yes, sir, uh-huh.

Q    Right?

Other than Greene and Tolbert, who -- who would have been your colleagues that you ran these by?

A    I don't recall who was in the office during that time.

Q    So you don't -- you don't know of anybody

else?

A    Offhand, I don't recall who else.

Q    Who were the other detectives at that time in -- in ICAC?

A    It was in 2023.  So we had, I believe, Detective Jimenero (phonetic), but I don't know if he would have been -- I don't know --

Q    Okay.

A    -- if they would have been in the office at that time.

Q    Camden, maybe, maybe not?

A    That I just -- I can't recall specific, who.

Q    Okay.  All right.  So you don't know -- you don't have a specific recollection of who you ran this by?

A    No, sir.

Q    Detective Greene has testified that he did not have any part in saying whether these were CSAM or not CSAM.  Do you disagree with that testimony?

A    What I'm saying is that if I stated back in that original depo that he viewed him, then he would have viewed them.  Now, if he doesn't recall it, he doesn't recall it.

Q    Okay.  All right.  Have you ever reached out to the FBI?

A    In reference to?

Q    ICAC issue.

A    Like, what exactly?

Q    In any investigation that you've done as an ICAC or SVU, have you ever reached out to the FBI for help?

A    Possibly.  I can't recall.

Q    Okay.  So you can't recall?

A    Uh-uh, not that I can recall, possibly.

Q    You don't have, like, a -- and I'm not being silly.  But, like, you don't have, like, memory issues, do you?

A    No.

Q    I mean, you've been an investigator since 2023, early 2023.  That's, like, two years, and you don't recall in that time ever having talked to an FBI agent?  You just don't have that recollection?

A    No, sir.  With the amount of cases that we get and the amount that goes on in that office, I can't recall specific events.

Q    Okay.

MR. ROBERTS:  All right.  I don't have any other questions.  Thank you.

MS. SHEVLIN:  Matt, I've got some questions.  I'm assuming you want me to go first?

MR. CARSON:  Yeah.

MS. SHEVLIN:  I do have follow-up.

MR. CARSON:  Yeah.  Go for it.

MS. SHEVLIN:  Okay.

CROSS EXAMINATION

BY MS. SHEVLIN:

Q    Detective Preston, my name is Amy Shevlin.  I represent Dr. Dully in this case.  There's a little bit of a delay.  I suspect sometimes the audio goes down --

A    Okay.

Q    -- and then it pops back up.  So if you have any issues hearing me, please do let me know.

A    Yes, ma'am.

Q    And I'll let you know if I have issues hearing your answer.  Okay?

A    Okay.

Q    So I -- I have a couple questions for you mostly based on the testimony that (unintelligible) for Mr. Roberts.  So you testified several times that you believe -- as we sit here today, you believe that the images in question show minors and not adults; correct?

A    Yes, ma'am.

Q    Okay.  Would it be fair to say that you formulated that opinion upon viewing those images?

A    Yes, ma'am.

Q    Okay.  And you viewed those images prior to taking them to Dr. Dully; is that correct?

A    Yes, ma'am.

Q    All right.  Can you tell me -- you may have said it already in your testimony, and I apologize if I'm rehashing.  But can you tell me how you know Dr. Dully?

A    So I don't -- she was referred to me by my sergeant, Sergeant Tolbert.

Q    Okay.

A    So this --

Q    And that was in the context of the underlying case with Mr. Lawshe; correct?

A    Yes, ma'am.  This was my first time meeting her, like, during this investigation.

Q    Okay.  Okay.  And I believe you also stated you have not worked with her since this case with Mr. Lawshe.  Am I remembering that correctly?

A    Yes, ma'am, that's correct.

Q    Okay.  What is your understanding of Dr. Dully's employer as we sit here today?

A    I don't remember offhand.  I know that she works in Jacksonville in -- possibly at the Child Protection Team.  I just don't remember the specifics offhand.

Q    Sure.

Do you remember her job or her title?

A    No, ma'am, not offhand.  No, I don't.

Q    Dr. Dully is not a -- she's not an employee of St. Johns; is that correct?

A    Yes, that is correct.

Q    Okay.  And when I say St. Johns, I am using shorthand.  I'm referring to your employer.  Do you understand that?

A    Yes, ma'am, the sheriff's office.  Yes, ma'am.

Q    Okay.  Thank you.  Yes, yes.

So how many times total did you meet with Dr. Dully regarding this case?

A    I believe it should have only been twice.

Sorry.

Sorry.

Q    Ms. Preston, I'm sorry.  You cut out.

A    Oh, yeah.  Sorry.  The Internet connection is saying it was unstable.

Q    Yeah.

A    I believe it should only have been twice.

Q    Twice?

A    Yes, ma'am.

Q    Okay.  And I believe you said that you met with Dr. Dully alone.  Do you remember anyone

accompanying you to either of the meetings that you had with her?

A    Not that I recall, no, ma'am.

Q    All right.  How did you come to meet with Dr. Dully, meaning who coordinated the meeting?

A    Sergeant Tolbert gave me her contact information, and then I reached out to her.

Q    And I believe the dates that you're meeting with her, I think you said February 20th and the 22nd. Am I remembering that correctly?

A    It should have been February 22nd and April.

Q    Okay.  February 22nd.  And then was that April 5th?

A    Yes, ma'am.

Q    Okay. All right.  And that would have been 2023?

A    Yes, ma'am.

Q    All right.  And the -- the -- let's talk about the first meeting on February 22nd.

A    Okay.

Q    Did you show Dr. Dully any of the images in question on that date, on the 22nd of February?

A    It would have been the one NCMEC photograph.

Q    Okay.  And that -- the NCMEC photograph is the first one that came in with the cyber tip?

A    No.  So it would have been the second one.  So it was the only one that we worked off because there was two photos.

Q    Okay.

A    Yeah.

Q    Okay.  Do you recollect how many photos you showed her in that first meeting on February 22nd?

A    It should have been only one.

Q    Just the one.  All right.

A    Yes, ma'am.

Q    How were the -- how was the photo presented to her?

A    On my agency-issued laptop.  I had a thumb drive, and I just plugged in the thumb drive and then opened up the image.

Q    That was your employer-issued laptop, you said?

A    Yes, ma'am.

Q    All right.  And when you showed her the images on your laptop, I am assuming when your meeting was over, you took that laptop.  You took that image.  She was not provided a copy.  Am I correct in that assumption?

A    That would be correct, yes, ma'am.

Q    All right.  Did you at any point on

February 22nd tell Dr. Dully the identity of the suspect?

     A    No, ma'am.

     Q    Okay.  Did you at any point reveal Mr. Lawshe's career or job or position as a law enforcement officer with -- during your meeting with Dr. Dully?

     A    No, ma'am.  Because it's an active investigation.

     Q    Would it be fair to say that Dr. Dully had absolutely no idea who the subject or the suspect of your investigation was?

     A    That would be correct.

     Q    Was Dr. Dully paid to review any of these images or render any of these opinions?

     A    Not by my knowledge, not by us.

     Q    Okay.  All right.  So St. Johns, through you, requested that Dr. Dully review these images; correct?

     A    Yes, ma'am.

     Q    Okay.  And who requested that Dr. Dully author the letters that we have?  We've got one from February 22nd.  There's one from April 5th, and then there's a second one from April 5th.  Who requested that she author those?

     A    You mean, like, write her opinion on it?

Q    Yes, ma'am.

A    I don't know if anybody requested it.  I think she just wrote it herself, but I can't recall.

Q    You cut out again.  It's freezing.  I'm so sorry.

A    No.  You're good.

I'm sorry.  I don't think anybody specifically requested she, like, write an opinion on it, if that answers your question.  I think she just wrote it on her own.

Q    Would it be part of St. Johns' expectation that if they're showing these images to Dr. Dully that she would render a written opinion?

A    That I don't know, just because this was my first time using her.  But I do believe she has written these in the past.

Q    You don't have a specific recollection of you specifically asking her for anything in writing regarding these images?

A    No, ma'am.  Not from me, no.

Q    Okay.  Do you know if anyone else from St. Johns asked her to author these?

A    No, not from my knowledge.

Q    Do you know -- I know you said you've only worked with her the one time.

A    Yes, ma'am.

Q    But do you know that if it is her normal practice or course of business to author a report when she is shown images from law enforcement?

A    That I don't know, just because this is my only time working with her, so I don't know if it's --

Q    Sure.

You never provided a copy of the images showing the two models holding their passports to Dr. Dully; is that correct?

A    Yes, that is correct.

Q    Okay.  And Dr. Dully was never provided with the affidavit from -- I think it's Mr. Douglas, who's the attorney in California, who states that these girls are, in fact, over 18 in his opinion?

A    No.  She was never provided that.

Q    Okay.

MR. ROBERTS:  I'll object to that question.

BY MS. SHEVLIN:

Q    Is it fair to say that all of the information that Dr. Dully had regarding these images came either from you or from St. Johns in some fashion?

A    Yes, ma'am.

Q    Do you believe that Dr. Dully acted in good faith in reviewing these records?

A    Yes, ma'am.

Q    Do you believe that Dr. Dully acted in good faith when she authored the February 22nd and the two April 5th, 2023, letters regarding these images?

A    Yes, ma'am, I do.

Q    After -- well, let me jump a little bit further ahead.

Okay.  So on April 5th, you met with her a second time; correct?

A    Yes, ma'am.

Q    All right.  And it looks like her -- on her April 5th letter, there's the first paragraph, which is a copy from the paragraph on February 22nd, 2023?

A    Yes, uh-huh.

Q    Okay.  And then there's a second paragraph that says that she was shown two additional images of the same female that was in the first image that she looked at, and you testified that was the second NCMEC cyber tip that came in?

A    Are you saying that these two images were the second NCMEC cyber tip?

Q    No.  The -- you -- you just told me earlier that the first image that you showed to Dr. Dully was the second NCMEC cyber tip that came in.  The first one you did not show her; correct?

A    Yes, that is correct.

Q    Okay.  And then in addition to that first one, which she had already seen on April 5th, you showed her two additional images depicting the same female --

A    Oh.

Q    -- that was in the second cyber tip that you showed her on February 22nd; correct?

A    Yes, ma'am.  I'm sorry.  I misunderstood.  Yes.

Q    Okay.  Okay.  That's okay.  I just want to make sure.

And then also, on February 5th, it looks like she was also shown another -- excuse me -- two additional images.  The first image is a -- let me see.  It was -- the image is -- it looks like YCBLVVFQ_0.jpg is the file name.

A    Yes.

Q    Is that correct?

A    Yes, ma'am.

Q    Okay.  And then the second image was the image that Mr. Roberts was asking you about earlier that says Big Heart on the bottom?

A    Yes.

Q    Okay.  I'm going to -- I'm notoriously bad at screen sharing, so bear with me a moment.

A    Okay.

MR. ROBERTS:  Is it an exhibit you think we have?

MS. SHEVLIN:  It is.  I'm sure you do have it. I mean, you do.  She's looking at them right now. It's just the three letters.  I have the composite in front of me.

MR. ROBERTS:  It's just where your computer is is, like, kind of hard for her to see.  But that's my only --

MS. SHEVLIN:  Okay.  All right.  Hang on a second.  Like I said, I'm not good at this.

You know what?  I'm going to come back to this because this screen share does not appear to want to work right now.

BY MS. SHEVLIN:

Q    All right.  We're going to come back to those letters.  I have a couple additional questions for you, but --

A    Okay.

Q    -- we'll come back to that.

After your -- your second meeting with Dr. Dully on April 5th of 2023, did you ever have any (unintelligible) you met with her?

A    You said did I have any -- you broke up.

Q    After -- after April 5th of 2023, did you have any other meetings with Dr. Dully?

A    Not that I recall, no, ma'am.

Q    Did you have any phone calls with her after April 5th of 2023?

A    Not that I recall, no.

Q    Did -- did you have any correspondence with her, either e-mail or letters through the mail, text message, anything like that regarding this case?

A    Not that I recall.

Q    Okay.  You said multiple times in your testimony that there were -- there was a variety of factors that led to the decision to bring charges against Mr. Lawshe.  Can you very briefly just describe what those multiple factors were that led you to believe that charges should be brought against him?

A    Yes, ma'am.  So obviously, based off the image, me viewing it as CSAM, Dr. Dully's statement, and then the entirety of the digital download that we did, that's why we felt as though we had probable cause for the arrest.

Q    Would it be fair to say, based on what you've just told me, that you did not base your decision to bring charges against Mr. Lawshe exclusively on Dr. Dully's opinion?

A    That would be correct.

Q    Now, Mr. -- excuse me.  I think I'm going to call him by the wrong -- by the wrong title.  I think it is Sergeant Tolbert, but please correctly -- correct me if I'm wrong.

A    No.  You've got it right, Sergeant Tolbert.

Q    It is sergeant?

A    Yes, ma'am.

Q    Okay.  Wonderful.

So Sergeant Tolbert was previously deposed in this case.  And in his deposition, he stated that if we, meaning St. Johns, didn't feel like it was CSAM, we wouldn't have taken it to Dr. Dully to begin with, meaning there was already an opinion that the images were depicting minors before they were brought to Dr. Dully.

Do you agree with that statement?

A    Yes, ma'am, I do.

Q    Okay.  Do you also agree with my statement that Dr. Dully never would have seen any of these images if St. Johns hadn't already determined that they depicted minors?

A    That, I don't know how she would have been able to see them without us showing them to her.

Q    Okay.  Did Dr. Dully apply for a search

warrant in this case?

A    No, ma'am, not from my knowledge.

Q    Did Dr. Dully testify at any hearings in this case?

A    Not from my knowledge, no, ma'am.

Q    Do you recall what you told Dr. Dully about the images when she was viewing them?

A    I don't recall our conversation at all.

Q    You testified that you do not believe that the models depicted in the images are age-difficult.  Do you remember that testimony?

A    Yes, ma'am, I do.

Q    Okay.  So you believed at the time of your investigation that these images were obviously of minors?

A    Yes, ma'am.

Q    Okay.  And you still believe that today?

A    Yes, ma'am, I do.

Q    You discussed a little bit earlier with Mr. Roberts your prior deposition testimony that was in November of 2023.  You remember discussing that today?

A    Yes, ma'am, I do.

Q    Okay.  On Page 22 of your deposition, you testified -- prior to taking the photos to Dr. Dully on the time line, you testified:  So that, I did know that

it was child pornography.  I felt that she, referring to the model, was definitely under the age of 18.

As we sit here today, do you stand by that testimony?  It's on Lines 21 and 23.

A    Thank you.  Sorry.  I was trying to look for it.

Q    That's okay.

A    Yes, ma'am, I still stand by that.

Q    Okay.  And on the next page, on Page 23, we've got Lines 1 through 5.  And you answered in the affirmative to a question that you concluded that the image was a minor prior to speaking to Dr. Dully; is that true?

A    You broke up.  You said --

Q    Did I break up?

A    Yes, ma'am.

Q    Okay.  All right.  Page 23, Lines 1 through 5 of your deposition from November 23 --

A    Yes, ma'am.

Q    -- you answered in the -- in the affirmative to a question regarding that you -- you concluded that the image was a minor prior to speaking to Dr. Dully.

A    Yes, ma'am.

Q    And then on Page 29 of your deposition -- let me get there.  I believe -- it's between Lines 5 and 20.

I know that's a lot.  But I'll break it down.  From Lines 5 to 10, you testified:  Nine times out of ten, you would always have another detective with you to confirm this is CSAM, just to get a second opinion on any image, especially if we're going to move forward with it.

And then at Lines 16 and 17, you stated that Kevin Greene reviewed the images.  Detective Scoggins reviewed the images.  And just a couple minutes ago, you also testified that Detective Tolbert also reviewed the images.  Are all of those people -- excuse me.

Were all of these people, at the time, employees of St. Johns?

A    Yes, ma'am.  They were and are.  Sorry.

Q    Okay.  I know you stated earlier in your testimony that you did not visit met-art.com.  So I will represent to you that met-art.com refers to their model as teens and girls.  Is that something you were aware of?

A    I know Kevin Greene stated something along those lines, but I don't remember verbatim what he stated.

Q    Okay.  And would it surprise you to learn there are suggested search terms on met-art.com, which include Roy's teen amateurs, teenage beauties, teen from

Argentina, Asian dream teen, nude hairy teens, petite teens naked, teens in lingerie, teen nipples, teen boobs, teen boobs teen, teens wearing thongs, teens up skirt?  Would any of that surprise you based on what you've seen?

A    Based on what I've seen just in investigations, like, for ICAC?

Q    Based on -- excuse me.  Thank you for clarifying.  Based on the images that you reviewed in relation to Mr. Lawshe.

A    No, that wouldn't surprise me.

Q    Okay.  Now, Mr. Roberts had asked you earlier if you were of the opinion that someone had potentially altered the identification or the passports of the models in question to make it appear that they were 18.  Do you remember that testimony?

A    Yes, ma'am, I do.

Q    Or that line of questions?

A    Yes, ma'am.

Q    Okay.  And you -- you saw the images of the two models.  There's one -- I believe her name is Melina (phonetic) D., and she's the one holding the two Ukrainian passports?

A    Yes, uh-huh.

Q    Okay.  And those images -- on the image with

Melina D. with the two passports, the passports on there are, in fact, redacted; correct?

A    Yes.  Based off what I could see, yes.

Q    Okay.  So IDs can be manipulated or altered, especially in a photo; correct?

A    Yes, ma'am, in a photograph especially.

Q    And, in fact, we do have an altered photograph on this one because the information that is contained on the passports have -- has been redacted; correct?

A    As in them altering it to redact it, yes, ma'am.

Q    Yes, ma'am.

And same questions with the other model.  I cannot recall her name right now, but she's one with darker hair.

A    Yes.

Q    She's holding a Latvian passport?

A    Uh-huh, yes, ma'am.

Q    And the passport that she is holding has also been redacted; correct?

A    Yes, ma'am, it has.

Q    Okay.  So, again, that image has been altered in that it has been redacted so that we can't actually see the information on that passport?

A    Yes, ma'am.

Q    Seeing the image -- or images, I should say, of these girls holding these passports that purport to show their age do not give you any indication of how old they were at the time that these photos were taken; correct?

A    You're saying -- I'm sorry.  Because you broke up.  Just based off them holding the photographs?

Q    You froze again.

A    Yes.  Sorry.

I was saying you're saying just based off the photographs?

Q    There would -- there would be no way of knowing --

A    Sorry.

Q    Yes.  Let me ask it again just so it's clear because you broke up, and I broke up on your end.

You would have no way of knowing how old these girls were at the time these images were taken just by looking at a picture of them holding their passports?

A    No, ma'am, I wouldn't.

Q    Okay.

Okay.  I am going to attempt to screen share again.

A    Okay.

Q    I am going to be looking -- and you have

everything in front of you I'm going to screen share, just so we're on the same page.  Going to have a few things highlighted.

A    Okay.

Q    But I'm going to refer to the February 22nd, 2023, letter from Dr. Dully and then the two letters that are authored on April 5th, 2023.

A    Okay.

Q    And I understand that my screen is a bit far from you.

A    Yes.  I have them in front of me.

Q    (Unintelligible) digital image.  Okay.

All right.  So on the first letter dated February 22nd, 2023.  So I've got some things here highlighted.  I don't know if you can see those.  But I'll just call your attention to the line so you can look at them with me.

A    Okay.

Q    And the first -- well, the first letter is only one paragraph.  The fourth line down in the paragraph states:  This image depicts what appears to be a naked pubertal female child wearing pink earrings and white lace socks on her feet.

A    Yes, ma'am.  I see that.

Q    Would you agree with me that that's what that

says?

A    Yes, ma'am.  That does say that.

Q    Okay.  And then two lines under that, it says: This female child appears younger than 18 years of age.

Would you agree with that assessment, that that is what this letter states?

A    Yes, ma'am.

Q    And then on the last line, it says:  She does not appear to be shaved.

Would you agree with me that that's what that says?

A    Yes, ma'am.  That's what it states.

Q    Okay.  I'm going to move to the April 5th, the first April 5th, 2020 -- excuse me -- 2023, letter.  And we've already established that first paragraph is the same as the February 22nd letter?

A    Yes.

Q    Starting on the second line of the second paragraph, she's describing the image or two images and says:  The model in that image is depicted to be, at most, SMR 3 or 4 and, therefore, between the ages of 12 and 15.

Would you agree with me that that's what that letter says?

A    I'm sorry.  What line was that?  I lost --

Q    Second paragraph.

A    Oh, okay.

Q    It starts on the second line and continues on to the third line.

A    Okay.

Q    Would you agree with me that that's what that letter says?

A    Yes, ma'am.

Q    Okay.  And then on the second April 5th letter --

A    Yes, ma'am.  I'm here.

THE WITNESS:  I don't know if she froze.

BY MS. SHEVLIN:

Q    I'm not sure if you answered because you broke up.  I'm sorry.

A    No.  I think you froze.  I couldn't hear -- this is freezing.

MR. ROBERTS:  We didn't hear the question.

MS. SHEVLIN:  I think there's a delay, yeah.

All right.

BY MS. SHEVLIN:

Q    On the first paragraph on the third line down, it states:  The model (unintelligible) visible and could be SMR 4 to 5.

Would you agree with me that that is

accurately stated in this letter; I'm -- I'm accurately stating what this letter says?

A    You froze.  But did you state her breasts are partially visible and could be SMR?  Is that --

Q    And could be SMR 4 or 5.

A    Yes, ma'am.  That's what it states on this one, yes.

Q    Okay.  And then the next line down says: Developmental appearance is 9 to 13 and a half years of age.

A    Yes, ma'am.

Q    Is that accurate?  Am I reading that accurately?

A    Yes, ma'am.

Q    Okay.  In the second paragraph, second line from the bottom, it says:  The model appears to have no pubic hair development.  She does not appear to be shaved.  Developmental appearance is 9 to 13 and a half years of age.

Am I reading that accurately?

A    Yes, ma'am, you are.

Q    Okay.  So earlier in your testimony, I believe you used the word certified, that Dr. Dully's certified that these images were of minors.  Having just looked at these letters, she says:  Appears, depicts between these

ages.

I don't see anything in here that certifies anything.  Do you?

A    Not using the term certified, yes, ma'am.  She does not specify that it's certified that this is what it is.  So yes, I would agree.

Q    Now, there was also some earlier testimony that Mr. Roberts was asking you about why not all of the images depicting the same model had been charged, and you couldn't remember the specific reason.

A    Yes, ma'am.

Q    So would it be fair to say that the ultimate decision on which images to charge, regardless of what Dr. Dully reviewed or rendered an opinion on, ultimately, that decision was St. Johns?  Correct?

A    Yes, ma'am.

Q    Okay.  And St. Johns was the one that made the decision to bring the chargers forward against Mr. Lawshe; is that correct?

A    Yes, ma'am.

MS. SHEVLIN:  Okay.  I believe that's all I have for you.  There's probably going to be some follow-up, so I'll turn it over to everybody else. But I appreciate your time, ma'am.  Thank you.

THE WITNESS:  Yes, ma'am.

MR. CARSON:  Do you have any more, Michael?

MR. ROBERTS:  I do.

MR. CARSON:  Go ahead.

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q    So I want to show you, in Exhibit 8, A and C.

A    Okay.

Q    We previously looked at these photographs. Can you read the file number of A?  Well, first of all, you agree that these are the same models?

A    They appear to be the same.

Q    Right?

A    They appear to be, yes.

Q    And I think you said you actually -- when you -- when you picked out A, you recognized that as the NCMEC image model?

A    As appearing to be, yes.

Q    Right?

Okay.  So can you read the file number of that?

A    It should be YCBLVVFQ_ -- either an O or a 0.

Q    Okay.  Now, I want you to go to April 5th, the one that deals with -- it repeats the findings from February 22nd.

A    Where it repeats, you said, the find -- this

one?

Q    Yeah.  The one where it repeats it.

A    Okay.

Q    And then you show her the additional images?

A    Okay.

Q    You got me?

A    Yes.  I think I'm on -- on this page.

Q    I wish there was, like, a number.  We could probably call it something but --

A    This one?

Q    Yes.

A    Okay.

Q    It's the one that begins I previously examined.

A    Yes.  Yes, sir.  I'm there, yes.

Q    Okay.  Now, this is describing -- and I think her name is Melania D., so let's just call her Melania D.  Okay?

A    Okay.

Q    All right.  This is describing the original NCMEC image of Melanie D., correct, in the first paragraph?

A    Yes, sir.

Q    All right.  In the second paragraph, you show her two additional images of that model; correct?

A    Yes.

Q    And I think you have -- that's one of the additional -- one of the additional files; correct?

A    The 0059?

Q    05 -- 0059.  That's 8C; correct?

A    Yes, uh-huh.

Q    Okay.  Both of these are Melania D.; correct?

A    I don't know if they are both.  They appear to be the same, but I don't know if it's confirmed if they are the same person.

Q    That was your impression?

A    That it appears to be the same person, yes, sir.

Q    Right.

And so she estimated that this model was an SMM -- SMR 4 -- correct? -- originally and then SMR 3 or 4 at most, therefore, 12 to 15 years of age?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Is that what she --

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Is that what it says in this document that we're looking at?

MR. CARSON:  Object to form.

THE WITNESS:  By saying --

MS. SHEVLIN:  Join.

THE WITNESS:  -- therefore, again, less than equal to 12 to 15.  That's what it says in this document.

BY MR. ROBERTS:

Q    So in this -- in this document that begins I previously examined a single color photograph, Dr. Dully is communicating to you.  This letter's directed to you; correct?

A    Yes, sir.

Q    That Melania D. -- and I understand you didn't know her name at the time.  But Melania D. is an SMR 4, maybe a 3, 12 to 15 years of age; correct?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

THE WITNESS:  You said an SMR 4 or what was the other one?

BY MR. ROBERTS:

Q    3 or 4.  I'm just reading her opinion.

A    Yes.

Q    And I'm trying to get -- when you got this, like, you tried to understand what she was telling you; correct?

A    Uh-huh.

Q    Yes?

A    Yes.  Sorry.

Q    And it says this model, who we now know is Melania D. -- and I'm just reading the last sentence; right?

A    Okay.  Yes, yes.

Q    Right?

A    Yes, sir.

Q    And it says:  She would have achieved this developmental genital appearance of SMR 4 at 12 to 15 years of age.

Did I read that correctly?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Did I read that correctly?

MS. SHEVLIN:  Join.

THE WITNESS:  You read it as it states it on here.

BY MR. ROBERTS:

Q    Right.

And then it says:  Today, you showed me two additional images of the same female child, and these confirm my previous determination that she's depicted to be, at most, SMR 3 or 4 and, therefore, again -- I think it says less than 12 to 15 years of age; correct?

A   Yes, sir.

Q   All right.  So Melania D., according to this, is an SMR 3 or 4, 12 to 15 years old; correct?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q   Is that what you took from this?

A   Based off this model?  Yes, based off these photographs of this model.

Q   Right.

So you went and you also showed her -- I want you to go to the next.

A   Uh-huh.

Q   Okay.  Read that first paragraph for me.

A   The entire paragraph?

Q   Yeah, the entire paragraph.

A   Today, you have provided to me two images for review displayed on a law enforcement laptop.  The first is YCBLVVFQ_ -- I'm assuming it's either a O or O -- .jpg and depicts a female child with no pubic hair development.  She does not appear to be shaved.  Her breasts are partially visible and could be SMR 4 to 5.  However, her genitals are plainly visible with her thighs spread widely apart and showing she's SMR 1 -- I'm assuming that's going to be 1 -- with respect to

pubic hair.  This developmental appearance is less than or equal to 9 to 13.5 years of age.

Q    Okay.  So you read this at the time before you sought the -- or the search warrant; correct?  Or the -- you made the arrest.  You read this; right?

A    Yes, uh-huh.

MS. SHEVLIN:  Form.

THE WITNESS:  I said yes.  Sorry.  I didn't know if you didn't hear me.

BY MR. ROBERTS:

Q    That's Melania D.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    That I -- like I said, I cannot confirm that it's her.

MS. SHEVLIN:  Form, assumes facts not in evidence.

BY MR. ROBERTS:

Q    You testified earlier that you believe that that was Melania D.

MR. CARSON:  Object to form.

THE WITNESS:  That it appears to be her.

MS. SHEVLIN:  Join.

THE WITNESS:  But I can't confirm that this is

her.

BY MR. ROBERTS:

Q    Uh-huh.  Right.  Now you can't confirm that.

Do you see the problem?

A    No.  Because I stated --

MS. SHEVLIN:  Form.

THE WITNESS:  -- to begin with, I can't

confirm that this is her.

BY MR. ROBERTS:

Q    Yeah.

A    It appears to be her.

Q    See, it says no pubic hair development,

doesn't it, in that first paragraph?

A    No pubic hair development.

Q    Right.

But -- but the other images of Melania D.

shows that she clearly has pubic hair.

MR. CARSON:  Object to form.

THE WITNESS:  Yes.

MS. SHEVLIN:  Join.

THE WITNESS:  But how do I know when this

photo was taken?  So I can't confirm that it's her,

just like I can't confirm that these photos were

taken a month apart, the same day.  I can't

confirm.

BY MR. ROBERTS:

Q   Okay.  Did you recognize that indiscrepancy --
or that discrepancy when you first read these reports?

MR. CARSON:  Object to form.

THE WITNESS:  What discrepancy?

MS. SHEVLIN:  Form, assumes facts not in
evidence, lack of predicate.

BY MR. ROBERTS:

Q   That she had a different sexual maturity
rating as to Melania D. in the April 5th that begins
today, you provided me with two images.  Then she did,
in the April 5th report -- I previously -- that begins I
previously examined.  Did you -- did you recognize that
discrepancy?

MR. CARSON:  Object to form.

THE WITNESS:  I don't --

MS. SHEVLIN:  Same objections.

THE WITNESS:  -- understand where the
discrepancy -- because she's not saying that this
is the same female.  So that's what I'm saying.  I
felt as though this appears to be the same, but
Dr. Dully is not saying that this is the same exact
female.  So I can't say that that's a discrepancy
because --

BY MR. ROBERTS:

Q    Okay.

A    -- she didn't say that.

Q    But at the time --

A    Just my opinion.

Q    But at the time you read this, it was your opinion that it was the same female?

A    That it appears to be the same female.  I don't -- like I said, I don't know when this photograph was taken.

Q    Okay.  And I -- and I appreciate that you don't.  But when you saw these images and read this report, did -- did you realize that what Ms. -- that what Dr. Dully was saying, that this was a prepubertal Melania D.?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Did you make that connection in your mind?

MS. SHEVLIN:  Join.

THE WITNESS:  No.  Because she never said --

MR. ROBERTS:  Same objection.

THE WITNESS:  -- that this was the same female.

BY MR. ROBERTS:

Q    I know she didn't.

A    Yeah.  So I can't make that connection that this is the same female.  I can say, hey, this appears to be, but I don't know because I don't know when these photographs were taken.  And I also can't confirm that this is the same female.  I'm just going based off this side and it said it appears to be the same person.

Q    Right.

And I know that she didn't tell you it was the same.  But at the time you read this report, it was your understanding, your belief that it was the same person?

A    No.  I said that it appears to be the same person, but I do not know that it is the same person.  So I can't say, yes, this is the same person.  It appears to be.

Q    So it appears to be, but you didn't believe it?

A    What?

Q    You're making a distinction between it appeared to be --

A    Yes.

Q    -- and you believed it to be.  Is that what you're doing?

A    No.  What I'm saying is that this appears to be the same person.

Q    Right.

A    But I'm not saying for a fact this is the same person. That's like if you have somebody that looks like you but it is not you, I'm not going to say, hey, that was, you know, attorney Roberts. I could say, hey, he appeared to be or he looked similar to that person, but I'm not going to say for a fact that that is that person.

Q    Okay. All right. So do you -- as we sit here today, do you think that that's the same model?

A    Like I previously stated, it appears to be, but I can't say for certain if it is or isn't.

Q    If it was, would it be, like, a problem to you that in this April 5th report, there is this discrepancy in the age description by Dr. Dully?

MR. CARSON:  Object to form.

THE WITNESS:  No, sir.

MS. SHEVLIN:  Form, assumes facts not in evidence, mischaracterizes her prior testimony, and lack of predicate.

BY MR. ROBERTS:

Q    So in -- in the Exhibit C, 8C, you agree that Dr. Dully rendered an opinion that gave an age range of 12 to 15?

A    Yes. Based off this photo, yes, sir.

Q    Correct?

A    Uh-huh.

Q    And then based on this photograph, which was 8A, she said less than 9 to 13 years old.

A    Yes, based off that photograph.

Q    Okay.  And you think that -- this is your testimony -- it appears that this is the same model.

A    Uh-huh.

Q    And is it your testimony that --

A    Yes.  Sorry.  I said uh-huh.

Q    Yes.

On the right-hand side, this appears to be a less than 19 -- 9- to 13-year-old version of Melania D., and on the left, this appears to be a 12- to 15-year-old version of Melania D.?

MR. CARSON:  Object to form.

MS. SHEVLIN:  Form.

THE WITNESS:  Like I said, I don't know if this is the same person, so I can't say that that's a younger version of her because I do not know if that is her.  And I do not want to say for a fact this is a younger version of her because I don't know who it is.

BY MR. ROBERTS:

Q    Does it appear to be a -- a younger version of her?

A    I don't know if it would be --

MS. SHEVLIN:  Asked and answered.

THE WITNESS:  -- a younger version of her.

BY MR. ROBERTS:

Q    You said it appears to be the same model.

A    Yes.

Q    I'm asking you, does it appear to be a younger
version of the model depicted in 8C?

MR. CARSON:  Object to form.

THE WITNESS:  And what I'm saying is --

MS. SHEVLIN:  Join.

THE WITNESS:  -- I can't say that because
that's a hypothetical.  I don't know if it appears
to be a younger version of her.

BY MR. ROBERTS:

Q    I'm -- I'm not playing semantics with you,
Detective.  You testified that they appear to be the
same person.

A    Yes, sir.

Q    All right.  I'm not asking you if you verified
through DNA or physical passport or fingerprints.  I'm
not asking you that.  I'm asking you, having testified
under oath that these appear to be the same model --

A    Uh-huh.

Q    -- does the model depicted in 8A appear to be

a younger version of the model depicted in 8C?

A    Like I said --

MS. SHEVLIN:  Asked and answered, form.

THE WITNESS:  -- I can't say because I don't know if this is a younger version of her.  Like, I can't give you an answer that I don't have, unfortunately.  Like, I don't know how to reword it.

BY MR. ROBERTS:

Q    Well, I mean, this case is entirely based -- not entirely based.  I don't want to be hyperbolic.  It is based, in a large part, on your determination of how old people look; correct?

A    Uh-huh.

Q    Is your testimony that although these models appear to be the same, you cannot look at them and say one is younger than the other one?

MR. CARSON:  Object to form.

THE WITNESS:  Like I said, I'm not a doctor.

MS. SHEVLIN:  Join.

THE WITNESS:  So I can't sit there and say, yes, she looks like she's 9 and she looks like she's 15 because I'm not certified to speak on that.

BY MR. ROBERTS:

Q    But just as a human being, as a person that walks around in the world -- and you're not a doctor, but you make determinations in your job:  This person's a minor; this person's not a minor.  I'm asking you, does the model, which you think appears to be Melania D., depicted in 8A, does she appear to be a younger version of the model, Melania D., that is depicted in 8C?

MR. CARSON:  Object to form.

THE WITNESS:  And like I stated --

MS. SHEVLIN:  Join, asked and answered several times.

THE WITNESS:  Like, I don't know how to restate that any further than I already have.  Every person is different, so I can't say that this person looks younger than that nine range.  I cannot say that.

BY MR. ROBERTS:

Q    But you can say with a -- that it's obviously less than 18?

A    Yes.

Q    But you can't tell whether or not this is a model that's less than 9 to 13 and this is 12 to 15?

A    Because I can't say a specific age.  No, I

will not attest to that.

Q    I'm just asking your opinion.  That doesn't seem to be younger than this one?

A    Like I said, I don't know.

Q    When you got this report, did you realize that she was talking about Melania D. or who appeared to be Melania D.?

MR. CARSON:  Object to form.

THE WITNESS:  What do you mean?

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    Did you realize that the file that she was describing was what you believed to be Melania D.?

A    You're saying the file that I gave her --

Q    Yeah.

A    -- that I said appears to be --

Q    Melania D.?

A    -- the same female?

Q    Yes.

When you read this report, did you look at it and say, oh, she's talking about the other picture of Melania D.?

MR. CARSON:  Object to form.

THE WITNESS:  I'm very confused by this question.  What do you mean?  I'm just very

confused by the question.

BY MR. ROBERTS:

Q    Is that the reason you didn't charge this image was because this didn't make any sense?

A    No.  That is not the reason.  That's not a reason to not charge for an image.

Q    Did it make sense to you that Dr. Dully had aged the model in 8C to be a Grade 3 or 4 and the model in 8A a Grade 1?

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Did that make sense to you?

MS. SHEVLIN:  Form.  Form, beyond the scope.

THE WITNESS:  She's looking at two totally different photographs, like you said, two totally different photographs, two totally different backgrounds.  I can't speak for her opinion on why she did that, but obviously, it is not the same photograph.

BY MR. ROBERTS:

Q    But it doesn't appear to be the same model at approximately the same age?

MR. CARSON:  Object to form.

THE WITNESS:  I can't speak for Dr. Dully.

BY MR. ROBERTS:

Q    I'm asking you.

MS. SHEVLIN:  Asked and answered, form.

BY MR. ROBERTS:

Q    I'm asking you.

A    Like I said, to me, it appears to be the same person at the same time.  I can't say that.

Q    But at -- around the same age; right?

MR. CARSON:  Object to form.

THE WITNESS:  That I can't say.

BY MR. ROBERTS:

Q    You can't say?

MS. SHEVLIN:  Join.

BY MR. ROBERTS:

Q    You have no opinion on whether or not these appear to be roughly at the same age?

A    No.  Because I do not know when the photograph was taken.

Q    I'm not asking you when the photograph was taken.  I'm asking you -- you make determinations on how old people are by looking at them all the time without knowing when the photograph was taken; correct?

MR. CARSON:  Object to form.

THE WITNESS:  I'm sorry.  What was your question?

BY MR. ROBERTS:

Q    You make determinations on how old, if someone's an adult or a minor, all the time without knowing when the photograph was taken.

MR. CARSON:  Object to form.

BY MR. ROBERTS:

Q    Correct?

A    I make the determination that they are under the age of 18.  A specific age, I cannot determine that.

Q    And what I'm asking you is do you have the ability -- and you can say no, I guess -- to look at these two images and say -- I'll just ask you the question, rather, this way:  Do these models not appear to be the same model at approximately the same age?

A    Like I said, I --

MS. SHEVLIN:  Form, asked and answered.

THE WITNESS -- cannot say that.

BY MR. ROBERTS:

Q    You have no opinion as we sit here today?

A    I cannot say that these appear to be at the same age or around about the same age.  I can't say that because I don't know.

Q    Do -- do they appear to be different ages to you?

A    I don't know because I don't know who this is.

I don't know if this is Melania.  I don't know if this is also Melania.  I don't know.  So I can't sit there and tell you, like, yeah, they appear to be two years apart.  I, unfortunately, cannot say that.

Q    You can't say that they appear to be roughly the same age?

MS. SHEVLIN:  Asked and answered.

THE WITNESS:  No.

MR. ROBERTS:  Okay.  All right.  No further questions.

MR. CARSON:  Amy, you good?

MS. SHEVLIN:  I am good.  Thank you.

MR. CARSON:  All right.  I have no questions.

She'll read if it's ordered, through me.

THE VIDEOGRAPHER:  This concludes the videotaped deposition of Mikayla Preston on March 13th, 2025.  We are going off the record at 6:37 p.m.

(Witness excused.)

(Deposition concluded at 6:38 p.m.)

- - -

CERTIFICATE OF OATH


STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

         I, Nicole Medlock, Registered Professional

Reporter, Notary Public, State of Florida, certify that

**MIKAYLA PRESTON** personally appeared before me on

March 13, 2025, and was sworn.

         Signed this 4th day of April, 2025.




         /s/ Nicole Medlock_____
         Nicole Medlock, RPR and FPR-C
         Notary Public, State of Florida
         My Commission No. HH 285922
         Expires:  July 24, 2026








                        Personally known _____
          OR Produced Identification _____X_____
     Type of Identification Produced Driver's License

C E R T I F I C A T E

STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

I, Nicole Medlock, Registered Professional Reporter, certify that I was authorized and did stenographically report the deposition of **MIKAYLA PRESTON**; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Signed this 4th day of April, 2025.


/s/ Nicole Medlock_____
Nicole Medlock, RPR and FPR-C

                    E R R A T A   S H E E T

WILLIAM LEE LAWSHE, an individual,
        v.
MIKAYLA PRESTON, in her individual capacity as a
detective for St. Johns County Sheriff's Office, and
KATHLEEN DULLY, in her individual capacity as medical
director of the UF Child Protection Team
Case No.:  3:24-cv-44-MMH-MCR
Depo taken:  03/13/2025
_____
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES BELOW

PAGE     LINE    CHANGE                REASON
_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

"Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true."
_____        _____
Date                     MIKAYLA PRESTON