UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM LEE LAWSHE,

       Plaintiff,

vs.                              CASE NO.: 3:24-cv-00044-MMH-MCR

MIKAYLA PRESTON, in her
individual capacity as a detective for
St. Johns County Sheriff's Office,
and KATHLEEN DULLY, in her individual capacity
as medical director of the UF Child Protection Team,

       Defendants.
_____/

DEPOSITION OF DR. SCOTT KRUGMAN

Taken on Behalf of Defendant

DATE TAKEN:    July 16, 2025
TIME:          8:04 a.m. - 9:30 a.m.
PLACE:         Zoom

Examination of the witness taken before:

CLARA C. ROTRUCK, Court Reporter
For the Record Reporting, Inc.
1500 Mahan Drive - Suite 140
Tallahassee, Florida 32308

FOR THE RECORD REPORTING, INC. 850.222.5491

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:
Michael K. Roberts, Esquire
Law Offices of Nooney, Roberts, Hewett, and Nowicki
1680 Emerson Street
Jacksonville, FL 32207
904-398-1992
mroberts@nrhnlaw.com


On behalf of the Defendant Kathleen Dully:

JOHN ALEXANDER WILSON, ESQ.
Howell, Buchan, & Strong
2898 Mahan Drive, Suite 6
Tallahassee, FL 32308-5462
850-877-7776
johnwilson@jsh-pa.com


On behalf of the Defendant Mikayla Preston:

MATTHEW J. CARSON, ESQ.
Sniffen & Spellman, P.A.
123 N. Monroe Street
Tallahassee, FL 32301
850-205-1996
mcarson@sniffenlaw.com

INDEX TO WITNESS

WITNESS                                                      PAGE
DR. SCOTT KRUGMAN
          Examination by Mr. Wilson               04

          Examination by Mr. Carson               41

          Examination by Mr. Roberts              48

          Further Examination by Mr. Wilson       57


                         * * *

Certificate of Reporter                           60
Read and Sign Letter                              61
Errata Sheet                                      62


                         * * *

DEPOSITION

Whereupon,

DR. SCOTT KRUGMAN

was called as a witness, having been first duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WILSON:

Q    Good morning, Dr. Krugman.  My name is John Wilson.  I represent Dr. Dully in this case.

Have you had your deposition taken before?

A    I have.

Q    Well, this will be undoubtedly just like the others.  I'm going to ask you some questions.  The court reporter will be taking down all of your answers.  So it's important to answer questions audibly, not with head nods or "uh-huhs" and "huh-uhs" because those are very hard to transcribe.

If you don't understand the question I've asked you, I'm happy to rephrase it until we get on the same page.

And if you don't know the answer to a question -- we're not here to have you guess -- just let me know you don't know and we'll move on to other topics.

And I don't want anyone to be uncomfortable while we're doing this process. So if you or anyone else needs a break, please just let me know. We'll stop questioning for a minute, go off the record, and then come back on when everyone's ready.

Dr. Krugman, can you state your full name for the record for me?

A    Scott Daniel Krugman.

Q    Sorry.

A    (Inaudible).

Q    Can you tell me how -- no, you don't need to spell it. We got your ID upfront. I'm sure the court reporter took it down.

Can you tell me how you're employed?

A    I am employed by the Sinai Hospital of Baltimore in Baltimore, Maryland.

Q    And how long have you been working there?

A    I have been at Sinai since 2018.

Q    All right. And are you licensed as a physician?

A    I am.

Q    In what states?

A    Maryland.

Q    Just Maryland?

A    Just Maryland.

FOR THE RECORD REPORTING, INC. 850.222.5491

Q   All right.  Have you ever had any discipline or public complaints against your medical license?

A   I have not.

Q   Okay.  And I got your CV.  I can tell you're very credentialed, but what I couldn't tell is how much time you're spending in clinical practice these days, what kind of patients are you seeing?

A   Yeah.  So for the past year and a half, I have primarily been doing outpatient general pediatrics one to one and a half days a week in clinic.  Additionally, I do child abuse consults whenever they come up for the hospital.

Q   And when is the last time in your career you really considered yourself full-time clinical medicine?

A   I'm not sure I was ever full-time because I was always about 50 to 60 percent clinical, even right after residency in a faculty position.  So, I mean, it was a full-time job, but with teaching and administrative work, I've always -- I had always been 50 to 60 percent until this past year and a half.

Q   And has that always been pediatrics?

A   Correct.

Q   And when we noticed you for a deposition, we attached a little Schedule A to that and asked you to bring some stuff with you.  I talked to Mr. Roberts

FOR THE RECORD REPORTING, INC. 850.222.5491

about that, and what we got back is a single journal article by the name of "The Difficult Issue of Age Assessment on Pedopornographic Material," we got your list of cases that you've participated in, I think we've got your CV and your fee schedule and your expert report, along with Dr. Dully's three reports, which are short one-pagers in the form of letters, and then Dr. Dully's depositions, her two-part deposition.

Did you rely on any other materials in the preparation of your report?

A    I didn't rely on any, but I did bring up a couple of the references in the article.  So I have two other articles that I've looked at that I can forward to you that are very similar.

Q    All right.  Yes, I would like copies of those, and we can talk about those articles a little bit later on in the depo.

You mentioned in your report emails from some Listserv discussion.  Do you have copies of those available?

A    No, I did not make copies of the emails because that violates Listserv policy.  I reviewed them. I didn't make copies.

Q    Talking about them doesn't violate Listserv policy?  What is the Listserv policy then?

FOR THE RECORD REPORTING, INC. 850.222.5491

A   My impression of the Listserv policy is that we are not to take emails and provide them to outside sources.

Q   Isn't that kind of functionally what you've done by paraphrasing it into an expert opinion?

A   Maybe.  I don't know.  I guess I might find out if somebody reports me to the Listserv that I've highlighted and that is determined to be such.

Q   All right.  Well, we'll talk about the Listserv and the contents based on your memory a little bit later.

So has anything you have reviewed since you authored your original report changed your opinions in this case?

A   No.

Q   Okay.  Have you developed any new opinions in the case based on your review of new materials?

A   No.

Q   So what we've got written in your report, the Paragraphs A through K, that's the sum of your opinions on this case?

A   Correct.

Q   Have you reviewed any images in preparation of this case?

A   I have not.

Q    Okay.  So you're well aware that this is a case about the review of some child sexual abuse material and you have not looked at those images?

A    Correct.

Q    All right.  Tell me about your board certifications.

A    Originally board certified in general pediatrics in 1999, and then I was board certified in child abuse pediatrics in 2012 and I've been recertified ever since then.

Q    And in -- especially in child abuse pediatrics, is sexual exploitation of children covered in that curriculum?

A    It is.

Q    And is production and dissemination of child pornography covered in that curriculum?

A    Not in the sense of -- like as a part of sexual exploitation, but not like the details of how pornography is done, and it's not a major part of it, let's put it that way.

Q    Sure.  Sure.  I don't mean that you get a seminar on the porn industry itself, but handling victims of the system, is that discussed?

A    Yes, it is.

Q    Okay.  And is it commonly understood in your

FOR THE RECORD REPORTING, INC. 850.222.5491

9

field that cases involving children who are -- are brought in unlawfully to the pornography industry, is that considered in your field to be child abuse?

A    Yes.

Q    And because of this Listserv discussion, I assume you know something about Dr. Dully prior to being involved in this case.  Have you ever spoken to her before?

A    We've been at conferences together, and I know -- I think I might be able to -- like if I had a room and saw her, I might be able to recognize her, but I don't know her well or don't know her -- I just know she is one of the child abuse pediatricians in the Florida system.

Q    Okay.  And prior to reviewing this case and looking at this materials, were you familiar with her name?

A    Yes.

Q    You would have seen it on the Listserv probably?

A    Yeah, and at conferences.

Q    And at conferences?  Okay.  And she has the same board certification as you do, correct?

A    Correct.

Q    So she would receive largely the same training

FOR THE RECORD REPORTING, INC. 850.222.5491

through that curriculum and be aware of the same standards for that board certification?

A    Yes, absolutely.

MR. ROBERTS:  Yeah.  I'm going to object to that question, but yeah.

BY MR. WILSON:

Q    So let's talk a little bit about this Listserv and the conversation.  What is the purpose of this Listserv that you all are on together?

A    It's to have peer discussion and evaluation of -- like for those of us -- it's all child abuse pediatricians, and if you have a case that's complicated or want to throw a question about -- let's call it like a procedural thing or how do you relate with that or -- it's a wide range of things.

Additionally, a lot of articles come through. Somebody often puts in a new article that come out.  And then there's some professional discussions about expert witnesses, have you worked with this one and how they testified.  So it's pretty wide-ranging.

Q    So is it fair to say it's just a general peer support, Listserv?

A    That's a much more succinct way of describing it.  Thank you.

Q    And in your discussions in that Listserv, do

FOR THE RECORD REPORTING, INC. 850.222.5491

they carry any weight with the specialty board or the state boards?

A    No.

Q    And do you set actual medical policies within that Listserv that you all then follow?

A    No.

Q    Do you debate appropriate standards of care?

A    Typically not.  I mean, people might express different opinions about things, but I'm not sure that's the -- that's not the location where standard of care is determined.  That's more of an American Academy of Pediatrics/American Board of Pediatrics function.

Q    Okay.  And as far as your comments on this case, can you tell me how this subject came up and who participated in the discussion?

A    On the Listserv or --

Q    On the Listserv.

A    It did not come up on this list.  When I was asked about this case, I remembered that there had been discussions on the Listserv about making judgments about pornographic pictures with one -- if you have just the genitals or just the breasts or with one image.  That's where it came up, and there was discussion around that. And so I remembered that there was discussion around that and people were uncomfortable doing that, and

FOR THE RECORD REPORTING, INC. 850.222.5491

that's -- that was it.

Q    And do you remember who those people were?

A    The ones who posted about it?

Q    Both.

A    I think it was somebody from Vermont, there was a colleague of mine from Maryland who commented, and I think that's -- I don't remember who else -- if there were other replies around it.

Q    Did Dr. Dully reply?

A    No.

Q    About how many emails per week does this Listserv generate?

A    Five to 10.

Q    Do you have any way of knowing if Dr. Dully even read those specific emails that week?

A    I do not.

Q    Okay.  And when this was brought up on the Listserv, it was as the result of a practice question, not as a result of reviewing any scholarly articles?

A    Correct.

Q    And how long did the discussion go back and forth before it sort of died out and other people took the floor?

A    I think it was probably like three or four emails.  It wasn't a lot.

FOR THE RECORD REPORTING, INC. 850.222.5491

Q    Over a period of just a day?

A    Couple days, yeah.  A day or two.

Q    A few days?

A    Yeah.

Q    Okay.  Was any consensus reached as the thread kind of closed down?

A    I mean, I guess each person who read the thread probably could have their own take on it, but my feeling from that was there was a lot of reticence to use one image to make a conclusion.

Q    You do forensic work as part of your medical practice, correct?

A    I do child abuse pediatrics, which includes interfacing with the legal system regularly, yes.

Q    Are you regularly working with law enforcement on investigations in your current role?

A    I'd say in my current role, intermittently, not regularly.

Q    How often in the course of a year would you say "intermittent" is for you right now?

A    I probably am producing reports on abused kids like six to eight times a year.

Q    Okay.  And how do those cases come to you?  Is there a process?

A    Most of them are children who've come through

our hospital who were injured, but a couple are -- I'm being reached out to from either state's attorney's office or law enforcement about a case because they had questions and need an expert to opine.

Q    And this is before charges are filed, or do you have the benefit of that information?

A    It depends on the case.  So some of them are well after charges have been filed, that's a court prep. Other times it's while the investigation is going on and I've done a consult and I need to interface with them and have multidisciplinary meetings to discuss what the next steps are and things like that.  So it runs the gamut.

Q    Okay.  And when you're doing these consults, be it for law enforcement or the state attorney's office, you're employing all of your medical knowledge and training, right?

A    Correct.

Q    And you're using the medical science that's available to you to guide their investigation?

A    I'm not sure I'm guiding their investigation, but providing input and insight as to, you know, what else needs to be done or taking -- as they do their scene investigation, putting that into -- it's like a -- it's a two-way street.  I don't think "guiding the

investigation" is the right term, though.

Q    Okay.

A    I think we're saying the right -- same thing.

Q    Yeah.  And by virtue of what you just explained to me, you don't consider when you offer a medical opinion on a forensic case, that that's authoritative and controlling for the rest of the investigation and the prosecution, do you?

A    I would hope not.  It should not be.

Q    You would expect law enforcement to do more work on the case than just talk to you?

A    Correct.  Yes.

Q    And as you're working with them, you're operating under the standards that are set by your specialty board and your regular licensure board; is that correct as well?

A    Correct.  Yes.

Q    You mentioned in your report some standards that the child abuse pediatric certification require of you.  Can you just flesh that out for me?  What does that specialty set as your standard of practice when you're doing work like this?

A    I think the key to the -- and I'm trying to think if the right standards are the board *per se*.  The -- our goal as child abuse pediatricians is to provide a

fair and unbiased evaluation of whatever situation comes in front of us and that it's important to make sure that we are -- you know, have honesty, integrity, try to be as unbiased as humanly possible, and state the limitations of any opinion, if there are limitations, and not sort of oversell and try to push an agenda, if that makes sense.

Q    Sure.  And is that your professional ethical standard of what you're doing, or is that adopted somewhere as a standard?

A    There are -- our child abuse society, the Helfer Society, I believe has some guidance around this. I couldn't pull off like off the top of my head which -- whether it's a policy or if it's just a standard operating procedure at times like that or if that's mine.  But I think it's discussed pretty regularly in our group about -- especially in this time, in this day and age where there's quite a bit of backlash against child abuse pediatricians, that we have to do what we can to uphold those things, but I don't think it's written in, like, the board certification guidance of what to do.  You know what I'm saying?  But I do think there are some -- there is some guidance around that. At least that's how I've been trained to do things.

Q    Okay.  Tell me -- I'm not in the child abuse

pediatric circle very often.  Tell me about this backlash that you're perceiving.

A    So there's a -- are you in Florida?

Q    Yes.

A    Okay.  So the case against All Children's Johns Hopkins about kidnapping Maya and the Netflix series really put the whole system in light of, you know, the doctors are there to take your kid away from you, and that's gained a bit of traction and there's quite a few lawsuits now against child abuse pediatricians, and it's been challenging.

Q    And you're aware that this case is a lawsuit against a child abuse pediatrician?

A    I am.

Q    Have you ever done a law enforcement review of child sex abuse material like the basis of this case?

A    I -- probably about 15 years ago I had -- when I worked much more close -- in my prior role, I was the director of the Franklin Square Child Protection Team, which was the acute sex abuse center for Baltimore County from 2000 to 2018.  So in that time period when I was doing a lot more sex abuse cases and working closely with law enforcement, there were intermittent times when they'd bring pictures for me to review, yes.

Q    And walk me through how you went about

FOR THE RECORD REPORTING, INC. 850.222.5491

18

evaluating those images.

A    So I think it was probably pretty similar to how Dr. Dully described how the police approached her. They said, "We have these images, we want to show you to them and we need your opinion as to whether or not this was a child or not."

Q    And how do you go about answering that question?

A    Well, I'd look at the images and try to determine the sexual maturity range and let them know if I could say one way or another if it was a child or not a child.  And I think all the ones they showed me, there wasn't a single one that I said I could be certain was a child because I don't remember ever writing a report to say -- because if they did that, I would have had to write a report and stuff, and I don't ever recall writing a report on a case like this.

Q    So during that period where you were a CPT doc, every time law enforcement brought photos for you to review for an age determination case, they walked away with no report?

A    I don't think it was that many times.  So it was probably like three or four times, but I do not recall ever writing a report.  I might be -- I could be missing or not remembering one, but I don't remember

ever having said, "This one definitely is a child."

Q    Okay.  And when you have a situation like that when you're reviewing images, from the perspective of a medical doctor, is it functionally any different than reading diagnostic images for a patient in another context?

MR. ROBERTS:  I'm just going to object to the form of the question.

THE WITNESS:  Can you -- I'm not sure I understand the question completely.

BY MR. WILSON:

Q    Yeah, I'm happy to flesh it out for you.

So in these child porn cases, police come to you with an image and want a medical determination about what that image means.  And there are other contexts where physicians take in images, whether it be a radiograph or some still pictures of a rash or something, where they're asked, "Hey, what's going on in this picture?  Can you give me a medical determination?"

My question is, given that doctors review images and make medical determinations, is there something grossly dissimilar about that process in the child pornography age review than any other medical setting?

MR. ROBERTS:  I'm going to object, but you can

FOR THE RECORD REPORTING, INC. 850.222.5491

20

answer.

THE WITNESS:  I would say that in the general sense, you're correct, right.  So whether I have a child with -- they're showing me bruises or determine -- age determination or here's an x-ray with fractures, it's the same approach.

I think the second layer of that is how you're able to and the scientific backing of your conclusion, and I think when you're dealing with, like, images of bruises, it can be challenging because the camera can distort it a little bit or might look darker than it is in real life.  So you have to be cautious and -- I'm not sure "couched" is the right term, but you have to be like "To the degree to which what I've seen, this is what the answer is."

With age determination based on sexual maturity rating, again, if the child is, like, sexual maturity 3 or under, I'm very confident and I'm happy to put this child is under 18.  The problem is when they're 4 or 5, you could be that at age 9, you could be that at age 15, you could be at that age 25, and you can't really just go based on those -- the maturity rating alone.

So it's a bit nuanced, but in general, yeah,

it's -- like it's the same approach.

BY MR. WILSON:

Q    And do you do much telehealth?

A    I do a fair amount, yeah.

Q    So, obviously, telehealth has exploded in the last decade, but that prevents a challenge for doctors in that they don't have the patient in the room with them to do the live exam.  It's synchronous or asynchronous video, but it's still practicing medicine based on a digital image consult at the end.  Is that your understanding?

A    Yes.

Q    And as you highlight in your report, and, of course, we're all aware, any digital images and video at the point of our technological savvy in society now can be altered?

A    Yes.

Q    And I think you say directly in your report that there's no medical training that can reliably allow you to determine when and how a digital image or video has been altered?

A    Correct.

Q    So knowing that, that any image could be altered and there's no way for you to know if it's been altered, speaking from a medical science perspective,

you still in your day-to-day practice rely on images; is that correct?

A    I mean, not day-to-day, but we rely on them -- yes, correct.

Q    When the situation calls for it --

A    When the situation calls for it, yeah.

Q    -- and you're looking at bruising?

A    Correct.

Q    And when you're doing those image and video reviews, that's standard medical practice?

A    Yes.

Q    And you're operating under established standards of care?

A    Yes.

Q    And those standards of care apply -- do they apply the same for a photograph in a patient that's in your office?

A    Yes.

Q    And does it change any quality of the actual medical services you're providing that one case of bruising is based on a photograph and another case, you have a patient in your office to evaluate physically?

A    I mean, it can, right?  It might not be as accurate with a video.  So I think that's where the -- highlighting the limitations of the technology and of

FOR THE RECORD REPORTING, INC. 850.222.5491

23

what your opinion is based on is super important.

Q    Sure.  And I've read some medical records, maybe not full-time medical record reviewer, but I can't remember a time -- let's say I saw a radiologist consult looking at an x-ray where they wrote in, "The limitation of this image might be digitally altered."  Is that something that's in the mind of physicians as they're doing casework?

A    So, again --

MR. ROBERTS:  I'm going to object to the question.

THE WITNESS:  -- if you are a radiologist, you have set up the system with whoever's taking the x-ray to not have it -- like there's quality control there, right?

So when -- I'll give an example.  If I have a child who Mom's like, "I can't bring the kid in, I need to do telehealth, they have a rash," I'm putting in my report "To the best of -- it looks like this, but I can't be certain."  And I'm going to tell Mom, "If this doesn't work, you need to come in because it can be very hard to tell through a digital image exactly what is going on."

So I think there's a big difference between -- you know, there's a lot of degrees of this, and the

farther away -- like if I'm having a telehealth or a mom's taking a picture and sending an image, you know, sometimes I can see, sometimes like I can't see, you got to come in, which is still me having a direct relationship with the patient and knowing where the image is coming from, but a lot of these -- and if we take this to the child sexual abuse material type stuff, the CSAM material, you don't know where that image is going, you don't know how many times -- who -- I think the risk for manipulation, altering, and things like that is much greater than me having a conversation with Mom on Zoom, right, or Mom taking -- so I think there's a lot of different degrees of this.  So I -- but in general, yes, you're correct, but the presumption isn't that parents who are taking pictures of rashes or bruises or radiology techs who are doing images aren't manipulating pictures for a purpose. So that's why they're not putting those things in there, if that makes sense.

BY MR. WILSON:

Q    So let's sort of get back to the way you would review child sexual abuse material.  You said SMR-3 is an easy case for you?

A    Correct.

FOR THE RECORD REPORTING, INC. 850.222.5491

25

Q    Tell me as a layperson what it means to pass that barrier -- what you're clinically observing that makes a case -- a SMR-3 transition into an unclear area?

A    Well, there's nothing -- so when you're evaluating breast and pubic hair -- we're going to go with -- let's go with girls because those are more common victims.  The breast development at 3 is there's no -- it would be a rare genetic, weird medical situation where somebody over the 18 had breast developments of 3.  Theoretically, it could happen, but it's super, super uncommon, right?  Whereas it's more likely for younger kids, because kids are going through puberty earlier, to have Breast Development 3.  So I can be very confident that at Development 3, it's a child under 18.

If it's 4, it's pretty likely -- it's more likely than not that they're under 18, but not necessarily.  Especially if you just have breasts, there's plenty of 30-year-olds with -- women with Tanner 4 breasts or Stage 4 breasts.

When -- what's important, I think, is the whole picture, like making sure you're able to see completely both at the same time, because when you only have one, you don't know what -- it can make it -- again, if the image has been altered, it could look like

FOR THE RECORD REPORTING, INC. 850.222.5491

26

Tanner -- like Stage 1 genitals, and if it's not Stage 1 or 2 of breast development, there's a big disconnect there, something's up.  So it makes it hard.  So you need good images, you need to have the ability to see -- Again, if you have facial features as well, that can help, but, again, I'm not an expert on saying, "That is a face of a 9-year-old, and that's a" -- I don't think there's -- I don't think there's good scientific evidence to state that a certain appearance of somebody's face is a certain age.  That gets more into just hocus-pocus type stuff.

Q    So it's still within the standard of care when you're evaluating the age of a patient in any context to go through the criteria in SMR or Tanner scales in evaluating?  That's still standard of care, right?

A    Yes.  Yes.  It's still -- it's a helpful piece of information, absolutely.

Q    Okay.  But in some cases, it just can't be conclusive?

A    Correct.  And we have to remember two things: One is that Tanner scales were designed for going forward, right, and to make sure kids were making progress.  They weren't designed to go backwards and assign an age to them.

And the second part is the certainty of that

age range.  Like for me to see a Tanner 2, I can't tell you if they're 2, 4, 6, 8, 10, 12.  Like you can't really give an age, if that makes sense.  I think making age range, I think that's why it's like under 18 or -- that would be how I would put it because you just cannot assign an age to -- by an image.  It just doesn't work.

Q    Is that the prevailing opinion in the child abuse pediatrics community?

A    I think that a lot of people feel that way, but there are probably others who feel like they have the ability to be a little more precise, but I'm not sure there's good scientific evidence around that, or at least if there is, I haven't seen it.  If you have it, please share, but I've never seen anything very specific about that.  And when you have -- when you have women who are over 18 with Tanner 4, whatever percent it is, 10, 15, 20, 30, it makes using that very challenging as the -- to have certainty that they're under 18.

Q    So as I understand your answer, the problem, in your opinion, with Dr. Dully's work was not the clinical markers that she used, but, rather, her determination to assign an age range based on those markers?

A    Yes, and the discrepancy between the breast development and the genital development and that not

FOR THE RECORD REPORTING, INC. 850.222.5491

28

raising concerns about either the image being altered or the person being shaved or just because it's Genital 1, that is a child in -- you know, I think she put 9 to 13 or something like that.  I think that was a bit -- I think that was erroneous.  I just -- to be able to have that discrepancy, it just doesn't make any sense.

Q   Now, given that discrepancy, do you think Dr. Dully was below the standard of care for an age evaluation, or do you think Dr. Dully is just being too dogmatic?

MR. ROBERTS:  I'm going to object to that question.

THE WITNESS:  I can't say what -- I think that writing a report that is saying that this child is for sure under 18 when there's uncertainty is -- it's problematic because -- because it has consequences, right?  If it was just in a medical chart, you know, and then a year later, it comes out that something's different, that's fine.  But when it's being used to go in front of a judge, that's where you have to be -- if you're going to be certain, you got to be certain, and I don't think the -- I don't think that there was enough scientific basis for her conclusion to have the certainty that was in her report.

BY MR. WILSON:

Q    Well, taking that, are you able to testify based on your review of the material that Dr. Dully provided deliberately false information?

A    No.

Q    Are you able to testify that she participated in some sort of conspiracy with law enforcement to achieve a specific result?

A    No.

Q    Are you able to testify that her report was anything more than negligently applying medical standards?

MR. ROBERTS:  I'm going to object to -- and I'm sorry I didn't object earlier to these questions about mental state and mental culpability and that kind of thing.  You can answer.

THE WITNESS:  I think that's what I would testify to, that last statement, the --

BY MR. WILSON:

Q    There's medical negligence?

A    Yeah.

Q    Okay.  And given that you believe medical negligence occurs, can you just state for me and articulate what you believe the bottom line standard of appropriate care for this review should have been?

FOR THE RECORD REPORTING, INC. 850.222.5491

A    At a minimum in her report, having a line about the potential uncertainty of the images being altered, the child -- or adult in this case -- being, you know, groomed, whether it's waxing, shaving, or whatever, to look like a younger child should have been mentioned.  And, additionally, I do think when there is such a discrepancy between genitals and breasts, you're probably better off not making the conclusion that there -- with certainty that this was a child and that this could be an adult.  And I think if there was hedging, if there -- I don't mean hedging.  If there was some sort of, you know, caveat to these conclusions, that these conclusions are based on what I saw, it just was too concrete and certain given the data that was presented.

Q    All right.  So we've talked a little bit about how you go about doing these evaluations and what the standards are in play.  In Paragraph D of your report, you mentioned that there's "published research that has shown chronological age estimation of models depicted in digital pornographic photographs by physicians is not medically or scientifically supported."  But you've also told me today at SMR-3, it's kind of a different story and you would be comfortable offering an opinion there.

Am I correctly understanding that there's maybe some more qualification to that Paragraph D than

FOR THE RECORD REPORTING, INC. 850.222.5491

31

you've given me?

A    Yeah, I think that probably should have been qualified with -- at SMR-4 or 5.  That's probably fair, yes.

Q    So once we're in SMR-4 or 5, it's your opinion all bets are off from a medical certainty standpoint?

A    I don't know if all bets are off, but the degree of certainty goes down substantially and there needs to be -- again, if -- you could come up with a lot of scenarios where, you know, they identify who the person is, they have a birth certificate and they have images, and then you're good, right?  Those probably aren't coming to the doctor, but they might come to the doctor early and say, "Well, it looks like a child, but I'm not a hundred percent sure.  Can you corroborate?" That's where it could be helpful, right?  But to have the image itself and be certain that it is a child, some people might feel comfortable doing that, but I think it's on shaky ground.  That's all I can say.

Q    Okay.  And let's take the image and photograph part out of the analysis for a minute.  If you have a patient come in and you need for clinical reasons to determine their age and you're doing an exam in person with them and they are SMR-4, does that change the reliability of a physician determining the age of that

patient to have them in person and be able to examine them?

A    I'm not sure where -- I mean, I don't think any of us have been trained to determine the age of a pers- -- like it's not -- I'm trying to think of a scenario -- like if someone came in as, like, a Jane Doe in a car crash and someone needs to know an age, you're still just going to be like guessing, right, based on height, weight, size, things like that.  But there is no scenario in which I can think of where I would be like, "Okay, that's a 12-year-old, that's a" -- I don't know if you can.  I mean, there are 12-year-olds out there who look like they're 18, and there's 18-year-olds out there who look like they're 12, and it's really hard. You can't just determine that.

Q    Yeah.  You'd need other information than what you'd get in a clinical patient exam; is that fair to say?

A    Yeah.

Q    And, obviously, because the needs of these kinds of cases is to determine that someone is under 18 to move forward with the prosecution for child pornography possession, promotion, or what have you, is everything we've talked about today on the limitations of aging an image or a patient, is it also true for a

determination that someone is over 18, could you confidently say an SMR-4 or 5 presentation photo was over the age of 18?

A    I don't think -- I mean, no, you can't.  It's -- it goes both ways, and that's the challenge, is that you can have 20-year-olds who can look very much like 12-year-olds -- I think, yes, I would agree with what you said.  It's challenging.

Q    So -- and I know you haven't even seen these pictures, but if you saw these pictures that are the subject of the discussions of this case, would it be medically possible for you to determine that they were over the age of 18?

A    With certainty?

Q    With the degree of medical certainty you expect from a physician doing this kind of review.

A    I would probably say I -- hypothetically, if they're right on that borderline, I would not be able to include one way or the other.  And I think that's probably what my usual response to police in these type of situations is, is "I can't help you."

Q    And that ultimately is the basis of your criticism for Dr. Dully, you believe she should have told them, "I can't help you in this case"?

A    Or "I'm not as" -- or couch the certainty --

FOR THE RECORD REPORTING, INC. 850.222.5491

34

yeah. I wouldn't be here if there were a couple lines of, "I'm not" -- you know, unless there's -- you know, if she couched it, there may have been grooming or something -- if she put those things in there, I wouldn't be here today.

Q   Gotcha. And you talked about, when we were talking about aging a patient, the possibility of collateral information like passports. Have you gone over the case to the extent that you know that there are passports as evidence related to these images that Dr. Dully reviewed?

A   I think that that was in one of the -- in her deposition, that there was mention of that, yes.

Q   Did you view any of those passports --

A   I did.

Q   -- or anything?

Okay. Would it change your opinion to see passports that showed that the images in question had passports showing they were over 18?

MR. ROBERTS:  Object to form.

THE WITNESS:  I mean, I think it would -- if they're over 18, I think it reinforces my opinion, but I don't think it would change it.

BY MR. WILSON:

Q   Would it change your opinion if they had

FOR THE RECORD REPORTING, INC. 850.222.5491

passports that showed they were clearly under 18?

A    Yeah, because then there would be corroborating evidence that they were under eight- -- I mean, again, I wouldn't be here if that was the case because there would have been -- there would have been a list of things to show that this was a child and her report would have been part of it, not it.  So I think that's the difference.

So I don't think it would change my opinion, but I think, again, it's -- that's where it's super important to have other data or evidence or timestamps or some- -- you know, something to ground the images into an actual timeframe that you can use.

Q    Gotcha.  Let's talk a little bit about the study you've provided that I've had a chance to review the difficult issue of age assessment (inaudible) pornographic material.

So in my lay reading, it looks like a panel of reviewers were given images that were all images of adults --

A    Correct.

Q    -- and asked to do an age determination?

A    Correct.

Q    So there was no possibility that --

A    They actually determined are they over or

FOR THE RECORD REPORTING, INC. 850.222.5491

36

under 18.  That was the (inaudible).

Q    Okay.  But there was no -- there was nothing in the panel of images they were showed that was actually under 18, they were all over 18?

A    Correct.

Q    And bringing in a group of pediatricians asking for an over/under age assessment where the only correct answer is over, does that seem to you like you might get a little bit of bias in your results on an exercise like that?

A    I don't -- would you get a bi- -- I mean, I think you could get biased either way like -- so if I'm being brought an image where I'm being told it's a child, then that's going to bias you to child.  If you're told nothing and they're all adults, I think if they said if -- a lot of it will depend on how the question was asked, like "We're doing a study on child sexual abuse materials," and then they bring only 18-year-olds, I would agree with you, yes, that would be biased.  But if they're asked, "Can you make a deter-" -- like it depends on the framing.  I don't know the framing of the question here, but I think the point of the matter is women over 18 can be confused for children under 18.  Whether it's 70 percent or if it's unbiased and asked a different way, it's 20 percent, I

think the point's the same, to be honest with you.  But, sure, they could have biased easily how they -- they could have said, "This is child sex abuse material," right, and then that would bias them to think that they're under 18, absolutely.

Q    And you're not sure exactly how the question was framed to them in this study?

A    No, I am not.

Q    Okay.  You mentioned you had some other studies.  Can you tell me about those?

A    They're very similar.  One was a systematic review of using these agents where they summarized all the literature.  And I can give you the citation.

Q    You know, for me, not being in the academic world, it might be easier if you could just give these to Mr. Roberts and he can send me a copy.

A    Yeah.  I think you might have this one, and I just -- it cited a paper from the U.S., so I reviewed that one, and that's in pediatrics, "Tanner 4 Breast Development in Adults:  Forensic Implications."

MR. WILSON:  Okay.  Yeah, if you could send those to Mr. Roberts, and Mr. Roberts, if you could send them over to us, we'd appreciate that.

THE WITNESS:  They pretty much say the same thing that adults can be Tanner 4.  That's...

BY MR. WILSON:

Q    Yeah.  And I guess to really simplify it, I don't think anyone's position is that you can obviously know an SMR-4 and 5 one way or the other.  It's hard, difficult work, and maybe it meets the level of scientific scrutiny, maybe it doesn't.  But there are easy child porn cases where they're SMR-3 and under, and there are difficult ones, and different people have different names for those cases, whether they're hard cases, age-difficult (inaudible) --

A    (Inaudible)?

Q    -- indeterminate.  Yeah.  These articles are just reinforcing that general principle that there's a sexual maturity where it is very difficult to determine an age?

A    You summed it up well again.  You're very good at this.  Thank you.

Q    Give me just a minute to take a look at my notes here, but I think I'm wrapping up.

(Brief pause.)

BY MR. WILSON:

Q    All right.  I don't want to belabor this because Dr. Dully was questioned on it at length and she agrees with you, there's no recognized medical method or expertise necessarily in determining whether a model is

shaved or groomed by looking at a digital photograph.

Again, as a matter of qualification, if you can see hair in the photograph, you can have some certainty about shaving; isn't that true?

A    True.  I think the point is if there's no pubic hair, you don't know if there was pubic hair. Like if you can't see pubic hair on the -- but if you see some, like there's a patch here and there's part there, then you know they were shaved, right?  So -- but -- and if they are shaved, then you know that they're at least Tanner 4 probably -- or SMR-4 because they're shaving and grooming certain areas.  So I think it just rules out that they're Tanner 1 if there's shaving going on, and 2 and 3, to be honest with you, because you're not shaving at any of those stages.

Q    Yeah.  And not saying it applies to any of the -- necessarily the photos in question here since you haven't had the opportunity to look at them, but with a sufficiently clear digital image, you could see bumps and follicles that would suggest that shaving occurred? Is that a feeling --

A    You might be able to, but, again, I -- they could be, you know, Photoshop, too, that they're gone.

Q    Yeah.

A    I think if it's there, yes, but in the

absence, you can't say it didn't happen, if that...

Q    Sure.  Yeah.  I just want to make sure we're in agreement that there can be --

A    Yes.

Q    -- medical markers of shaving or not shaving that can be seen on digital images?

A    Correct.  Yes, I agree with that.

Q    Okay.  It's just whether or not they're appropriately observed, characterized, and documented that's the substance of your criticism of Dr. Dully's work?

A    Yes.

MR. WILSON:  Okay.  All right.  Dr. Krugman, that's all the questions I have.

Matt, do you have questions?

MR. CARSON:  I've got just a couple for you, Dr. Krugman.

EXAMINATION

BY MR. CARSON:

Q    My name is Matt Carson.  I represent Detective Mikayla Preston, who is also a defendant in this action. I just wanted to ask a couple of clarification questions regarding your time where you would intermittently review pictures as part of your role as director of the child abuse team in Baltimore.

FOR THE RECORD REPORTING, INC. 850.222.5491

41

A    Yes.

Q    You said that was approximately 15 years ago?

A    At -- the timeframe when I was doing the primary sex abuse work was 2000 to 2018.  So I don't remember exactly when in that range, but I think it was in the 2010 to 2015 range when I was covering the Child Advocacy Center when I was asked about the images, yes.

Q    Okay.  So just trying to get a picture in my head.  So there was a five-year period, give or take, where you were asked to review pictures, kind of like Dr. Dully was asked to review pictures in this case?

A    Yes.

Q    Okay.  And in the past 10 years or so, you've not reviewed any pictures in that context?

A    Correct.

Q    Okay.  What pictures were you reviewing during that time?  Can you describe the photographs that you were asked to review?

A    I'm not sure I can even remember these.  Like I think they were images of naked women or girl -- I can't describe -- I do not have as good enough memory to remember exactly what I saw that long ago, sorry.

Q    I should have asked my question more artfully than that.  I presumed they were naked individuals or somehow sexually --

A    Yes.

Q    Here's what I meant to ask, and I'll try to ask more for you now:  Did someone come in with printed pictures?  Did someone come in with a computer?  How was it that you were shown these pictures?

A    I was at the Child Advocacy Center, so I'm pretty sure they showed me on a computer screen, if I remember correctly.

Q    Do you remember -- so you were never shown like a 5 by 7 --

A    No.

Q    -- photograph?

You know, I think we're all of the age that we remember a period of time where you would drop your roll of film off at Eckerd's, and two days later, you'd pick up photographs.  But even when you were doing this 10 years ago or so, it was all online or all digital?

A    It was all on a computer, yes.

Q    Do you have any recollection of seeing or learning information about how those images were obtained?

A    No, I did not -- I think it was more, "Can you say with certainty that this is a child, yes or no," and my answer was, "No, I cannot say with certainty," and -- but I did not -- I was not privy or didn't get the whole

this is the whole scoop and all that stuff.

Q    Was there anything on the photographs that you recall that showed whether or not they were downloaded from the internet?

A    I don't have any knowledge of that whatsoever.

Q    Was there any sort of watermark, digital timestamp, anything like that on the photographs that you recall?

A    I don't recall.

Q    And what kind of cases -- if you recall, what kind of cases was law enforcement working on where they would come to you and say, "Hey, could you give us an opinion about the age of the subject?"

A    I honestly don't recall whether -- if it was a -- something they found like on a perpetrator's computer or if it was a report from a national -- I don't recall. It could have been either or both.  I just don't remember.

Q    It didn't matter for purposes of the opinion you were asked to get?

A    It shouldn't, I don't think.

Q    So you don't know if the subject of the photograph was somebody who was in the Baltimore area or in the United States or elsewhere?

A    I have no recollection either way.

FOR THE RECORD REPORTING, INC. 850.222.5491

Q    And there was no way for you to know based on the information you were given in order to form your opinion?

A    Correct.

Q    You said this in passing, but I picked up on it.  You were talking about different ratings and looking at pictures and opining on the potential age of the subject, and you said, you know, "the child, comma, or adult in this case," and I was wondering -- and you're nodding now.  You remember saying that?

A    Yes.

Q    What makes you so certain that the subjects of the photographs that are at issue in this case are adults?

A    I guess I'm relying on what was presented in Dr. Dully's deposition that the images are of an adult that were taken off the internet and what Mr. Roberts has told me about that.  So that was -- my understanding for the factual base of the case was these were adult images that have been circulating around the internet for a long time.

Q    Okay.  And that's what I thought might have been the basis for your statement, but you don't have any factual knowledge such that you would give an opinion one way or the other as to the age of the

FOR THE RECORD REPORTING, INC. 850.222.5491

45

subjects of these photographs at the time the photographs --

A    I am not going to opine on the age of the subject of the photographs at all.

Q    Perfect.  Do you know what happened -- in the cases where you were asked to opine on the age of a subject in a photograph as a member of the child abuse team in Baltimore, do you remember what happened with those cases when you told law enforcement, "I can't help you"?

A    I did not hear any outcomes of those, no.

Q    Did you understand that whether or not you could give an opinion might dictate whether or not a prosecution moved forward?

A    Yeah.  I mean, I think in these type of situations when I'm asked for a report or anything, the assumption is that's going to be used to move forward as part of an evidence package for the judicial process. That's my assumption anytime I'm asked about these things.  So whether or not they went forward without me, I don't know.  It's...

Q    You were never able to give an opinion one way or the other, but during your time and your years of involvement in this area, do you know of situations where coworkers, other members of the child abuse team,

medical folks, medical doctors, did give opinions to law enforcement that they believed -- or that it was their opinion that the subject of a photograph was a child?

A    I honestly don't know.  I'm pretty sure that some of my colleagues have, but I can't say, "Dr. Chudow testified on this case," I just -- we never had those conversations, let's put it that way.

Q    Right.  And I guess my next question is, do you understand that when law enforcement comes to the medical doctors that are part of these teams, or at least as are part of the child abuse team in Baltimore, that they're coming to you because of the inherent difficulty in determining the age of the victim -- or of the subject of the photograph, I'm sorry?

A    Yes.

Q    In other words, you don't know of anybody coming to you with a picture of an obvious --

A    If it's a 5-year-old, I'm guessing they don't need a medical opinion to say it's a 5-year-old, right?

Q    That was my question.  You answered it better than I asked it.

MR. CARSON:  That's all I have for you, Doctor.  I appreciate your time.

THE WITNESS:  Thank you.

MR. ROBERTS:  Doctor, I have just a couple of

FOR THE RECORD REPORTING, INC. 850.222.5491

follow-ups just to kind of -- and it'll be mixing around a little bit.

EXAMINATION

BY MR. ROBERTS:

Q    But you were asked some questions about the use of imaging in general medical practice by Mr. Wilson.  Do you recall those questions?

A    Yes.

Q    I wanted to -- the question struck me and, you know, I do many types of law and also read medical records, and I see radiologist reports all the time that reference a motion artifact or an inability to read an MRI.  What is a motion artifact and why do radiologists put that in their reports?

A    Yeah.  So that happens a lot in kids because kids don't hold still in the CT scanner or the MRI.  And when there is motion artifact, there's certain images that make it harder to see the details.  So they're doing that to say, "If there is a teeny little brain tumor in that spot I couldn't see, it's not my fault, it's motion artifact."  So they are in a sense hedging their conclusions based on an incomplete image or an image that isn't perfect.

Q    And I know you're not a radiologist, but if there were motion artifact and the radiologist could not

accurately read it, or as you as a physician may actually look at the images yourself and not be able to see -- you know, interpret that, you would expect that rather than relying on an image that was not -- that was affected by motion artifact, you would redo that MRI, generally speaking?

A    If there was clinical concern that you needed to, yes, you would.  So, like, if you were convinced that this child had something and you wanted to make sure and there was more (inaudible), you'd redo it, absolutely.

Q    And sometimes you may be suspicious of a disease or pathology that isn't very well depicted on an MRI; for example, a bleed or a subdural hematoma or something like that.  You might order a CAT scan to see some things differently than you would an MRI, for example?

A    Yeah --

Q    Maybe I gave a bad example, but yeah.

A    The skull fracture is not seen on MRI, but seen on CAT scan.  So that would be a better example. But, yes, you would order a different test to get a better look at it.

Q    Because some imaging just inherently has limitations in what it reveals?

FOR THE RECORD REPORTING, INC. 850.222.5491

49

A    Correct.

Q    All right.  So what I've also seen in reviewing medical records that happens is sometimes, you know, somebody will go in for one condition and -- I assume in your practice, you're familiar with reading radiology reports.  Do I understand that correctly?

A    Right.

Q    There'll be a reason given or a history of present illness or something on there, and it'll say something like "automobile accident" or "back pain secondary to trauma," something like that.  And the radiologist will read an MRI and sometimes tragically will come back with a finding that they weren't expecting.  You hear cases where somebody goes into the hospital for one thing and testing reveals they have a brain tumor and they never really knew it, they didn't even have any symptoms of that.  Are you familiar with things like that happening?

A    Yes.

Q    All right.  And because the radiologists, when they're looking at an MRI, they're not biased or they're not, like, only looking for what is in the history of present illness, correct?

A    Radiology uses a systematic approach to do the entire -- everything, so yeah.

FOR THE RECORD REPORTING, INC. 850.222.5491

50

Q    Right.  And the reason I'm bringing this up is because when we talk about medical science -- and I think you testified this earlier -- the goal is to have objective, reliable, scientific opinions when a doctor gives an opinion, correct?

A    Correct.

Q    So if the opinions are greatly affected -- you recall the questions by Mr. Wilson where he says, "Well, you know, the results might be skewed by the way you ask the question"?  Do you recall his questions about that?

A    Yes.

Q    If the results of a test are dramatically skewed by something as simple as how you ask the question, doesn't it follow that the methods being applied are not really scientific in the way that we hope science to function?

A    They're not as objectively reliable as we would like for sure.

Q    Right.  I mean, when I get an opinion from a doctor, or a diagnosis, I hope, as I hope everyone here does, that that diagnosis isn't based on solely my -- you know, what I'm telling them, but based on some sort of science that could include what I'm telling them, but is based on the objective medical testing and differential diagnosis and things like that.  Do you

think that's a reasonable expectation for people understanding --

A    Yes.

Q    Okay.  All right.  Now, in your opinions, you talked about this sort of dividing line with sexual maturity rating and Grade 4 and Grade 3 and all this kind of stuff.  I think what -- I think maybe in the question that -- maybe it was just assumed, but I want to make sure is clear is your testimony that a Grade 3 is pretty -- you know, more likely pretty certain that that's not an 18-year-old, that's based on an accurate sexual maturity rating, though, correct?

A    Correct, yes.

Q    Yeah.  I mean, all of your opinions, what you're talking about is if I have a true, accurate sexual maturity rating, then I could say this person is most likely under the age of 18?  Did I understand that correctly?

A    Yes.

Q    Okay.  And do I also understand from your report and your testimony that one of the real problems of using online pornographic images is it is very, very difficult to obtain an accurate sexual maturity rating from a professionally produced pornographic image?

A    I think the farther you are away from the

patient, the less reliable it is.  And, again, the more that it's a photo shoot and -- like we know that people doctor up -- like we're in the Instagram world.  Most pictures on Instagram aren't really what people look like, and it's because you can put filters and do things.  So I think the farther you are away from the patient, the less reliable it is.  So anything that's circulating or been professionally done is going to be a lot less reliable than having the patient or having me taking a picture of a patient or having someone I know take a picture of a pa- -- you know, you can walk down the line, and the farther you get, the less reliable it is.

Q    So let me just make a statement and see if you agree with it or not:  The absence of visible pubic hair in and of itself on a pornographic model does not establish that they are a sexual maturity rating of 1 with any reliability.

A    I would agree with that.

Q    I think you said this earlier in your testimony that really to obtain an accurate sexual maturity rating, you need to look, at the very least, both the breast and the pubic region or genital region?

A    I believe that's the case.  I think there's people who will do it without that, but I think it's

much more accurate if you have both.

Q   Well, and, of course, going to the -- we talked about this study that you pulled it up, I mean, the results were dramatic that -- correct me if I'm wrong.  I think in some instances, pediatricians were wrong about the age ninety something percent of the time?

A   I think it was 75, but it wasn't great.

Q   Yeah.  I mean, pathologists -- it looked like gynecologists or pathologists may be a little bit better than pediatricians in the result.  Did I read that correct?

A   Yeah.

Q   Yeah.  Those types of results are -- what's the takeaway from you as a medical doctor looking at that study?

A   The takeaway from me is it's very hard to have certainty based on an image when an image is of Maturity Levels 4 or 5.  You just -- you can't be certain that it is a child just based on the image alone.

Q   Right.  I think -- and I've just pulled it up here that -- and this is just a quote.  Do you have it there in front of you?

A   I do.

Q   I'm just reading from the last paragraph

FOR THE RECORD REPORTING, INC. 850.222.5491

54

before the acknowledgment:  "These researchers determined that our study, in fact, proves that it's nearly impossible to say that adults who look like sub-adults are indeed adults, which obviously may apply to all those sub-adults who seem sexually immature."

Did I read that correctly?

A    That's their conclusion, yes.

Q    Yeah.  Isn't that what you were saying, though, when you were talking about, like, look, you know -- I don't know what you said.  18-year-old may look 12 or a 17-year-old may look 22.  Is that really what you're getting at is that you really can't look at someone in this subadult category and say they are above or below the age of 18 with any reliability?

A    At least without any certainty, and the reliability part (inaudible) in question as well.

Q    Yeah.  And so just kind of bringing it back to the analogy of the radiologist and the MRI and talking about the value of talking about that, you know, when a radiologist puts in there, "Hey, there's motion artifact," right, you've talked about what you think the science is or the ability to, you know, accurately sexual immaturity rate an individual from a pornographic image, but you've also talked about, look, if you're going to engage in this, you have to put qualifiers on

there to explain, you know, any limitations in what you're talking about.  Is that kind of what you're talking about is, you know, like a radiologist puts, "Hey, the image was unreadable because of motion artifact," or "There are limitations on my opinions because there's motion artifact"?  You're talking about that as a child protection team doctor, at the very least you should do the same as a radiologist and notify whoever is reading this that there are limitations, serious limitations, or however you see those limitations, but that should be in any report that you're giving to someone else?

A    I would agree with that, and I think it's -- again, your degree of certainty needs to be communicated and the limitations of the certainty need to be communicated as well, whether it's physical abuse, sexual abuse, pornography.  We have to be open and honest about what our abilities are to conclude what we conclude and why we conclude them.

Q    And your opinion is that these three letters were not open and honest about the science that supported the opinions?

A    The science and the limitations.

Q    Right.  You've been asked a lot of questions, and we have your affidavit.  Is anything that's been

asked of you today changed the opinions that you expressed in your affidavit?

A     No.

MR. ROBERTS:  I don't have any other questions.

MR. CARSON:  John, do you want to follow up with more questions, or are you good?

MR. WILSON:  Yeah, I just have one final follow-up.

FURTHER EXAMINATION

BY MR. WILSON:

Q    Dr. Krugman, we've talked a lot about the scientific reliability of these age estimations, how doctors should go about doing them, and even in some cases, what other evidence should be used in determining the age of a person.

Is it your opinion that even in an SMR-4 case, that with other reliable evidence to consider other than just photographs, say passports, historical data, birth certificates, an actual interview with patients, the medical evaluation is an important part of determining that age of that person?

MR. ROBERTS:  I'm going to object to that question.

THE WITNESS:  I think -- is the medical piece

FOR THE RECORD REPORTING, INC. 850.222.5491

an important part?  I think it's -- I believe that there's a role for child abuse pediatricians to produce reports to help put things in context, and there can be definite value of having a medical opinion about these things, but I don't know if you'd be relying on it in the situation you described where you have other corroborating evidence.  You know, a lot of times, if that's the case, we're seeing the child just to make sure that they're well taken care of, there's no trauma, you know, we're doing our medical piece to them and not using it to make a determination of the images.  So I don't know how to answer that any better than I just did.

BY MR. WILSON:

Q    Sure.  It was not the most clear question.  Let me try one more time then.

Is there a legitimate place for a child abuse pediatrician to provide testimony on a case that's admittedly hard to age the picture?

MR. ROBERTS:  Object --

THE WITNESS:  There might be, yes.

MR. WILSON:  Okay.  Thank you.  That's the only question.

Okay.  Dr. Krugman, are you familiar with the concept of reading or waiving?

THE WITNESS:  I am.

MR. WILSON:  Would you like to read or waive?

THE WITNESS:  I'll read, that's fine, just to make sure I didn't mess anything up and it was transcribed correctly.

(Whereupon, the witness did not waive reading and signing of the deposition, and the deposition was concluded at 9:30 a.m.)

C E R T I F I C A T E

STATE OF FLORIDA    )

COUNTY OF LEON      )

I hereby certify that the foregoing transcript is of a tape-recording taken down by the undersigned, and the contents thereof were reduced to typewriting under my direction;

That the foregoing pages 4 through 59 represent a true, correct, and complete transcript of the tape-recording;

And I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

Dated this 29th day of July, 2025.


CLARA C. ROTRUCK

Notary Public

State of Florida at Large

Commission Expires:

November 13, 2026

Commission No.: HH 327478


FOR THE RECORD REPORTING, INC. 850.222.5491

                                    For the Record Reporting, Inc.
                                    1500 Mahan Drive, Suite 140
                                    Tallahassee, Florida 32317
                                    850-222-5491


                                    July 29, 2025

Dr. Scott Krugman

C/O Attorney address

RE:   William Lee Lawshe vs.
         Mikayla Preston and Kathleen Dully


Dear Dr. Krugman:

        The deposition of Dr. Scott Krugman, taken on July 16, 2025, in the above-styled case, is ready for review.  Please have the deponent make an appointment to review the transcript in our office.


        In the alternative, if you have ordered a copy of the transcript and will be handling reading and signing, have the deponent note any corrections on the errata sheet provided.  The review must be completed on or before August 29, 2025, and the errata sheet returned to For the Record Reporting, Inc., 1500 Mahan Drive, Suite 140, Tallahassee, Florida 32317 so it may be included with the original transcript.


        Please contact our office if there are any questions you may have.  Thank you for your prompt and careful attention to this matter.

                        Sincerely,

                        For the Record Reporting, Inc.


cc:   Matthew Carson, Esq.
      Michael Roberts, Esq.
      John Wilson, Esq.


        FOR THE RECORD REPORTING, INC. 850.222.5491

                                                            61

ERRATA SHEET

IN RE:  Corrections to the Deposition of Dr. Scott Krugman, William Lee Lawshe vs. Mikayla Preston and Kathleen Dully, on July 16, 2025.

PAGE    LINE   CORRECTION

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

____    ____   _____

   Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____        _____

Date                          Signature

FOR THE RECORD REPORTING, INC. 850.222.5491