**In the Matter of:**

*WILLIAM LAWSHE*

*vs*

*MIKAYLA PRESTON, et al.*

*WILLIAM LEE LAWSHE*

*March 14, 2025*



1260 North Ponce de Leon Blvd., Suite E
St Augustine, FL 32084
(904) 825-0570    www.staugcr.com

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:24-cv-00044-MMH-MCR

WILLIAM LAWSHE,

                Plaintiff,

vs.

MIKAYLA PRESTON, in her individual capacity as a detective for St. Johns County Sheriff's Office, and KATHLEEN DULLY, in her individual capacity as medical director of the UF Child Protection Team,

                Defendants.
_____

                        VIDEO RECORDED

DEPOSITION OF:     WILLIAM LEE LAWSHE

DATE TAKEN:        Friday, March 14, 2025

PLACE TAKEN:       1260 North Ponce de Leon Boulevard
                   Suite E
                   St. Augustine, Florida 32084

TIME:              9:16 a.m. - 12:16 p.m

BEFORE:            LAURA DWYER PIERLE, RPR
                   STENOGRAPHIC COURT REPORTER
                   AND NOTARY PUBLIC - STATE
                   OF FLORIDA AT LARGE
*******************************************************

            ST. AUGUSTINE COURT REPORTERS
     1260 NORTH PONCE DE LEON BOULEVARD, SUITE E
            ST. AUGUSTINE, FLORIDA  32084
                   904-825-0570

APPEARANCES:


     On behalf of the Plaintiff:
        NOONEY AND ROBERTS, P.A.
        1680 EMERSON STREET
        JACKSONVILLE, FLORIDA  32207
        By:  MICHAEL KEITH ROBERTS, II, ESQUIRE


     On behalf of the Defendant Mikayla Preston:
        SNIFFEN & SPELLMAN, P.A.
        123 NORTH MONROE STREET
        TALLAHASSEE, FLORIDA  32301
        By: MATTHEW J. CARSON, ESQUIRE
              AND
          CHRISTEN PETRUZZELLI, ESQUIRE
          (Present via videoconference)

     On behalf of the Defendant Dr. Dully:
        BANKER, LOPEZ, GASSLER, PA
        1900 SOUTHEAST 18th AVENUE
        SUITE 300
        OCALA, FLORIDA 34471-8237
        By:  AMY SHEVLIN, ESQUIRE
          (Present via videoconference)

ALSO PRESENT:

     DAN BISHOP, VIDEOGRAPHER

- - -
I N D E X
- - -

WITNESS:                                                    PAGE
WILLIAM LEE LAWSHE

DIRECT EXAMINATION BY MR. CARSON                            5
CROSS EXAMINATION BY MS. SHEVLIN                            88
REDIRECT EXAMINATION BY MR. CARSON                         121


CERTIFICATE OF OATH                                        127
CERTIFICATE OF REPORTER                                    128


- - -
E X H I B I T S
- - -

NUMBER                      DESCRIPTION                     PAGE

DEFENDANT'S  EX.  10   PLAINTIFF'S  ANSWERS  TO  DEFENDANT   40
                      MIKAYLA  PRESTON'S  INTERROGATORIES
DEFENDANT'S  EX.  11   PLAINTIFF'S  ANSWERS  TO  DEFENDANT   40
                      DR.  DULLY'S  INTERROGATORIES

- - -

VIDEOGRAPHER:  This begins media unit number one to the video recorded deposition of William Lee Lawshe in the matter of William Lee Lawshe versus Mikayla Preston, et al. being heard before the U.S. District Court, Middle District of Florida, Jacksonville Division.  Case Number is 3:24-cv-00044-MMH-MCR.

Today's deposition is being conducted at 1260 North Ponce de Leon Boulevard, Suite E, in St. Augustine, Florida.  Today is March 14th, year 2025.  The time is 9:16 a.m.

My name is Dan Bishop.  And I'm your videographer.  The court reporter this morning is Laura Pierle.

Counsel, will you please state your appearances for the record and then our court reporter may swear in the witness.

MR. ROBERTS:  Michael Roberts for Mr. Lawshe.

MR. CARSON:  Matthew Carson for Detective Mikayla Preston.

MS. SHEVLIN:  Amy Shevlin on behalf of Dr. Dully.

- - -

Thereupon,

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

WILLIAM LEE LAWSHE,

Being by the undersigned Notary Public first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. CARSON:

Q    **Good morning, Mr. Lawshe.**

A    Good morning.

Q    **My name is Matt Carson.  I represent Detective Mikayla Preston one of the Defendants in this action. You and I just met a couple of minutes ago, correct?**

A    Yes, sir.

Q    **Okay.  And you were having a little bit of a hard time maintaining your composure then, and, you know, you're just getting started and you're already a little bit upset.  I want you to know that if at any point during the deposition today you need to take a break for whatever reason, to use the restroom, to, you know, take a breath, take a walk outside, that's fine. You've just got to let me know.  All right.  As long as there is not a question pending that shouldn't be a problem.  Okay.**

**It's not my intent to unnecessarily prolong the deposition today or to make it any worse for you than it is, but I have to ask questions and this is my**

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

one opportunity to do so.  All right?

A    Yes, sir.

Q    Okay.  Have you had your deposition taken before?

A    No, sir.

Q    Okay.  Well, there is a couple of rules that I want to go over at the beginning that will help us get through today hopefully quickly.  One of them is as you see we have a court reporter taking down everything I say, everything you say, everything your attorney says.  And as good as she is at her job, she can only take down one person talking at a time.  So it's critically important that we not talk over one another.  So I'm going to ask you to wait until I'm done asking my question before you start giving your answer.  And I'm going to do my best to let you finish your answer before I ask a follow-up question.  All right?

A    Yes, sir.

Q    Similarly, if I ask you a yes or no question, I'm going to ask you to give a yes or no response as opposed to uh-uh or uh-huh or shaking your head or nodding your head.  I'll tell you, I don't know if I ever sat through a deposition where somebody didn't fall into that uh-huh or uh-uh.  So if that happens and I ask you if that was a yes, sir or was that a no, sir, I

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

don't want you to think me rude.  I'm just trying to make sure we get a good record.  All right?

A    Yes, sir.

Q    All right.  Are you under the influence of alcohol or drugs right now?

A    No, sir.

Q    Okay.  Is there any reason you can't give a truthful deposition testimony today?

A    No, sir.

Q    Okay.  Why are you -- why are you upset right now?

A    Because of everything I've gone through and still going through.

Q    What do you mean?

A    Just the way that I am treated in the community.  I was very well-known here because I grew up here.  I have been here since 1980.  And I knew half of the town.  And then I was officer of the year.  And it's a small town.  And it's just devastating to me.

Q    Are you nervous about giving your depo today?

A    I'm not nervous as the standpoint of anything, like, that's going to come out of this.  I mean, just having to relive it again and talk about it, and go through the emotions again.

Q    What year were you born?

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 9 of 147 PageID
3053
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                    Page 8

A    1969.

Q    Okay.  Where were you born?

A    Gainesville, Florida.

Q    Where else have you lived other than Gainesville and St. Augustine?

A    We spent some time in Miramar, Florida and Hollywood, Florida, Savannah, Georgia and I think that's most of -- well, I lived in Hawaii when I was in the military, too.

Q    Okay.  So you said that you've been in St. Augustine since roughly 1980?

A    Yes, sir.

Q    Okay.  And then have there been breaks where you've lived in other areas?

A    Once I become an adult I started living and I got my job with FWC, yes, but other than that I've lived here all of the time.  I was in Stuart, Florida for a little while when I got hired on with FWC.

Q    Okay.  When did you start working with FWC?

A    I'd probably have to look at some of my paperwork you-all sent me.  I don't -- I can't remember the date now.  It was roughly 15 years ago.  I worked for them 15 years.

Q    Okay.  And you worked -- that's Fish and Wildlife Commission, correct?

A    Yes, sir.

Q    **And you were a certified law enforcement officer for them?**

A    Yes, sir.

Q    **What kind of work did you do?**

A    Just what they do enforcement of the wildlife laws and, I mean, other laws because we do mainstream law enforcement as well.

Q    **So I'm just trying to start our consideration in hopefully a lighthearted way so that, you know, we can get comfortable talking with each other.  Are you looking for people that are catching fish above the limit, undersized, that kind of thing?**

A    That's the primary enforcement. Anything to do with wildlife.  I was a -- I was a hill officer so I did more investigative stuff to where I was out in the woods working alone mostly listening for gunshots, going to gunshots, seeing if there any violations of that, DUI, BUI, all that kind of stuff.

Q    **Did you say hill officer?**

A    Hill officer.

Q    **Okay.  And what does that mean?**

A    I primarily worked in the woods and didn't work on the water.  They typically put the more seasoned officers on the hill because it's more difficult work,

it's more dangerous.  And you do more investigative stuff than on the water.  On the water is just a contact driven law enforcement.  You just make contacts and ask questions.

Q    Okay.  So hill officer is that kind of slang for more of a wildlife dry land guy?

A    Yeah.  Yeah.  If you remember back in the '90's the agency was two separate things.  It was Fish and Game and Florida Marine Patrol.  In '91 they combined, but they still realized that hill was a different animal altogether working on the hill or in the woods.

Q    Okay.  What was your jurisdiction, if you will?

A    The State of Florida.  I mean, we patrolled any and everywhere.  My office was out of Ocala and we had an area or region we patrolled and mine was mostly St. Johns, Flagler and Putnam Counties.

Q    Okay.  Did you ever go outside of St. Johns -- what did you say St. Johns, Putnam and --

A    St. Johns, Putnam and Flagler.

Q    Did you ever go outside those three counties?

A    Yeah, I mean, we did disaster relief with all the hurricanes.  And we get deployed to all those areas and we help out there.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 11

Q    But during your --

A    Other states too.

Q    Okay.  During your kind of regular assignment, those were the three counties that you stayed inside?

A    Yes, sir.

Q    Okay.  How often would you have to go to Ocala?

A    It was just for regional meetings and things. So, I mean, it varied.

Q    A couple of times a year?

A    Sometimes.  Sometimes not.  I mean, it just depends on when they wanted us over there.  A lot of times they would come to us for a meeting.

Q    Gotcha.  Are you married?

A    I am.

Q    What's your wife's name?

A    Sheila Marie Lawshe.

Q    How long have you been married to Mrs. Lawshe?

A    Thirty-four years.  We met in high school.

Q    Do you have any kids?

A    I have two sons.

Q    Okay.  Where do they live?

A    One lives in Boston, Massachusetts.  The other lives in Canada.  I'm trying to think the name of the little town, but in Canada.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 12

Q    Do you know what province?

A    It's one just over the border closest to the border.  Big town.

Q    Toronto, Ontario?

A    Is it Quebec?  Quebec.

Q    Oh.  Okay.

A    Quebec City.

Q    All right.  Very good.  Do you -- what is he doing there?

A    He is with his girlfriend.

Q    Okay.  I'm from Canada that's why I was asking.

A    Okay.  He met her online during COVID.

Q    Okay.  I think it's cool.  So I was going to say good for him.  But, you know --

A    Yeah.

Q    Do you have a good relationship with your sons?

A    I do.

Q    Okay.  Has your relationship with your sons been affected at all by this incident?

A    Yeah.

Q    How so?

A    Well, when it first happened they didn't know what to think just like everybody else.  My son has a

doctorate degree in criminology.  He teaches criminology.  And, of course, with him being in that line he had professors coming to him and asking him what was going on and he was getting counseling.  And I felt so bad for him.  But after he talked to my lawyer and saw what was going on and he was a lot better.  He's probably got more choice words to say than that, but I'm not going to say them.

Q    What do you mean when you say he saw what was going on?

A    Just the fact that once he saw the evidence that was being brought against me and all, after it had been -- the charges had been dropped, my lawyer shared with him some of the photos and they were beyond pissed that those photos were used to say it was CP.

Q    By CP you mean child pornography?

A    Yes, sir.

Q    Okay.  And that's both your sons were beyond pissed?

A    Yes.

Q    Why is that?

A    For obvious reasons.

Q    Well, tell me.

A    They were -- they were obviously pictures of grown adult women and they were like, oh, my God, dad, I

feel so bad for you.

Q    How is it -- we'll get to the pictures, I guess, in a little bit.  Are you currently employed?

A    No.  I can't work.

Q    Why not?

A    I had some jobs lined up that if and when I retired I could do them, but since then I can't work in those jobs just because being such a small town and the liability they just can't hire me.

Q    What jobs did you have lined up for retirement?

A    There was a guy -- I knew the manager at Publix in town here and he was going to sign me on as either like somebody to cut meat in the back or just help out because I have a lot management background from other companies.  I used to work at a lot of Fortune 500 companies prior to becoming law enforcement.

Q    You said you had some jobs lined up.  You mentioned Publix, what else?

A    Oh.  I had a friend that had a car wash that he was like trying to grow it and since then it has gone out of business.  But there was that.  And then I don't know there was any number of other things I could have done in retail marketing and stuff, but with what happened and knowing that I have to sit down in a job

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 15

interview and tell them basically that what I have been accused of and arrested for, no company is going to hire me with that.

Q    Has any company told you that they won't hire you because of that?

A    I have done some online stuff and I have not got anything returned.

Q    Okay.  Has any company told you that they won't hire you because of these criminal charges?

A    That specifically, no.  They just haven't replied back.

Q    And I hate to say it, but that's, you know, that could be systematic of the job market.  That's why I'm asking you if anybody has given you any solid indication that it's because of these criminal charges?

A    No, I don't think legally they can.

Q    Okay.  You had the criminal charges expunged, correct?

A    Yes.

Q    Okay.  Why did you do that?

A    For obvious purposes so I could try to start my life over again and get jobs.

Q    Any other reason?

A    No.

Q    So where have you applied for work since your

arrest?

A    All the online stuff I cannot recall.  I really can't.  It was just --

Q    **How many jobs have you applied for?**

A    Probably 30.

Q    **How many call backs did you get?**

A    None.

Q    **Have you had any --**

A    I'm sorry.

Q    **No worries.**

**Have you done any -- have you done any work for pay since the arrest?**

A    I am washing friends and families cars. Basically just odd jobs.  Some friends need their house painted and stuff like that I have done that for them, just because they know I need money.

Q    **And that's just kind of free-lance as needed you don't have a business or an LLC or anything like that?**

A    No, sir.

Q    **Okay.  I think we got some discovery from you in this case and there were some W-2s.  I thought I saw Publix.  Had you done some work for Publix at some point in the past?**

A    When I was with FWC we did off duty work.

Yes, I did off duty work for Publix.

Q    Okay.  That's the fellow that stands at the front and makes sure no one is walking out --

A    No.  So, no, for that we didn't do that kind of law enforcement or off duty work.  Ours was -- that was actually during TPC where we would sit outside in our vehicles and any vehicles that would come in and park illegally for TPC and stuff we would ask them to leave.

Q    Gotcha.

What -- are you applying to jobs using websites?

A    Yeah.  I was -- I can't remember which one. But it was one of them either Hot Jobs or Monster or something.  One of those things.  I did online -- online resume and I submitted a resume and all of that.

Q    Okay.  All right.  Do you still have your law enforcement certification?

A    I believe it would have expired by now, because I haven't had any retraining.

Q    Do you know what it would take to get that law enforcement certification back?

A    No clue.

Q    Do you have any interest in getting it back?

A    No.

Q    Why not?

A    Just with those allegations no agency would ever hire me.

Q    Has anyone told you based on those allegations that no law enforcement agency would hire you?

A    I used to be in hiring so I know.  I did the HR stuff.  But, no.

Q    If you were to apply for a job right now, would you be able to deny that you were ever arrested?

A    No.

Q    Why not?

A    Because I was arrested.

Q    Okay.  But those charges were expunged, correct?

A    Yeah.  But that doesn't matter.  It's all over the internet.

Q    I understand.  But my question was if you apply for a job, would you be able to lawfully deny that you were arrested?

A    In my opinion, no.  I mean, I was arrested. They put handcuffs on me; they took me to jail.  It happened.

Q    Have you read the expungement statute in Florida law?

A    No, sir.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 19

Q    Okay.  Other than this arrest have you ever been arrested?

A    No, sir.

Q    The videographer asked you if you had your phone with you today.  And you said no, correct?

A    Correct.

Q    Okay.  Where is your cellphone?

A    My wife has my cellphone.

Q    Your wife is in the lobby, correct?

A    Yes.

Q    Is it the same cellphone that you had in April 2023?

A    No, sir.

Q    Same phone number?

A    No, sir.

Q    All right.  Let's talk about the arrest, which occurred on April 12, 2023; correct?

A    I don't remember the date.  But if that's the date I'll believe you.

Q    Okay.  Yeah, I won't try to mislead you at all today.  But certainly not about the date of the arrest.

A    That's fine.

Q    Okay.

A    He would here to object if it was wrong.

Q    Sure.  What was -- what was -- what do you remember about that day?

A    I was supposed to go teach man tracking and I got a phone call a couple of days before that they had a missing person.  I had helped them before with finding a missing person and could I meet with them.  I said sure.  I went to the Sheriff's Department.  I waited for a short period.  I went back to talk to -- I think it was Tolbert.  I don't remember his -- his classification, detective or whatever.  But anyway I went back there, and I don't know, where I was grabbed by other officers and told I was under arrest.  And I was placed in a room.  They told me they would be back with me.

Q    All right.  Let's -- let's break that down just a little bit.  Who called you regarding a missing person?

A    I don't recall who it was.  It was -- it might have been Tolbert.  I'm not sure.

Q    And had you worked with Detective Tolbert in the past?

A    No, not directly.

Q    Okay.  Did you know him?

A    After it all went down I remembered that, yes, I did know him, because my son and his daughter were in the same karate class together.  So we saw them for

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 21

probably three years, four years in karate every week.

Q    Okay.  Before the incident, before the arrest?

A    Correct.

Q    Okay.  When he called you, did his name show up on your phone?

A    I don't recall that.

Q    Okay.  You don't recall if you had his name stored in your phone or not?

A    No, I know I didn't have his name stored in my phone.  I just -- I didn't work that closely with him.

Q    Did you work closely with anybody at the St. Johns County Sheriff's Office?

A    A lot of the hill deputies.  I mean, probably Sergeant Matuse and I am trying to think of their names. I used to know them all.  But I just -- they don't call me; I don't call them.  There was a K9 deputy I was real close with.  All the deputies that worked at Hastings I was close with because that was -- I backed them up all of the time.  I don't remember names.

Q    Okay.  You said hill deputies, what does that mean?

A    Just they kind of work the same areas as me in the woods.  They would come out and be my backup because we didn't have a lot of backup.  So if I needed something they would come into the woods where I was at

just for backup.  Because like I told you we worked by ourselves a lot.

Q    Okay.  You said that you had helped St. Johns County Sheriff's deputies with missing person in the past?

A    Yes, sir.

Q    Do you remember who you worked with at that time?

A    It would have been at the time Commander Strickland called me specifically because he knew that I did man tracking and was good at tracking.  It was when they had -- I forget her last name.  But it was a lady that was missing.  She worked at the restaurant right here in town.  She actually served us and she was suspected to have been murdered and actually that morning me and another officer found her body within probably 20 minutes of the search.  I forget her name now too which is bad.  But we were called in for that.

Q    What makes you good at finding missing people?

A    Just my training and my attention to detail.  I did it in the military as well.  I went through ranger training and airborne ranger training and just attention to detail, I guess.  And I enjoyed it.  I liked to be in the woods and to just be observant and not overlook things that a lot of other people did.  I guess I am

part Indian, so maybe that is part of it.  Just tracking piece of it.  It takes a lot of attention to detail.

I need some more water.

MR. ROBERTS:  Yeah.  Just real quick I will grab some.  We don't need to go off the record.  I will just --

MR. CARSON:  No worries.  No worries.

MR. ROBERTS:  Is it right down here?

THE WITNESS:  Thank you.

BY MR. CARSON:

Q    So you're called by somebody with the St. Johns County Sheriff's Office?

A    Commander Strickland called me specifically.

Q    Okay.  The first time or the second time?

A    I am losing track.  First, second.

Q    Yeah.  Let me be clear then.  I am talking about in April 2023?

A    Okay.  No, he didn't call me for that.

Q    Yeah.

A    It was just Tolbert.

Q    You believe it was Tolbert?

A    Well, I think -- I think he said it was Tolbert on the phone when he called me.

Q    And he said need your help with a missing person, can you come in?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                              Page 24

A    Yes, sir.

Q    Okay.  What phone did he call?

A    It would have been the phone that I had at that time which was, I guess, the phone that you-all got all the data off of still.

Q    Is that your personal phone?

A    That was my personal phone.

Q    Okay.  Because I understand at the time you had a personal cellphone and then you had a cellphone that had been issued by Fish and Wildlife, correct?

A    Yes, sir.  Yes, sir.

Q    So when he called you and said we need help with a missing person, did you believe that that was the purpose for you going to the Sheriff's Office to meet with him?

A    Of course.  I mean, I had no other reason not to believe it.

Q    All right.  You get there.  You said that you waited a while and then you went back and met with some folks; correct?

A    Yes, sir.

Q    Okay.  Who did you meet with?

A    The only one I know was Tolbert or deputy or Officer, Detective Tolbert, whatever his nomenclature is.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 25

Q    I'll just tell you this, we have been calling everyone detective, because they have rank and then they get promoted.  And so detective, I think, covers it.

A    Okay.

Q    No one will fault you if you call everyone you dealt with detective.

A    Okay.

Q    All right.  Was anybody else in the room when you meet with Detective Tolbert?

A    Not at the time.

Q    What did Detective Tolbert and you talk about during the initial meeting?

A    Nothing really.  There wasn't time for it.  He asked me if I wanted to sit down.  I went to sit down and out of nowhere two other officers appeared and grabbed me by my left and right hand and told me don't move.  And asked me where my -- well, they didn't ask me where my gun was because they seen my gun.  But they basically stripped me of all my equipment.

Q    Do you know the two other officers that entered the room?

A    No, sir.

Q    Okay.  Did they appear to be uniformed deputies?

A    As best I can recall they were uniformed.  But

honestly as soon as it happened I was in such shock if I could have known them I wouldn't even be able to tell you I knew them.

Q    Sure.  You said that they took your gun, they took your other equipment?

A    Yes, sir.

Q    Okay.  Were you in full Fish and Wildlife Commission garb?

A    I was.

Q    Okay.  So you had your duty belt?

A    Vest, everything.

Q    Okay.

A    They took it all off.

Q    So before you and Detective Tolbert, or really anyone at the Sheriff's Office had any opportunity to talk that was the first thing that happened?

A    Yes, sir.

Q    Okay.  What did you think was going on?

A    I really had no idea I was in shock.  I kept asking, "What's going on?  What's going on?  What is this all about?"

And he kept telling me or he told me several times, "We'll get to that.  We'll get to that."

And I don't remember at what point they escorted me to a room and I actually started to deal

with Detective Greene, I think I saw him first, and Detective Preston.  It was a while before they entered the room.

Q    Can you estimate how long?

A    Honestly, no.  I mean, it was a while.  In light of the situation it could have been 10 minutes. It could have been an hour.  I don't know, because time was just like -- my mind was just spinning.

Q    And at that point you still had no idea why?

A    I didn't know until they walked in and they started their questioning.

Q    Okay.

A    And they didn't want to tell me anything then either.

Q    Okay.  So let's do this.  The first person you see after you are moved to a different room is Detective Greene; correct?

A    I think so.

Q    Okay.  And then did you have any conversation with Detective Greene, was anything said at that time?

A    I think, I mean, I can't remember, but I am sure it's all being -- it was all recorded because in those rooms it's all recorded so you can probably look at that.  But I honestly don't recall.  But I think he asked me something.  I asked him what was going on.  He

said, we'll get to that.  Just to sit tight.  And I think he had to ask -- he asked me something about my phone.  Like where is my phone, because I guess they went through my equipment and couldn't find the phone in question that they were looking for.

**Q      Where was the phone?**

A      I had forgotten it at home.

**Q      Did you have your work issued phone?**

A      I think I did, but I'm not positive.

**Q      All right.  And a short time or some period of time later Detective Preston joins you and Detective Greene?**

A      Yes, sir.

**Q      And what, if anything, do you remember being said during that time?**

A      It was all focused around the phone.  They came and asked me where is my phone and then they asked specifically where is my phone.  And it took me a little bit to realize that I left it -- I thought it was in my truck or on me.  But I guess in getting ready that morning I just forgot it.  Anyway I told them it must be at home.

And they were asking me maybe where.  And so I kind of went back through my mind where it could be. They left for a little bit.  They came back in.  They

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

said they were getting a search warrant.  That they needed to know specifically where it was at.  They left a little bit, they came back, they said they couldn't get into my house.  So I think I gave them a garage door number to get in the garage door.  And then some more time went by when they weren't in there.  And then they came back and said okay.  I don't know if they told me they got my phone or not.  I just assumed maybe they got it.  And I think that's when they started questioning.  So, yeah, I think.  That's the best I can recall.

     Q    And that's fine.  You know, the purpose of today is for me to find out what you remember.  And I don't expect you to remember everything.  But you are doing a really good job of trying and I appreciate that.

          Other than what you've already said, do you remember anything that was said during your time being interviewed, questioned at the St. Johns County Sheriff's Office on April 12, 2023?

     A    I mean, is there something I'm not saying?

     Q    No.  Listen.  I'll be clear.  I'll just put this out there.  What I am trying to do and, you know, your lawyer may tell you the same kind of thing when you meet with him privately.  Lawyers like to know what the witnesses are going to say at trial.  And what I don't want to do is get to trial and have you all of a sudden

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                                    Page 30

remember that Detective Greene or Detective Tolbert or Detective Preston said this or that.  I prefer to know that now.  So when I ask you those kind of questions saying is there anything else, I am not suggesting that there is anything else that you should remember, what I am trying to do is prevent me leaving here today not knowing everything I need to know.  Does that make sense?

A    Yes, sir.  Well, I think I'm pretty sure they were recording it.  So I don't want to say something that's inappropriate wrong.  I do remember at some point them asking me or them telling me finally what it was about.  And I don't remember how she said it.  I remember him kind of cracking a joke about something. And I just thought that was weird about why is he cracking a joke with this going on.  And then that's when I told him I wanted a lawyer.  I wasn't going to talk to him anymore.

Q    Who cracked a joke?

A    Greene.

Q    Okay.  Do you remember what he said?

A    I don't.  It had something to do about the name of a school, the school or training center that we have in Tallahassee.

Q    What's the name of the school?

A    Now it's -- I don't even know if I can remember.  Tallahassee something Institute.  I can't remember.

Q    **Is it the Old Pat Thomas?**

A    Yeah.  He made a joke about the name of Pat Thomas versus what the new name is.  It was just weird.

Q    **It wasn't inappropriate?  It wasn't rude --**

A    I don't know.  Anything at that point in my life would have been inappropriate.

Q    **Okay.**

A    But, no, there was nothing like lude or lascivious about it.

Q    **Gotcha.  What happened after you said that you wanted a lawyer?**

A    They got up and walked out.

Q    **Were you in handcuffs at this point?**

A    I think they had taken -- I think they took them off once they put me in the room.

Q    **At some point were you placed back in handcuffs?**

A    And walked into the jail.  I'm fine.

Q    **All right.  Do you remember anything being said either by you or the detectives as you were walked into the jail?**

A    I don't.  I remember walking by a deputy and

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                            Page 32

he called me a piece of shit.

Q    Who was that?

A    I don't know.  I was crying.  I was --

Q    Why were you crying?

A    For obvious reasons.  I was upset that I am going to jail and being arrested for something that I had no idea what was going on.

Q    Well, at that point you knew?

A    I knew what they were allegating, yes.

Q    Can you describe the deputy that called you a piece of shit?

A    No.  He was white.  I know that.

Q    Uniformed guy?

A    Yeah.  I'm sorry.  Yes, sir.

Q    Yeah, you're good.

My reason for asking that is separate from thinking it's relevant to this case.  I'm just wanting to know who it was.

A    Yeah.  No.  Nothing will ever be done to them.

Q    Well, ultimately where was your cellphone?

A    At that point they had it.

Q    I'm sorry.  Let me rephrase my question. Where was it before law enforcement located your cellphone?

A    It was in my house in my room where I take all

my equipment off.

Q     And where is that?

A     It's like -- it's like -- it's like a utility room, I guess.  I have lyme disease and once I got diagnosed with that I had to be very careful.  I didn't want to bring ticks home to my wife.  So there is just a room when you enter in from the garage.  It's a utility room that's where I would take everything off or put everything on because I didn't want to get ticks in the house and stuff.  It's just easy to keep track of all my equipment.

Q     So is it like a mud room?

A     That's a good -- yeah.

Q     What does that room attach to?

A     The garage and the rest of the house.

Q     Is it in between the garage and the rest of the house?

A     Uh-huh.  Yes, sir.

Q     Okay.  If you're walking from the garage into the mud room and then into the house, what room are you in when you enter the house?

A     Well, you enter into the mud room from the garage.

Q     Okay.  And then if you were to enter into the house from the mud room where would you be?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 34

A    The kitchen.

Q    Okay.  If law enforcement said that they found your phone above the refrigerator --

A    No.  That's inaccurate.

Q    Okay.

A    There is no frig in that room at all.

Q    If they said they found it above the refrigerator in your kitchen would that be inaccurate?

A    That's inaccurate.  It was in the mud room. There is -- I don't know what you even call it, maybe a chest of drawers would be maybe the most accurate description.  It was on top of that.

That's where I usually set it.  And I'm sure it wasn't on top of the frig because that is a whole another room.

Q    Okay.  Did you ever put your personal cellphone above your refrigerator?

A    No, sir.

Q    It was reported -- you understand that it was reported that that's where they located the cellphone?

A    No, I didn't know that.

Q    This is the first time you're hearing that?

A    Yes, sir.  That's hundred percent inaccurate and false.

Q    Okay.  It's been reported that when they

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 36 of 147 PageID 3080

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 35

located your personal cellphone it was in airplane mode?

A    That's possible.

Q    Okay.  Did you frequently put your personal cellphone in airplane mode?

A    I did.

Q    Why is that?

A    Well, again, with my lyme and airplane mode, I was like -- I don't think I'm a, quote unquote -- what's the word I'm looking for -- oh, gosh.  Give me a second. I've got to think of the word.  Not a health activist or anything.  But cellphone -- having a cellphone on all of the time, they've shown it causes cancer and things like that with the EMP and like all that kind of stuff.  So I would any time when I took it off I would always put it in airplane mode generally.  Didn't sleep with it in the room with me, nothing like that because it's unhealthy. And that was pointed out by my doctor and just research that I've done with effects of that microwave stuff.

Q    Which doctor told you that?

A    I believe it was my lyme's doctor.

Q    What's his or her name?

A    Oh.  She's on the paperwork the questions you asked me about my doctor.

Q    Okay.  No worries then.  Don't -- don't stress yourself.  We'll get to it.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 36

**What are the -- what are the symptoms that you have as a result of having lyme disease?**

A    Lyme, I mean, the worse things are the heart palpitations and it caused my blood pressure to drop.  I have cognitive issues.  When I am having really, really bad lyme symptoms there's times that I've actual lost track of where I was at.  I was sitting at an intersection one day with my wife and I just looked at her and she was scared out of her mind, because I was like "Where are we at?"  I mean, we were sitting at an intersection that I had been at a thousand million times and I had no clue for like 30 seconds where I was at all.

The most common symptom that I have that I am having right now because of the stress that I'm under, is just debilitating tiredness.  It doesn't matter how much I sleep.  I'm exhausted and I'll sleep 12, 13 hours a day.  I wake up I'm exhausted.  I have no energy.

The other milder symptoms are just like skeletal bone pain, nauseous -- nauseousness really bad.  I mean, those are the things that I typically fight.

Q    **Are you on any medication for your lyme disease?**

A    I am on medications, yes.

Q    **Okay.  Are you on any medications for your**

lyme disease?

A     I am.

Q     Okay.  What are they?

A     I couldn't -- I don't know the name of them. It's mostly all -- I'm on what they call a -- I'm off the heavy meds.  I'm on like it's all homeopathic medications and stuff.  Like tinctures and there is a bunch of Chinese herbs like called tick support I think is the name of the pill that she gives me now that I take every day.  But I am off like all the heavy, heavy antibiotic stuff now.  I was on that for two years.  I'm kind of in a remission kind of state for the most part.

Q     Do you frequently carry your cellphone with you now?

A     Yeah.

Q     Do you leave it on airplane mode or do you leave it off airplane mode?

A     It just depends, I mean, if I'm using it. During the time it's off airplane mode if when I go to sleep or go to bed I'll generally still put it in airplane mode.

Q     Are you at all concerned about somebody needing to contact you in the middle of the night?

A     No.  I mean, my wife has got hers.  But we put them in other rooms so that way, I mean, if it rings it

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 39 of 147 PageID 3083

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 38

rings, but it's not right there with you.

Q    Gotcha.

How long were you in jail?

A    Honestly I don't remember.  I think it was a full day.

Q    You were able to bond out the following day or was it the same day?

A    I don't remember.  I know I was on like a 72-hour suicide watch.  It was before the 72 hours up because I was still in the suicide watch cell.

Q    What did that entail?

A    Basically once I got in-process they stripped all my clothes down naked; they put a burlap sack kind of on me and threw me in there.  It was filthy.  There was shit all over the toilet.  It hadn't been cleaned.

Q    Anything else that you remember about your time in the St. Johns County jail?

A    I tried to talk to the jailer a couple of times.  He didn't want to talk to me.  He also walked over and told me I was a piece of shit.

Q    When you say the jailer, are you talking about a corrections deputy?

A    Whoever was on duty, yeah.  It was a white guy.  I kept asking him about -- I can't remember what I kept asking him.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 39

Q    Yeah.  What were you trying to talk to him about?

A    I don't remember.  I don't know if it was trying to get a phone call.  I think it was.  I think I was trying to see when I could get a phone call to call my wife to see what was going on.

Q    Were you able to get a phone call?

A    Eventually, yes, sir.

Q    How long after you were placed in the jail were you able to make a phone call?

A    It was a while.  It was absolutely the next day, because it got dark and the sun came up.  That's all I could tell because there was really no clocks to look at.

Q    Did you have to eat any meals while you were in the jail?

A    Yeah.

Q    How many meals do you recall?

A    It was just one.  I really couldn't eat.  You had to eat with your hands because they didn't give you any silverware or anything.

Q    Do you know why you were placed on suicide watch?

A    I imagine because of what I was in for.

MR. CARSON:  I am going to mark some exhibits.

Michael, if it's okay with you I am just going to start at 10?

MR. ROBERTS:  Just do a better job than I did yesterday.

MR. CARSON:  Yeah.  All right.  So I am going to mark Plaintiff's Answers to Defendant Mikayla Preston's Interrogatories as Exhibit 10.  I am not going to ask you to look at these right now, sir. I am just marking them and putting them in front of you.

I am going to mark Plaintiff's Answers to Defendant Kathleen Dully's interrogatories as Exhibit 11.

(Defendant's Exhibit Nos. 10 and 11 were marked for identification.)

BY MR. CARSON:

Q    Do you recognize those documents, sir?

A    I think those are the ones where you sent questions to me.

Q    It is.  So it's one of the ways we do discovery in civil cases.  It's propounding what we call interrogatories, which are questions.  I'll just refer you to the last page of these documents which if I printed them correctly should include your declaration. Do you remember signing that either in person or

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 41

electronically?

A    Yes, sir.

Q    Okay.  I am actually going to give you a minute to look at these.  I think now might be a good time to take a brief break, because we've been going about an hour.  Actually we started a little bit late.  Maybe not a full hour.  Let me take a quick break.  Let you review those and then when we get back we'll get into the meat of it.

VIDEOGRAPHER:  All right.  We're off the record at 10:03.

(Whereupon, recess was taken 10:03 to 10:10 a.m.)

VIDEOGRAPHER:  We are back on the record at 10:10.

BY MR. CARSON:

Q    All right.  Mr. Lawshe, before we went on a break, I identified for -- as exhibits your answers to Detective Preston's interrogatories and your answers to Dr. Dully's interrogatories as Exhibits 10 and 11 respectively.  During the break did you have a chance to review those documents?

A    Yes, sir.

Q    All right.  Does everything in both of those documents still appear to be true to the best of your

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                      Page 42

knowledge?

     A     They look the same, yes, sir.

     Q     Okay.  And they are the documents that you prepared with the assistance of counsel and ultimately signed declaration pages too, correct?

     A     As best I can tell, yes, sir.

     Q     Okay.  So I want to go over some of the questions.  I want to direct you to question number 8 on Detective Preston's interrogatories, which is Exhibit 10.

     A     Okay.

     Q     And I'm going to go ahead and take 11 back from you for now.

           So Interrogatory Number 8 asks you information or asks you questions trying to elicit information regarding some of the photographs that are at issue in this case.  They have been identified as Composite Exhibit 8 in this case.  And so what I would like to do is go through some of those now and ask you some questions about them.  All right?

     A     Yes, sir.

     Q     All right.  I am going to try to do it in order that we -- that they appear in Detective Preston's interrogatories.  And so if you go to the next page following where Question 8 is found there is an image

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 43

that ends in ac18e?

A    Yes, sir.

Q    I'm going to show you what has been marked as Exhibit 8F.

A    8F.

Q    And that's a redacted version of the photograph.  Do you recognize that photograph?

A    I don't, no, sir.

Q    Okay.  Had that image ever been on your cellphone?

A    I mean, if they got it off it it was, but I don't remember this photo.

Q    How would you get photos on your cell phone; how would they be transmitted, transferred, downloaded onto your cell phone?

A    I don't -- I mean, however it would be done. I mean, I don't remember -- I think depending on the website you go you hit whatever it asks to download it and you download it.

Q    And that's exactly what I'm asking for.  So you don't specifically remember that picture ever being on your phone?

A    No, sir.

Q    But generally pictures that were on your phone were downloaded from websites?

A    Yes, sir.

Q    Okay.  And how would you access these websites?

A    Just via the internet.

Q    What kind of phone did you have?

A    I don't recall.  I mean, it was -- not Iphone. It was an android.

Q    Do you know the name of the web browser that you used?

A    If I said, I wouldn't -- I'd be lying if I was truthful I knew that's what it was.  I really don't.

Q    Okay.  Is it one that came on the phone?

A    I would -- I would think so.

Q    Did you ever download onto your phone the one that you had in April 2023 any browser other than the one that came on the phone?

A    I think it had -- I think the phone had several browsers on it, but I don't recall what they were.

Q    Did you download any additional browsers?

A    I don't recall.

Q    Did you download any other program that would allow you to access, view or download photographs?

A    I honestly don't recall.

Q    Did you download anything that would conceal

your identity as you browse the internet?

A    I don't believe so, no, sir.

Q    Did you ever download a VPN?

A    No, sir.

Q    Did you ever download an anonymizer?

A    Not that I am aware of, no, sir.

Q    When you searched did you search in regular mode?

A    I'm not sure regular mode.

Q    So a lot of web browsers will have what they call an incognito mode?

A    Okay.  Um.  I don't recall.  I -- whatever the settings were if I downloaded something or whatever was there I just used what was there.

Q    Okay.  Did you ever delete your search history?

A    Not that I recall.

Q    Did you ever use a search engine or a browser that does not save your search history?

A    Didn't know that was possible.  I'm not aware that I did.

Q    You're assuming that that picture was found on your phone because I'm representing to you that it was found on your phone.  But as we sit here today you have no recollection of that photograph ever being on your

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                        Page 46

phone; is that correct?

A    No, sir.  Correct.

Q    Do you have any reason to dispute the assertion that that photograph was found on your phone?

A    No, sir.

Q    All right.  Do you know what your -- you had Verizon at the time, correct?

A    The provider that was provided Verizon.

Q    Okay.  Did Verizon as part of your subscription, as part of your plan with Verizon was there any sort of cloud storage that accompanied your cellphone?

A    I think they all come with it.

Q    Are you familiar with what Verizon uses for its cloud storage?

A    No, sir.

Q    Are you aware, do you know if the photos that you downloaded to your phone were also simultaneously or later uploaded to a cloud storage site?

A    No, sir.

Q    Let me take that one back.

A    Although I can say it was alleged it did go to a cloud.  I think that's what they said at some point during the lawsuit.

Q    And I'll just tell you this for whatever it's

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                      Page 47

worth, there are a lot of questions that I might ask you that other people are better suited to answer and that's fine. My point today is to find out what your understanding and what your knowledge is.

A    Okay.

Q    And I believe this is 8B, which if you skip ahead a couple of pages, sir -- I am going to help you find it. This is the next image that we're going to talk about. It's the one that ends in f6a487.

A    Okay.

Q    And we have marked that as Exhibit B -- 8B. Excuse me. Do you recall ever seeing that image?

A    I recognize the face, but that's all I can say that I recognize.

Q    Okay. What do you recognize the face as?

A    Just one of the models that was on a site that I guess I saw. I can't tell you the site.

Q    Do you remember downloading that photograph?

A    No, sir.

Q    Do you remember having that phone on your phone -- I'm sorry -- that image on your phone?

A    No, sir.

Q    Do you remember -- if I represent to you that that image was at some point on your phone, would you have any reason to dispute that?

A    I mean other than I don't know that -- they found it and they say it was there, other than that, no, I mean.  I don't know if that makes sense.  But...

Q    Well, I'm trying to -- there is a bunch of questions that follow which are based on the presumption that that photograph was on your phone at some point. If you can't answer those questions because you don't know for certain that it was ever on your phone, that's fine, but I'm going to ask you those questions anyway.

A    No, I understand.

Q    Yeah.  Because the answers to interrogatories you were having -- you were unable to respond because you didn't know --

A    Correct.

Q    -- what the images were.

A    No, I would be lying to you if I told you I remember that being on my phone.

Q    Okay.  Do you know where you might have found that photograph?

A    On the internet.  I believe -- see, I hate to say I don't know for a fact.  I don't want to say something that's not a fact.  But I think she was a model of Med-Art, but I'm not positive.

Q    What is Med-Art?

A    It was just an art site that had supposedly

high resolution, good, you know, photos of, I guess, naked models.

Q    Is it a paid site?

A    It was.

Q    Did you pay to subscribe?

A    I don't recall.

Q    Have you ever paid and subscribed to a website?

A    Yes, sir.

Q    Have you ever paid or subscribed to a website that includes nudity or sexual content of any kind?

A    Yes, sir.

Q    Do you remember what those are?

A    The only one that comes to mind was -- is -- I guess he is a famous artist Petter Hegre. I don't know how to spell his last name. And it was called Hegre Art. Hegre Art I think. And I just -- I think she was a model of him too. But Hegre Art.

Q    What's her name?

A    I have no clue.

Q    In your complaint you allege that these photographs could be found through a simply goggle search. What would I search to try to find that picture?

A    That you would have to have refer to my

lawyer, because I think he is the one that did that.

Q    So you don't know that a Google search would find that picture?

A    Other than him telling me.

Q    Okay.

A    He called me and told me.

Q    Hold on.  Hold on.  I don't --

MR. ROBERTS:  It's okay.  And we talked about this.  And you are referring to your criminal attorney, correct?

THE WITNESS:  Correct.

MR. ROBERTS:  Yeah, you don't have to disclose --

THE WITNESS:  Okay.

MR. CARSON:  -- attorney/client privilege. But at the same time it's nothing that we are hiding.

THE WITNESS:  I'm sorry.

MR. CARSON:  No, it's fine.  And, again, I appreciate you clarifying that it's not your knowledge, it's what somebody else told you. That's not going to be helpful to me today.  I want to know what you know.

THE WITNESS:  Okay.

BY MR. CARSON:

Q   **Do we need to take break?**

A   No.  I just don't want --

Q   **You don't want to what?**

A   I don't want to mess anything up.  I don't want to say anything that I'm not supposed to.  I'm nervous.

Q   **Well, listen, as long as you are being truthful and as long as you don't divulge attorney/client privilege, you're doing fine.  All right.**

A   I guess I almost did.

Q   **No, you --**

MR. CARSON:  No, it's okay.

THE WITNESS:  Sorry.

MR. ROBERTS:  And we spoke about this.  It's okay.

BY MR. CARSON:

Q   **I don't know if you noticed, but as soon as you said my attorney, I was like hold on.  You know, I don't -- I don't want to hear that either.  So you're doing just fine.**

**All right.  Do you know if you -- did you ever search for these types of photos on a search engine?**

A   I mean, type -- I don't know.  I mean, all --

no.  I mean, I just would -- I went to one or two sites usually and that was it, because I wanted to be careful.

Q    Of what?

A    Well, there is a lot of shit on the internet. And I'm a police officer and I know I uphold and represent and I don't want to go to some website that is shady or have something that's not legal.

**Q    What do you mean there is lots of shit on the internet?**

A    Just that.  I mean, you turn on anything on the internet.  I mean, I've made -- what was this thing I did the other night.  On Snapchat people were just putting stuff that is not appropriate.  And on Snapchat there was a picture that obviously somebody had like monochrome to make it monochrome.  So I guess to get past their AI stuff so kids could still see it and it was obviously two people having sex.  And it's like so I reported that as an inappropriate image to them and so they could take it off.  That's just something that shouldn't be on a site like that.

**Q    Was there something inappropriate about the two people having sex?**

A    Well, yeah, because kids have access --

**Q    To Snapchat?**

A    -- to Snapchat.

Q    Okay.

A    That's only an adult should be able to see that stuff.  I mean, I would be -- go out of my mind if my five year brought something to me or 10 year old, hey, Dad, what is this?  Can you explain this?

**Q    I guess my point is, you know, we're dealing with allegations of minors.**

A    Okay.

**Q    And I just wanted to make sure your objection to it was that it was on Snapchat, not that the video or the image itself was illegal?**

A    Right.  No.  No.  No.  It was -- well, it should be illegal to have -- if somebody put something like that for a kid to see that should be illegal.

**Q    Sure.**

A    But, no, there was no -- this was an adult site for all intents and purposes.  It had all the USC's down at the bottom of the website.  It was all models were legal under the United States law.  I can't remember the verbiage.  But so I had nothing to assume anything in that website was legal --

**Q    Was illegal?**

A    Legal.

**Q    You believed it was legal?**

A    Correct.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 54

Q    Because of the disclaimers?

A    Because of the disclaimers and, I mean, it was a paid site.

Q    You -- and I'm going to ask you again because you said it is a paid site.  Do you recall -- do you have any recollection if you paid?

A    I don't.  Most of those sites offer like three day trial free offers and stuff that you get like two or three days to watch it, to view the site, to see if you want to pay.  And I'm sure that's what I did, because I was cheap.

Q    Okay.  And during that two to three day trial period would you download photographs?

A    Safe to say, yes.

Q    I want to make sure I understand this.  Before you looked at any of the photographs on Med-Art.com you went to the bottom of the web page and checked that there were --

A    I didn't specifically go there for it.  But it was -- it's put on the site.  I mean, you could go to the site and look at it yourself.  It's there in a manner that you can see that it complies with all U.S., I think it even says Canadian laws.

Q    My question to you is this though, before you looked at any of the images did you look to see if it

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                              Page 55

had those disclaimers?

A    I believe so.  But I'm not 100 percent certain.  But I'm pretty sure I did, because, again, like I told you, I wanted to make sure it was a valid site, you know.  That there was -- because I was a police officer.

Q    If it didn't have the USC sites at the bottom, would you have still looked at the photographs?

A    Probably not.  I mean, I just know.  I mean, you have things that pop up on the phones sometimes, and I would just go away from that site.  I mean, I tried to stay with what I considered to be legitimate sites.

Q    Okay.  What would you be concerned about seeing, viewing on a nonvalid site or non-legitimate site?

A    I mean, I'm concerned, I guess, what some people might construe as being extreme or whatever.  I mean, I just wanted stuff like Playboy or Penthouse, I mean, that's what I grew up.  When I was in the Army I looked at Playboy and Penthouse.  And this site and the Hegre Art site was familiar with and looked just like Playboy and Penthouse.  It was what I called tasteful.

Q    But you said a couple of times you were concerned as a police officer about --

A    Right.

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 57 of 147 PageID
3101
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 56

**Q     What were you concerned about viewing?**

A     I mean anything that potentially could be offensive or brought to be illegal I guess.

**Q     Okay.  Was part of your concern about viewing photographs on a website that didn't have a disclaimer, didn't have the USC sites that it might contain child pornography?**

A     No, because I don't think that's available on the regular internet.

**Q     Okay.  So, I mean, this disclaimer USC sites or not, you can go to any website and you shouldn't be afraid as a law enforcement officer that you're going to see something illegal, correct?**

A     Well, illegal and the society we live in, what might -- somebody might find offense may not be illegal but they would find offensive.  And me as a police officer I always try to draw the line on I need to be better than the average person.  I'm also a Christian. And I didn't want to look at anything that potentially would get into that realm to where, you know, I'm kind of breaking my upbringing with Christ and things like that.  I just look for tasteful pictures.  And if you go to either one of those sites these are tasteful pictures in my opinion.  They don't demoralize women or anything like that.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 57

Q    Do you know if Med-Art is marketed towards -- marketed as having images of young girls and teenagers?

A    No.

Q    You mentioned that, and I think you answered this question in a roundabout way, you said you've only gone to one or two sites, you've mentioned the Hegre Art site, you've mentioned Med-Art.  Any other sites that you've gone to?

A    Not that I can recall.  Best of my memory those were pretty much my -- where I went.

Q    Okay.  Is it your testimony today that there is no image of child pornography available on the internet on a public website today?

A    I would say yes.  I mean, I've never come across it or never heard of another officer telling me they've come across it.  I've always heard the dark web.  You know, the dark web, dark web type stuff.

Q    Do you know where you were when -- you don't remember specifically viewing the picture that's 8B, correct?

A    Correct.  But I do recognize her face.

Q    Okay.

A    And that just comes from being a law enforcement officer.

Q    What does that mean?

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 59 of 147 PageID
3103
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                      Page 58

A    Well, I mean there are certain things, I guess, everybody is good at.  You may be a person that's good at remembering faces, but you can't remember names, those kind of things.  I was always a person that I could remember faces, I couldn't tell you where I saw them or if I arrested them or not, but I could remember the face if that makes sense.

Q    I gotcha.

So it's not because of any sort of specialized training that you have in --

A    No.  No.  No.

Q    -- pornography or CSAM or anything like that?

A    No, sir.

Q    I will have you skip ahead to a couple of pages until you get to the image name 0059, which I believe we have marked as Exhibit 8G -- no, I'm sorry -- 8C.

MR. ROBERTS:  Did you do those in the same way that I did?  Like so my C is your C?

MR. CARSON:  Your exhibits are these exhibits.

MR. ROBERTS:  Okay.  I just wanted -- yeah. Yeah.

MR. CARSON:  Yeah. I know you labeled them yesterday.  You labeled them as Plaintiff's exhibit.  I don't want to have to start anew.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 59

So...

MR. ROBERTS:  No, I was just when I go back like my 8C is the same as your 8C.

MR. CARSON:  That's right.  I think so.

MR. ROBERTS:  Okay.

MR. CARSON:  I believe that's your handwriting?

MR. ROBERTS:  Yeah.  Yeah, it is.  Yeah.

BY MR. CARSON:

Q    Mr. Lawshe, do you recognize that photograph?

A    Not as one that was -- that I downloaded or anything, no, sir.

Q    You downloaded a fair number of pictures on your phone, correct?

A    Yes, sir.

Q    Do you remember how many ballpark rough estimate?

A    No, sir, I don't.  I was -- I do remember that when they told me how many my forensic guys said that were there, I was like that's a lot.  But I don't remember, no, sir.

Q    It was in the thousands, correct?

A    I think it was.

Q    Okay.  So if you don't remember specifically having that picture on your phone I don't suspect you

remember when you looked at it?

A    No, sir.  To be honest most of these downloaded I would never ever go back and look at them.

Q    Why were you downloading them then?

A    So of the one things when I was going through my lyme and everything I started struggling with erectile dysfunction.  And one of my doctors, I mean, she actually just was like, "Hey, have you-all tried reading stories?  Have you looked at pictures?"  And she goes, "You know, that sometimes help."

And so I think that's when I started downloading more of the photos just so I thought maybe it would help with my erectile dysfunction.  Because it's -- it's bothered me a lot not being able to kind of be romantic with my wife the way I used to be.  And she knows it.  So we were trying to -- I was trying to just see if it helped.  And so I'm not somebody that looked at a lot of porn historically.  But I started looking at it more so after that just downloading the photos.

Q    Was that your lyme's doctor?

A    Yes, sir.  Dr. Kimberly Kaye.  I remember it now.

Q    Yeah.  Yeah.  You had an opportunity to review your answers.  And that's what I was going to refer you to.

A    Yeah.

Q    So Dr. Kaye told you that maybe to look at stories or pictures?

A    Yeah.  She just said have you tried pornography.  She didn't really -- I don't think she specified exactly what, but -- and she put me on testosterone and some other things to try to help.

Q    Showing you 8B and C.

A    Yes, sir.  That's the same girl.

Q    Yeah.  How old is that girl in that picture?

MR. ROBERTS:  Objection.  You can still answer.

THE WITNESS:  Oh, yeah.  Yeah.

BY MR. CARSON:

Q    You can answer.

A    23, 24.

Q    What makes you say that?

A    Just observation skills.  I mean, just looking at her she looks 23, 24 years old.

Q    Other than just observation skills anything else that leads you to believe that young lady is 23 or 24 years old?

A    No, sir, there is nothing else there.  I mean, I would say she's 23 or 24.

Q    Do you know what website that photograph is

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                    Page 62

from?  Let me put them in front of you again.  8B, 8C, do you know what website those photographs are from?

A    I'd be lying if I said I did know, sir.  But I know the two websites that I mentioned to you I would assume they were from that one, because that's primarily where I went.

Q    Any other websites you remember going to?

A    None other than the ones I just told you about.

Q    You can go ahead and skip a couple of pages, sir, to actually I think it's the next page.  Maybe one more.  I misled you.

A    Am I looking for a file name again?

Q    You're looking for file -- image number 0065.

A    006 --

Q    There it is, sir, right there?

A    Right here, yes, sir.

Q    Okay.  I am going to show you what we've marked as Exhibit --

MR. ROBERTS:  D.

BY MR. CARSON:

Q    This is 8D.

A    Yes, sir.

Q    I'm going to rename these -- or renumber these with clearer letters before we leave here today.

MR. ROBERTS:  I won't take offense of that, Matt.

BY MR. CARSON:

Q    All right.  So that's image 0065.  0065 (1), do you recognize that photograph?

A    No.  I recognize it to be the same girl, though.

Q    Same girl as 8B and 8C, correct?

A    Yes, sir.

Q    Do you recall when you might have viewed that photograph?

A    No, sir.

Q    Do you recall when you might have downloaded that photograph?

A    No, sir.

Q    And you testified just a minute ago you would download them -- a lot of times download these photos but never look at them, is that the same with this one you downloaded it and might never have looked at it again?

A    I would assume because honestly -- again, being honest, I don't even know why I have that many photos on there because I never looked at them, but, yes.  I would imagine if I looked at it more like repeatedly I could tell you probably more about the

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                    Page 64

photo but I didn't.

Q    So you were arrested in April 2023.  Do you understand what lead to the investigation that lead to your arrest?

A    I mean, I can describe what I think what I remember is that it was alleged that some photos were flagged that were on my phone through the cloud and that they believe they were of underaged girl and that's the reason I got arrested.

Q    Are you familiar with NCMEC, the National Center for Missing and Exploited Children --

A    Not until all this happened.

Q    Make sure you let me finish my question.

A    Oh, I'm sorry.

Q    No, listen you are not being rude.  We've been doing really, really good.  Oh, man, I don't mean to upset you with that.  Yeah, I just want to make sure we get all of our answers and questions down correctly.  Okay?

A    Yes, sir.

Q    All right.  Are you familiar with cybertips?

A    No, sir.

Q    Okay.  And you wouldn't be, right, your law enforcement career has been --

A    It's wildlife.  We had -- we had training on

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 65

human trafficking.  But it was not extensive.

Q    Okay.  So I'll represent to you that the first picture I showed you of the model that we had three pictures of.

A    Yes, sir.

Q    So that's 8B was the subject of a NCMEC cypertip.  Okay.  So that is Verizon and/or its cloud provider finding that picture and tracing it to a phone number that belongs to you.  That was in January of 2023 --

A    Okay.

Q    -- that that NCMEC cypertip was generated. Does that help you at all with when you might have downloaded and viewed these photos?

A    No, sir.  It really doesn't.  I mean, no.

Q    Okay.  So the photograph that we looked at first, which is 8F, was of the subject of a NCMEC cypertip from October 2022?

A    Okay.

Q    And it was determined that this likely was not an underaged female so no investigation was triggered by this photograph?

A    Okay.  This is the first time I seen these photos by the way since all this started.

Q    I understand.

A    Okay.

Q    I understand.  And listen I'm not -- I'm not trying to embarrass you.  But, you know, 3,000 photos I don't expect you to have a photographic memory of each one.  But I do want to talk to you about another thing.  So that's the first -- 8F is the first NCMEC cypertip.  And as far as we know in this case there has only been two.  The second NCMEC cypertip was related to the photograph that's been marked as 8B.  When you were arrested in April of 2023, your phone was searched.  You're aware of that, correct?

A    Yes, sir.

Q    Okay.  They did a Cellebrite extraction, they were able to access the thousands of pictures, correct?

A    Best I know, yes.

Q    Best you know.  These photographs were not on your phone at that time?

A    Okay.

Q    Do you know why?

MR. ROBERTS:  I'm going to object to that question.  Lack of predicate and foundation.

THE WITNESS:  No, sir, I don't.

BY MR. CARSON:

Q    Do you have any reason to dispute that those photographs were not on your phone at that time?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 67

MR. ROBERTS:  Objection.

THE WITNESS:  Neither way, no, sir.

BY MR. CARSON:

Q     Did you have a practice of at some time during the months between and including October 2022 and April 2023 would you deplete photos from your phone from time to time?

A     I mean, I'm sure I did because memory would run out and stuff.  I think there were programs on my phone that would clean up memory and do stuff, I mean, yeah.

Q     Okay.  Do you remember ever going through and saying -- whether to clear up memory space or for any other reason, do you remember ever going through your phone and deleting photographs that you had downloaded from the internet?

A     Not specifically, no.

Q     Other than visiting websites and downloading photos, did you receive any photographs of naked woman or otherwise sexually explicit photographs in any other manner?

A     No.

Q     Did anyone ever text you a photograph?

A     Some officers.

Q     Okay.  Did you ever save any of those

photographs?

A    They would have been in my text messages probably.  I mean, unless they got cleaned up too.  Because, I mean, but it would be like -- I think I remember one photo that an officer sent me for the Fourth of July it was a topless woman with a flag bottom and somethin' somethin' and it said happy Fourth of July stuff like that.  It was, you know, they were being funny.

Q    That was sent to your personal telephone number?

A    Yes, sir.

Q    Okay.  Did you ever save those to the phone?

A    Not that I am aware of, no.

Q    Did you ever save any picture that was sent to you containing a naked woman or otherwise being sexually explicit to your phone?

A    Can you word -- can you say that again?  I'm sorry.

Q    Sure.  Other than -- I mean, you mentioned specifically a fellow officer sending you --

A    Right.

Q    -- quote unquote, funny, you know, photographs, you didn't save those, but do you recall ever receiving a naked -- a photograph of a naked woman

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 69

or otherwise sexually explicit photograph via text message and saving it to your phone?

A    Someone other than officers is what you are asking?

Q    At all.  At all.

A    Maybe.  Maybe not.  I'm not sure.  I mean, I have friends that would send goofy stuff too.  But I don't -- I don't specifically recall.  It wasn't a frequent thing.

Q    Okay.  Has anyone ever sent you a photograph, an image of a naked woman or otherwise sexually explicit image via e-mail?

A    Probably.  But I'm not certain.

Q    Have you ever saved any of those photographs to your phone?

A    I'm not sure.

Q    Are you familiar with file sharing sites?

A    I am after since this occurred.

Q    Okay.  What are file sharing sites?

A    Well, I think -- so I think one of the things that when they questioned my wife they mentioned Discord that's the only thing and my sons have taught me -- taught me about Discord since then.  So I am familiar with discord now.

Q    What is Discord?

A    It's basically, I guess -- well, I really don't even know.  They want me to get on it.  I haven't got on it yet because they play video games.  But I guess it's a site where you can go and you can communicate with other people and I guess according to my sons and my lawyer --

MR. ROBERTS:  Well, let's keep it to what your sons told you.

THE WITNESS:  My son says that people can do -- share stuff on there and you've got to be really careful because you can get into some discords and they'll be CSAM.

BY MR. CARSON:

Q    Okay.

A    And I was like I've never been to Discord.  I didn't have a clue of it.  And I told them that in the first place.

Q    Have you ever used programs, products like One Drive or Share File?  Do you know what they are?

A    No, sir.  Is there another page I need to go to?

Q    Yeah, I'm going to -- I think you skipped forward three, the file name is at the top.

A    Okay.  YCB.

Q    YCB?

A     LVVFQ.

Q     Underscore o.  But we are going to call that --

        MR. ROBERTS:  That's actually a different image.  That's it.

BY MR. CARSON:

Q     Exhibit 8A, do you recognize that photograph?

A     Other than being the same girl over there, no. I don't recognize downloading it.

Q     You said same girl, you pointed over here.  I want to --

A     The photos we've been looking at prior it's the same model I believe.

Q     8 B, C and D?

A     It's the same model it looks like.

Q     And you said you kind of have a knack for recognizing faces?

A     Yes, sir.

Q     So you believe that the model in photograph 8A is the same one that's in B, C and D?

A     It appears to be.

Q     Okay.  Do you remember ever viewing that photograph on your phone?

A     Not that one specifically, no, sir.

Q     Do you remember ever downloading that

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 72

photograph on your phone?

     A    No, sir.

     Q    The last photograph I'm going to show you is
-- I think skip ahead a couple of pages and I will show
you where it appears.

          MR. ROBERTS:  The DuckDuckGo.

BY MR. CARSON:

     Q    Yeah, we're going to call that the DuckDuckGo?

     A    Yes, sir.

     Q    And it has been marked as Exhibit 8E.  Do you
recognize that photograph?

     A    I don't.  But I do remember the name of that
site.

     Q    What site is that, sir?

     A    Amour Angels.

     Q    Okay.  Is that a site that you would go to?

     A    I think it was a sister site that I remember
to -- I forget the name of the other one.  The Med-Art
that we were talking about.  I think they are all sister
sites with the Petter Hegre one.

     Q    If you were subscribed to Petter Hegre your
understanding is that you also would have access to
Med-Art and Amour Angels?

     A    As best I remember I think that was the way it
worked.  It was a trial, free trial thing.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                            Page 73

Q    Okay.  If you were to subscribe to any one of
these sites for more than just the trial period, would
that show up as a charge on a credit card?

A    I would of -- well, I guess it has to be
because you're paying.

Q    Okay.  I guess that's my follow up question.
Would you be able to look at credit card statements and
determine if you ever subscribed?

A    I never paid just because my wife does the
bills.  And I didn't want her to see, hey, why are you
paying for porn.

Q    And that kind of leads to one of the questions
I had for you.  Did your wife know that you were looking
at these photographs?

A    She knows I looked at porn, I mean, yeah.

Q    She knew at the time?

A    Yeah.  I mean, we talked to my doctor about
it.  And, I mean, she has been married to me my entire
life.  So she would not say I didn't look at porn.

Q    We've been referring to this as a screen
capture primarily because at the top it appears to have
86 percent battery.  It says 4G.  There is a time in the
upper left-hand corner.  To a lot of people this looks
like a screen capture of what you might see on a cell
phone screen --

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 74

A    Yes.

Q    -- when you are browsing the internet; is that accurate?

A    I would say-so, yes, sir.

Q    Did you create this screen capture?

A    I don't recall.  I mean, if it was on my phone potentially.

Q    Did you ever do that?  Did you ever do the screen capture function where whatever you are looking at on your phone gets saved as a photograph?

A    I have used the screen capture mode before, yes, sir.

Q    Is it possible that you created this one?

A    It is possible, yes, sir.

Q    Do you recognize any of the models on that page?

A    No, sir, I don't.

Q    Did you ever use the DuckDuckGo web browser?

A    I mean, I'm sure I have.  But I use -- I mean, I use whatever web browser on the phone.  Sometimes I would -- I think there was the way the phone is set there is one on the front page, there is one on the back page.  Just whatever is easiest to get to.  I mean, a browser was a browser.  So I didn't specifically use any particular one.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                           Page 75

Q    Do you know what DuckDuckGo is?

A    It's a web browser.

Q    That's all you know about DuckDuckGo?

A    Yes, sir.

Q    Okay.  How -- if you know, how is it different than Google Chrome or Safari or Internet Explorer?

A    I think -- oh, man, I don't even know if that would be right to say, but I want to say somebody told me like a friend or something was like it's just easier to use.

Q    Okay.  Do you remember who might have told you that?

A    I don't.  And I think it was pre-installed on the phone.  I'm pretty sure it was.

Q    What kind of phone did you have, was it a Samsung?

A    I believe it was a Samsung android.  I think referred to pop ups.  It had fewer pop ups I think is what they said.  Because Google has a bunch of annoying pop ups for ads and stuff.

Q    Was that your experience using Google Chrome on your phone that it had pop ups?

A    Yes.

Q    I've represented to you that the photograph that is in 8F was the target or the subject of what

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                            Page 76

we've been calling the first NCPIC -- NCMEC cypertip.

A    Yes, sir.

Q    And so that was not part of the documents that were viewed in order to bring charges against you. We've also talked about 8B, C, D, A and E. Do you know which of these photographs were used to charge you with possession of CSAM?

A    No, sir.

Q    Do you know who took these photographs or any one of them?

A    No, sir.

Q    Do you know when any of these photographs were taken or any one of them?

A    No, sir.

Q    I'm going to represent to you that one of the photographs that formed the basis of the criminal charges against you was the top photograph on Exhibit 8E, because there is three photographs or portions of photographs. But I'm going to represent to you and your counsel will correct me if I am wrong, but it was the top photographs on 8E that was one of the photographs that you were charged with possessing. Okay.

A    Yes, sir.

Q    Do you know who that is?

A    No, sir.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 77

Q    Okay.  The -- underneath it it says Amour Angels Sanija?

MR. ROBERTS:  Sanija.

MR. CARSON:  Sanija.  Thank you.

BY MR. CARSON:

Q    Do you know who that is?

A    No, sir.  Other than a model for that website obviously.

Q    Do you know how old that model is in that picture?

A    No, sir.

Q    Do you know what Med-Art stands for?

A    No, sir.

Q    Do you know if it's an acronym for something?

A    No, sir.

Q    You testified that one of the things that you looked at before you looked at the photographs was that there was some reference to federal age verification law compliance at the bottom of the web page, correct?

A    Yes, sir.

Q    Did you know then that these websites that you visited claimed that these models were adults?

A    Yes, sir.

Q    But don't you just presume that all public websites are only showing adults?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                Page 78

A    I mean, you could presume that.  But, again, like I stated earlier, I really pride myself -- sorry. I really pride myself for being a law enforcement officer and I just didn't want to go to something that was -- could be construed as bad.

Q    And by bad you mean what?

A    Something that is like, you know, of demoralizing value toward women.

Q    Okay.  But having a federal age verification statute on the web page doesn't necessarily mean it's not going to be demoralizing to women, correct?

A    In my opinion it does.  I mean, like I said, I grew up looking at Playboy and Penthouse and those were very well respected magazines very mainstream.  I mean, hell, Hugh Hefner was famous for taking pictures of models and naked models.  Petter Hegre is the same way. He's famous.  So I just assumed that those -- they got the laws there.  This is a valid website and they are not -- and they don't -- if you look at the pictures, in my opinion, they are not demoralizing to women.

Q    Okay.  But if there is a 40-year old woman and she is a willing participant, she chooses to allow herself to be photographed in a truly demoralizing way, however you define that word, that would still exist on

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                          Page 79

a web page that had a federal age verification law certificate at the bottom, correct?

A    I've never experienced that.

Q    Okay.  Is it your experience then if you find a photograph online of a woman being demoralized, again your word, that they are not going to have federal age verification law compliance certificate at the bottom?

A    They may or may not.  It just depends on, like I said, when you look at the website you can see, again my opinion, you can tell if a website looks like a professional website or not just by looking at it, you know.  It's either going to be one that's presented professional -- presented professionally or not.  And I tried to just go to the ones that looked professional. And all of the ones that looked professional have that age verification on it.  Because, again, they are in the business to make money.  They don't make money by not being professional and treating -- treating their models respectfully and so forth.

Q    Is it your testimony that web pages that show what you would consider demoralizing photographs of adult women will not have federal age verification law compliance?

A    Can you repeat that one more time.

Q    Sure.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 80

A    I'm sorry.

Q    In the whole of the internet -- let me start again.  Is it your testimony that in the whole of the internet as it currently exists, and as it existed in April 2023, web pages that contain demoralizing photographs of adult women who have consented wouldn't have federal age verification law compliance referenced on their web page?

A    A hundred percent of the time I don't think there is anything hundred percent of the time.  So, no, there could be valid websites out there that don't demoralize women that don't have that.  But if I remember right, by federal law they have to have that disclaimer for the most part.

Q    I guess what I am trying to differentiate is the difference between subject matter that's demoralizing and subject matter that's illegal?

A    Okay.  I mean, I guess that would be -- I don't even know what you're asking there.

Q    Let me ask you this.  I am to going show you 8F.  It's been redacted, but what we can see is a woman on a bed, she appears to be tied by rope to the post. She's got a ball gag in her mouth.

A    Yeah.

Q    Would you consider that to be a demoralizing

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 81

picture?

A     I would.

Q     Okay.  Is that woman -- is the woman in the picture of lawful age?

A     As best I can tell.

Q     Okay.  Did this come from a legitimate website?

A     Yeah, it would have to be.

Q     Okay.  And if this came from a website that complies with federal law --

A     Right.

Q     -- it would contain a statement somewhere on the web page that says we have complied with or are complying with federal age verification laws, correct?

A     Correct.

Q     So that's my point, this is a demoralizing photograph, we would all agree?

A     Okay.

Q     But it exists and is available for viewing --

A     Right.

Q     -- on a legit web page that says it complies with age verification laws?

A     Okay.

Q     So if your purpose is to avoid seeing pictures like this, what good does checking for federal age

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 82

verification laws do you?

A     Well, that site specifically should be -- it's legal.  They are saying that, hey, we are models, we follow an HR policy, we screen our people to make sure they are of age.  And that's the legality thing.  That's a legality thing and more of a, I guess, a fetish thing.

**Q     And that's my point, right, is you testified is that the reason you looked for age verification laws was not necessarily to make sure that the models were 18 and that the photographs weren't CSAM.  You said it was because you didn't want to see stuff that was demoralizing and that's where I got confused.  Because there are, as I understand it, on the internet, a fair number of web pages that will show stuff that I think you and I would agree are demoralizing but are lawful and comply with all federal age verification laws.  Would you agree with that?**

A     Yeah.

**Q     Okay.**

A     My comment to that was more on the line of, again, me being a law enforcement officer, a Christian, if my wife were to walk in and see me looking at something like that that she would be like, "What are you looking at, Lee?"  And I would be embarrassed.  But I didn't look at that.  I mean, if you went through

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 83

those -- I'm sure they went through the photos. I guarantee you there ain't many like that. I'm just saying there should not be.

Q    Are there some like that?

A    There might be some like that, but there is not a bunch, because that's not a thing I was into.

Q    You downloaded some like that, correct?

A    It's possible, yes.

Q    Okay. When you're saying -- well, when you say "like that" we are referring to?

A    I'm talking about the girl tied up.

Q    8F?

A    Yeah.

Q    Okay. And I knew what you were talking about, but, again, I want to make sure that the record reflects. So you would have been embraced to be -- if your wife walked in and you were looking at that photograph, correct?

A    Yes.

Q    Okay. Would you have been embarrassed if you walked in -- if your wife walked in and you were looking at 8B?

A    No.

Q    Okay. Would you have been embraced if your wife walked in and you were looking at the photograph

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 84

that is the top of 8E?

A    No.

Q    And when I say -- when I ask you questions about the photographs obviously we've redacted these for purposes of being able to handle them and not, you know, unnecessarily embarrass the folks that need to look at these when they become part of the record.  But when I'm asking you these questions I'm talking about the unredacted version and stuff?

A    No, I understand.  Yeah, I know.  They're of legal age.

Q    Pardon me.

A    They're of legal age.

Q    Okay.  That's -- your testimony is that they are of legal age?

A    They look legal to me, yes.

Q    Do you know where any of those photographs were taken?

A    No, sir.

Q    In the whole of the internet, is it possible that a website that states it complies with all federal age verification law requirements and tries to comply with all federal age verification requirements might inadvertently fail to comply with federal age verification law requirements and inadvertently post a

picture of say a 17-year old model?

A    Is it possible?  Absolutely.  I guess it's possible.  Anything is possible.

Q    **Have you received any medical, psychiatric, mental health treatment as a result of this incident?**

A    No.  Can I get more water?

Q    **Why don't we take another break.**

MR. ROBERTS:  Yeah, I could use the restroom.

VIDEOGRAPHER:  All right.  We are off the record at 11:04.  End of media unit number one.

(Whereupon a recess was taken 11:04 to 11:16 a.m.)

VIDEOGRAPHER:  We are back on the record at 11:16 beginning of media number two.

BY MR. CARSON:

Q    **Mr. Lawshe, I've asked you to provide a computation of the damages that you allege that you suffered as a result of this incident.  In your Rule 26 disclosure you've listed past loss of earnings, future loss of earnings, past and future cost of medical care, and pain and suffering, damaged reputation, loss of enjoyment of life, et cetera, past and future.**

**Let's talk about past loss of earnings.  Have you calculated your past loss of earnings you allege are a result of this incident?**

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 87 of 147 PageID 3131

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                        Page 86

A    Yeah, we have prepared something.  I think we gave it to you already.

MR. CARSON:  Did we get that, Michael?

MR. ROBERTS:  Uh-huh.

MR. CARSON:  What was that?

MR. ROBERTS:  Our expert disclosure economist.

MR. CARSON:  Oh, gotcha.

MR. ROBERTS:  He has like a whole spread sheet of loss earnings.

MR. CARSON:  Has that been provided?

MR. ROBERTS:  Yep.

BY MR. CARSON:

Q    Okay.  That's past loss of earnings, future loss of earnings?

A    That and, I mean, he calculated everything also to include my off duty work that I obviously aren't doing, yes.  So its -- he's got everything in there.

Q    Does that include medical care?

A    It did.

Q    Okay.  What future medical care do you allege that you will receive as a result of this incident?

A    Well, my lyme -- anything that's super stressful aggravates my lyme like I told you.  I mean, I'm in the middle of a lyme flareup right now with all this stress on me.  So it takes meds, it takes me going

to the doctor more often to get my meds.  I may eventually seek some type of counseling.  Probably will, but I am going to get through this.  So I'll get counseling and things like that.  So and just the stress what it's done to me health wise.  I mean, my blood pressure is through the roof.  My doctor can't figure out how to get it down.  It's all directly because of what I deal with every day.  I mean, I'm basically untouchable.  You know what untouchable is.

In India there are these people called untouchables.  They were the ratters.  They cleared the country of rats.  It's part of the cast system.  Well, that's what I am now in this -- I'm untouchable.  Nobody wants to do anything with me.  I get looks out of the side of eyes that people used to know me for 20 plus years.  I go into restaurants.  That's not ever going away.  And I have to deal with that every day.  And my wife has to deal with it.  My wife -- my mom lost her hairdresser.  She just told me this the other day.  And it destroyed me.  We wife -- my mom was like, "Lee, I haven't told you this, but my hairdresser stopped doing my hair because of all of these allegations that came down."  Yeah, that's -- that causes issues.  Sorry.

MR. CARSON:  All right.  Mr. Lawshe, that's all the questions I have for you.  Ms. Shevlin may

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 88

have some other questions.

THE WITNESS:  That's fine.

MS. SHEVLIN:  Thank you, Mr. Carson.

CROSS-EXAMINATION

BY MS. SHEVLIN:

Q    Mr. Lawshe, my name is Amy Shevlin. I represent Dr. Dully in this action. I do have some questions for you.  And I'll echo what Mr. Carson said at the beginning of this deposition.  I'm sure some of my questions may be upsetting or make you uncomfortable. It's certainly not my intention.  But this is my opportunity to ask you some questions that I do need to ask you.  Let me go back through my notes here for one second.

You mentioned earlier in your testimony I believe you said that you had two sons, if I am remembering that correctly?

A    Yes, ma'am.

Q    Okay.  And how old are your sons?

A    35 and 24 or 25.

Q    Do they have children?

A    Not yet.  They are talking about it.  We've actually have to have conversations about that, because I told them I can never have a sleepover with my grandkids and stuff, because after this allegation came

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 90 of 147 PageID
3134
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                        Page 89

up, I don't want them to think in the least that something inappropriate would happen or could happen.

Q    That's something that you told your sons?

A    Yes.  Because they called me and they have been talking about having grandchildren.  They are all excited about it.  And I can't be, because the relationship I would have with my grandkids and I can have now has changed.  Even though they know they trust me.

Q    Are there any legal restriction on you spending --

A    No, there is not.  But once this kind --

Q    I apologize.  I didn't hear your last testimony.  There is a little bit of a delay.  I apologize.

A    Yeah.  No, there is not any kind of restriction.  But once this kind of allegation is made, I have to be careful.  I can't -- I can't act and do the things that I used to do anymore because people are always going to question it.  And I can't open myself up to that.

Q    Did your sons tell you that they did not want you to be alone with their future children?

A    No, just the opposite.  They want it.  But I can't.  I know it's in the back of their minds.  It's in

the back of everybody's minds.  And that's what's so messed up about this.

Q    Would you characterize your relationship with your sons currently as a positive relationship?

A    Yes, ma'am.  It's a great relationship.  We are a very close family.  They are the only reason I am still here.

Q    In your answers to Dr. Dully's interrogatories you mentioned that you are currently receiving payments from a pension?

A    Yes.

Q    Is that still true to this day, are you still receiving pension payments?

A    Yes, it is.

Q    Can you tell me how much you receive monthly from your pension?

A    I think it's like $1400.  I'm not positive though.  My wife does all of the bills.  But I'm close.

Q    Is that -- I apologize if I speak over you. There is a little --

A    It's about $1400.

Q    -- little bit of a delay.  So it can get a little bit tricky sometimes.  So.

A    It's about $1400 once a month.

Q    And is that -- is that pension from FWC?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 91

A    Yes, ma'am.

Q    And you also stated in your interrogatories that it was less than you would have received had you worked until your full age of retirement.  Do you have any way of knowing how much you would have received from your pension had you worked 'til full age of retirement?

A    I believe the economist miscalculated that.  I think he reached out to the Florida Sunshine State or whatever and tried to calculate it the best he could.

Q    All right.  But you don't have any independent knowledge of how much you're alleging you would have received had you worked through to retirement?

A    I mean, it's -- all you would have to do is, yeah, call them and they could tell me.  Yeah, they can tell you what it is going to be because it's an accrual rate.  They know what the accrual rate is.

Q    And that's -- as we sit here today that's not something that you know off the top of your head, correct?

A    No, ma'am.  No, ma'am.  Right now I don't know that exact number.

Q    You mentioned also early on in your testimony that you had applied to approximately 30 jobs, but you had not heard back from anybody.  Am I remembering that correctly?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 92

A   Yes, ma'am.

Q   **Can you tell me what span of time in which you applied to those 30 jobs?**

A   Approximate would be maybe the last eight months.  And I probably haven't applied for any more in the last two months.

Q   **And the last application that you put in was approximately two months ago?**

A   It's probably a little later than that.  Maybe four months ago.  Probably that whole thing could be slide -- slid back a little bit further.

Q   **Is there any particular reason you haven't applied for anything in the last two to four months?**

A   Other than it's kind of hopeless.  And I'm not going to go to work for some group that a bunch of felons work for, because that's not the kind of person I am.  And that's really only going to be probably the only kind of job that I can get.  So I'm honestly trying to start my own business right now.

Q   **What kind of business?**

A   Car detailing business.  It's going to be a mobile car detailing business.

Q   **Is that -- you mentioned earlier that you had a friend who had a car wash that went out of business, is that related to that in any sort of way?**

A    No, he just gave me the idea.  And so all my -- I've got family members -- because I have quite a few family in town.  So I have got about 13 cars I do a month.  Well, no, maybe not that many, about 8 cars I do a month and they pay me.  But it's all family.  So it's -- but I'm trying to expand on that and down the road get a business license and things like that and actually make it a real business.

**Q    And how much are you earning with the, I think you said, eight cars a month?**

A    Well, it's not every month.  But I would say maybe 500, if that, a month.  It's probably more like 300 a month.  Because I don't charge them -- I mean, it's family.  I don't charge them what a car detailer would charge them, if you know what I mean.  You wouldn't charge your family members a couple of hundred dollars.  I charge them like 50, 60 bucks.  And that just helps.

**Q    When -- you stated you're not going to go work where a bunch of felons work.  What exactly did you mean by that?**

A    The restaurant industry is full of felons.  A lot of septic -- septic tank places, jobs that people don't want basically because they are dirty.  I like law enforcement.  I like retail.  I was always served and

worked in the entertainment industry and Fortune 500 Companies.  I worked for Gap, Inc.  I worked for Blockbuster Video.  I worked for Gander Mountain.  All really big Fortune 500 companies and as soon as they find out and I tell them about and they have to be told because everybody in that genre knows me so they're going to walk into the store.  Somebody is going to say something to the manager, oh, hey, do you know this guy was arrested for such and such and they walk over and go, hey, is this true, is this what happened.  How embarrassing that would be.  So, yeah, I can't work in those kind of places.

**Q    When you say you have to tell them about the arrest, is it your understanding that you legally have to tell them about the arrest, or are you saying that you want to tell them up front to avoid the potentially embarrassing situation that you just described?**

A    The second.  I think it's just morally and ethically correct I should let them know about it.  If you were a business owner I think that you would want to know that.

**Q    You mentioned the -- your diagnosis of lyme disease, when were you first diagnosed with lyme disease?**

A    I think it was 2019.  My doctor said I had had

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                             Page 95

it for probably four or five years undiagnosed which is why it had progressed to the point it had.

Q    What kind of symptoms were you having that led to your diagnosis?

A    Memory loss, my handwriting changed, cognitive abilities, I couldn't write a police report.  A report that would normally take me maybe an hour or two, would take me a week to write.  Debilitating -- debilitating -- I'm sorry.  Debilitating like just fatigue.  I would go -- I might be able to work two or three days and I would sleep for four or five days just straight never get out of bed.  I had very bad stomach cramps and nauseous and also, you know, the main thing, too, was I had five or six instances where I just had -- I didn't know where I was at.  And that's when I had a buddy who also has lyme disease that got me finally in to see his doctor.  I had been to about 15 doctors getting diagnosed.  And I finally got the late stage diagnosis through the doctor that I gave you guys in your paperwork.

Q    That's Dr. Kimberly Kaye?

A    Yes, ma'am.

Q    When is the last time that you saw Dr. Kaye, most recent appointment with her?

A    It was last year.  I'm kind of on a yearly

thing now.  I'm supposed to see her this month.

**Q     Your appointment for this month is that your yearly visit with her, you see her in March generally?**

A     Yes, ma'am.  It's my yearly visit and she dictates after that how much -- how many symptoms I am still having whether I have to see her more or not.

**Q     What was the timeline where -- I just want to pin down, you know, what year, around about, if you recall, you were saying, you know, you were having some cognitive issues and normally a report that would take you about an hour to write would take a week, you would work two days, and then you would sleep for four or five days, what year approximately did that start happening?**

A     Give me a second to really think.

**Q     Sure.**

A     2019.  I think it was like it started in 2019 through up until 2020 is when I was experiencing -- I think I went to the emergency room eight times.  They were about ready to give me a pacemaker, it was a whole bunch of stuff and it was all in my lyme.  So I think -- because I was out of also -- I was out of work for about three or four months bedridden.

**Q     Did you take like family medical leave or something like that --**

A     I did.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                              Page 97

Q    -- while you were working?

A    I was on FMLA from that time all the way to the time I was let go with FWC.

Q    So when is your last day that you actually worked at FWC before you took FMLA leave?

A    I'm sorry.  Say that one more time.

Q    What's the last day that you actually worked before taking FMLA leave from FWC?

A    So I was on FMLA leave all the way up to the day I was arrested.  There is an FMLA -- there is a part of FMLA that's a flexible FMLA.  And what would happen is whenever I would experience flareups I was able to use FMLA.  So I was on FMLA from about 2019 all the way up to the day I was arrested.

Q    So the four to five month period when you didn't work at all --

A    So that was --

Q    -- that was when?

A    -- regular traditional FMLA I was just out of work totally.  But there is also part of FMLA that allows you to flexibly work with lyme.  So what it allowed me to do, and this is one of the things that I have issues with trying to find a job, because I got a job I would have to immediately be moved back on FMLA, was that, you know, I could work and I might work during

the summer part of the year and get really hot and really stressful because of the heat and wearing all the stuff that I wore for my vest.  And I would work my regular 13-hour shifts, 12-hour shifts, but because of that I couldn't get the rest I needed and I could then go out on FMLA with what's called flexible FMLA I just -- it was already called in, it was already done. I would just have -- I could take three days off and they couldn't say anything about it because I was on FMLA.  And I then would sleep and do what I need to do and I would come back to work and I would work fine until the next thing happened that would maybe cause my lyme to flare up.

My doctor said I will have my lyme flareups for the rest of my life because of how long I went untreated.  Does that make sense?

Q   The -- it does.  Yes, I am just trying to pin down -- I am not quite sure you answered my question. So I will try to ask it a different way.  The four to five month period where you didn't go into work at all.

A   Yes, ma'am.

Q   When was that?

A   My wife would know.  I can't -- I don't know exactly for sure.  It was -- I think it was in 2019. Because it was after I was off for the year for the

nation and I think that was -- I honestly I don't know. I could -- I could come back -- get back with you on that, because I could call my lyme's doctor and find out.  But I don't know.  I really don't.  I'm sorry.

**Q   Okay.  Yeah, that's okay.  For purposes of today, I just want to know what your best recollection is.  So that's fine.  And then the follow-up question I have for you, again, I'm not expecting you to know exact dates and tell me it's January 12th of 2020, but do you recollect when you went back to work and you began working on the flexible FMLA instead of being completely on FMLA?**

A   I think I was -- I couldn't tell you the month or date, but I think I was out about three months.  So whatever that was.  I remember I also had to call -- I had -- I had -- I had a rep for my -- my FOP -- what do you call it.  PBA.  I had a PBA rep or an IUPA rep.  I'm sorry.  I had an IUPA rep for my -- my -- give me a second.  I'm drawing a blank here.

**Q   That's okay.**

A   For my union.  Because I was being threatened actually by one of my -- I was being threatened by my captain.  He didn't believe I was sick and had lyme.  He actually came to my house and was like telling me he was going to put me on some kind of investigation for fit

for duty.  And so I called my rep and got him involved and that all went away.  But it took my work a while to understand that -- they didn't believe I was sick at first.

So I remember all that happened when I was out sick because they just -- they were trying to get me to quit or fire me.  And I actually was trying to create a bill -- I had a state congressman that was trying to create a lyme bill for us and I really think they didn't like that anyway.  So I think they were looking for a reason to get rid of me.  But we were trying to create a lyme bill because there is a lot of police officers, there is a lot of people who work for Division of Forestry, and just working the woods in Florida that have all contracted lyme in Florida.  And I hate to say it, I mean, I was a big proponent of this, but it's not being told to the public, that lyme is actually in Florida.

The University of Florida did a study that showed the white-footed mouse from Matanzas State Forest right here in St. Johns County up to the border of Florida and Georgia that all the mice in that area can have lyme disease.  But yet we continue to let people walk in our state forest and recreate and we are not telling people about that.  I believe they looked at

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 101

that as a threat.  I mean, I did.  I went to my colonel about it.  I talked to -- that they were -- what they were doing was wrong.  They need to educate the public and they are not.

Q    What's the name of the colonel that you spoke to about this?

A    It would have been, oh, gosh.  It's not the colonel.  It would have been -- it's the one that retired two years ago.  I can't remember his name.  I'm sorry.

Q    That's okay.

A    But he was a big proponent of it too.

Q    Okay.

A    He was not against it.  But his hands were tied because he's elected.

Q    There is a delay.  I'm sorry.  All right.  I think we are back.

You also mentioned your captain at the time came to your house and threatened you with, you know, seeing if you were fit for duty, what's the name of that captain if you recall?

A    Captain Smith.

Q    What's Captain Smith's first name?

A    I can't remember.  I don't think he works for our agency anymore.  He's -- he was -- they fired him

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 102

eventually.

Q    You mentioned when we were just speaking about the lyme symptoms you mentioned that you had gone to the emergency room eight times, did you go to the same emergency room every single time?

A    No, ma'am, I went to several because one time I was on vacation.  So I think I had been to Flagler and to what's the really good hospital up in Jacksonville.  Mayo Clinic.

Q    Those are the only two, you went to those two eight times between the two of them?

A    Yes, ma'am, I'm pretty sure that's the only two I went for emergency room issues.

Q    Was that before or after you had your lyme diagnosis?

A    It was kind of -- I think it was kind of during, because I had --

Q    You were already seeing Dr. Kaye?

A    Yes.  Well, actually it was probably while I was waiting to see Dr. Kaye.  Because I was -- that's where I had the lyme carditis.  It affected my heart.  It got into my heart and it was causing my blood pressure to bottom out and heart palpitations and everything.  And that's what I was going to the emergency rooms for.

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 104 of 147
PageID 3148
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                              Page 103

Q    Where you say causing your blood pressure to bottom out, what do you mean?

A    So my heartbeat would slow down so much and skip so many beats that they thought I had AFib but I didn't.  It was -- it was what's called lyme carditis. And can be --

Q    Are you under the care of a cardiologist for the lyme carditis?

A    So I have a cardiac doctor at Mayo.  And I see him once a year.  But my primary is with Doc Kaye.  Once they got me on the meds and treated the lyme carditis it's pretty much subsided. I haven't had an incident with that for probably two years now.

Q    What's the name of the cardiologist that you see at Mayo once a year?

A    I can't remember, ma'am.  I'm sorry.

Q    Okay.  When is the last time that you saw that cardiologist?

A    Like I said about two years ago.

Q    I just want to make sure that I am correct, because I -- I think there is some information in the file that is possibly discrepant on my end.  But when you were arrested, did you end up resigning from FWC or were you fired?  Because I am just not sure on that.

A    Okay.  So what happened was I was sitting

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                           Page 104

there.  They looked at me and my captain and my major said, "We can't tell you what to do, Mr. Lawshe or Lee.  We are flabbergasted by this.  I have one question and you have one answer to give."

And I saw said, "Okay."

And they said, "Do you resign or are we firing you?"

And I asked them, "Well, can I talk to somebody?  I have some questions."

And they said, "That's all we can give you right now."

And I said, "Well, I guess I resign."  And that's what happened.

Q    What date was that if you recall?

A    The day that I was arrested.

Q    Where did this occur?

A    In the sheriff's department.

Q    Was that Captain Smith?

A    No.  That was -- it was -- give me a second. It was Major Russel and I had a new captain.  Captain Creech, Captain Robby Creech.

Q    I'm going to guess that's C-r-e-e-c-h?

A    I believe so, ma'am.  I'm not -- I believe so. I'm not positive.

Q    You mentioned that you were on -- and I think

Case 3:24-cv-00044-JAR-SJH   Document 86-8   Filed 09/12/25   Page 106 of 147
PageID 3150
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025
Page 105

you said currently on some prescription medications for your lyme disease.  Can you tell me what prescription meds you are currently taking?

A    So prescription med I am not actually on a lyme other than I'm taking two what they call tinctures.  They're -- it's a bunch of Chinese herbs really for -- it's like -- and I told him -- I can't remember the name of it now, but Dr. Kaye could probably tell you.  But I do take a lot of supplemental vitamins and things.  I'm off -- I'm off any per se prescription med now because of how I have progressed.

Q    Are you taking any other prescription medications currently that are unrelated to your lyme disease?

A    Yeah, I'm taking one Ramipril for my high blood pressure.  Ramipril.  And she prescribed a few -- a few other meds for me to use as needed for my stress and that I have been under with all this.  I can't tell you the names of them.  But it was like -- I don't like the way they make me feel.  So I don't take them unless I absolutely need it.  It's like -- I can't remember the names of them.  But there is one that's like a benzopine they dumb you down and slow you down and just make you not feel.  But she would -- she would have a list of them.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 106

Q    Sure.  And that's Dr. Kaye as well?

A    Yes, ma'am.  Yeah.  All my medicine I take are prescribed from Doc Kaye.

Q    I mean, I assume based on what you just told there may be like an antianxiety medication?

A    Yes, ma'am.  I mean, if you said a couple of them I will be able to -- if you knew them, but I don't know the name of them.

Q    That's okay.  And so the high blood pressure medication, the antianxiety medication which the name you can't recall right now, you've got the herbal tinctures, and some vitamin supplements, is there anything else that you are currently taking?

A    Just vitamins, you know, that also aid with my lyme.  Vitamin B, Vitamin K, Vitamin D, Magnesium, Vitamin C, Quercetin, there is a couple of them I am not remembering, but that's probably most of them.

Q    Okay.  Were there any prescription medications that you were taking in the past that you are no longer taking for any conditioning including the lyme?

A    Yeah.  There was -- I was taking 60 pills a day when my lyme -- when I was really sick.  I mean, they had me on -- there is a pill that they used to give addicts.  Antabuse.  I was on Antabuse for a long period of time.  I was also on Narcan.  They had me on Narcan

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 108 of 147
PageID 3152
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                       Page 107

for a while.  A couple of antifungal medicines because with most lyme patients you have fungal overgrowth.  And then I was taking very, very high doses of antibiotics and I can't remember what antibiotics they were, but I was taking super high doses of antibiotics three times a day.  I think it was like Amoxicillin and things like that.

Q    Anything else that you were prescribed -- any prescription medications that you used to take that you no longer take?

A    I think that's pretty much it.

Q    You also mentioned that as a result of the lyme disease, you again experienced some erectile dysfunction.  Do you recollect when that symptom began?

A    Probably about a year into the medications.  Once I got diagnosed with Doc Kaye I started having issues.  I thought it was the Antabuse.

(Simultaneous talking)

A    Yeah.  I am sorry.  I thought it was the Antabuse because one of the side effects of the Antabuse and she told me was erectile dysfunction.  But she assured me that once I was off that it would go away, but it never really did.

Q    That would have been roundabout 2020 maybe?

A    Maybe.  Like I said Doc Kaye would have record

Case 3:24-cv-00044-JAR-SJH   Document 86-8   Filed 09/12/25   Page 109 of 147
PageID 3153
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 108

of it when I went on that.  It was when I was really
sick and bedridden and couldn't work.

Q    Was she the one that diagnosed you?

A    Yes, ma'am.  She specializes in lyme disease.

Q    And you also mentioned -- I think that you
said both you and your wife spoke with Dr. Kaye about
her recommendation that you maybe look at pornographic
images, do you recall?  Am I remembering that correctly?

A    Yes, ma'am.

Q    Do you recall when that conversation took
place?

A    It would have been on one of my visits.  I'm
not sure which visit it was.

Q    Do you recall -- again, I know you are not
specific with dates, but roundabout maybe what year you
began downloading pornographic images after speaking
with Dr. Kaye?

A    Not really because I don't remember when the
conversation happened.  But, no, I don't.  I really
don't.

Q    Have you ever met Dr. Kathleen Dully?

A    No, ma'am.

Q    Do you know if your wife or anyone in your
family has ever met her?

A    I would venture to say, no, they've never met

her.

Q    Do you know who Dr. Dully is?

A    Only from the proceedings that we are dealing with now.

Q    Tell me what your understanding of who Dr. Dully is.  And the same thing is going to apply if you have learned anything from your counsel, please do not divulge any attorney/client privileged conversations, but just your independent knowledge as we sit here today of who Dr. Dully is if you could tell me.

A    Well, as best I understand she is just somebody that works for the State of Florida that when NCMEC things come up they can contact her and let her do her supposed scientific process, divulge maybe whether a picture is or isn't or determine their age by looking at pictures.

Q    Do you know who contacts her?

A    I believe it was NCMEC.  And, again, I only know that because of these proceedings.

Q    Sure.  If I represented to you that St. Johns County Sheriff's Office contacted Dr. Dully and NCMEC directly would you have any reason to dispute that?

A    No.

Q    Have you and your wife sought marriage counseling as a result of this incident?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Page 110

A    No, ma'am.

Q    And how about family counseling with your sons or anyone else in your family, you mentioned your mother earlier as well?

A    I think my oldest son has seeked some counsel, but I don't I think it's directly because of this.

Q    You haven't had family counseling with anyone?

A    No.  No, ma'am.  I'm sorry.

Q    With your mother or anybody else as result of this?

A    No, ma'am.

Q    That's okay.

You mentioned a little bit ago that you may seek counseling in the future.  Why haven't you sought counseling thus far?

A    I -- just the type of person I am, you know, being in the military I've talked to soldiers who were in combat.  I was never specifically in combat.  But I'm a proponent of -- and I've seen what those drugs do to the people that are chronically depressed and so forth. And I -- it's my opinion that those meds actually make things worse for them.  Many of them cause them to commit suicide.  And I just choose not to go that route. This is a scar --

Q    Would you agree with me that --

A     Go ahead.

Q     I'm sorry.  Go ahead.  There was a delay.  I didn't want to cut you off.  Go ahead.

A     Yeah.  There is just a scar that I'm going to have to carry the rest of my life and it is what it is.

Q     Would you agree with me that you could seek counseling without taking medications?

A     You could.  But for me, every time I talk about this and bring it up it brings it back.  And it needs to be compartmentalized in a part of my brain and put away so I can enjoy my life.  I don't smile anymore my wife will tell you.  I'm not the person that I used to be.  And I'm trying.  We have a great marriage.  And I have a great wife.  I'm very thankful she didn't leave me.  But no counseling could make this go away.  Nothing is going to make it better.  I just need time with anything that is going to help I think.

Q     Have you spoken with any of your medical doctors about possibly receiving counseling?

A     Doc Kaye.  Doc Kaye suggested it and I told her I appreciate it.  And I've left it open, but I don't see me seeking any counsel, I don't right now.

Q     What would change that, would make you seek counseling in the future?

A     I don't know.  I guess if I started thinking

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 112

more about suicide.  But right now my family is enough to keep me from thinking about that to where I would consider doing it.  But during the process of all this I did think about it.  I would be lying to you if I didn't tell you that.

Q     Is that when you were on the suicide watch?

A     It wasn't when I was on the suicide watch, but it was after I got out and they continued to press charges and didn't want to admit that they made a mistake.  And how I was basically more or less in my opinion being framed that I could end up spending 45 years in prison for this.  Knowing what happens to people in prison for that kind of crime on top of being a law enforcement officer, yeah, it made me consider suicide.

Q     When you say they were pressing charges and they didn't want to admit that they made a mistake, who are you referring to?

A     The state attorney and the Sheriff's Department.

Q     Give me one moment here.  I just want to look through.  I have some documents in front of me.  So I'm looking through here.  Give me just a moment.  I appreciate it.

       When was your arrest expunged?

A    It should be in the record somewhere.  I'm not sure.

Q    **Does October 2024 sound right to you?**

A    Honestly I would be lying if I said it did.  I really don't know.  I remember my lawyer calling and telling me that he had received documentation, but I don't remember the date.  And I think right now it's not fully expunged because they had -- there had to be some kind of special thing put in to where you all could leave it open still I think.

Q    **What do you mean, where you all could leave it open?  Who are you referring to?**

A    I guess counsel, because under expungement everything would have been destroyed and gotten rid of but because we're doing this case, there had to be some kind of special something submitted in order to still not got rid of the digital data so you-all could still look at it.

Q    **Okay.  I am not familiar with what you're referring to.  Is there a specific document that you are referring to?  And, again, if the information you know came from your counsel, I don't --**

A    Okay.

Q    **I don't want to know that.**

MR. ROBERTS:  Amy, Matt and I had extensive

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 115 of 147
PageID 3159

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                      Page 114

discussions about this.  We can provide you with the documentation. I don't know that he knows anything outside of what I've told him.

MS. SHEVLIN:  Okay.  I believe I just have the expungement order here.  I was just wandering if there was anything else.  So that's fine.

MR. ROBERTS:  There is -- there is an amended order.

MS. SHEVLIN:  I wouldn't suspect Mr. Lawshe would know this.

MR. ROBERTS:  Sorry.  There is an amended order that I'd be happy -- I think it was provided, but like we can do that.

MS. SHEVLIN:  Okay.  Yeah, if you would get that over to me, because I don't see that in my file.  So thank you.

BY MS. SHEVLIN:

**Q    As far as the damages that Mr. Carson was discussing with you earlier, Mr. Lawshe, you advised that you had a -- there was an expert that helped you calculate some of your damages?**

A    Yes, ma'am.

MS. SHEVLIN:  Michael, I received -- I'm assuming that's Mr. Borg, Michael?

MR. ROBERTS:  Yes.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 115

THE WITNESS:  Yes, ma'am.

MS. SHEVLIN:  Okay.  I received his C.V.  I do not have a report from him.

MR. ROBERTS:  I think I sent it the following day.  I think it was like not in the original.  So like our deadline was the third.  So I think it was like the fourth that I sent it.  It was like in a separate e-mail.

MS. SHEVLIN:  Okay.  I will have Rachel double check.

MR. ROBERTS:  I can resend it.  Yeah.

MS. SHEVLIN:  Thank you.

BY MS. SHEVLIN:

Q    Mr. Lawshe, you also in your answers to Dr. Dully's interrogatories, which were previously marked, I believe, as Defense Exhibit 11, but let me double check, you indicated that you had seen a doctor, I think it was D'Arienzo?

A    Yes.

Q    D'Arienzo?

A    Yes.

Q    Can you tell me who that person is?

A    He was just a doctor that I went to one time to potentially get diagnosed with PTSD.

Q    When did you first see him?

A    I don't know the date honestly.  And, like I said, I only saw him the one time.

Q    Why did you only see him one time?

A    Just because of, like I told you before, my feelings of the psychiatrist and the issuing of all these psychotropic heavy drugs that kill people, I just -- I'm not an anti-vac or anything like that, but I just -- it's they over prescribe these medications that do more harm.  Every one of those medications that you see these doctors issue they tell you side effects are depression, suicidal thoughts.  I don't need to take those kind of meds.

Q    Did Dr. D'Arienzo give you a diagnosis?

A    No.  I don't think I went enough time to get a diagnosis for it, no, ma'am.

Q    Did he attempt to prescribe medications to you?

A    No.  No.  Like I said it was just counsel.  It was just a first visit, I guess.  So it never went that far.

Q    Do you think that would have occurred in 2023, 2024 or was it this year?

A    When was my arrest date?

Q    Hang on.

A    It would have been some time after that when I

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 118 of 147
PageID 3162
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                              Page 117

saw him.

Q    I can't find the exact date and I apologize, but I know your arrest date was in, I believe, spring of '23.  And if anyone else has it in front of them please feel free to chime in.

MR. CARSON:  April 12th, 2023.

THE WITNESS:  So it would have probably been within twelve months of that date some time.

BY MS. SHEVLIN:

Q    Within twelve months you said?

A    I believe so as best I can recollect.

MR. ROBERTS:  Can we just take a quick -- I want to say something.  Because I made a comment that I sent this to you this report.

MS. SHEVLIN:  Sure.

MR. ROBERTS:  It may be sitting in my drafts because you guys didn't have it. I'm looking.  I have a draft from the next day to send you the report.  So I may not have sent you the report.  But it was completed.  So if it wasn't sent, and I'm not saying it wasn't sent, but if you don't have it it may have just been in a draft, and I am not trying to misrepresent that I sent it to you.  If it was my error, that there was no report.  I think our disclosure said that there was an

Case 3:24-cv-00044-JAR-SJH    Document 86-8    Filed 09/12/25    Page 119 of 147
PageID 3163
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 118

attached report.  And so if it wasn't -- but anyway.  Okay.

MS. SHEVLIN:  I don't have it attached to that.  I got the C.V., Michael.  And I certainly -- I mean, you and I've worked together before.  I don't believe you have any intention of pretending you sent me something that you didn't.

MR. ROBERTS:  Right.  I think the original disclosure --

MS. SHEVLIN:  If you could send that over, though, it'd be helpful.

MR. ROBERTS:  Yeah.  Yeah.  Yeah.  Yeah.  Yeah.

MS. SHEVLIN:  Yeah.

BY MS. SHEVLIN:

Q    Okay.  And I assumed from, Mr. Lawshe, from your answers regarding Dr. D'Arienzo that he is a mental health provider of some kind.  Do you know what kind of doctor he is?

A    I don't.  But, yes, he is a mental health.

Q    Aside from Dr. D'Arienzo have you been evaluated or treated by any other mental health provider or counselor after the date of your arrest?

A    No, ma'am.

Q    Okay.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 119

A     My -- my current counselor is my wife.

Q     Checking a document.  Hang on one second, please. I appreciate your patience.

Based on what you told me your understanding of Dr. Dully's role was earlier just a couple of minutes ago, I just want to clarify, do you believe that Dr. Dully is an employee of St. Johns Sheriff's Office or she works for someone else?

A     She works for someone else.  I'm pretty sure she works for the Gainesville college, I think.

Q     Was your understanding that Dr. Dully was asked to assist in St. Johns Sheriff's Office investigation?

A     Yes.

Q     Based on what you told me earlier that you don't believe you or anyone else in your family have met Dr. Dully before, I would assume that there is no history of bad blood between families or anything like that with Dr. Dully?

A     No, ma'am.  I have no clue who she is.

Q     Would you agree with me that if there were sexually explicit photos of minors being taken, that that would be a form of child abuse?

A     Yes, ma'am.

Q     Were you aware that Dr. Dully was not paid or

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                  Page 120

compensated for her assistance with St. Johns

investigation?

     A    Could you say that one more time.  I'm sorry.

     Q    Sure.  Were you aware that Dr. Dully was never

paid or compensated in any form for her assistance with

St. Johns investigation?

     A    No.

     Q    Have you heard of the child protection team

before?

     A    Only since this incident.

     Q    Are you aware that the child protection team

is designated by statute to aid in law enforcement

investigations of child abuse including suspected CSAM

material?

          MR. ROBERTS:  Objection.

          THE WITNESS:  Only since --

BY MS. SHEVLIN:

     Q    Do you know?

     A    I'm sorry.

     Q    You can answer.  I'm just asking if you know.

     A    Only what I know from, I mean, this case.  I

mean, I really don't I guess.  I just heard it mentioned

since this case.

     Q    You don't have an independent -- you don't

have any independent knowledge of the role or the

statutory requirements related to the child protection team or any of their employees or directors?

A    No, ma'am.

MS. SHEVLIN:  Mr. Lawshe, I believe that's all I have for you at this time.  There may be some follow-up from Mr. Carson and your counsel may have of some questions for you as well.  I appreciate your time.  Thank you.

THE WITNESS:  Yes, ma'am.

MR. ROBERTS:  You go ahead.  I don't have any questions.

MR. CARSON:  Appreciate it.

REDIRECT EXAMINATION

BY MR. CARSON:

Q    I have just a couple of hopefully quick follow-ups with you, Mr. Lawshe.

You mentioned that you were on, I don't want to misquote you, some kind of modified FMLA leave immediately prior or in the years prior to your arrest, correct?

A    Yes, sir.

Q    All right.  In the seven days prior to your arrest, what was your work schedule like?

A    I don't remember.  I know I was planning on -- I had planned a man tracking course for the Flagler

Case 3:24-cv-00044-JAR-SJH   Document 86-8   Filed 09/12/25   Page 123 of 147
PageID 3167
WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 122

County Sheriff's Department and their SWAT Team and that's what I was going to do that morning as soon as I met with them.  But it was a regular work week.  I don't think I called out sick or anything.

Q    All right.  I'm going to pull up the April 2023 calendar.  I will represent to you April 12th appears to have been a Wednesday.

A    Possible.

Q    Okay.  So you -- when you received -- do you know what time of day it was that you received the call from Detective Tolbert?

A    Oh, it was -- it was like a week or two before that.

Q    Gotcha.

A    And I think that's the reason that morning I was running behind on everything because I had actually forgot about my meeting with him and it popped back into my mind, oh, shit, I was getting ready for man tracking and get all the stuff together for that.

Q    Do you remember what time it was that you met with detectives at the St. Johns County -- St. Johns County Sheriff's Office on April 12, 2023?

A    In whatever that time was that morning that they arrested me.  I mean, because the arrest was pretty much immediate.

Q    Is that the first thing that you did that day was meet with them?

A    Yes.

Q    You had your Fish and Wildlife uniform on, correct?

A    Yes, sir.

Q    So you were going to go directly from that job --

A    To man tracking.

Q    From that meeting to the man tracking training?

A    Yes, sir.

Q    Did you work on April 11?

A    Is that the day before?

Q    Yes, sir, that Tuesday.

A    I don't recall.

Q    You mentioned that you were on Antabuse for a time?

A    Uh-huh.

Q    Is that correct?

A    Uh-huh.  Yes, sir.  I'm sorry.

Q    What were you on Antabuse for?

A    For my lyme.  It's a treatment for lyme.  It's shown to kill the Spirochetes.

Q    It's shown -- it's shown to kill what?

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                        Page 124

A    Spirochete of -- that's what lyme bacteria is Spirochete.

Q    Same thing for the Narcan?

A    Narcan also kills the lyme Spirochete.  It's a known treatment now.  It was -- I think it was being tested then with a lot of good results and that's the reason I was put on it, which caused me difficult went to the hospital, because they thought I was junkie.  They were like, "What are you on?  We never heard of this."

And I am like, "Well, look it up."

They came back, "Hey, we're sorry."  Because I guess they get junkies coming in with those kind of drugs.

Q    Well, yeah, I mean, I don't know I would call somebody in recovery a junkie, but I get what you are saying.

A    Well, they didn't have a clue.  Fortunately you can read about it, it's tragic, but lyme in the State of Florida is so undiagnosed.  There are people walking around with it that they are going to die from lyme that they think it's heart disease or something else.  It's just we are not taking care of it here.

Q    Other than what you've already talked about, do you recall any other conversations or interactions or

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                   Page 125

communications with Detective Preston?

A    Prior to or?

Q    At any time.

A    No.

Q    So other than that one day on April 12th, 2023, when you came into the Sheriff's Office to meet with detectives you've had no other opportunity to speak with or correspond with or communicate with Detective Preston; is that accurate?

A    Yeah.  I mean, I've seen her at meetings and stuff at the Sheriff's Department.  Like when they had ceremonies and stuff, but we never -- we never conversated or anything.  Just seen her.

Q    Okay.  And that was before the incident, correct, before the arrest?

A    Yeah, correct.  I haven't seen her afterwards either.

MR. CARSON:  Okay.  That's all I have.

MR. ROBERTS:  Amy, are you good?

MS. SHEVLIN:  Good.  Thank you.

MR. CARSON:  Will he read?

MR. ROBERTS:  Yeah.  Yeah.  We'll read.  Yeah.

VIDEOGRAPHER:  All right.  This concludes the videotaped deposition of William Lee Lawshe.  The time is 12:16 p.m. on March 14th, year 2025.

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                          Page 126

MS. SHEVLIN:  Are you ordering?

MR. CARSON:  Probably not right now.

(Witness excused.)

(Thereupon, at 12:16 p.m. the deposition was concluded.)

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 127

THE STATE OF FLORIDA,       )
COUNTY OF ST. JOHNS.        )


    I, the undersigned authority, certify that

WILLIAM LAWSHE personally appeared before me and was

duly sworn this 14th day of March 2025.


        WITNESS my hand and official seal this 29th

day of July 2025.


                        Laura Dwyer Pierle, RPR
                        Notary Public-State of FL
                        My Commission #HH 598918
                        My Commission Expires
                        10/26/28

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 128

C E R T I F I C A T E


The State of Florida       )
County of St. Johns        )


        I, Laura Dwyer Pierle, Court Reporter, do hereby certify that I was authorized to and did report the above deposition in stenotype; and that the foregoing pages numbered from 1 to 126, inclusive, are a true and correct transcription of my stenotype notes taken during said deposition.


        I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.


        The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.


        IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of July, 2025.


                                    Laura Dwyer Pierle, Notary
                                    Public, in and for the State
                                    of Florida at large.
                                    My Commission Expires
                                    10/26/28
                                    My Commission #HH 598918

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Page 129

E R R A T A   S H E E T

In Re: William Lee Lawshe vs. Mikayla Preston, et al
Case No. 3:26-cv-00044-MMH-MCR
Reporter: Laura Dwyer Pierle Date of Deposition: 3-14-25
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

ATTORNEYS: MATTHEW CARSON, ESQUIRE
           MICHAEL ROBERTS, ESQUIRE
PAGE NO.          LINE NO.              CHANGE

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

_____          _____          _____

                                  _____

     Under the penalties of perjury, I declare that I
have read the foregoing deposition and that the facts
stated in it are true.

     Dated this _____ day of _____, 2025.


                              _____
                              WILLIAM LEE LAWSHE

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: $1400..allege

## $

**$1400**  90:17,21,24

## (

**(1)**  63:4

## 0

**0059**  58:15

**006**  62:15

**0065**  62:14 63:4

## 1

**10**  27:6 40:2,7,14 41:20 42:10 53:4

**100**  55:2

**10:03**  41:11,12

**10:10**  41:12,15

**11**  40:13,14 41:20 42:12 115:16 123:13

**11:04**  85:10,11

**11:16**  85:11,14

**12**  19:17 29:18 36:17 122:22

**12-hour**  98:4

**1260**  4:9

**12:16**  125:25 126:4

**12th**  99:9 117:6 122:6 125:5

**13**  36:17 93:3

**13-hour**  98:4

**14th**  4:11 125:25

**15**  8:22,23 95:17

**17-year**  85:1

**18**  82:9

**1969**  8:1

**1980**  7:17 8:11

## 2

**20**  22:17 87:15

**2019**  94:25 96:16 97:13 98:24

**2020**  96:17 99:9 107:24

**2022**  65:18 67:5

**2023**  19:12,17 23:17 29:18 44:15 64:2 65:10 66:10 67:6 80:5 116:21 117:6 122:6,22 125:6

**2024**  113:3 116:22

**2025**  4:12 125:25

**23**  61:16,19,21,24 117:4

**24**  61:16,19,22,24 88:20

**25**  88:20

**26**  85:18

## 3

**3,000**  66:3

**30**  16:5 36:12 91:23 92:3

**300**  93:13

**35**  88:20

**3:24-cv-00044-mmh-mcr**  4:8

## 4

**40-year**  78:22

**45**  112:11

**4G**  73:22

## 5

**50**  93:17

**500**  14:16 93:12 94:1,4

## 6

**60**  93:17 106:21

## 7

**72**  38:9

**72-hour**  38:9

## 8

**8**  42:8,14,18,25 71:14 93:4

**86**  73:22

**8A**  71:7,19

**8B**  47:6,11 57:19 61:8 62:1 63:8 65:6 66:9 76:5 83:22

**8C**  58:17 59:3 62:1 63:8

**8D**  62:22

**8E**  72:10 76:18,21 84:1

**8F**  43:4,5 65:17 66:6 75:25 80:21 83:12

**8G**  58:16

## 9

**90's**  10:8

**91**  10:9

**9:16**  4:12

## A

**a.m.**  4:12 41:13 85:12

**abilities**  95:6

**absolutely**  39:11 85:2 105:21

**abuse**  119:23 120:13

**ac18e**  43:1

**access**  44:2,23 52:23 66:14 72:22

**accompanied**  46:11

**accrual**  91:15,16

**accurate**  34:11 74:3 125:9

**accused**  15:2

**acronym**  77:14

**act**  89:18

**action**  5:10 88:7

**activist**  35:10

**actual**  36:6

**addicts**  106:24

**additional**  44:20

**admit**  112:9,17

**ads**  75:20

**adult**  8:15 13:25 53:2,16 79:22 80:6

**adults**  77:22,25

**advised**  114:19

**affected**  12:21 102:21

**AFIB**  103:4

**afraid**  56:12

**age**  77:18 78:9 79:1,6, 16,22 80:7 81:4,14,22, 25 82:5,8,16 84:11,13, 15,22,23,24 91:4,6 109:15

**agency**  10:8 18:2,5 101:25

**aggravates**  86:23

**agree**  81:17 82:15,17 110:25 111:6 119:21

**ahead**  42:12 47:7 58:14 62:10 72:4 111:1,2,3 121:10

**AI**  52:16

**aid**  106:14 120:12

**airborne**  22:22

**airplane**  35:1,4,7,15 37:16,17,19,21

**alcohol**  7:5

**allegating**  32:9

**allegation**  88:25 89:17

**allegations**  18:2,4 53:7 87:22

**allege**  49:21 85:17,24 86:20

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: alleged..brings

**alleged** 46:22 64:6

**alleging** 91:11

**allowed** 97:22

**altogether** 10:11

**amended** 114:7,11

**Amour** 72:15,23 77:1

**Amoxicillin** 107:6

**Amy** 4:22 88:6 113:25 125:19

**and/or** 65:7

**android** 44:7 75:17

**anew** 58:25

**Angels** 72:15,23 77:2

**animal** 10:11

**annoying** 75:19

**anonymizer** 45:5

**answers** 40:6,11 41:18, 19 48:11 60:24 64:18 90:8 115:14 118:17

**Antabuse** 106:24 107:17,20 123:17,22

**anti-vac** 116:7

**antianxiety** 106:5,10

**antibiotic** 37:11

**antibiotics** 107:3,4,5

**antifungal** 107:1

**anymore** 30:18 89:19 101:25 111:11

**apologize** 89:13,15 90:19 117:2

**appearances** 4:17

**appeared** 25:15

**appears** 71:21 72:5 73:21 80:22 122:7

**application** 92:7

**applied** 15:25 16:4 91:23 92:3,5,13

**apply** 18:8,18 109:6

**applying** 17:11

**appointment** 95:24 96:2

**Approximate** 92:4

**approximately** 91:23 92:8 96:13

**April** 19:12,17 23:17 29:18 44:15 64:2 66:10 67:5 80:5 117:6 122:6, 22 123:13 125:5

**area** 10:17 100:22

**areas** 8:14 10:24 21:22

**Army** 55:19

**arrest** 16:1,12 19:1,16, 21 20:12 21:2 64:4 94:14,15 112:25 116:23 117:3 118:23 121:19,23 122:24 125:15

**arrested** 15:2 18:9,12, 19,20 19:2 32:6 58:6 64:2,9 66:10 94:9 97:10, 14 103:23 104:15 122:24

**art** 48:25 49:17,18 55:21 57:6

**artist** 49:15

**asks** 42:14,15 43:18

**assertion** 46:4

**assignment** 11:3

**assist** 119:12

**assistance** 42:4 120:1, 5

**assume** 53:20 62:5 63:21 106:4 119:17

**assumed** 29:8 78:17 118:16

**assuming** 45:22 114:24

**assured** 107:22

**attach** 33:14

**attached** 118:1,3

**attempt** 116:16

**attention** 22:20,22 23:2

**attorney** 6:10 50:10 51:20 112:19

**attorney/client** 50:15 51:10 109:8

**Augustine** 4:11 8:5,11

**average** 56:18

**avoid** 81:24 94:16

**aware** 45:6,20 46:17 66:11 68:14 119:25 120:4,11

---

**B**

---

**back** 10:7 14:14 15:11 17:22,24 20:8,10,13 24:19 28:24,25 29:3,7 31:19 41:8,14 42:12 46:21 59:2 60:3 74:22 85:13 88:13 89:25 90:1 91:24 92:11 97:24 98:11 99:2,10 101:17 111:9 122:17 124:12

**backed** 21:18

**background** 14:15

**backs** 16:6

**backup** 21:23,24 22:1

**bacteria** 124:1

**bad** 13:5 14:1 22:18 36:6,20 78:5,6 95:12 119:18

**ball** 80:23

**ballpark** 59:16

**based** 18:4 48:5 106:4 119:4,15

**basically** 15:1 16:14 25:19 38:12 70:1 87:8 93:24 112:10

**basis** 76:16

**battery** 73:22

**beats** 103:4

**bed** 37:20 80:22 95:12

**bedridden** 96:22 108:2

**began** 99:10 107:14 108:16

**beginning** 6:7 85:14 88:9

**begins** 4:2

**behalf** 4:22

**believed** 53:24

**belongs** 65:9

**belt** 26:10

**benzopine** 105:22

**big** 12:3 94:4 100:16 101:12

**bill** 100:8,9,12

**bills** 73:10 90:18

**Bishop** 4:13

**bit** 5:13,16 14:3 20:15 28:19,25 29:3 41:6 89:14 90:22,23 92:11 110:13

**blank** 99:19

**Blockbuster** 94:3

**blood** 36:4 87:5 102:22 103:1 105:16 106:9 119:18

**body** 22:16

**bond** 38:6

**bone** 36:20

**border** 12:2,3 100:21

**Borg** 114:24

**born** 7:25 8:2

**Boston** 11:23

**bothered** 60:14

**bottom** 53:18 54:17 55:7 68:6 77:19 79:2,7 102:23 103:2

**Boulevard** 4:10

**brain** 111:10

**break** 5:18 20:14 41:5,7, 18,21 51:2 85:7

**breaking** 56:21

**breaks** 8:13

**breath** 5:19

**bring** 33:6 76:4 111:9

**brings** 111:9

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: brought..compartmentalized

**brought** 13:12 53:4 56:3

**browse** 45:1

**browser** 44:8,15 45:18 74:18,20,24 75:2

**browsers** 44:18,20 45:10

**browsing** 74:2

**bucks** 93:17

**buddy** 95:15

**BUI** 9:19

**bunch** 37:8 48:4 75:19 83:6 92:15 93:20 96:20 105:6

**burlap** 38:13

**business** 14:22 16:18 79:17 92:19,20,21,22,24 93:7,8 94:20

**C**

**C-R-E-E-C-H** 104:22

**C.V.** 115:2 118:4

**calculate** 91:9 114:21

**calculated** 85:24 86:15

**calendar** 122:6

**call** 16:6 20:4 21:15,16 23:18 24:2 25:5 34:10 37:5 39:4,5,7,10 40:21 45:11 71:2 72:8 91:14 99:3,15,17 105:5 122:10 124:15

**called** 20:15 21:4 22:10, 18 23:11,13,23 24:12 32:1,10 37:8 49:16 50:6 55:22 87:10 89:4 98:6,7 100:1 103:5 122:4

**calling** 25:1 76:1 113:5

**Canada** 11:24,25 12:11

**Canadian** 54:23

**cancer** 35:12

**captain** 99:23 101:18, 21,22,23 104:1,18,20,21

**capture** 73:21,24 74:5, 9,11

**car** 14:20 92:21,22,24 93:14

**card** 73:3,7

**cardiac** 103:9

**cardiologist** 103:7,14, 18

**carditis** 102:21 103:5,8, 11

**care** 85:20 86:18,20 103:7 124:23

**career** 64:24

**careful** 33:5 52:2 70:11 89:18

**carry** 37:13 111:5

**cars** 16:13 93:3,4,10

**Carson** 4:20 5:6,9 23:7, 10 39:25 40:5,16 41:16 50:15,19 51:1,14,18 58:20,23 59:4,6,9 61:14 62:21 63:3 66:23 67:3 70:13 71:6 72:7 77:4,5 85:15 86:3,5,7,10,12 87:24 88:3,8 114:18 117:6 121:6,12,14 125:18,21 126:2

**case** 4:7 16:22 32:17 42:17,18 66:7 113:15 120:21,23

**cases** 40:21

**cast** 87:12

**catching** 9:12

**caused** 36:4 124:7

**causing** 102:22 103:1

**cell** 38:10 43:13,15 73:24

**Cellebrite** 66:13

**cellphone** 19:7,8,11 24:9 32:20,24 34:17,20 35:1,4,11 37:13 43:10 46:12

**center** 30:23 64:11

**ceremonies** 125:12

**certificate** 79:2,7

**certification** 17:18,22

**certified** 9:2

**cetera** 85:22

**chance** 41:21

**change** 111:23

**changed** 89:8 95:5

**characterize** 90:3

**charge** 73:3 76:6 93:13, 14,15,16,17

**charged** 76:22

**charges** 13:13 15:9,15, 17 18:13 76:4,17 112:9, 16

**cheap** 54:11

**check** 115:10,17

**checked** 54:17

**checking** 81:25 119:2

**chest** 34:11

**child** 13:16 56:6 57:12 119:23 120:8,11,13 121:1

**children** 64:11 88:21 89:23

**chime** 117:5

**Chinese** 37:8 105:6

**choice** 13:7

**choose** 110:23

**chooses** 78:23

**Christ** 56:21

**Christian** 56:18 82:21

**Chrome** 75:6,21

**chronically** 110:20

**City** 12:7

**civil** 40:21

**claimed** 77:22

**clarify** 119:6

**clarifying** 50:20

**class** 20:25

**classification** 20:9

**clean** 67:10

**cleaned** 38:15 68:3

**clear** 23:16 29:20 67:13

**cleared** 87:11

**clearer** 62:25

**Clinic** 102:9

**clocks** 39:13

**close** 21:17,18 90:6,18

**closely** 21:10,11

**closest** 12:2

**clothes** 38:13

**cloud** 46:11,15,19,23 64:7 65:7

**clue** 17:23 36:12 49:20 70:16 119:20 124:18

**cognitive** 36:5 95:5 96:10

**college** 119:10

**colonel** 101:1,5,8

**combat** 110:18

**combined** 10:10

**comfortable** 9:11

**Commander** 22:9 23:13

**comment** 82:20 117:13

**Commission** 8:25 26:8

**commit** 110:23

**common** 36:14

**communicate** 70:5 125:8

**communications** 125:1

**community** 7:16

**companies** 14:16,17 94:2,4

**company** 15:2,4,8

**compartmentalized** 111:10

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: compensated..deployed

**compensated** 120:1,5

**complaint** 49:21

**completed** 117:20

**completely** 99:11

**compliance** 77:19 79:7,23 80:7

**complied** 81:13

**complies** 54:22 81:10, 21 84:21

**comply** 82:16 84:22,24

**complying** 81:14

**Composite** 42:17

**composure** 5:14

**computation** 85:17

**conceal** 44:25

**concern** 56:4

**concerned** 37:22 55:13,16,24 56:1

**concluded** 126:5

**concludes** 125:23

**conditioning** 106:20

**conducted** 4:9

**confused** 82:12

**congressman** 100:8

**consented** 80:6

**consideration** 9:9

**considered** 55:12

**construe** 55:17

**construed** 78:5

**contact** 10:2 37:23 109:13

**contacted** 109:21

**contacts** 10:3 109:17

**content** 49:11

**continue** 100:23

**continued** 112:8

**contracted** 100:15

**conversated** 125:13

**conversation** 27:19 108:10,19

**conversations** 88:23 109:9 124:25

**cool** 12:14

**corner** 73:23

**correct** 5:11 8:25 15:18 18:14 19:5,6,9,17 21:3 24:10,20 27:17 42:5 46:1,2,7 48:14 50:10,11 53:25 56:13 57:20,21 59:14,22 63:8 66:11,14 76:20 77:19 78:11 79:2 81:14,15 83:7,18 91:19 94:19 103:20 121:20 123:5,20 125:15,16

**corrections** 38:22

**correctly** 40:24 64:18 88:17 91:25 108:8

**correspond** 125:8

**cost** 85:20

**counsel** 4:16 42:4 76:20 109:7 110:5 111:22 113:13,22 116:18 121:6

**counseling** 13:4 87:2,4 109:25 110:2,7,14,15 111:7,15,19,24

**counselor** 118:23 119:1

**counties** 10:18,22 11:4

**country** 87:12

**County** 21:12 22:4 23:12 29:17 38:17 100:21 109:21 122:1,21, 22

**couple** 5:11 6:6 11:10 20:4 38:18 47:7 55:23 58:14 62:10 72:4 93:16 106:6,16 107:1 119:5 121:15

**court** 4:6,14,17 6:9

**covers** 25:3

**COVID** 12:13

**CP** 13:15,16

**cracked** 30:19

**cracking** 30:14,16

**cramps** 95:12

**create** 74:5 100:7,9,11

**created** 74:13

**credit** 73:3,7

**Creech** 104:21

**crime** 112:13

**criminal** 15:9,15,17 50:9 76:16

**criminology** 13:1,2

**critically** 6:12

**CROSS-EXAMINATION** 88:4

**crying** 32:3,4

**CSAM** 58:12 70:12 76:7 82:10 120:13

**current** 119:1

**cut** 14:14 111:3

**cybertips** 64:21

**cypertip** 65:7,12,18 66:6,8 76:1

**D**

**D'ARIENZO** 115:18,20 116:13 118:17,21

**dad** 13:25 53:5

**damaged** 85:21

**damages** 85:17 114:18, 21

**Dan** 4:13

**dangerous** 10:1

**dark** 39:12 57:16,17

**data** 24:5 113:17

**date** 8:22 19:18,19,21 99:14 104:14 113:7 116:1,23 117:2,3,8 118:23

**dates** 99:9 108:15

**daughter** 20:24

**day** 20:2 36:8,18 37:10 38:5,6,7 39:12 54:8,12 87:8,17,19 90:12 97:4,7, 10,14 104:15 106:22 107:6 115:5 117:18 122:10 123:1,14 125:5

**days** 20:4 54:9 95:10,11 96:12,13 98:8 121:22

**de** 4:10

**deadline** 115:6

**deal** 26:25 87:8,17,18

**dealing** 53:6 109:3

**dealt** 25:6

**debilitating** 36:16 95:8, 9

**declaration** 40:24 42:5

**Defendant** 40:6,12

**defendant's** 40:14

**Defendants** 5:10

**Defense** 115:16

**define** 78:25

**degree** 13:1

**delay** 89:14 90:22 101:16 111:2

**delete** 45:15

**deleting** 67:15

**demoralize** 56:24 80:12

**demoralized** 79:5

**demoralizing** 78:8,11, 20,24 79:21 80:5,17,25 81:16 82:12,15

**deny** 18:9,18

**department** 20:7 104:17 112:20 122:1 125:11

**depending** 43:17

**depends** 11:12 37:18 79:8

**deplete** 67:6

**deployed** 10:24

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: depo..enforcement

**depo** 7:20

**deposition** 4:3,9 5:17, 24 6:3,23 7:8 88:9 125:24 126:4

**depressed** 110:20

**depression** 116:11

**deputies** 21:13,17,20 22:4 25:24

**deputy** 21:16 24:23 31:25 32:10 38:22

**describe** 32:10 64:5

**description** 34:12

**designated** 120:12

**destroyed** 87:20 113:14

**detail** 22:20,23 23:2

**detailer** 93:14

**detailing** 92:21,22

**detective** 4:20 5:9 20:10,19 24:24 25:2,3,6, 9,11 26:14 27:1,2,16,20 28:11 30:1,2 41:19 42:9, 23 122:11 125:1,8

**detectives** 31:23 122:21 125:7

**determine** 73:8 109:15

**determined** 65:20

**devastating** 7:19

**diagnosed** 33:5 94:23 95:18 107:16 108:3 115:24

**diagnosis** 94:22 95:4, 18 102:15 116:13,15

**dictates** 96:5

**die** 124:21

**difference** 80:16

**differentiate** 80:15

**difficult** 9:25 124:7

**digital** 113:17

**direct** 5:5 42:8

**directly** 20:21 87:7 109:22 110:6 123:7

**directors** 121:2

**dirty** 93:24

**disaster** 10:23

**disclaimer** 56:5,10 80:14

**disclaimers** 54:1,2 55:1

**disclose** 50:13

**disclosure** 85:19 86:6 117:25 118:9

**discord** 69:21,23,24,25 70:15

**discords** 70:12

**discovery** 16:21 40:21

**discrepant** 103:22

**discussing** 114:19

**discussions** 114:1

**disease** 33:4 36:2,23 37:1 94:23,24 95:16 100:23 105:2,14 107:13 108:4 124:22

**dispute** 46:3 47:25 66:24 109:22

**District** 4:6

**Division** 4:7 100:13

**divulge** 51:9 109:8,14

**Doc** 103:10 106:3 107:16,25 111:20

**doctor** 35:17,19,20,23 60:20 73:17 87:1,6 94:25 95:17,19 98:14 99:3 103:9 115:17,23 118:19

**doctorate** 13:1

**doctors** 60:7 95:17 111:19 116:10

**document** 113:20 119:2

**documentation** 113:6 114:2

**documents** 40:17,23 41:22,25 42:3 76:3 112:22

**dollars** 93:17

**door** 29:4,5

**doses** 107:3,5

**double** 115:9,17

**download** 43:18,19 44:14,20,22,23,25 45:3, 5 54:13 63:17

**downloaded** 43:14,25 45:13 46:18 59:11,13 60:3 63:13,19 65:14 67:15 83:7

**downloading** 47:18 60:4,12,19 67:18 71:9, 25 108:16

**draft** 117:18,22

**drafts** 117:16

**draw** 56:17

**drawers** 34:11

**drawing** 99:19

**Drive** 70:19

**driven** 10:3

**drop** 36:4

**dropped** 13:13

**drugs** 7:5 110:19 116:6 124:14

**dry** 10:6

**Duckduckgo** 72:6,8 74:18 75:1,3

**DUI** 9:19

**Dully** 4:23 88:7 108:21 109:2,6,10,21 119:7,11, 17,19,25 120:4

**Dully's** 40:12 41:20 90:8 115:15 119:5

**duly** 5:3

**dumb** 105:23

**duty** 16:25 17:1,5 26:10 38:23 86:16 100:1 101:20

**dysfunction** 60:7,13 107:14,21

---

**E**

---

**e-mail** 69:12 115:8

**earlier** 78:2 88:15 92:23 110:4 114:19 119:5,15

**early** 91:22

**earning** 93:9

**earnings** 85:19,20,23, 24 86:9,13,14

**easier** 75:9

**easiest** 74:23

**easy** 33:10

**eat** 39:15,19,20

**echo** 88:8

**economist** 86:6 91:7

**educate** 101:3

**effects** 35:18 107:20 116:10

**elected** 101:15

**electronically** 41:1

**elicit** 42:15

**embarrass** 66:3 84:6

**embarrassed** 82:24 83:20

**embarrassing** 94:11, 17

**embraced** 83:16,24

**emergency** 96:18 102:4,5,13,25

**emotions** 7:24

**EMP** 35:13

**employed** 14:3

**employee** 119:7

**employees** 121:2

**end** 85:10 103:22,23 112:11

**ends** 43:1 47:9

**energy** 36:18

**enforcement** 9:2,6,8, 14 10:3 14:17 17:5,18,

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: engine..foundation

22 18:5 32:23 34:2 56:12 57:24 64:24 78:3 82:21 93:25 112:14 120:12

**engine** 45:18 51:24

**enjoy** 111:11

**enjoyed** 22:23

**enjoyment** 85:22

**entail** 38:11

**enter** 33:7,21,22,24

**entered** 25:21 27:2

**entertainment** 94:1

**entire** 73:18

**equipment** 25:19 26:5 28:4 33:1,11

**erectile** 60:7,13 107:13, 21

**error** 117:24

**escorted** 26:25

**estimate** 27:4 59:17

**et al** 4:5

**ethically** 94:19

**evaluated** 118:22

**eventually** 39:8 87:2 102:1

**everybody's** 90:1

**evidence** 13:11

**exact** 91:21 99:8 117:2

**EXAMINATION** 5:5 121:13

**examined** 5:3

**excited** 89:6

**Excuse** 47:12

**excused** 126:3

**exhausted** 36:17,18

**exhibit** 40:7,13,14 42:9, 18 43:4 47:11 58:16,25 62:19 71:7 72:10 76:17 115:16

**exhibits** 39:25 41:18,20 58:20

**exist** 78:25

**existed** 80:4

**exists** 80:4 81:19

**expand** 93:6

**expect** 29:13 66:4

**expecting** 99:8

**experience** 75:21 79:4 97:12

**experienced** 79:3 107:13

**experiencing** 96:17

**expert** 86:6 114:20

**expired** 17:19

**explain** 53:5

**explicit** 67:20 68:17 69:1,11 119:22

**Exploited** 64:11

**Explorer** 75:6

**expunged** 15:17 18:13 112:25 113:8

**expungement** 18:23 113:13 114:5

**extensive** 65:1 113:25

**extraction** 66:13

**extreme** 55:17

**eyes** 87:15

---

**F**

**f6a487** 47:9

**face** 47:13,15 57:21 58:7

**faces** 58:3,5 71:17

**fact** 13:11 48:21,22

**fail** 84:24

**fair** 59:13 82:13

**fall** 6:23

**false** 34:24

**familiar** 46:14 55:21 64:10,21 69:17,23 113:19

**families** 16:13 119:18

**family** 90:6 93:2,3,5,14, 16 96:23 108:24 110:2, 3,7 112:1 119:16

**famous** 49:15 78:15,17

**fatigue** 95:9

**fault** 25:5

**federal** 77:18 78:9 79:1, 6,22 80:7,13 81:10,14, 25 82:16 84:21,23,24

**feel** 14:1 105:20,24 117:5

**feelings** 116:5

**fellow** 17:2 68:21

**felons** 92:16 93:20,22

**felt** 13:4

**female** 65:21

**fetish** 82:6

**fewer** 75:18

**fight** 36:21

**figure** 87:6

**file** 62:13,14 69:17,19 70:19,23 103:22 114:16

**filthy** 38:14

**finally** 30:12 95:16,18

**find** 28:4 29:12 47:3,8 49:23 50:3 56:15,16 79:4 94:5 97:23 99:3 117:2

**finding** 20:5 22:19 65:8

**fine** 5:19 19:22 29:11 31:21 47:3 48:9 50:19 51:10,22 88:2 98:11 99:7 114:6

**finish** 6:16 64:13

**fire** 100:7

**fired** 101:25 103:24

**firing** 104:6

**fish** 8:24 9:12 10:8 24:10 26:7 123:4

**fit** 99:25 101:20

**flabbergasted** 104:3

**flag** 68:6

**flagged** 64:7

**Flagler** 10:18,21 102:7 121:25

**flare** 98:13

**flareup** 86:24

**flareups** 97:12 98:14

**flexible** 97:11 98:6 99:11

**flexibly** 97:21

**Florida** 4:6,11 8:3,6,7, 17 10:9,15 18:24 91:8 100:14,15,18,19,22 109:12 124:20

**FMLA** 97:2,5,8,9,10,11, 13,19,20,24 98:6,10 99:11,12 121:18

**focused** 28:16

**folks** 24:20 84:6

**follow** 48:5 73:6 82:4

**follow-up** 6:17 99:7 121:6

**follow-ups** 121:16

**FOP** 99:16

**forensic** 59:19

**forest** 100:20,24

**Forestry** 100:14

**forget** 22:12,17 72:18

**forgot** 28:21 122:17

**forgotten** 28:7

**form** 119:23 120:5

**formed** 76:16

**Fortunately** 124:18

**Fortune** 14:16 94:1,4

**forward** 70:23

**found** 22:16 34:2,7 42:25 45:22,24 46:4 48:2,18 49:22

**foundation** 66:21

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                                      Index: fourth..hot

**fourth** 68:6,7 115:7

**framed** 112:11

**free** 54:8 72:25 117:5

**free-lance** 16:17

**frequent** 69:9

**frequently** 35:3 37:13

**friend** 14:20 75:9 92:24

**friends** 16:13,14 69:7

**frig** 34:6,14

**front** 17:3 40:9 62:1 74:22 94:16 112:22 117:4

**full** 26:7 38:5 41:7 91:4, 6 93:22

**fully** 113:8

**function** 74:9

**fungal** 107:2

**funny** 68:9,23

**future** 85:19,20,22 86:13,20 89:23 110:14 111:24

**FWC** 8:16,18,19 16:25 90:25 97:3,5,8 103:23

### G

**gag** 80:23

**Gainesville** 8:3,5 119:10

**Game** 10:9

**games** 70:3

**Gander** 94:3

**Gap** 94:2

**garage** 29:4,5 33:7,15, 16,19,23

**garb** 26:8

**gave** 29:4 86:2 93:1 95:19

**generally** 35:15 37:20 43:24 96:3

**generated** 65:12

**genre** 94:6

**Georgia** 8:7 100:22

**get all** 64:18 122:19

**girl** 61:9,10 63:6,8 64:8 71:8,10 83:11

**girlfriend** 12:10

**girls** 57:2

**give** 6:20 7:7 35:9 39:20 41:3 96:14,19 99:18 104:4,10,19 106:23 112:21,23 116:13

**giving** 6:15 7:20

**God** 13:25

**goggle** 49:22

**good** 5:7,8 6:11 7:2 12:8,15,17 22:11,19 29:14 32:15 33:13 41:4 49:1 58:2,3 64:16 81:25 102:8 124:6 125:19,20

**goofy** 69:7

**Google** 50:2 75:6,19,21

**gosh** 35:9 101:7

**gotcha** 11:14 17:10 31:13 38:2 58:8 86:7 122:14

**grab** 23:5

**grabbed** 20:11 25:16

**grandchildren** 89:5

**grandkids** 88:25 89:7

**great** 90:5 111:13,14

**Greene** 27:1,17,20 28:12 30:1,20

**grew** 7:16 55:19 78:13

**group** 92:15

**grow** 14:21

**grown** 13:25

**guarantee** 83:2

**guess** 14:3 22:23,25 24:4 28:3,20 33:4 47:17 49:1,15 51:12 52:15 53:6 55:16 56:3 58:2 70:1,4,5 73:4,6 80:15,18

82:6 85:2 104:12,22 111:25 113:13 116:19 120:22 124:13

**gun** 25:18 26:4

**gunshots** 9:17,18

**guy** 10:6 14:12 32:13 38:24 94:8

**guys** 59:19 95:19 117:17

### H

**hair** 87:22

**hairdresser** 87:19,21

**half** 7:17

**hand** 25:16

**handcuffs** 18:21 31:16, 20

**handle** 84:5

**hands** 39:20 101:14

**handwriting** 59:7 95:5

**Hang** 116:24 119:2

**happen** 89:2 97:11

**happened** 12:24 14:25 18:22 26:1,16 31:13 64:12 94:10 98:12 100:5 103:25 104:13 108:19

**happening** 96:13

**happy** 68:7 114:12

**hard** 5:14

**harm** 116:9

**Hastings** 21:17

**hate** 15:12 48:20 100:15

**Hawaii** 8:8

**head** 6:21,22 91:18

**health** 35:10 85:5 87:5 118:18,20,22

**hear** 51:21 89:13

**heard** 4:5 57:15,16 91:24 120:8,22 124:9

**hearing** 34:22

**heart** 36:3 102:21,22,23 124:22

**heartbeat** 103:3

**heat** 98:2

**heavy** 37:6,10 116:6

**Hefner** 78:15

**Hegre** 49:15,16,17,18 55:21 57:6 72:20,21 78:16

**hell** 78:15

**helped** 20:5 22:3 60:17 114:20

**helpful** 50:22 118:11

**helps** 93:18

**herbal** 106:11

**herbs** 37:8 105:6

**hey** 53:5 60:8 73:10 82:3 94:8,10 124:12

**hiding** 50:17

**high** 11:19 49:1 105:15 106:9 107:3,5

**hill** 9:15,20,21,25 10:5, 10,11 21:13,20

**hire** 14:9 15:2,4,9 18:3,5

**hired** 8:18

**hiring** 18:6

**historically** 60:18

**history** 45:16,19 119:18

**hit** 43:18

**hold** 50:7 51:20

**Hollywood** 8:7

**home** 28:7,22 33:6

**homeopathic** 37:6

**honest** 60:2 63:22

**honestly** 26:1 27:5,24 38:4 44:24 63:21 92:18 99:1 113:4 116:1

**hopeless** 92:14

**hospital** 102:8 124:8

**hot** 17:14 98:1

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: hour..Lawshe

**hour** 27:7 41:6,7 95:7 96:11

**hours** 36:17 38:9

**house** 16:14 29:4 32:25 33:10,15,17,20,21,25 99:24 101:19

**HR** 18:7 82:4

**Hugh** 78:15

**human** 65:1

**hundred** 34:23 80:9,10 93:16

**hurricanes** 10:24

**I**

**idea** 26:19 27:9 32:7 93:1

**identification** 40:15

**identified** 41:18 42:17

**identity** 45:1

**illegal** 53:11,13,14,22 56:3,13,14,15 80:17

**illegally** 17:8

**image** 42:25 43:9 47:8, 12,21,24 52:18 53:11 57:12 58:15 62:14 63:4 69:11,12 71:5

**images** 48:15 54:25 57:2 108:8,16

**imagine** 39:24 63:24

**immediately** 97:24 121:19

**important** 6:13

**in-process** 38:12

**inaccurate** 34:4,8,9,23

**inadvertently** 84:24,25

**inappropriate** 30:11 31:7,9 52:18,21 89:2

**incident** 12:21 21:2 85:5,18,25 86:21 103:12 109:25 120:10 125:14

**include** 40:24 86:16,18

**includes** 49:11

**including** 67:5 106:20 120:13

**incognito** 45:11

**independent** 91:10 109:9 120:24,25

**India** 87:10

**Indian** 23:1

**indication** 15:15

**industry** 93:22 94:1

**influence** 7:4

**information** 42:14,15 103:21 113:21

**initial** 25:12

**inside** 11:4

**instances** 95:14

**Institute** 31:2

**intent** 5:23

**intention** 88:11 118:6

**intents** 53:17

**interactions** 124:25

**interest** 17:24

**internet** 18:16 44:4 45:1 48:20 52:4,9,11 56:9 57:13 67:16 74:2 75:6 80:2,4 82:13 84:20

**interrogatories** 40:7, 12,22 41:19,20 42:9,24 48:11 90:8 91:2 115:15

**Interrogatory** 42:14

**intersection** 36:8,11

**interview** 15:1

**interviewed** 29:17

**investigation** 64:3 65:21 99:25 119:13 120:2,6

**investigations** 120:13

**investigative** 9:16 10:1

**involved** 100:1

**Iphone** 44:6

**issue** 42:16 116:10

**issued** 24:10 28:8

**issues** 36:5 87:23 96:10 97:23 102:13 107:17

**issuing** 116:5

**IUPA** 99:17,18

**J**

**Jacksonville** 4:7 102:8

**jail** 18:21 31:21,24 32:6 38:3,17 39:9,16

**jailer** 38:18,21

**January** 65:9 99:9

**job** 6:11 8:16 14:25 15:13 18:8,18 29:14 40:3 92:18 97:23,24 123:8

**jobs** 14:6,8,10,18 15:22 16:4,14 17:11,14 91:23 92:3 93:23

**Johns** 10:18,19,20,21 21:12 22:3 23:12 29:17 38:17 100:21 109:20 119:7,12 120:1,6 122:21

**joins** 28:11

**joke** 30:14,16,19 31:5

**July** 68:6,7

**junkie** 124:8,16

**junkies** 124:13

**jurisdiction** 10:13

**K**

**K9** 21:16

**karate** 20:25 21:1

**Kathleen** 40:12 108:21

**Kaye** 60:21 61:2 95:21, 23 102:18,20 103:10 105:8 106:1,3 107:16,25 108:6,17 111:20

**kid** 53:14

**kids** 11:20 52:16,23

**kill** 116:6 123:24,25

**kills** 124:4

**Kimberly** 60:21 95:21

**kind** 9:5,13,19 10:5 11:3 16:17 17:4 21:22 28:24 29:22 30:3,14 35:13 37:12 38:13 44:5 49:11 56:20 58:4 60:14 71:16 73:12 75:15 89:12,16,17 92:14,16,18,20 94:12 95:3,25 99:25 102:16 112:13 113:9,16 116:12 118:18 121:18 124:13

**kitchen** 34:1,8

**knack** 71:16

**knew** 7:17 14:12 22:10 26:3 32:8,9 44:11 73:16 83:14 106:7

**knowing** 14:25 30:7 91:5 112:12

**knowledge** 42:1 47:4 50:21 91:11 109:9 120:25

**L**

**labeled** 58:23,24

**Lack** 66:21

**lady** 22:12 61:21

**land** 10:6

**lascivious** 31:12

**late** 41:6 95:18

**Laura** 4:15

**law** 9:2,8 10:3 14:17 17:5,17,21 18:5,24 32:23 34:2 53:19 56:12 57:23 64:23 77:18 78:3 79:1,7,22 80:7,13 81:10 82:21 84:22,25 93:24 112:14 120:12

**lawful** 81:4 82:15

**lawfully** 18:18

**laws** 9:7 54:23 78:18 81:14,22 82:1,8,16

**Lawshe** 4:4,19 5:1,7

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: lawsuit..mentioned

11:17,18 41:17 59:10 85:16 87:24 88:6 104:2 114:9,19 115:14 118:16 121:4,16 125:24

**lawsuit** 46:24

**lawyer** 13:5,13 29:22 30:17 31:14 50:1 70:6 113:5

**Lawyers** 29:23

**lead** 64:3

**leads** 61:21 73:12

**learned** 109:7

**leave** 17:9 37:16,17 62:25 96:23 97:5,8,9 111:14 113:10,11 121:18

**leaving** 30:6

**led** 95:3

**Lee** 4:3,4 5:1 82:24 87:20 104:2 125:24

**left** 25:16 28:19,25 29:2 111:21

**left-hand** 73:23

**legal** 52:7 53:19,21,23, 24 82:3 84:11,13,15,16 89:10

**legality** 82:5,6

**legally** 15:16 94:14

**legit** 81:21

**legitimate** 55:12 81:6

**Leon** 4:10

**letters** 62:25

**liability** 14:9

**license** 93:7

**life** 15:22 31:9 73:19 85:22 98:15 111:5,11

**light** 27:6

**lighthearted** 9:10

**limit** 9:13

**lined** 14:6,10,18

**list** 105:24

**listed** 85:19

**listen** 29:20 51:8 64:15 66:2

**listening** 9:17

**live** 11:22 56:14

**lived** 8:4,8,14,16

**lives** 11:23,24

**living** 8:15

**LLC** 16:18

**lobby** 19:9

**located** 32:23 34:20 35:1

**long** 5:20 11:18 27:4 38:3 39:9 51:8,9 98:15 106:24

**longer** 106:19 107:10

**looked** 36:8 54:16,25 55:8,20,21 60:1,9,17 63:19,23,24 65:16 73:15 77:17 79:14,15 82:8 100:25 104:1

**losing** 23:15

**loss** 85:19,20,21,23,24 86:9,13,14 95:5

**lost** 36:6 87:18

**lot** 11:12 13:6 14:15,16 21:13,24 22:2,25 23:2 45:10 47:1 52:4 59:20 60:14,18 63:17 73:23 93:23 100:12,13 105:9 124:6

**lots** 52:8

**lude** 31:11

**LVVFQ** 71:1

**lying** 44:10 48:16 62:3 112:4 113:4

**lyme** 33:4 35:7 36:2,3,6, 22 37:1 60:6 86:22,23, 24 94:22,23 95:16 96:20 97:21 98:13,14 99:23 100:9,12,15,17,23 102:3,14,21 103:5,8,11 105:2,5,13 106:15,20,22 107:2,13 108:4 123:23 124:1,4,19,22

**lyme's** 35:20 60:20 99:3

---

**M**

**made** 31:5 52:11 89:17 112:9,14,17 117:13

**magazines** 78:14

**Magnesium** 106:15

**main** 95:13

**mainstream** 9:7 78:14

**maintaining** 5:14

**major** 104:1,20

**make** 5:24 7:2 10:3 30:7 39:10 52:15 53:9 54:15 55:4 64:13,17 79:17 82:4,9 83:15 88:10 93:8 98:16 103:20 105:20,23 110:21 111:15,16,23

**makes** 17:3 22:19 48:3 58:7 61:17

**man** 20:3 22:11 64:16 75:7 121:25 122:18 123:9,10

**management** 14:15

**manager** 14:12 94:8

**manner** 54:22 67:21

**March** 4:11 96:3 125:25

**Marie** 11:17

**Marine** 10:9

**mark** 39:25 40:6,11

**marked** 40:14 43:3 47:11 58:16 62:19 66:9 72:10 115:16

**market** 15:13

**marketed** 57:1,2

**marketing** 14:24

**marking** 40:9

**marriage** 109:24 111:13

**married** 11:14,18 73:18

**Massachusetts** 11:23

**Matanzas** 100:20

**material** 120:14

**Matt** 5:9 63:2 113:25

**matter** 4:4 18:15 36:16 80:16,17

**Matthew** 4:20

**Matuse** 21:14

**Mayo** 102:9 103:9,15

**meals** 39:15,18

**meat** 14:14 41:9

**med** 105:4,10

**Med-art** 48:23,24 57:1,7 72:18,23 77:12

**Med-art.com** 54:16

**media** 4:2 85:10,14

**medical** 85:4,20 86:18, 20 96:23 111:18

**medication** 36:22 106:5,10

**medications** 36:24,25 37:7 105:1,13 106:18 107:9,15 111:7 116:8,9, 16

**medicine** 106:2

**medicines** 107:1

**meds** 37:6 86:25 87:1 103:11 105:3,17 110:21 116:12

**meet** 20:6 24:14,22 25:9 29:23 123:2 125:6

**meeting** 11:13 25:12 122:17 123:10

**meetings** 11:8 125:10

**members** 93:2,16

**memory** 57:9 66:4 67:8, 10,13 95:5

**mental** 85:5 118:17,20, 22

**mentioned** 14:19 57:4, 6,7 62:4 68:20 69:21 88:15 90:9 91:22 92:23 94:22 101:18 102:2,3 104:25 107:12 108:5 110:3,13 120:22 121:17

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

123:17

**mess** 51:5

**message** 69:2

**messages** 68:2

**messed** 90:2

**met** 5:11 11:19 12:13 24:19 108:21,24,25 119:16 122:3,20

**mice** 100:22

**Michael** 4:19 40:1 86:3 114:23,24 118:4

**microwave** 35:18

**middle** 4:6 37:23 86:24

**Mikayla** 4:5,21 5:10 40:6

**milder** 36:19

**military** 8:9 22:21 110:17

**million** 36:11

**mind** 27:8 28:24 36:9 49:14 53:3 122:18

**minds** 89:25 90:1

**mine** 10:17

**minors** 53:7 119:22

**minute** 41:4 63:16

**minutes** 5:11 22:17 27:6 119:5

**Miramar** 8:6

**miscalculated** 91:7

**mislead** 19:20

**misled** 62:12

**misquote** 121:18

**misrepresent** 117:23

**missing** 20:5,6,15 22:4, 13,19 23:24 24:13 64:11

**mistake** 112:10,17

**mobile** 92:22

**mode** 35:1,4,7,15 37:16, 17,19,21 45:8,9,11 74:11

**model** 48:23 49:18 65:3 71:13,15,19 77:7,9 85:1

**models** 47:16 49:2 53:18 74:15 77:22 78:16 79:18 82:3,9

**modified** 121:18

**mom** 87:18,20

**moment** 112:21,23

**money** 16:16 79:17

**monochrome** 52:15

**Monster** 17:14

**month** 90:24 93:4,5,10, 11,12,13 96:1,2 97:15 98:20 99:13

**monthly** 90:15

**months** 67:5 92:5,6,8, 10,13 96:22 99:14 117:8,10

**morally** 94:18

**morning** 4:14 5:7,8 22:16 28:21 122:2,15,23

**mother** 110:3,9

**Mountain** 94:3

**mouse** 100:20

**mouth** 80:23

**move** 25:17

**moved** 27:16 97:24

**mud** 33:12,20,22,25 34:9

**murdered** 22:15

---

**N**

**naked** 38:13 49:2 67:19 68:16,25 69:11 78:16

**names** 21:14,19 58:3 105:19,22

**Narcan** 106:25 124:3,4

**nation** 99:1

**National** 64:10

**nauseous** 36:20 95:13

**nauseousness** 36:20

**NCMEC** 64:10 65:6,12, 17 66:6,8 76:1 109:13, 18,21

**NCPIC** 76:1

**necessarily** 78:10 82:9

**needed** 16:17 21:24 29:2 98:5 105:17

**needing** 37:23

**nervous** 7:20,21 51:7

**night** 37:23 52:12

**nodding** 6:22

**nomenclature** 24:24

**non-legitimate** 55:14

**nonvalid** 55:14

**North** 4:10

**Nos** 40:14

**Notary** 5:2

**notes** 88:13

**noticed** 51:19

**nudity** 49:11

**number** 4:2,7 14:23 19:14 29:5 42:8,14 59:13 62:14 65:9 68:11 82:14 85:10,14 91:21

---

**O**

**object** 19:24 66:20

**objection** 53:9 61:11 67:1 120:15

**observant** 22:24

**observation** 61:18,20

**obvious** 13:22 15:21 32:5

**Ocala** 10:16 11:7

**occur** 104:16

**occurred** 19:17 69:18 116:21

**October** 65:18 67:5 113:3

**odd** 16:14

**offense** 56:15 63:1

**offensive** 56:3,16

**offer** 54:7

**offers** 54:8

**office** 10:16 21:12 23:12 24:14 26:15 29:18 109:21 119:7,12 122:22 125:6

**officer** 7:18 9:3,15,20, 21 10:5 22:16 24:24 52:5 55:6,24 56:12,17 57:15,24 68:5,21 78:4 82:21 112:14

**officers** 9:25 20:11 25:15,20 67:24 69:3 100:12

**oldest** 110:5

**online** 12:13 15:6 16:2 17:15 79:5

**Ontario** 12:4

**open** 89:20 111:21 113:10,12

**opinion** 18:20 56:24 78:12,20 79:10 110:21 112:11

**opportunity** 6:1 26:15 60:23 88:12 125:7

**opposed** 6:21

**opposite** 89:24

**order** 42:23 76:4 113:16 114:5,8,12

**ordering** 126:1

**original** 115:5 118:8

**overgrowth** 107:2

**overlook** 22:24

**owner** 94:20

---

**P**

**p.m.** 125:25 126:4

**pacemaker** 96:19

**pages** 42:5 47:7 58:15

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

62:10 72:4 79:20 80:5 82:14

**paid** 49:3,7,10 54:3,5,6 73:9 119:25 120:5

**pain** 36:20 85:21

**painted** 16:15

**palpitations** 36:4 102:23

**paperwork** 8:21 35:22 95:20

**Pardon** 84:12

**park** 17:8

**part** 23:1 37:12 46:9,10 56:4 76:3 80:14 84:7 87:12 97:10,20 98:1 111:10

**participant** 78:23

**past** 16:24 20:20 22:5 52:16 85:19,20,22,23,24 86:13 106:19

**Pat** 31:4,5

**patience** 119:3

**patients** 107:2

**Patrol** 10:9

**patrolled** 10:15,17

**pay** 16:12 49:5 54:10 93:5

**paying** 73:5,11

**payments** 90:9,13

**PBA** 99:17

**pending** 5:21

**pension** 90:10,13,16,25 91:6

**Penthouse** 55:18,20,22 78:13

**people** 9:12 22:19,25 47:2 52:12,17,22 55:17 70:5,9 73:23 82:4 87:10, 15 89:19 93:23 100:13, 23,25 110:20 112:13 116:6 124:20

**percent** 34:23 55:2 73:22 80:9,10

**period** 20:8 28:10 54:13 73:2 97:15 98:20 106:24

**person** 6:12 20:5,6,16 22:4 23:25 24:13 27:15 40:25 56:18 58:2,4 92:16 110:16 111:12 115:22

**personal** 24:6,7,9 34:16 35:1,3 68:10

**Petter** 49:15 72:20,21 78:16

**phone** 19:5,14 20:4 21:5,8,10 23:23 24:2,3, 4,6,7 28:3,4,6,8,16,17, 18 29:8 34:3 39:4,5,7,10 43:13,15,22,24 44:5,12, 14,16,17 45:23,24 46:1, 4,18 47:20,21,24 48:6,8, 17 59:14,25 64:7 65:8 66:10,17,25 67:6,10,15 68:13,17 69:2,15 71:23 72:1 73:25 74:6,10,20, 21 75:14,15,22

**phones** 55:10

**photo** 43:12 64:1 68:5

**photograph** 43:7 45:25 46:4 47:18 48:6,19 59:10 61:25 63:5,11,14 65:16,22 66:9 67:23 68:25 69:1,10 71:7,19, 23 72:1,3,11 74:10 75:24 76:17 79:5 81:17 83:18,25

**photographed** 78:24

**photographic** 66:4

**photographs** 42:16 44:23 49:22 54:13,16 55:8 56:5 62:2 66:16,25 67:15,19,20 68:1,24 69:14 73:14 76:6,9,12, 16,18,19,21 77:17 79:21 80:6 82:10 84:4,17

**photos** 13:14,15 43:13 46:17 49:1 51:24 60:12, 19 63:17,23 64:6 65:14, 24 66:3 67:6,19 71:12 83:1 119:22

**picture** 43:21 45:22 49:24 50:3 52:14 57:19 59:25 61:10 65:3,8

68:15 77:10 81:1,4 85:1 109:15

**pictures** 13:24 14:2 43:24 56:22,23 59:13 60:9 61:3 65:4 66:14 78:15,20 81:24 109:16

**piece** 23:2 32:1,11 38:20

**Pierle** 4:15

**pill** 37:9 106:23

**pills** 106:21

**pin** 96:8 98:17

**pissed** 13:14,19

**place** 70:17 108:11

**places** 93:23 94:12

**Plaintiff's** 40:6,11 58:24

**plan** 46:10

**planned** 121:25

**planning** 121:24

**play** 70:3

**Playboy** 55:18,20,22 78:13

**point** 5:17 16:23 26:24 27:9 30:11 31:8,16,19 32:8,21 46:23 47:3,24 48:6 53:6 81:16 82:7 95:2

**pointed** 35:17 71:10

**police** 52:5 55:6,24 56:16 95:6 100:12

**policy** 82:4

**Ponce** 4:10

**pop** 55:10 75:18,20,22

**popped** 122:17

**porn** 60:18 73:11,15,19

**pornographic** 108:7,16

**pornography** 13:16 56:7 57:12 58:12 61:5

**portions** 76:18

**positive** 28:9 48:23 90:4,17 104:24

**possessing** 76:22

**possession** 76:7

**possibly** 103:22 111:19

**post** 80:22 84:25

**potentially** 56:2,19 74:7 94:16 115:24

**practice** 67:4

**pre-installed** 75:13

**predicate** 66:21

**prefer** 30:2

**prepared** 42:4 86:1

**prescribe** 116:8,16

**prescribed** 105:16 106:3 107:8

**prescription** 105:1,2,4, 10,12 106:18 107:9

**presented** 79:12,13

**press** 112:8

**pressing** 112:16

**pressure** 36:4 87:6 102:23 103:1 105:16 106:9

**Preston** 4:5,21 5:10 27:2 28:11 30:2 125:1,9

**Preston's** 40:7 41:19 42:9,23

**presume** 77:24 78:1

**presumption** 48:5

**pretending** 118:6

**pretty** 30:9 55:3 57:10 75:14 102:12 103:12 107:11 119:9 122:24

**prevent** 30:6

**previously** 115:15

**pride** 78:2,3

**primarily** 9:23 62:5 73:21

**primary** 9:14 103:10

**printed** 40:24

**prior** 14:17 71:12 121:19,22 125:2

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: prison..remember

**prison** 112:12,13

**privately** 29:23

**privilege** 50:15 51:10

**privileged** 109:8

**problem** 5:22

**proceedings** 109:3,19

**process** 109:14 112:3

**products** 70:18

**professional** 79:11,13, 14,15,18

**professionally** 79:13

**professors** 13:3

**program** 44:22

**programs** 67:9 70:18

**progressed** 95:2 105:11

**prolong** 5:23

**promoted** 25:3

**proponent** 100:16 101:12 110:19

**propounding** 40:21

**protection** 120:8,11 121:1

**provide** 85:16 114:1

**provided** 46:8 86:10 114:12

**provider** 46:8 65:8 118:18,22

**province** 12:1

**psychiatric** 85:4

**psychiatrist** 116:5

**psychotropic** 116:6

**PTSD** 115:24

**public** 5:2 57:13 77:24 100:17 101:3

**Publix** 14:13,19 16:23 17:1

**pull** 122:5

**purpose** 24:14 29:11 81:24

**purposes** 15:21 53:17 84:5 99:5

**put** 9:24 18:21 29:20 31:18 33:8 34:16 35:3, 14 37:20,24 38:13 53:13 54:20 61:6 62:1 92:7 99:25 111:11 113:9 124:7

**Putnam** 10:18,20,21

**putting** 40:9 52:13

**Q**

**Quebec** 12:5,7

**Quercetin** 106:16

**question** 5:21 6:15,17, 19 18:17 28:5 32:22 42:8,25 54:24 57:5 64:13 66:21 73:6 89:20 98:18 99:7 104:3

**questioned** 29:17 69:21

**questioning** 27:11 29:9

**questions** 5:25 10:4 30:3 35:22 40:19,22 42:8,15,20 47:1 48:5,7,9 64:18 73:12 84:3,8 87:25 88:1,8,10,12 104:9 121:7,11

**quick** 23:4 41:7 117:12 121:15

**quickly** 6:8

**quit** 100:7

**quote** 35:8 68:23

**R**

**Rachel** 115:9

**Ramipril** 105:15,16

**ranger** 22:21,22

**rank** 25:2

**rate** 91:16

**rats** 87:12

**ratters** 87:11

**reached** 91:8

**read** 18:23 124:19 125:21,22

**reading** 60:9

**ready** 28:20 96:19 122:18

**real** 21:16 23:4 93:8

**realize** 28:19

**realized** 10:10

**realm** 56:20

**reason** 5:18 7:7 15:23 24:16 32:16 46:3 47:25 64:9 66:24 67:14 82:8 90:6 92:12 100:11 109:22 122:15 124:7

**reasons** 13:22 32:5

**recall** 16:2 20:17 21:6,7 25:25 27:24 29:10 39:18 44:6,18,21,24 45:12,17 47:12 49:6 54:5 57:9 63:10,13 68:24 69:8 74:6 96:9 101:21 104:14 106:11 108:8,10,14 123:16 124:25

**receive** 67:19 86:21 90:15

**received** 85:4 91:3,5,12 113:6 114:23 115:2 122:9,10

**receiving** 68:25 90:9,13 111:19

**recent** 95:24

**recess** 41:12 85:11

**recognize** 40:17 43:7 47:13,14,15 57:21 59:10 63:5,6 71:7,9 72:11 74:15

**recognizing** 71:17

**recollect** 99:10 107:14 117:11

**recollection** 45:25 54:6 99:6

**recommendation** 108:7

**record** 4:17 7:2 23:5

41:11,14 83:15 84:7 85:10,13 107:25 113:1

**recorded** 4:3 27:22,23

**recording** 30:10

**recovery** 124:16

**recreate** 100:24

**redacted** 43:6 80:21 84:4

**REDIRECT** 121:13

**refer** 40:22 49:25 60:24

**reference** 77:18

**referenced** 80:7

**referred** 75:18

**referring** 50:9 73:20 83:10 112:18 113:12,20, 21

**reflects** 83:16

**refrigerator** 34:3,8,17

**region** 10:17

**regional** 11:8

**regular** 11:3 45:7,9 56:9 97:19 98:4 122:3

**related** 66:8 92:25 121:1

**relationship** 12:17,20 89:7 90:3,4,5

**relevant** 32:17

**relief** 10:23

**relive** 7:23

**remember** 8:21 10:7 17:13 19:18 20:2,9 21:19 22:7 26:24 27:21 28:14 29:12,13,16 30:1, 5,11,13,14,21 31:2,3,22, 25 38:4,8,16,24 39:3 40:25 43:12,17,21 47:18,20,23 48:17 49:13 53:20 57:19 58:3,5,6 59:16,18,21,24 60:1,21 62:7 64:6 67:12,14 68:5 71:22,25 72:12,17,24 75:11 80:13 99:15 100:5 101:9,24 103:16 105:7, 21 107:4 108:18 113:5,7

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

121:24 122:20

**remembered** 20:23

**remembering** 58:3 88:17 91:24 106:17 108:8

**remission** 37:12

**rename** 62:24

**renumber** 62:24

**rep** 99:16,17,18 100:1

**repeat** 79:24

**repeatedly** 63:25

**rephrase** 32:22

**replied** 15:11

**report** 95:6 96:10 115:3 117:14,19,24 118:1

**reported** 34:19,20,25 52:18

**reporter** 4:14,18 6:9

**represent** 5:9 47:23 52:6 65:2 76:15,19 88:7 122:6

**represented** 75:24 109:20

**representing** 45:23

**reputation** 85:21

**requirements** 84:22, 23,25 121:1

**research** 35:17

**resend** 115:11

**resign** 104:6,12

**resigning** 103:23

**resolution** 49:1

**respected** 78:14

**respectfully** 79:19

**respond** 48:12

**response** 6:20

**rest** 33:15,16 98:5,15 111:5

**restaurant** 22:13 93:22

**restaurants** 87:16

**restriction** 89:10,17

**restroom** 5:18 85:8

**result** 36:2 85:5,18,25 86:21 107:12 109:25 110:9

**results** 124:6

**resume** 17:16

**retail** 14:24 93:25

**retired** 14:7 101:9

**retirement** 14:11 91:4, 6,12

**retraining** 17:20

**returned** 15:7

**review** 41:8,22 60:23

**rid** 100:11 113:14,17

**rings** 37:25 38:1

**road** 93:7

**Robby** 104:21

**Roberts** 4:19 23:4,8 40:3 50:8,12 51:16 58:18,21 59:2,5,8 61:11 62:20 63:1 66:20 67:1 70:7 71:4 72:6 77:3 85:8 86:4,6,8,11 113:25 114:7,11,25 115:4,11 117:12,16 118:8,12 120:15 121:10 125:19, 22

**role** 119:5 120:25

**romantic** 60:15

**roof** 87:6

**room** 20:13 25:8,21 26:25 27:3,16 31:18 32:25 33:4,7,8,12,14,20, 22,25 34:6,9,15 35:16 96:18 102:4,5,13

**rooms** 27:23 37:25 102:25

**rope** 80:22

**rough** 59:16

**roughly** 8:11,22

**roundabout** 57:5 107:24 108:15

**route** 110:23

**rude** 7:1 31:7 64:15

**Rule** 85:18

**rules** 6:6

**run** 67:9

**running** 122:16

**Russel** 104:20

---

**S**

**sack** 38:13

**Safari** 75:6

**Safe** 54:14

**Samsung** 75:16,17

**Sanija** 77:2,3,4

**sat** 6:23

**Savannah** 8:7

**save** 45:19 67:25 68:13, 15,24

**saved** 69:14 74:10

**saving** 69:2

**say-so** 74:4

**scar** 110:24 111:4

**scared** 36:9

**schedule** 121:23

**school** 11:19 30:23,25

**scientific** 109:14

**screen** 73:20,24,25 74:5,9,11 82:4

**search** 22:17 29:1 45:7, 15,18,19 49:23 50:2 51:24

**searched** 45:7 66:10

**seasoned** 9:24

**seconds** 36:12

**seek** 87:2 110:14 111:6, 23

**seeked** 110:5

**seeking** 111:22

**send** 69:7 117:18 118:10

**sending** 68:21

**sense** 30:8 48:3 58:7 98:16

**separate** 10:8 32:16 115:8

**septic** 93:23

**Sergeant** 21:14

**served** 22:14 93:25

**set** 34:13 74:21

**settings** 45:13

**sex** 52:17,22

**sexual** 49:11

**sexually** 67:20 68:16 69:1,11 119:22

**shady** 52:7

**shaking** 6:21

**share** 70:10,19

**shared** 13:13

**sharing** 69:17,19

**sheet** 86:8

**Sheila** 11:17

**sheriff's** 20:7 21:12 22:4 23:12 24:14 26:15 29:18 104:17 109:21 112:19 119:7,12 122:1, 22 125:6,11

**Shevlin** 4:22 87:25 88:3,5,6 114:4,9,14,17, 23 115:2,9,12,13 117:9, 15 118:3,10,14,15 120:17 121:4 125:20 126:1

**shifts** 98:4

**shit** 32:1,11 38:15,20 52:4,8 122:18

**shock** 26:1,19

**short** 20:8 28:10

**show** 21:4 43:3 62:18 72:3,4 73:3 79:20 80:20 82:14

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025                                    Index: showed..suggesting

**showed** 65:3 100:20

**showing** 61:8 77:25

**shown** 35:12 123:24,25

**sick** 99:23 100:3,6 106:22 108:2 122:4

**side** 87:15 107:20 116:10

**sign** 14:13

**signed** 42:5

**signing** 40:25

**silverware** 39:21

**Similarly** 6:19

**simply** 49:22

**simultaneous** 107:18

**simultaneously** 46:18

**single** 102:5

**sir** 5:12 6:2,5,18,25 7:3, 6,9 8:12 9:1,4 11:5 13:17 16:20 18:25 19:3, 13,15 22:6 24:1,11,21 25:22 26:6,17 28:13 30:9 32:14 33:18 34:18, 23 39:8 40:8,17 41:2,23 42:2,6,21 43:2,8,23 44:1 45:2,4,6 46:2,5,16,20 47:7,19,22 49:9,12 58:13 59:12,15,18,21 60:2,21 61:9,23 62:3,11, 16,17,23 63:9,12,15 64:20,22 65:5,15 66:12, 22 67:2 68:12 70:20 71:18,24 72:2,9,14 74:4, 12,14,17 75:4 76:2,8,11, 14,23,25 77:7,11,13,15, 20,23 84:19 121:21 123:6,12,15,21

**sister** 72:17,19

**sit** 14:25 17:6 25:14 28:1 45:24 91:17 109:10

**site** 46:19 47:16,17 48:25 49:3 52:20 53:17 54:3,5,9,20,21 55:5,11, 14,15,20,21 57:7 70:4 72:13,14,16,17 82:2

**sites** 52:1 54:7 55:7,12 56:6,10,23 57:6,7 69:17, 19 72:20 73:2

**sitting** 36:7,10 103:25 117:16

**situation** 27:6 94:17

**skeletal** 36:20

**skills** 61:18,20

**skip** 47:6 58:14 62:10 72:4 103:4

**skipped** 70:22

**slang** 10:5

**sleep** 35:15 36:17 37:20 95:11 96:12 98:10

**sleepover** 88:24

**slid** 92:11

**slide** 92:11

**slow** 103:3 105:23

**small** 7:19 14:8

**smile** 111:11

**Smith** 101:22 104:18

**Smith's** 101:23

**Snapchat** 52:12,13,24, 25 53:10

**society** 56:14

**soldiers** 110:17

**solid** 15:14

**somethin'** 68:7

**son** 12:25 20:24 70:9 110:5

**sons** 11:21 12:18,20 13:18 69:22 70:6,8 88:16,19 89:3,22 90:4 110:2

**sort** 46:11 58:9 92:25

**sought** 109:24 110:14

**sound** 113:3

**space** 67:13

**span** 92:2

**speak** 90:19 125:7

**speaking** 102:2 108:16

**special** 113:9,16

**specialized** 58:9

**specializes** 108:4

**specific** 108:15 113:20

**specifically** 15:10 22:10 23:13 28:18 29:2 43:21 54:19 57:19 59:24 67:17 68:21 69:8 71:24 74:24 82:2 110:18

**spell** 49:16

**spending** 89:11 112:11

**spent** 8:6

**spinning** 27:8

**Spirochete** 124:1,2,4

**Spirochetes** 123:24

**spoke** 51:16 101:5 108:6

**spoken** 111:18

**spread** 86:8

**spring** 117:3

**St** 4:11 8:5,11 10:18,19, 20,21 21:12 22:3 23:12 29:17 38:17 100:21 109:20 119:7,12 120:1,6 122:21

**stage** 95:18

**standpoint** 7:21

**stands** 17:2 77:12

**start** 6:15 8:19 9:9 15:21 40:2 58:25 80:2 92:19 96:13

**started** 5:15 8:15 26:25 27:11 29:9 41:6 60:6,11, 18 65:24 96:16 107:16 111:25

**state** 4:16 10:15 37:12 91:8 100:8,20,24 109:12 112:19 124:20

**stated** 78:2 91:2 93:19

**statement** 81:12

**statements** 73:7

**states** 11:2 53:19 84:21

**statute** 18:23 78:10 120:12

**statutory** 121:1

**stay** 55:12

**stayed** 11:4

**stomach** 95:12

**stopped** 87:21

**storage** 46:11,15,19

**store** 94:7

**stored** 21:8,9

**stories** 60:9 61:3

**straight** 95:11

**stress** 35:24 36:15 86:25 87:4 105:17

**stressful** 86:23 98:2

**Strickland** 22:10 23:13

**stripped** 25:19 38:12

**struggling** 60:6

**Stuart** 8:17

**study** 100:19

**stuff** 9:16,19 10:2 14:24 15:6 16:2,15 17:8 18:7 33:10 35:13,18 37:7,11 52:13,16 53:3 54:8 55:18 57:17 67:9,10 68:8 69:7 70:10 75:20 82:11,14 84:9 88:25 96:20 98:3 122:19 125:11,12

**subject** 65:6,17 75:25 80:16,17

**submitted** 17:16 113:16

**subscribe** 49:5 73:1

**subscribed** 49:7,10 72:21 73:8

**subscription** 46:10

**subsided** 103:12

**sudden** 29:25

**suffered** 85:18

**suffering** 85:21

**suggested** 111:20

**suggesting** 30:4

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

Index: suicidal..trust

**suicidal** 116:11

**suicide** 38:9,10 39:22 110:23 112:1,6,7,15

**Suite** 4:10

**suited** 47:2

**summer** 98:1

**sun** 39:12

**Sunshine** 91:8

**super** 86:22 107:5

**supplemental** 105:9

**supplements** 106:12

**support** 37:8

**supposed** 20:3 51:6 96:1 109:14

**supposedly** 48:25

**suspect** 59:25 114:9

**suspected** 22:15 120:13

**SWAT** 122:1

**swear** 4:18

**sworn** 5:3

**symptom** 36:14 107:14

**symptoms** 36:1,6,19 95:3 96:5 102:3

**system** 87:12

**systematic** 15:13

**T**

**takes** 23:2 86:25

**taking** 6:9 78:15 97:8 105:3,5,12,15 106:13, 19,20,21 107:3,5 111:7 124:23

**talk** 6:13 7:23 19:16 20:8 25:11 26:16 30:18 38:18,19 39:1 47:9 66:5 85:23 104:8 111:8

**talked** 13:5 50:8 73:17 76:5 101:2 110:17 124:24

**talking** 6:12 9:11 23:16

38:21 72:19 83:11,14 84:8 88:22 89:5 107:18

**Tallahassee** 30:24 31:2

**tank** 93:23

**target** 75:25

**tasteful** 55:22 56:22,23

**taught** 69:22,23

**teach** 20:3

**teaches** 13:1

**team** 120:8,11 121:2 122:1

**teenagers** 57:2

**telephone** 68:10

**telling** 26:22 30:12 50:4 57:15 99:24 100:25 113:6

**tested** 124:6

**testified** 5:3 63:16 77:16 82:7

**testimony** 7:8 57:11 79:20 80:3 84:14 88:15 89:14 91:22

**testosterone** 61:7

**text** 67:23 68:2 69:1

**thankful** 111:14

**thing** 9:13 26:16 29:22 52:11 66:5 69:9,22 72:25 82:5,6 83:6 92:10 95:13 96:1 98:12 109:6 113:9 123:1 124:3

**things** 10:8 11:8 14:23 17:15 22:25 35:12 36:3, 21 55:10 56:21 58:1,4 60:5 61:7 69:20 77:16 87:4 89:19 93:7 97:22 105:9 107:6 109:13 110:22

**thinking** 32:17 111:25 112:2

**Thirty-four** 11:19

**Thomas** 31:4,6

**thought** 16:22 28:19 30:15 60:12 103:4 107:17,19 124:8

**thoughts** 116:11

**thousand** 36:11

**thousands** 59:22 66:14

**threat** 101:1

**threatened** 99:21,22 101:19

**threw** 38:14

**tick** 37:8

**ticks** 33:6,9

**tied** 80:22 83:11 101:15

**tight** 28:1

**til** 91:6

**time** 4:12 5:14 6:12 8:6, 17 21:19 22:8,9 23:14 24:4,8 25:10,13 27:7,20 28:10,11,15 29:6,16 34:22 35:12,14 37:19 38:17 41:5 46:7 50:16 65:23 66:17,25 67:4,6,7 73:16,22 79:24 80:9,10 92:2 95:23 97:2,3,6 101:18 102:5,6 103:17 106:25 111:8,16 115:23 116:2,3,14,25 117:8 120:3 121:5,8 122:10, 20,23 123:18 125:3,25

**timeline** 96:7

**times** 11:10,13 26:23 36:6,11 38:19 55:23 63:17 96:18 102:4,11 107:5

**tinctures** 37:7 105:5 106:12

**tiredness** 36:16

**today** 4:11 5:17,24 6:8 7:8,20 19:5,21 29:12 30:6 45:24 47:3 50:22 57:11,13 62:25 91:17 99:6 109:10

**Today's** 4:9

**toilet** 38:15

**Tolbert** 20:9,18,19 23:20,21,23 24:23,24 25:9,11 26:14 30:1 122:11

**told** 15:4,8 18:4 20:12, 13 22:1 25:16 26:22 28:21 29:7 30:17 35:19 38:20 48:16 50:6,21 55:4 59:19 61:2 62:8 70:8,16 75:8,11 86:23 87:19,21 88:24 89:3 94:5 100:17 105:7 106:4 107:21 111:20 114:3 116:4 119:4,15

**top** 34:12,14 70:23 73:21 76:17,21 84:1 91:18 112:13

**topless** 68:6

**Toronto** 12:4

**totally** 97:20

**town** 7:18,19 11:25 12:3 14:8,13 22:14 93:3

**TPC** 17:6,8

**tracing** 65:8

**track** 23:15 33:10 36:7

**tracking** 20:3 22:11 23:1 121:25 122:18 123:9,10

**traditional** 97:19

**trafficking** 65:1

**tragic** 124:19

**training** 22:20,22 30:23 58:10 64:25 123:11

**transferred** 43:14

**transmitted** 43:14

**treated** 7:15 103:11 118:22

**treating** 79:18

**treatment** 85:5 123:23 124:5

**trial** 29:24,25 54:8,12 72:25 73:2

**tricky** 90:23

**triggered** 65:21

**truck** 28:20

**true** 41:25 90:12 94:10

**trust** 89:8

**truthful** 7:8 44:11 51:9

**Tuesday** 123:15

**turn** 52:10

**twelve** 117:8,10

**type** 51:25 57:17 87:2 110:16

**types** 51:24

**typically** 9:24 36:21

---

**U**

**U.S.** 4:5 54:22

**uh-huh** 6:21,24 33:18 86:4 123:19,21

**uh-uh** 6:21,24

**ultimately** 32:20 42:4

**unable** 48:12

**uncomfortable** 88:10

**underaged** 64:8 65:21

**underneath** 77:1

**Underscore** 71:2

**undersigned** 5:2

**undersized** 9:13

**understand** 18:17 24:8 34:19 48:10 54:15 64:3 65:25 66:2 82:13 84:10 100:3 109:11

**understanding** 47:4 72:22 94:14 109:5 119:4,11

**undiagnosed** 95:1 124:20

**unhealthy** 35:16

**uniform** 123:4

**uniformed** 25:23,25 32:13

**union** 99:21

**unit** 4:2 85:10

**United** 53:19

**University** 100:19

**unnecessarily** 5:23

84:6

**unquote** 35:8 68:23

**unredacted** 84:9

**unrelated** 105:13

**untouchable** 87:9,13

**untouchables** 87:11

**untreated** 98:16

**upbringing** 56:21

**uphold** 52:5

**uploaded** 46:19

**upper** 73:23

**ups** 75:18,20,22

**upset** 5:16 7:10 32:5 64:17

**upsetting** 88:10

**USC** 55:7 56:6,10

**USC's** 53:17

**utility** 33:3,7

---

**V**

**vacation** 102:7

**valid** 55:4 78:18 80:11

**varied** 11:9

**vehicles** 17:7

**venture** 108:25

**verbiage** 53:20

**verification** 77:18 78:9 79:1,7,16,22 80:7 81:14, 22 82:1,8,16 84:22,23, 25

**Verizon** 46:7,8,9,10,14 65:7

**version** 43:6 84:9

**versus** 4:4 31:6

**vest** 26:11 98:3

**video** 4:3 53:10 70:3 94:3

**view** 44:23 54:9

**viewed** 63:10 65:14

76:4

**viewing** 55:14 56:1,4 57:19 71:22 81:19

**violations** 9:18

**visit** 96:3,4 108:13 116:19

**visited** 77:22

**visiting** 67:18

**visits** 108:12

**vitamin** 106:12,15,16

**vitamins** 105:9 106:14

**VPN** 45:3

---

**W**

**W-2S** 16:22

**wait** 6:14

**waited** 20:7 24:19

**waiting** 102:20

**wake** 36:18

**walk** 5:19 82:22 94:7,9 100:24

**walked** 27:10 31:15,21, 23 38:19 83:17,21,25

**walking** 17:3 31:25 33:19 124:21

**wandering** 114:5

**wanted** 11:12 25:14 30:17 31:14 52:2 53:9 55:4,18 58:21

**wanting** 32:17

**warrant** 29:1

**wash** 14:20 92:24

**washing** 16:13

**watch** 38:9,10 39:23 54:9 112:6,7

**water** 9:24 10:2 23:3 85:6

**ways** 40:20

**wearing** 98:2

**web** 44:8 45:10 54:17

57:16,17 74:18,20 75:2 77:19 78:10 79:1,20 80:5,8 81:13,21 82:14

**website** 43:18 49:8,10 52:6 53:18,21 56:5,11 57:13 61:25 62:2 77:7 78:18 79:9,10,11 81:7,9 84:21

**websites** 17:12 43:25 44:3 62:4,7 67:18 77:21, 25 80:11

**Wednesday** 122:7

**week** 21:1 95:8 96:11 122:3,12

**weird** 30:15 31:6

**well-known** 7:16

**white** 32:12 38:23

**white-footed** 100:20

**wife** 19:8,9 33:6 36:8 37:24 39:6 60:15 69:21 73:9,13 82:22 83:17,21, 25 87:18,20 90:18 98:23 108:6,23 109:24 111:12, 14 119:1

**wife's** 11:16

**wildlife** 8:25 9:6,15 10:6 24:10 26:7 64:25 123:4

**William** 4:3,4 5:1 125:24

**wise** 87:5

**witnesses** 29:24

**woman** 67:19 68:6,16, 25 69:11 78:22 79:5 80:21 81:3

**women** 13:25 56:24 78:8,11,21 79:22 80:6, 12

**woods** 9:17,23 10:12 21:23,25 22:24 100:14

**word** 35:9,10 68:18 78:25 79:6

**words** 13:7

**wore** 98:3

**work** 9:5,24,25 14:4,7, 16 15:25 16:11,23,25

WILLIAM LAWSHE vs MIKAYLA PRESTON, et al.
Lawshe, William Lee on 03/14/2025

17:1,5 21:10,11,22 28:8
86:16 92:15,16 93:19,20
94:11 95:10 96:12,21
97:16,20,21,25 98:3,11,
20 99:10 100:2,13 108:2
121:23 122:3 123:13

**worked** 8:22,24 9:23
20:19 21:17 22:1,7,13
72:25 91:4,6,12 94:1,2,3
97:5,7 118:5

**working** 8:19 9:17
10:11 97:1 99:11 100:14

**works** 101:24 109:12
119:8,9,10

**worries** 16:10 23:7
35:24

**worse** 5:24 36:3 110:22

**worth** 47:1

**write** 95:6,8 96:11

**wrong** 19:24 30:11
76:20 101:3

---

**Y**

---

**YCB** 70:24,25

**year** 4:11 7:18,25 11:10
53:4 95:25 96:8,13 98:1,
25 103:10,15 107:15
108:15 116:22 125:25

**yearly** 95:25 96:3,4

**years** 8:22,23 11:19
21:1 37:11 61:19,22
87:16 95:1 101:9
103:13,19 112:12
121:19

**yesterday** 40:4 58:24

**you-all** 8:21 24:4 60:8
113:17

**young** 57:2 61:21